# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

DELISA HERNANDEZ REID,
ADMINISTRATOR OF THE
ESTATE OF DAMIAN HERNANDEZ

     *Plaintiff*,

v.                             **Case No. 3:24-cv-309**

THE GEO GROUP, INC., et al,

     *Defendants*.

## DEFENDANT DELISA JORDAN, L.P.N.'S MEMORANDUM IN SUPPORT OF HER MOTION TO DISQUALIFY PLAINTIFF'S STANDARD OF CARE EXPERTS DR. ARTHUR FOURNIER AND DR. ALIX MCLEAREN

COMES NOW DeLisa Jordan, L.P.N. ("Ms. Jordan" or "Nurse Jordan"), by counsel, and submits the following Memorandum in Support of her Motion to Disqualify Plaintiff's Standard of care Experts Dr. Arthur Fournier and Dr. Alix McLearen.

## I.    RELEVANT FACTS AND PROCEDURAL BACKGROUND

Delisa Hernandez Reid (hereinafter, "Ms. Reid" or "Plaintiff") is the Administrator of the Estate of Damian Hernandez (hereinafter, "Mr. Hernandez" or "Decedent"), and has brought this medical malpractice action against Nurse Jordan, related to the emergency response to Mr. Hernandez's suicide on November 6, 2020. At the time of his death, Mr. Hernandez was an inmate at Lawrenceville Correctional Center in Lawrenceville, Virginia, serving a sentence for Murder, and Nurse Jordan was a licensed practical nurse, contracted to work at Lawrenceville Correctional Center through an agency. On November 5, 2020, the day before his death, Mr. Hernandez reported

1

that he was bleeding from his rectum and that blood was found in his urine. Mr. Hernandez made no complaints of sexual assault (Exhibit 1- Nursing Evaluation Tool).

The following day, November 6, 2020, Plaintiff alleges that Mr. Hernandez was discovered by his cellmate, who called a medical emergency because Mr. Hernandez was found bleeding profusely.[1] Within 2-3 minutes, Nurse Jordan and Nurse Mariam Kamara ("Nurse Kamara") responded to Mr. Hernandez's cell from the medical unit, which was located in a separate building on the prison compound. They were unable to locate the source of Mr. Hernandez's bleeding due to the amount of blood that was already lost. With the help of correctional staff, Nurse Jordan and Nurse Kamara placed Mr. Hernandez on a stretcher, carried him down the stairs, and transferred him to the medical unit. Prior to leaving Mr. Hernandez's housing unit, Nurse Jordan and Nurse Kamara instructed correctional staff to call 911 (Exhibit 2- Nurse Jordan's Note; Exhibit 3- Nurse Kamara's Note). This much is corroborated by Defendant Tanis Fritz, as he states in his Answers to Interrogatories that he recalled hearing Officer Jones call master control over the radio to call 911, and heard master control reply 10/4". (Ex 4, Fritz Answer to Interrogatory 6).

Mr. Hernandez, along with Nurse Jordan, arrived in the medical unit around 3:30 p.m. (Ex. 2). At that time, Mr. Hernandez was still responsive, and the nurses were able to locate his lacerations, which were on the dorsal side of his hands. Nurses applied pressure and gauze to control Mr. Hernandez's bleeding. Shortly after his arrival in the medical unit, Mr. Hernandez became unresponsive. Nurses administered Narcan at 3:35 a.m. and 3:40 a.m., and Mr. Hernandez became pulseless at 3:57 a.m. Shocks were administered via the defibrillator at 4:05 a.m. and 4:13 a.m. At 4:20 a.m., EMS arrived, and at 4:27 a.m., Mr. Hernandez was pronounced dead. (Ex. 2).

---

[1] See Plaintiff's Third Amended Complaint, ECF 101, ¶ 23.

Ms. Reid brought suit under Virginia Code §§ 8.01-50, 8.01-25, and 42 U.S.C. § 1983 against thirteen named defendants, including Ms. Jordan. On May 15, 2025, the Court issued a Memorandum Opinion dismissing Counts V, VI, and VII against Nurse Jordan, leaving only survival and wrongful death negligence claims against her.[2] The remaining claims against Ms. Jordan are solely related to the medical response on November 6, 2020.

