**Eagle Security Group, Inc.**
1380 Central Park Blvd., Suite 202
Fredericksburg, VA 22401
Phone: 540-548-4060
Fax: 540-301-1396
www.eaglesecuritygroup.com

## PROFESSIONAL REPORT

Mr. Stephen Teague

Law Office of Stephen C. Teague

5029 Corporate Woods Drive

Suite 302

Virginia Beach, VA 23462

**Re: Delisa Hernandez Reid, Administrator of the Estate of Damian Hernandez v. The GEO Group, Inc., et. al., Civil Action No. 3:24-cv-309**

### Introduction and Scope of Work

1. I am a clinical psychologist, former corrections executive, and retired federal law enforcement officer with more than 20 years' experience working in prisons and jails. My experience includes providing direct services to incarcerated individuals inside prison and jail facilities as well as serving in national-level corrections leadership roles. I oversaw the Department of Justice's Federal Bureau of Prisons' (BOP) work on complying with the Prison Rape Elimination Act (PREA), managed agency response and training tied to suicide and self-harm, and later served as a member of the BOP's senior leadership team wherein I was involved with all agency oversight issues. I was responsible for agency responses to death by suicide and suicide attempts across 122 federal facilities. I also led the National Institute of Corrections, the only federal agency mandated to provide training and technical assistance to all of the 750,000 professionals working in correctional systems across the United States. I have extensive experience in developing programs and services and drafting and implementing

EXHIBIT 8



EAGLE SECURITY GROUP, INC.
Report of Dr. Alix M. McLearen on Civil Action No. 3 :24-cv-309 (Hernandez v. GEO Group)

policies that balance safety, treatment, and internal or external standards, best practices, and regulations.

2. I have been retained by The Office of Stephen Teague in Civil Action No. 3:24-cv-309. I have been asked to provide my opinion on whether GEO Group, Inc. staff ("GEO") at the Lawrenceville Correctional Facility ("LCF") complied with standards of care regarding their treatment of and response to the death of Mr. Damian Hernandez.

3. My opinion, which is explained in further detail below, addresses the consistency between GEO's responses to Mr. Hernandez's needs prior to his death and both the applicable external standards of care and the company's own policies. I also opine on actions of the agency occurring after Mr. Hernandez died.

4. Based on my experience and knowledge, it is my opinion GEO acted in a manner that is incompatible with relevant internal and external standards of care before, during, and after the injury to, and death of Mr. Hernandez.

**Background and Qualifications**

5. In 2003, I obtained my doctorate from the University of Alabama in Clinical Psychology and the Law. During the course of my college education, I began working in justice settings, starting as a probation intern in 1995, and later delivering mental health services in both a state prison and a large county jail.

6. I completed my predoctoral internship at the United States Medical Center for Federal Prisoners in 2003 and then continued my career with the BOP until I retired effective September 1, 2024.

7. During my approximately 22 years with the BOP, I held positions of increasing responsibility in a variety of prisons and oversight offices across the United States wherein I practiced psychology and also worked collaboratively and closely with other disciplines to meet the agency's mission of operating facilities that were both safe and replete with programmatic opportunities in areas ranging from mental health treatment to leisure time management.



8.  In 2010, I was chosen for a position in BOP's headquarters in Washington, DC, where I worked on matters of sexual dangerousness and policy development, and continued my work on reentry services.

9.  I was later promoted to be the first National Administrator of the Women and Special Populations Branch and was responsible for providing guidance and oversight to all 122 federal correctional facilities and over 35,000 employees on issues affecting women, juveniles, persons with disabilities, veterans, and the aging and transgender populations. While maintaining these responsibilities, I also served as the agency's PREA Coordinator. I worked to update and implement the BOP's sexual assault policy after the issuance of the PREA standards in 2012. I was a member of the Department of Justice's PREA Working Group, which interpreted PREA standards and provided practical guidance about their implementation to all United States' corrections systems. Additionally, I developed and delivered agency training for all staff on PREA implementation and sexual assault prevention, detection, and response.