## II.    DR. FOURNIER'S BACKGROUND AND OPINIONS

Plaintiff has designated Dr. Arthur Fournier as her nursing standard of care and causation expert. (Exhibit 5- Dr. Fournier's Report). His CV is being attached as Exhibit 6. During his deposition, Dr. Fournier testified that he retired from full-time practice in 2014 (Exhibit 7- Dr. Fournier's Deposition Transcript, 14: 15-17); however, he still holds an active Virginia license as a medical doctor (Ex. 7, 10:18-21). He agreed that providing medical care *at* a correctional facility was different than providing medical care at a hospital emergency department or at a primary care office. (Ex. 7, 15:14-21). He testified that his experience with correctional medicine was limited to (1) his role as an Intern and Resident at a correctional center from 1973-1976, and (2) his role in supervising Nurse practitioners in a jail medical unit in a jail, via telehealth  (Ex. 7, 46: 22-25; 47:1-12). Dr. Fournier testified that there "absolutely" was a difference between a nurse practitioner and a nurse. (Ex. 7, 18: 2-4).  Dr. Fournier retired as a faculty member from the University of Miami in 2014. (Ex. 7, 25: 5-23).

Since his retirement in 2014, Dr. Fournier's clinical practice has been limited to taking students to Haiti to provide prenatal and maternity care, as well as treat common conditions such as malnutrition, Marfan Syndrome, tuberculosis, and HIV. (Ex. 7, 25:24-25; 26: 1-17; 27: 9-17).

---

[2] See Memorandum Opinion, ECF 130.

Other than the work Dr. Fournier completed in Haiti, Dr. Fournier's clinical work stopped when he retired in 2014. (Ex. 7, 33:19-22).

Between the years of 2019 and 2021, Dr. Fournier's experience was limited to fundraising, serving in an advisory role on the Board of Eastern Shore Rural Health, and taking students down to Haiti, two to three times per year, to do primary care in impoverished communities (Ex. 7, 34:25; 35:12-14). He did not work in any correctional facilities while in Haiti during that time period (Ex. 7, 35: 15-23). Dr. Fournier also testified that from 2019 to 2021, he did not personally respond to a medical emergency involving a hemorrhaging patient (Ex. 7, 80: 17-25; 81:1-4).

Plaintiff designated Dr. Arthur Fournier to opine on the alleged breaches in the standard of care by "the medical team" and on causation. Within his expert report, Dr. Fournier opines that the "medical team" breached the standard of care as follows: (1) they failed to consider the possibility of sexual assault to explain Mr. Hernandez's complaints of rectal bleeding; (2) they failed to do an appropriate physical examination, including a rectal examination and rape protocol; (3) they failed to assess Mr. Hernandez for risk of suicide; (4) they caused an unacceptable delay in calling emergency services to transfer Mr. Hernandez to another facility capable of providing emergency and resuscitative care; (5) they failed to establish intravenous access for "potentially" lifesaving intravenous fluid therapy; and (6) they inappropriately applied compression alone, and failed to use a tourniquet to stem Mr. Hernandez's bleeding (Ex. 5, P. 2).

During his deposition on December 19, 2023, Dr. Fournier conceded that his opinions related to the care that Mr. Hernandez received on November 5, 2020 (breaches 1-3) did not apply to Nurse Jordan or Nurse Kamara, as they did not provide care to Mr. Hernandez that day. (Ex. 7, 45:6-25; 46: 1-12). Dr. Fournier also conceded that Nurse Jordan complied with the standard of care by directing a correctional officer to call 911. (Ex. 7, 84: 24-25; 85: 1-9. The remaining

standard of care opinions that could potentially be attributed to Nurse Jordan are failure to administer IV fluids and failure to use tourniquets to stop bleeding. However, Dr. Fournier has completely omitted any mention of Nurse Jordan within the standard of care opinions in his report (Exhibit 5, P. 2). Dr. Fournier stated during his deposition that he did not formulate his opinions as to any particular defendant; rather, he is asserting violations of the standard of care by "the medical team" as a whole. (Ex. 7, 83: 2-15, 23-25; 84: 1-7, 10-20; 89:15-25; 90: 1-20; 151: 23-25; 152: 1-7). When asked by Plaintiff's counsel whether Nurse Jordan violated the standard of care on November 6, 2020, Dr. Fournier responded, "She was part of a team that violated the standard of care. It's—obviously there's chaos and confusion, and it's hard to know what the chain of command was and who is responsible according to the...protocols, etc., but you have a patient who's hemorrhaging to death, and the team failed, and she was part of that team." (Ex. 7, 151:23-25; 152: 1-7).