10. Beginning in 2018, I served first as Acting, and then as Senior Deputy Assistant Director for BOP's Reentry Services Division and in 2021 I was named Acting Assistant Director of Reentry Services. In these roles, I was responsible for psychology services, women and special populations, PREA, education and recreation, chaplaincy, transitional programming, and over 200 halfway houses. I managed a budget of nearly one billion dollars. I oversaw the BOP's sexual assault prevention work as well all suicide prevention efforts for both staff and incarcerated people. This role included developing and issuing after-action reports on deaths by suicide and identifying any corrective actions needed, as well as using this information to train staff. It also involved collaborating across disciplines to monitor national policy, inclusive of overseeing quarterly training exercises on emergency responses to potential suicides. Like all law enforcement staff at BOP, I was CPR certified and trained in the use of Narcan for possible overdose incidents. Finally, as a member of BOP's senior leadership team, I was involved in making decisions across disciplines on a wide range of security, staffing, and services.

EAGLE SECURITY GROUP, INC.
Report of Dr. Alix M. McLearen on Civil Action No. 3 :24-cv-309 (Hernandez v. GEO Group)

11. In December 2022, I was appointed by then-U.S. Attorney General Merrick Garland as Acting Director of the National Institute of Corrections (NIC). Both NIC and BOP are divisions of the Department of Justice. I remained a member of BOP's senior leadership team, but my primary responsibilities shifted to leading NIC, the agency that provides guidance to state and local correctional facilities across the country. Amongst the many workstreams I managed at NIC were those pertaining to facility healthcare operations, suicide prevention, and sexual assault/PREA response.

12. I am now retired from Federal service and work as a consultant on various corrections issues.

13. I have published articles and chapters on a wide range of correctional topics and have delivered invited addresses at convenings around the country and world. A copy of my Curriculum Vitae, which provides a complete overview of my experience, is attached to this report as Appendix A.

14. I have been retained as a contractor through Eagle Security Group, who is being compensated at a rate of $500 per hour for my time spent developing this report.

## Bases for Opinions

15. In preparing this report, I have relied on my training; my years of experience working on issues pertaining to correctional settings and my specific experience writing and applying prison policy about emergency and suicide responses and PREA; my knowledge of the policies and practices surrounding these issues in correctional systems across the United States gained at both BOP and NIC; and my knowledge of the relevant literature, standards, and best practices.

16. In addition, in preparing this report, I have reviewed the following discovery information provided to me by counsel to inform my opinion:

    i.   Prison logs (Bates 0190-0201);

    ii.   Disciplinary and classification records (Bates 0185-0189);

    iii.   Contract between Virginia and GEO;

    iv.   Institutional Classification Authority hearing forms;

    v.   Letter from Paul W. Haymes, dated March 5, 2021;

EAGLE SECURITY GROUP, INC.
Report of Dr. Alix M. McLearen on Civil Action No. 3 :24-cv-309 (Hernandez v. GEO Group)

vi.    Report from the Special Investigations Unit November 6, 2020;

vii.    Memo from Michael Breckon, dated April 22, 2021;

viii.    Mortality Review dated February 16, 2022;

ix.    Cellmate interview audio recording;

x.    Unit and medical unit video recordings;

xi.    Hernandez CCR file;

xii.    Hernandez medical and mental health records;

xiii.    Email records;

xiv.    Work history records;

xv.    Prison policies and post orders (Bates 0203-0245); and

xvi.    Logs, Custodial Death report, and photos (Bates 0246-0342);

17. I also reviewed material not provided to me by counsel that I cite in the report, such as professional standards.

## Incident Overview

18. Damian Hernandez was serving a lengthy sentence in the Virginia Department of Corrections, and per visiting logs was housed at LCF beginning in 2011.

19. He had no documented history of mental health concerns and limited medical contacts, when on November 5, 2020, he sent an emergency request to medical providers indicating he was bleeding from his rectum and penis. He was seen that day, but records reflect no documentation of a physical exam, and no indication he was questioned about sexual assault. He was given Pepto Bismol.