During his deposition, Dr. Fournier also testified that he was not aware that medical staff in a correctional center are not permitted to have cell phones while working in the correctional Center. (Ex. 7, 47: 13-20). He testified that he was not aware of the rules and regulations with regard to Lawrenceville (Ex. 7, 47: 21-25; 48: 2-4). He testified that he was not aware of the Virginia Board of Nursing Requirements related to the ordering and administration of IV fluid therapy (Ex. 7, 74: 18-20). Dr. Fournier even testified that he did not care if it violated Virginia nursing regulations, the nurses should have administered IV fluid therapy anyway (Ex. 7, 74: 1-15).

Related to causation, Dr. Fournier was designated to opine and testify that Mr. Hernandez died from self-inflicted wounds and that Mr. Hernandez's suicidal ideations were a result of a sexual assault that was not diagnosed on November 5, 2020. (Ex. 5, P. 2).  Dr. Fournier's causation

opinions solely relate to the care that Mr. Hernandez received on November 5, 2020. As noted above, Dr. Fournier does not attribute the breaches associated with November 5, 2020, to Nurse Jordan.

### III.    DR. ALIX MCLEAREN'S BACKGROUND AND OPINIONS

Plaintiff has designated Dr. Alix McLearen to testify regarding correctional standards of care, policies, and practices applicable to the treatment and response to Mr. Hernandez during the times at issue. (Exhibit 8- Dr. McLearen's Report). Her CV is being attached as Exhibit 9. While Dr. McLearen was not specifically designated to testify regarding the standard of care applicable to correctional nurses, she expressed multiple opinions concerning the medical care provided to Mr. Hernández on November 6, 2020. She opines that "even if nurses were in the unit within four minutes, nothing was done to stem Mr. Hernandez's bleeding or otherwise provide treatment, which is not consistent with internal or external standards." (Ex. 8, ¶ 61). She opines that "even after 13 minutes after notification of the incident, staff delayed treatment for several more minutes in the medical unit before bandages and oxygen were provided to Mr. Hernandez. Twenty-three minutes into the video from the medical unit, staff can be heard saying the oxygen is not hooked up. Staff also note difficulty with AED pads" (Ex. 8, ¶ 61). Finally, she opines that "Officers involved in delivering CPR clearly made valiant efforts to save Mr. Hernandez; however, there were multiple shortcomings in his care that could possibly have prevented his death." (Ex. 8, ¶ 70. Dr. McLearen testified during her deposition on December 11, 2025, that her expert report "did not focus on the individual… my report really focused on the system response, although I did in place, as we talked about, kind of differentiate between medical and non-medical staff. So I don't know these people's names." (Exhibit 10, 69:1-9).  During her deposition, Dr. McLearen also

6

testified that she was unaware of the standard of care for nurses in a correctional setting, under Virginia law. (Ex. 10, 88: 8-15).

During her deposition, Dr. McLearen testified the following regarding her educational and professional background:

- She has about 25 years of experience working in and around corrections (Ex. 10, 19: 1-2);

- She has a Bachelor of Science in Psychology, a Master of Science in Clinical Psychology, and a Doctor of Philosophy (Ex. 10, 18:16-20);

- She is a licensed psychologist in the state of Alabama, and holds no other licenses or certificates (Ex. 10, 18: 10-15);

- She has never been a licensed Psychologist in Virginia and has never practiced psychology in Virginia (Ex. 10, 27: 8-14);

- She has never been licensed as a registered nurse or a licensed practical nurse (Ex. 10, 87: 12-15);

- She was once responsible for supervising two nurses (Ex. 10, 87: 16-21); and

- She "would absolutely agree" that she has never provided clinical nursing care (Ex. 10, 87: 22; 88: 1-2).