20. A few hours later, on November 6, 2020, his cellmate contacted officers to indicate Mr. Hernandez was bleeding heavily. He had lacerations on his hands and neck. Timing is inconsistent between videos and various log notes, but it is clear officers responded to the cell immediately upon being notified of the situation. Medical staff were called right away and arrived within a few minutes; however, it took about 10 minutes for Mr. Hernandez to be transported to the medical area. During that time, he was not provided medical care. It is not clear when emergency services outside the facility (911) were called because records



EAGLE SECURITY GROUP, INC.
Report of Dr. Alix M. McLearen on Civil Action No. 3 :24-cv-309 (Hernandez v. GEO Group)

do not align. Paramedics arrived in the medical area about one hour after the initial emergency was called.

21. Mr. Hernandez was alive and pleading not to die when staff responded, per their own reports. He was pronounced dead within minutes of outside responders' arrival.

22. A photo suggests the cell may have been secured, but no information is provided about when or for how long that occurred. No causes of death other than suicide appear to have been considered and there is no analysis of the events or information about after-action review and recommendations amongst the discovery materials.

## Lawrenceville Correctional Facility

23. LCF is a medium-security, male institution operated by the Virginia Department of Corrections. The facility was managed by GEO for 21 years until Virginia assumed oversight in 2024, noting GEO's removal would "enhance public safety in the Commonwealth."[1]

24. Before the move from GEO, the Virginia Interfaith Center for Public Policy issued a report detailing management and operational failures at LCF in the months leading up to and following the death of Mr. Hernandez.[2] In particular, the document highlights persistent staffing shortages, drug overdoses, and unresponsive leadership at LCF.

25. A number of news reports also suggest corners were cut in an effort to save costs and that conditions at LCF were generally inadequate.[3] [4]

---

[1] Vogelsong, S., Virginia to close four prisons, reassume control of sole private prison. Virginia Mercury, Dec 15, 2023. Retrieved from https://virginiamercury.com/2023/12/15/virginia-to-close-four-prisons-reassume-control-of-sole-private-prison/

[2] Virginia Interfaith Center for Public Policy. Lawrenceville Correctional Facility: Virginia for-profit prison run amok. October, 2022. Retrieved from https://virginiainterfaithcenter.org/wp-content/uploads/2022/10/Lawrenceville-Correctional-Center-A-Prison-Run-Amok-2.pdf

[3] O'Brien. K. Senator pushing to end a "prison for profit" in Virginia. WRIC ABC 8 News. December 22, 2020. Retrieved from https://www.wric.com/news/taking-action/push-to-end-a-prison-for-profit-in-virginia/

[4] Hipolit, M. Virginia Sheriff is concerned about this prison: 'You failed this community.' CBS 6 News Richmond. September 20, 2022. Retrieved from https://www.wtvr.com/news/problem-solvers/problem-solvers-investigations/lawrenceville-correctional-center-issues-september-20-2022

## Corrections Overview

26. The United Stated operates hundreds of correctional facilities. The majority are operated by federal, state, or county governments. A much smaller proportion of facilities are operated by private companies such as GEO. These for-profit prisons have long been controversial and primarily appear to offer minimal cost savings while operating with fewer or less qualified staff.[5]

27. Generally speaking, all prisons and jails – including privately-operated facilities - are beholden to three broad categories of care standards: those that are codified in law, those issued by the facility, and those of external accrediting bodies. While the latter may not be binding, they both identify best practices and showcase expected service and care benchmarks for facilities nationwide.

28. Furthermore, the burden of care extends across the entirety of a person's time in custody. Thus, services should be provided consistent with care standards from the time of intake until release, or in the case of death, until all responsibilities have been met.

29. Both statue and case law have built a strong foundation underscoring the responsibilities of correctional facilities in delivering care and service to their population dating back decades (for example, Estelle v. Gamble).[6] This report does not address such issues but rather focuses on specific standards as they apply to the case of Mr. Hernandez.