According to her CV, From the 2018-2022 timeframe, she worked as an Assistant Director/ Senior Deputy Assistant Director of Reentry Services Division for the Federal Bureau of Prisons in Washington, D.C. She gives a lengthy description of her role, and states the following:

As a member of the senior leadership team for the largest federal law enforcement component, led all agency reentry work, ensuring access to rehabilitative services for incarcerated persons. Designed and oversaw the implementation of women's institution cultural assessments to improve the quality of prison operations. Spearheaded suicide prevention efforts for staff, leading to the successful implementation of both a new Employee Assistance Program and a leadership-driven model of staff well-being. Led agency implementation of the First Step Act, resulting in the delivery of more than 85 structured programs for prisoners and negotiation and issuance of new policies compliant with the law. Directed agency work with transgender individuals, approving the first gender confirmation for a person in federal custody. Coordinated community transitions during the COVID Pandemic, resulting in the agency successfully implementing the CARES Act. Created and launched new mental health treatment, vocational, and education programs, including adding college course for incarcerated people. Authored the Female Offender Manual, the agency's policy pertaining to

7

the management of pregnant offenders. Implemented drug treatment services, including medication-assisted treatment, impacting the health of thousands of prisoners with opioid and substance use histories. Worked regularly with White House staff and DOJ leadership on high-priority directives associated with treatment access and stakeholder partnerships. Developed training for more than 35,000 staff on trauma, special populations, sexual assault, and rehabilitation. Led the agency's executive working group on addressing solitary confinement. Consulted with White House and DOJ on proposed legislation affecting women in detention, such as the Violence Against Women Act.

Ex. 9, P. 2-3. From 2019 to 2021, Dr. McLearen's experience was not related to nursing care or the supervision of nurses in a correctional setting.

**IV.    DR. FOURNIER AND DR. MCLEAREN ARE NOT QUALIFIED TO TESTIFY REGARDING THE STANDARD OF CARE APPLICABLE TO MS. JORDAN BECAUSE THEY DO NOT MEET THE REQUIREMENTS OF RULE 702 AND VIRGINIA CODE § 8.01-581.20.**

Federal Rule of Evidence 702 states that a witness is qualified to testify as an expert based on their knowledge, skill, experience, training, or education if they demonstrate, more likely than not, that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflect a reliable applicable of the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993), the Supreme Court clarified the standards for admitting expert scientific testimony at trial and instructed the federal trial courts to rely upon Rule 702 to ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." In other words, an expert's testimony must be both reliable and relevant. Later, the Supreme Court applied such standards to other expert testimony, based on technical or other specialized knowledge. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137,

8

141 (1999). "With respect to reliability, the district court must ensure that the proffered expert opinion is 'based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (Citing *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)). *Daubert's* main purpose is to "protect juries from being swayed by dubious" expert testimony. *Nease*, 848 F.3d at 231.

The Fourth Circuit has held that although the Federal Rules of Evidence generally control the admissibility of expert witness testimony in federal court, when the testimony at issue is required to establish a prima facie case for medical malpractice under Virginia law, state law governs the admissibility of such evidence. *Creekmore v. Maryview Hosp.*, 662 F.3d 686, 690 (4th Cir. 2011). Virginia law is firm that expert testimony is ordinarily required to establish: (1) that the defendant healthcare provider breached the standard of care; (2) that the plaintiff suffered damages; and (3) that the breach in the standard of care proximately caused the damages. *See Raines v. Lutz*, 231 Va. 110, 113 (1986). The question whether a witness is qualified to testify as an expert is "a determination lying within the sound discretion of the trial court." *Creekmore*, 662 F. 3d at 690 (Citing *Hinkley v. Koehler*, 269 Va. 82, 91 (Va. 2005)). In the context of a medical malpractice action, this determination must be made with reference to Va. Code § 8.01-581.20.

In order to testify as an expert pursuant to Va. Code § 8.01-581.20, two important requirements must be met: (1) "knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standards;" and (2) "an active clinical practice in either the defendant's specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of the action." Va. Code § 8.01-581.20. To qualify as an expert to testify regarding the standard of care in compliance with Va. Code § 8.01-581.20, Plaintiff's

9

proffered expert witnesses must satisfy both the "knowledge requirement" and the "active clinical practice requirement." *Creekmore*, 662 F. 3d at 691 (Citing *Hinkley*, 269 Va. at 88).