## Sexual Assault Prevention Standards

30. By the 1990s, corrections officials were well-aware of the risk of sexual assault in carceral environments. As a result, a congressionally-supported working group was established to develop basic standards for preventing, detecting, and responding to inappropriate sexual behavior in prisons and jails.

---

[5] For a historical review, see Austin, J. & Coventry, G. (2001). Emerging Issues in Private Prisons. Bureau of Justice Assistance.
[6] *Estelle v. Gamble*, 429 U.S. 97 (1976).



31. Citing figures on sexual assaults in correctional facilities, PREA was signed into law on September 4, 2003.[7] Amongst its purposes were to prioritize prison rape prevention and to develop national standards to aid in achieving this goal.

32. In 2012, the Department of Justice published the PREA Final Rule, which included standards for implementing the 2003 statute.[8] These standards apply to all corrections facilities in the country.

33. Amongst the PREA standards are those pertaining to training. Specifically, standards § 115.31 – 35 identify the importance of, detecting and responding to sexual abuse, with specialized training on assessing and preserving signs of sexual abuse required for medical staff. PREA standards also address evidence collection, reporting, and investigation.

34. Following the issuance of PREA standards, many correctional facilities issued or updated existed sexual abuse prevention policies. Although GEO provided no sexual assault-related policies as part of discovery, several were identified on their corporate website.[9] While said policies appear to have been updated since the time of Mr. Hernandez's reported rectal bleeding, they reiterate the PREA requirements of properly detecting, investigating, and reporting sexual abuse.

35. Also relevant to sexual abuse, GEO's policy on suicide prevention notes "rape" as a potential suicide risk factor.

**Suicide Prevention Standards**

36. As noted, standards of care can come from both internal and external sources. There is now a deep body of science addressing the prevalence of suicide in correctional settings. This information has been used to develop professional standards of practice that are widely recognized across systems.

37. The American Correctional Association (ACA), a 152-year- old professional organization with thousands of members focused on improving the justice

---

[7] Prison Rape Elimination Act (PREA) of 2003 (P.L. 108-79).
[8] 28 CFR Part 115 National Standards To Prevent, Detect, and Respond to Prison Rape; Final Rule
[9] See https://www.geogroup.com/PREA

system, is the largest accrediting body for corrections.[10] [11]The standards of ACA are designed to be based on "valid, reliable research and exemplary correctional practice."

38. ACA standards include standards related to prevention of and response to suicidal behavior. In addition to training requirements for all staff, specific standards address planning and follow-up responses.

39. Standard 5-ACI-6A-35 mandates a suicide prevention plan that, amongst other items, addresses responses to suicidal individuals and communication between custody and medical staff.

40. This same standard and standard 5-ACI-6A-36 require a leadership after-action review and psychological autopsy, while similar requirements are described for medical providers in standard 5-ACI-6D-02.

41. The National Commission on Correctional Healthcare (NCCHC) is another accrediting body setting prison standards, with a particular focus on healthcare. This organization was established in the 1970s.[12] NCCHC recommends screening for suicide during primary care visits and having cross-discipline response training exercises to facilitate confidence and positive outcomes during real events.[13] Many agencies require such training exercises as part of normal operations.[14]

42. In terms of internal standards, GEO's policy 4.1.1 provides details on a number of requirements pertaining to suicide prevention at LCF. As noted, sexual abuse is identified as a risk factor for suicide in this document. Also referenced in this policy is the requirement training address responding to a suicide "including immediate intervention requirements."[15]

43. Policy tasks Master Control with calling 911 if directed to do so by medical staff. Additionally, the document notes "if a suicide attempt has or is occurring, the

---

[10] American Correctional Association. Performance-based standards and expected practices for adult local detention facilities, 5th ed.
[11] American Correctional Association. About Us. Retrieved from https://www.aca.org/ACA_Member/ACA/ACA_Member/AboutUs/AboutUs_Home.aspx
[12] https://ncchc.org/about-us/
[13] Suicide Prevention Resource Guide. National Commission on Correctional Healthcare (2019).
[14] For example, see BOP-DOJ Program Statement 5324.08, "Suicide Prevention. (2007).
[15] See Bates 0213