To meet the first element of the expert qualification requirements (knowledge), Plaintiff's expert must have "expert knowledge of the standard of the defendant's specialty and of what conduct conforms or fails to conform to those standards". Va. Code § 8.01-581.20. Plaintiff's expert must demonstrate knowledge of the standard of care, which is defined by statute as the "degree of skill and diligence practiced by a reasonably prudent practitioner in the field of practice or specialty in this Commonwealth." *Id*. "[T]here is no rigid formula to determine the knowledge or familiarity of a proffered expert concerning the Virginia standard of care. Instead, that knowledge may derive from study, experience, or both." *Henning v. Thomas*, 235 Va. 181, 186 (Va. 1988). The second requirement, active clinical practice, "concerns the 'relevant medical procedure at issue in a case' or, more specifically, the 'actual performance of the procedures at issue,' which 'must be read in the context of the actions by which the defendant is alleged to have deviated from the standard of care.'" *Creekmore*, 662 F. 3d at 691 (Citing *Hinkley*, 269 Va. at 89). Here, Dr. Fournier and Dr. McLearen are not qualified to testify as standard of care experts pursuant to Federal Rule of Evidence 702 nor Va. Code § 8.01-581.20; therefore, they should be disqualified

### A. Dr. Fournier and Dr. McLearen do not Meet the Active Clinical Practice Requirement Pursuant to Virginia Code § 8.01-581.20.

As noted above, Va. Code § 8.01-581.20 states explicitly that for an expert to be qualified to testify regarding the standard of care, that expert must have "had [an] active clinical practice in either the defendant's specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of the action.). In *Sami v. Varn*, the Virginia Supreme Court explained: "It is sufficient if in the expert witness's clinical practice the expert performs the

procedure at issue and the standard for performing the procedure is the same" <u>within one year of the alleged negligence</u>. 260 Va. 280, 285 (Va. 2000). The Court explained: "The purpose of the requirement in § 8.01-581.20 that an expert have an active practice in the defendant's specialty or a related field of medicine is to prevent testimony by an individual who has not recently engaged in the actual performance of the procedures at issue in a case." *Id*. Here, Dr. McLearen and Dr. Fournier both did not have active clinical practices within one year of the alleged negligence of Ms. Jordan. Plaintiff alleges that Ms. Jordan was negligent in multiple respects related to her response to Mr. Hernandez's suicide on November 6, 2020. Therefore, Dr. McLearen and Dr. Fournier were required to have an active clinical practice between November 6, 2019, and November 6, 2021, which they did not.

> **i.**      **Dr. Fournier Lacked an Active Clinical Practice Between November 6, 2019, and November 6, 2021, and Must be Disqualified as a Standard of Care Expert.**

As noted above, Dr. Fournier's experience with correctional medicine is limited to (1) his role as an intern and resident at a correctional center from 1973 to 1976, and (2) his role in supervising physician assistants at a medical unit in a jail, via telehealth, while he was faculty at the University of Miami, which ended when he retired in 2014. From 2019 to 2021, his sole clinical practice involved taking students to Haiti two to three times per year to provide primary care in impoverished communities. Moreover, he did not personally respond to a medical emergency involving a hemorrhaging patient during that time period.

Based on the above experience, Dr. Fournier does not satisfy the active clinical practice requirement under Virginia law. In *Perdieu v. Blackstone Family Practice Ctr., Inc.*, 264 Va. 408, 419-20 (Va. 2002), the Virginia Supreme Court upheld the trial court's decision to strike three of plaintiff's proposed experts: one did not have an active clinical practice within a year of the alleged malpractice because he saw patients only once per week at a clinic and health department, another

only had acute care hospital experience and did not have experience in the relevant field of nursing home care, and a third was retired and had not treated nursing home patients in over 30 years. The Virginia Supreme Court focused on whether the proffered experts had "recently engaged in the actual performance of the procedures at issue," rather than their titles or prior experience. *Id*. The Court found that the purpose of Va. Code § 8.01-581.20 was to prevent testimony by an individual who had not recently engaged in the actual performance of the procedures at issue in a case. *Id*.