EAGLE SECURITY GROUP, INC.
Report of Dr. Alix M. McLearen on Civil Action No. 3 :24-cv-309 (Hernandez v. GEO Group)

staff member shall immediately call a medical emergency (Major Medical) and act to ensure the safety of the offender until help arrives. This may include First Aid, CPR, and/or the removal of items presenting a danger to the offender."[16] Finally, the document requires quarterly mock drills, consistent with best practices requirements of other systems and professional standards.

## Emergency Response Standards

44. Because possible self-harm/suicide attempts are emergencies, there is considerable overlap in standards for both suicide and general emergency responses. Therefore, the standards of care referenced above cover most emergency response requirements. Response time, however, is not specific to situations of possible self-harm.

45. ACA standard 5-ACI-6B-08 specifies the requirement that staff responding to medical emergencies do so within 4 minutes. Staff are expected to understand what to do in such emergencies, including recognizing possible drug intoxication, suicide interventions, and administration of basic first aid.

46. GEO has no corresponding policy that was provided or located.

## Follow-up Standards

47. As noted, if a suicide is suspected, ACA requires after-action reviews involving healthcare and leadership staff.

48. Both ACA and PREA also require an investigation in the event of a sexual assault.

49. Beyond these situations, in the event of an emergency, crime scene, or death, it is routine in corrections to secure the area to allow for a thorough investigation of circumstances.

50. ACA standard 5-ACI-3A-42 requires policy that establishes chain of custody and procedures for securing physical evidence.

---

[16] See Bates 0217



EAGLE SECURITY GROUP, INC.
Report of Dr. Alix M. McLearen on Civil Action No. 3 :24-cv-309 (Hernandez v. GEO Group)

51. GEO policy 10.002 documents evidence preservation information in the event of crime, but the standard does not extend to potential crime or emergency scenes making directives to staff somewhat unclear.

## Analysis and opinions

52. Mr. Hernandez died in the custody of GEO staff while serving time at LCF on November 6, 2020. Several missteps were made leading up to and following his passing, each of which could possibly have led to different outcomes and conclusions.

53. The day before his death, Mr. Hernandez submitted an emergency request related to rectal bleeding. Certainly, this symptom can have many causes, and particularly in a correctional environment, sexual abuse is one possibility that should be thoroughly explored. Under PREA law and company policy, GEO staff should have had ample information from training to suggest sexual assault as a potential cause for rectal bleeding.

54. Medical documents before and after Mr. Hernandez's death offer no information as to how sexual assault was considered in diagnosing the bleeding rectum. No exam was performed, and PREA-type victimization questions were not documented. Additionally, no suicide discussion was held during the medical exam despite this being a recommended healthcare practice. And because no sexual assault questioning took place, there was no further exploration of this factor as a suicide risk.

55. All of the forms completed after Mr. Hernandez died indicate PREA was not a factor, but there is no indication a PREA incident was ever considered.

56. *It is my opinion PREA protocol requirements were not properly followed and an opportunity to intervene with Mr. Hernandez was missed.*

57. According to logs, Mr. Hernandez's cellmate contacted officers at 3:17 am and requested help, noting Mr. Hernandez was bleeding profusely. Video shows officers responding immediately. A medical emergency was called, although logs are not consistent as to whether this occurred at 3:18, 3:19, or 3:20 am.

EAGLE SECURITY GROUP, INC.

Report of Dr. Alix M. McLearen on Civil Action No. 3 :24-cv-309 (Hernandez v. GEO Group)

58. Medical staff arrived on the unit at either 3:21 or 3:22 am and spent several minutes attempting to move Mr. Hernandez onto a backboard/stretcher, down the stairs, and to the medical unit. Records reveal there was a large amount of blood on the scene, but there is no indication in video, logs, or notes that First Aid or CPR are performed or that medical staff communicate about such needs until Mr. Hernandez arrives in the medical area at 3:30 am. Ms. Jordan notes she did not know his arms were bleeding until he was in medical and she applied gauze at that time.