Here, like the experts stricken in *Perdieu*, Dr. Fournier did not have an active clinical practice from 2019 to 2021. The Court in *Perdieu* held that an expert who saw patients only once a week did not have an active clinical practice. Likewise, Dr. Fournier's active clinical practice during the relevant time periods was limited to traveling to Haiti two to three times per year and supervising medical students. If a physician who sees patients once a week does not satisfy Va. Code § 8.01-581.20, then traveling to Haiti two to three times per year similarly does not meet the statutory requirements. The Court in *Perdieu* also struck two of the plaintiff's experts because they lacked experience specific to the care at issue in that case: nursing home care. Here, Dr. Fournier also lacks active clinical experience specific to the care at issue in this case: correctional nursing care. Dr. Fournier's most recent experience working physically in a correctional setting was limited to his internship and residency in the 1970s. Additionally, Dr. Fournier remotely supervised a medical unit in a jail; however, he ceased such supervision in 2014, upon his retirement. Therefore, Dr. Fournier did not have the requisite active clinical practice in a correctional setting from 2019-2021. Finally, from 2019 to 2021, Dr. Fournier did not engage in or perform the procedure at issue in this case: responding to and treating a patient who was hemorrhaging. Dr. Fournier conceded at his deposition that from 2019 to 2021, he did not respond to a medical emergency involving a hemorrhaging patient. Therefore, Dr. Fournier should be stricken as an expert testifying as to the

12

standard of care applicable to Delisa Jordan, because he lacks the requisite active clinical practice under Virginia law

### ii.    Dr. McLearen Lacked an Active Clinical Practice Between November 6, 2019, and November 6, 2021, and Must be Disqualified as a Standard of Care Expert.

Dr. McLearen testified that she has never been licensed as a registered nurse or a licensed practical nurse in any state and that she "would absolutely agree" that she has never provided clinical nursing care. The Virginia Supreme Court has held that a healthcare provider who did not provide direct patient care within a year of the alleged date of negligence was not qualified to testify regarding the standard of care. *Hinkley v. Koehler*, 296 Va. 82, 89-90 (Va. 2005). In that case, the Defendant designated an expert to testify regarding the standard of care for the treatment and management of pregnancy and delivery; however, during the relevant time periods, the expert worked solely in the capacity of a teacher and consultant in the field of obstetrics. The Court held that this was insufficient to satisfy the active clinical practice requirement under Va. Code § 8.01-581.20, because the doctor "did not evaluate, manage, or treat problems in pregnancies in the context of direct patient care as did the defendant doctors." *Id*. Here, like the expert in *Hinkley*, Dr. McLearen did not evaluate, manage, or treat problems related to hemorrhaging in the context of direct patient care, as Nurse Jordan did. In fact, Dr. McLearen has never been licensed as a nurse in any state. While she testified that she had, at some point, *supervised* two nurses, she also testified that she "would absolutely agree" that she never provided any clinical nursing care. Therefore, to the extent Dr. McLearen's opinions regarding breaches of the standard of care apply to Nurse Jordan, Dr. McLearen should be stricken as an expert testifying as to the standard of care applicable to Nurse Jordan, because she lacks the requisite active clinical practice under Virginia law.

### B. Dr. Fournier and Dr. Mclearen Do Not Meet the Knowledge Requirement Pursuant to Virginia Code § 8.01-581.20.

Under Va. Code § 8.01-581.20, there are two methods by which a court may presume that a healthcare provider knows the statewide standard of care "in his particular specialty or field of medicine." *Boley v. Armor Corr. Health Servs.*, 2022 U.S. Dist. LEXIS 206656 (E.D. Va. 2022) (Citing *Lloyd v. Klime*, 275 Va. 98 (Va. 2008)). First, a healthcare provider licensed in Virginia is presumed to know the standard of care *in that healthcare provider's specialty or field of medicine*. *Id*. (emphasis added). Likewise, a healthcare provider who is licensed in a state other than Virginia who meets the educational and examination requirements of the statute is presumed to know the standard of care *in the field of medicine or specialty in which the healthcare provider is certified and qualified*. *Id*. (emphasis added). "A witness to whom the presumption applies may none the less be disqualified as an expert witness if he does not meet either of two statutory requisites." *Wright v. Kaye*, 267 Va. 510, 518 (Va. 2004). Here, neither Dr. McLearen nor Dr. Fournier meets the knowledge requirement of Va. Code § 8.01-581.20; therefore, they are not qualified to testify as experts on the nursing standard of care applicable to Ms. Jordan in this medical malpractice action and should be stricken.