59. It is not clear when 911 was contacted – one logbook has a notation about it at 3:25 am, while another references it at 4:05 am.

60. After Mr. Hernandez arrived in medical, he was alive and speaking, although weak. Although the cellmate had reportedly expressed the belief Mr. Hernandez had taken drugs, no evidence exists that this individual was interviewed immediately or that the cell was searched for any possible substances. GEO staff were unable to find an oxygen mask for several minutes and waited an additional several minutes after providing oxygen to administer Narcan. CPR began about 3:40 am.

61. Timing is extremely important in this situation because a life-threating emergency was underway. It is quite concerning that video and written documentation vary considerably regarding timing of critical lifesaving activities. Even with video, it is unknown which clocks and accounts are correct and what was happening verbally given the inconsistency in records. Furthermore, ACA standards indicate responses should occur within four minutes, and it is not clear if that happened. Even if nurses were in the unit within four minutes, nothing was done to stem Mr. Hernandez' bleeding or otherwise provide treatment, which is not consistent with internal or external standards. No training documentation was provided, but whether or not practice mock suicide scenarios had been done, responses were slow and needed materials were not easy to obtain.

62. Even 13 minutes after notification of the incident, staff delayed treatment for several more minutes in the medical unit before bandages and oxygen were provided to Mr. Hernandez. Twenty-three minutes into the video from the

medical unit, staff can be heard saying the oxygen is not hooked up. Staff also note difficulty with the AED pads.

63. While it is not clear what time 911 was contacted, it is unlikely the call was immediate. Paramedics arrived nearly an hour later despite the hospital being located approximately 22 miles from LCF.

64. It also does not appear the cellmate was interviewed until well after Mr. Hernandez had died. The information he provided, therefore, was not used or considered in the response to Mr. Hernandez.

65. *It is my opinion suicide prevention and emergency response standards were not properly followed in Mr. Hernandez's care after his bleeding was noticed.*

66. Mr. Hernandez was declared deceased shortly after emergency services personnel arrived. While the cause of death ultimately was determined to be self-inflicted, it does not appear other causes were even considered by GEO. While suicidal behavior was likely, it was presumed in all documentation, and there was no analysis of other possible causes of death.

67. An image was provided of an officer sitting outside the cell where Mr. Hernandez cut his hands. However, it is unknown when the person was stationed there, for how long, and what happened to the property within. There is no discussion of substances found or information about investigating contraband on the compound.

68. No documents were provided showing any kind of mental health or leadership after-action occurred. Information in reports was not analyzed in any way and specific actions were not reviewed, only summarized. The medical review was dated 2022, well over a year after the incident. Part of the reason for after-action reviews is to apply information to prevent future harm or mistakes.

69. *It is my opinion follow-up standards were not properly followed in the aftermath of Mr. Hernandez's death.*

## Conclusion

70. The management of correctional facilities is a massive responsibility requiring thorough training, regular practice of emergency scenarios, and familiarity with



policy. Officers involved in delivering CPR clearly made valiant efforts to save Mr. Hernandez; however, there were multiple shortcomings in his care that could possibly have prevented his death.

71. It is my opinion the initial response to Mr. Hernandez's complaint of rectal bleeding was inadequate and not consistent with correctional standards. It is also my opinion that while staff responded to the reports of Mr. Hernandez bleeding in his cell quickly, the lack of action upon arrival and failure to deliver rapid treatment was not consistent with correctional standards. Finally, it is my opinion that the failure to complete a thorough after-action review and evaluate and secure evidence was not consistent with correctional standards.

I reserve the right to modify or supplement my opinions at a future date. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Alix McLearen (Nov 10, 2025 10:33:44 EST)

Nov 10, 2025

---

Alix M. McLearen, Ph.D.
Eagle Security Group

Date