### i.    Dr. Fournier Does Not Meet Va. Code § 8.01-581.20's Knowledge Requirement and Must be Disqualified as a Standard of Care Expert.

Because Dr. Fournier is currently licensed as a medical doctor within the Commonwealth of Virginia, he is entitled to the presumption that he knows the standard of care in his specialty or field of medicine. However, that presumption is easily rebutted for multiple reasons. First, Nurse Jordan's field of specialty is correctional nursing. Dr. Fournier's experience in correctional medicine is limited to his internship and residency, which occurred in the 1970s, and supervising nurse practitioners via telehealth, who were providing care in a local jail, not a prison. Dr. Fournier

14

conceded during his deposition that there is a difference between nurse practitioners and nurses, and that his supervisory role ended in 2014, approximately six years prior to the events at issue. Second, as noted above, Dr. Fournier does not satisfy the active clinical practice requirement. Third, Dr. Fournier testified that he was not aware that correctional facilities prohibit the use of cellphones by correctional nurses while they are within the facility, and that he was not aware of the rules and regulations regarding Lawrenceville. Fourth, Dr. Fournier testified that he was not aware of the Virginia Board of Nursing requirements related to the ordering and administration of IV fluid therapy. He further testified that, regardless of those standards, he did not care, and IV fluids should have been administered. This is in direct contradiction of Va. Code § 54.1-2901(A)(4), which requires "orders of a person licensed to practice medicine or osteopathy, an advanced practice registered nurse, or a physician assistant" for the "giving of intravenous infusions and intravenous injections." When asked whether IV therapy should have been started if it violated Virginia Nursing Regulations, he responded, "I don't care… I don't care."  Therefore, based on the above, Dr. Fournier lacks the knowledge to opine on the standards of care for correctional nurses in Virginia generally, nor does he possess the expertise to opine on the standards of care for nurses administering IV fluid therapy in Virginia.

### ii.    Dr. McLearen Does Not Meet Virginia Code § 8.01-581.20's Knowledge Requirement, and Must be Disqualified as a Standard of Care Expert.

Unlike Dr. Fournier, Dr. McLearen is not entitled to a presumption of knowledge of the standard of care applicable to correctional nurses. Dr. McLearen testified in her deposition that, although she is licensed as a psychologist in Alabama, she has never been licensed as a psychologist in Virginia and has never been licensed as a nurse in any state. Additionally, even if Dr. McLearen meets "the educational and examination requirements" in Virginia as a

psychologist, she would only be presumed "to know the standard of care in the field or medicine or specialty in which she is qualified." That would be psychology, not correctional nursing. Moreover, even if Dr. McLearen were entitled to such a presumption, it would undoubtedly be rebuttable. First, as noted above, she has never had an active clinical nursing practice. Second, her experience with regard to nursing is limited to a supervisory role of two nurses throughout the course of her 25-year career. Therefore, Dr. McLearen does not satisfy the knowledge requirement of Va. Code § 8.01-581.20, and should be stricken as a standard of care expert as it relates to the care that Nurse Jordan provided.

**V.    THE OPINIONS OF DR. FOURNIER AND DR. MCLEAREN AMOUNT TO GROUP MALPRACTICE OPINIONS, AND DO NOT COMPLY WITH VIRGINIA LAW; THEREFORE, THEIR STANDARD OF CARE OPINIONS SHOULD BE DISQUALIFIED AND STRICKEN.**

Va. Code § 8.01-581.1 defines "malpractice" as "any tort action…for personal injuries or wrongful death, based on health care or professional services rendered, or which should have been rendered, by **a health care provider**, to a patient." (emphasis added). Under the statute, a healthcare provider means "(i) **a person**…licensed by this commonwealth to provide health care or professional services as…a registered nurse or licensed practical nurse or a person who holds a multistate privilege to practice such nursing under the Nurse Licensure Compact." (emphasis added). Moreover, as explained above, Va. Code § 8.01-581.20 states that to be qualified as an expert, one must have knowledge of the standards **of the defendant's specialty** and must have an active clinical practice **in the defendant's specialty** within a year of the alleged malpractice. The language of the Virginia Medical Malpractice statutes does not provide for group or global malpractice; rather, it focuses on an individual person and defendant. According to the act, malpractice is attributable to an individual, not a group of individuals.

16

Here, Dr. Fournier's opinions on the standard of care amount to group malpractice opinions, and he admitted as much during his deposition. When explicitly asked what his opinion was regarding whether Nurse Jordan violated the standard of care on November 6, 2020, Dr. Fournier responded, "She was part of a team that violated the standard of care. It's—obviously there's chaos and confusion, and it's hard to know what the chain of command was and who is responsible according to the...protocols, etc., but you have a patient who's hemorrhaging to death, and the team failed, and she was part of that team." Moreover, Dr. Fournier's standard of care opinions in his expert report completely fail to name Nurse Jordan individually. Therefore, in addition to those reasons stated above, Dr. Fournier should be stricken as a standard of care expert against Ms. Jordan because his opinions they are not specific to Nurse Jordan.

Along the same lines, Dr. McLearen did not offer any specific opinion for any of the named defendants. During her deposition, she testified that her expert report "did not focus on the individual…" and that her report "really focused on the system response, although [she] did in places, … differentiate between medical and non-medical staff." She testified that she did not "know these people's names." Therefore, in addition to those reasons stated above, Dr. McLearen's opinions, which could potentially be attributed to Nurse Jordan, should be stricken because they were global opinions regarding the "system response," and not specific to Nurse Jordan's care.

## VI.    CONCLUSION

WHEREFORE, for the above stated law and arguments, DeLisa Jordan, L.P.N. respectfully requests that this Court grant her Motion to Disqualify Dr. Fournier and Dr. McLearen as standard of care experts against Nurse Jordan, or other further relief that the court deems just and proper.

17

Respectfully submitted,

**DELISA JORDAN, L.P.N.**


/s/ Anna M. Cotto
Rodney S. Dillman, Esquire (VSB #46803)
Anna M. Cotto, Esquire (VSB #99970)
DILLMAN LEGAL GROUP
295 Bendix Road, Suite 220
Virginia Beach, Virginia 23452
Telephone: (757) 356-2300
Facsimile: 757-356-2341
rsdillman@dillmanlegalgroup.com
amcotto@dillmanlegalgroup.com
***Counsel for Defendant DeLisa Jordan, LPN***

18

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of December 2025, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to

the following:

Stephen C. Teague, Esq. (VSB No. 24324)
Law Office of Stephen C. Teague
P.O. Box 706
Newport News, VA 23607
Tel: 757.317-0716
Fax: 757. 217- 2974
stephen@teaguelawoffice.com
***Counsel for Plaintiff***

Gregory Scott Bean, Esq. (VSB No. 80119)
Whiteford, Taylor, & Preston, LLP
1021 E. Cary Street, Suite 2001
Richmond, VA 23219
Telephone (804)977-1241
gbean@whitefordlaw.com
***Counsel for Defendants The GEO Group, Inc., Samuel Davis, Shirley Williams, Martre Powell, Tewanda Patton, Quinton Hawkes, Tanis Fritz, Connie Jones, Shekenna Turner and Darrin Boyd***

Nancy F. Reynolds, Esq. (VSB No. 38236)
Kiernan Trebach LLP
1108 E Main Street, Suite 801
Richmond, VA 23219
Tel: 540-797-0932
nreynolds@kiernantrebach.com
***Counsel for Meriam Kamara, R.N.***

/s/ Anna M. Cotto_____
Rodney S. Dillman, Esquire (VSB #46803)
Anna M. Cotto, Esquire (VSB #99970)
DILLMAN LEGAL GROUP
295 Bendix Road, Suite 220
Virginia Beach, Virginia 23452
Telephone: (757) 356-2300
rsdillman@dillmanlegalgroup.com
amcotto@dillmanlegalgroup.com
***Counsel for Defendant DeLisa Jordan, LPN***

19