

**Planet Depos**
*We Make It Happen*™

# Transcript of Christopher Bingham Colburn, Ph.D

**Date:** December 3, 2025
**Case:** Hernandez Reid/ Estate of Hernandez -v- The Geo Group, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

- - - - - - - - - - - - - x

DELISA HERNANDEZ              :

REID, ADMINISTRATOR          :

OF THE ESTATE OF             :    Civil Action No.

DAMIAN HERNANDEZ,            :    3:24-cv-309

     Plaintiff,           :

  v.                          :

THE GEO GROUP, INC.,         :

et al.,                      :

     Defendants.          :

- - - - - - - - - - - - - x

Deposition of CHRISTOPHER BINGHAM COLBURN, Ph.D

Conducted Virtually

Wednesday, December 3, 2025

1:00 p.m. EST

Job No.: 611257

Pages: 1 - 97

Reported By: Carol M. Tayloe, RMR, CMRS, CCR

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                    2

Deposition of CHRISTOPHER BINGHAM COLBURN, Ph.D, conducted virtually:

Pursuant to notice, before Carol M. Tayloe, E-Notary Public in and for the Commonwealth of Virginia.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF, HERNANDEZ REID:

STEPHEN C. TEAGUE, ESQUIRE

LAW OFFICE OF STEPHEN C. TEAGUE

P. O. Box 706

Newport News, VA 23607

757-317-0716


ON BEHALF OF THE DEFENDANTS, THE GEO GROUP,

DAVIS, WILLIAMS, POWELL, PATTON, HAWKES, FRITZ,

JONES, TURNER, AND BOYD:

BRETT C. HERBERT, ESQUIRE

WHITEFORD TAYLOR PRESTON, LLP

Two James Center

1021 E. Cary Street

Richmond, VA 23219

804-977-3306

              A P P E A R A N C E S (continued)

    ON BEHALF OF THE DEFENDANT, JORDAN:

          ANNA M. COTTO, ESQUIRE

          DILLMAN LEGAL GROUP

          295 Bendix Road, Suite 220

          Virginia Beach, VA 23452

          757-356-2300


    ON BEHALF OF THE DEFENDANT, KAMARA:

          NANCY R. REYNOLDS, ESQUIRE

          KEIRMAN TREBACH LLP

          1108 E. Main Street, Suite 801

          Richmond, VA 23219

          804-797-0932


Also present:  DeLisa Hernandez Reid

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                    5

C O N T E N T S

EXAMINATION OF CHRISTOPHER B. COLBURN, Ph.D.   PAGE

By Mr. Herbert                      6, 93

By Ms. Cotto                          74

By Ms. Reynolds                       81

By Mr. Teague                         86

E X H I B I T S

COLBURN DEPOSITION EXHIBIT                      PAGE

Exhibit 1 - CV                                   26

Exhibit 2 - Screening form                       26

Exhibit 3 - DOC incident report                  39

Exhibit 4 - Report                               44

Exhibit 5 - U.S. Department of Justice report 54

Exhibit 6 - Article                              55

Exhibit 7 - Work history                         68

Exhibit 8 - Account summary                      74

PLAINTIFF DEPOSITION EXHIBIT

Exhibit 1 - CCR file                             93

Whereupon,

CHRISTOPHER BINGHAM COLBURN, Ph.D.,

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE DEFENDANTS

BY MR. HERBERT:

Q   Mr. Colburn -- sorry, Dr. Colburn, my name is Brett Herbert.  I am an attorney at the law firm of Whiteford Taylor & Preston, and I along with my colleague Greg Bean represent several of the defendants in this case, including the Geo Group, Inc., Samuel Davis, Shirley Williams, Martre Powell, Tewanda Patton, Quinton Hawkes, Tanis Fritz, Connie Jones, Shakeenna Turner, and Darrin Boyd.  And there are two other lawyers on this deposition today, one of them being Nancy Reynolds, who you're going to hear from shortly, and also Anna Cotto, who represents co-defendants as well, and they can tell you who they represent when the time comes.

This is your deposition in a lawsuit

that's pending in the United States District court for the Eastern District of Virginia styled Hernandez Reid versus the Geo Group, et al.

I'm going to go over just as we get started some preliminary instructions that will hopefully make this go a little bit easier, a little bit faster, and you can tell me if you have any questions about the process.

Starting first, did you have a chance to take a look at the exhibits that were circulated earlier today?  I think Mr. Teague had indicated that he was going to e-mail them to you.  Do you have those, Dr. Colburn?

A  Yes.  I didn't pull them but they look like the things that I referred to in my report, yes.

Q  Great.  And the reason I ask is that if you have them in front of you I wasn't necessarily going to share my screen and sort of go through that whole process.  If at any point you aren't sure what I'm referring to I can share my screen, no problem, and we can make sure we're are on the

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                    8

same page.

A  Okay.

Q  So, Dr. Colburn jumping right in, some basic preliminary instructions.  Have you ever had your deposition taken before?

A  Yes.

Q  Okay.  How many times?

A  Oh, goodness.  I should have looked that up.  Probably ten, 12, somewhere in that neighborhood.

Q  Are you familiar today generally how the deposition process works?  It sounds like you might be.

A  Yeah, yeah.  You ask me questions and I'll try to answer them clearly.  Hopefully I won't mumble, but, yes, I'm familiar with it.

Q  Great.  And just to confirm, it's going to proceed with I'll ask you a series of questions, you're under oath, obviously you've been sworn, you answer those questions under oath.  The other lawyers on the deposition are going to have a chance to ask you questions as well.

So a bit of kind of two challenges when we take depositions. Number one, we have lots of people in the deposition, and there is always the potential of us talking over each other. So, Dr. Colburn, I'm going to do my best to not talk over you, to wait for you to fully answer a question before I jump into the next one.

A  Okay.

Q  And in exchange if you could try to do the same for me. If you could wait to answer the question until I finish asking the question, and I know it's perfectly natural to say I know where he's going with this, I know the answer, let me just jump in. It's perfectly normal in normal conversation. The challenge here is we've got the court reporter who is preparing a transcript and when people start talking over each other it gets confusing.

So I will do my best to try to not talk over you and I'd appreciate you doing the same in return.

Dr. Colburn, if there's ever a question

you don't understand that's no problem.  Just tell me and I can try to rephrase it.  With that being said, if you do answer a question that I ask I'm going to assume that you understood the question.  Is that a fair assumption?

A  Yes.

Q  Great.  If there's ever anything you don't understand just let us know.  And this is -- I don't anticipate your deposition going particularly long.  I think it's scheduled for two hours.  But if at any time you need to take a restroom break or something like that, that's fine.  Just let me know.  I just ask that you answer whatever question has been asked of you at that time and then we can just take a break.

So as far as shortcuts, Dr. Colburn, I'm going to refer in your deposition periodically to Damian Hernandez as Mr. Hernandez just as a shortcut.  If I refer to Damian Hernandez as Mr. Hernandez, do you understand that I'm referring to Damian Hernandez?

A  Yes.

Q  All right.  And for your report, you had done a report related to this case.  It's dated November the 9th of 2025.  Again, same thing. Throughout the deposition I'm going to refer to your report dated November 9, 2025, as your report, and if I refer to it as your report you understand I'm referring to that November 9th, 2025, report you did?

A  Yes.

Q  Great.  All right.  Any reason why you can't give truthful testimony today, Dr. Colburn?

A  No.

Q  Not a trick question.  We ask that of everybody.  So let's go ahead and jump right it. Will you please state your full name and spell it for the court reporter?

A  Christopher Bingham Colburn, C-H-R-I-S-T-O-P-H-E-R B-I-N-G-H-A-M, C-O-L-B-U-R-N.

Q  Thank you.  And would you please tell us your business address, or your office address?

A  My office address.  I guess my home

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                    12

office.  I do this from home, it's a part-time thing, so 3178 East Ocean View Avenue, Norfolk, Virginia, 23518.

Q  Dr. Colburn, do you understand that we're here today to obtain your expert testimony as it relates to the opinions that were set forth in your report that you authored November 9th of 2025?

A  Yes.

Q  Have you performed or created any other supplemental reports other than your November 9, 2025, report?

A  No.  Let me make sure.  Can I look at it?

Q  Yeah, sure.

A  I brought my report.

Q  You're just referring to your report? That's fine.

A  No, that's it.  No, no other supplements.

Q  Do you recall when you were first contacted by plaintiff in this case or plaintiff's counsel?

A  It seems like it was early November.

Q  2025?

A  Early November 2025, yes.

Q  Do you recall who reached out to you?

A  Stephen Teague.

Q  And would you tell us your understanding of the reason you were retained in this case?

A  I was asked to compute a lost earnings report on someone who had passed.

Q  And do you recall what was explained to you initially about the case, the nature of the case?

A  That it was something happened in prison while Mr. Hernandez -- is that the correct way of saying it -- Mr. Hernandez was in prison and something occurred and he ended up passing.

Q  Do you have an estimate or an approximation of how many conversations you've had with attorney Steven Teague in this case?

A  Three or four, I guess.

Q  All right.  Jumping to your CV, Dr. Colburn, I just had some questions for you about that.  Could you tell us your current occupation,

please?

A  I'm a professor of economics at Old Dominion University, associate professor.

Q  What percentage of your professional time is devoted to serving as a consultant or expert witness in legal matters?

A  Let's see.  I would say five percent. Somewhere like that.

Q  Could you give us a summary of your educational background?

A  Yeah.  I have a bachelor's of science in economics which I earned in 1980, master of arts in economics earned in 1982, and a Ph.D. in economics earned in 1988.  The Ph.D. is from Texas A&M University.

Q  Could you give us a summary of your employment background, please?

A  I'm smiling because mine is kind of interesting.  Everything I've ever done has been associated with education.  I had an assistant-ship in getting my master's program.  I came to Old Dominion just before I finished my

Ph.D.  I've been here ever since.

Do you want me to go back before 1980?  I worked for the School Book Depository in Dallas.  School system in Dallas.

Q  Do you hold any licenses or certifications, Dr. Colburn?

A  No.  No.

Q  Have you ever held any certifications or licenses?

A  I was thinking I might have been certified for some statistical stuff years ago when I would do training, but that's years and years ago.  So nothing of any recent, no.

Q  The one you just told us about that's possible, is that -- sounds like that's not currently licensed or certified?

A  No.

Q  What professional organizations are you a member of at present?

A  Let's see.  The American Association of Forensic Economists, I'm a member of that.  Could be a member of the American Economics Association.

I don't know if I let that slip.  Public Choice Society, I think I'm still a member there.  These are all academic institutions.  I think that's right.

Q  Dr. Colburn, I think you estimated about five percent of your time, professional time, relates to serving as a consultant or an expert witness in legal matters.  Do you have an idea approximately how much of your income per year is a result of that expert witness service or consulting in legal matters?

A  Let's see.  About five to seven percent, eight percent, something like that.  No more than that.

Q  I'd like to just quickly show you a document.  It's the CV that was produced.  This was premarked as Exhibit 1 and given to the court reporter and all counsel.  So let me just share my screen with you quickly, Dr. Colburn, and get this in front of everybody.

Can you see this on my screen?

A  Uh-huh.

Q   It looks like it's about 16 pages there. I'll just sort of quickly scroll through that.  Do you happen to have that in front of you, Dr. Colburn?

A   I see it.  I didn't print it out.

Q   Does this appear -- and I know it's several -- 16 pages.  I'm just going through quickly.  Does this appear to be a true and accurate copy of your CV and it looks like a fee schedule and a summary of the cases you've testified in?

A   Yeah.

Q   Now, I'm going to leave this screen up because I have some additional questions about this.

A   When you say my CV, wait a minute.

Q   If I've misconstrued that I apologize.

A   Yeah, so that looks like it's from the top of -- from the bottom of my statement, but my CV begins there.

Q   I apologize.  I didn't mean to misconstrue that.  Thank you for pointing that out.

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                    18

So, Dr. Colburn, as I scroll down here on Exhibit 1 you see where it says expert witness forensic economics reports there?

A   Uh-huh.

Q   There are several cases, one, two, three, four, five, six -- many of them actually.  My question on these, I think all told in this document there are about 36 cases --

A   Wow.

Q   -- that you've either had your deposition taken or a trial appearance.  But it wasn't clear to us whether or not you were retained by the plaintiff or the defendant in these.  And so I'm not going to ask you to go through each one, but do you have a general estimate of whether -- of how often in these cases you were retained by plaintiff versus a defendant?

A   Right.  And let me say these are reports that I've written but I was not always deposed.

Q   Okay.  I think there's a separate section in this document.  I'll scroll that in a second. But thank you for pointing that out.

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                    19

For the reports --

A   Those look like what I've sent to Stephen, yes.

Q   So let's start there.  So for this portion, expert witness forensic economics reports, there looks like a few -- looks to be to be a few dozen of these cases.  In these cases here that are on the screen, do you have a general estimate of what percentage of these were plaintiff retaining you, what percentage were the defendants retaining you for those reports?

A   Primarily the plaintiffs.  I've done a few defendants.  I would say 90 percent of them probably are plaintiffs.

Q   Okay.  What types of cases are these, Dr. Colburn?  Are these personal injury cases predominantly?

A   Primarily, yes, personal injury cases. I've done some employment discrimination cases. I've done some estimating wage changes in the military.  That one was kind of interesting.  But primarily -- I'm trying to think.  Yes, personal

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                    20

injury, a few employment discrimination, yeah. That's who usually reaches out, yes.

Q   Understood.  I'm going to scroll down a bit further in this document, this Exhibit 1, and I believe there's another section -- here it is. List of expert witness cases for Christopher B. Colburn, Ph.D, August 2022.  Do you see that on the screen, Dr. Colburn?

A   Yeah, yeah.

Q   And similarly it looks like another list of probably a couple dozen --

A   It might be some repeats.  I mean I don't -- yeah.

Q   Yeah.  I think I noticed that, too.

A   Maybe I need to -- it needs to be cleaned up some.

Q   So, Doctor, similar question on this group.  Do you have an estimation of the breakdown of these cases that are listed pages 13, 14, and 15, what percentage of those were you being retained by a plaintiff versus you being retained by a defendant?

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                    21

MR. TEAGUE:  Objection, relevance, but you can answer.

Q  Go ahead and answer.

A  I'd say about the same.

Q  About 90 percent?

A  Probably 90 percent is my guess, yeah.

Q  Okay.  Dr. Colburn, do you have any other active cases with Attorney Stephen Teague aside from this one?

A  No.

Q  Have you ever had any cases referred to you by Attorney Stephen Teague where you served as a consultant or expert even if it was a case that Stephen Teague wasn't necessarily involved in?

MR. TEAGUE:  Objection to relevance.  You can answer.

Q  Go ahead.

A  No, not that I'm aware of.  You know, a lot of this is done by referral networks I believe, so I would not know sometimes.

Q  Okay.  Dr. Colburn, going back up -- I'm going to share my screen again, sorry about that.

The first group of cases -- let me scroll to it here -- under expert witnesses forensic economics reports, do you know if any of these cases, and feel free to look through them, do you know if any of these cases involve projections for income of incarcerated persons or formerly incarcerated persons?  And if you'd like me to scroll through it I'm happy to do that it.

A  No.  No, I don't have to -- the reason I'm pausing I'm wondering -- I'm just thinking.  Well, I guess the basic answer is no, I don't believe that.  I think a couple of cases in the past involved some people that had been in prison but had come back into the workforce.  But, no, I would say not many -- if any, not many.  I'll put it that way.  I do not believe -- none of them come to the top of my head as being someone that has been incarcerated.

Q  Understood.  A similar question for this second list of cases, list of expert witness cases for Dr. Christopher B. Colburn, Ph.D.  Were any of these involving projections of income for

incarcerated persons?

A   No.   No.   I'll just say no.

Q   Dr. Colburn, have you ever been found as not qualified as an expert witness in any case?

A   No, not that I'm aware of, no.

Q   Dr. Colburn, have you yourself ever been the subject of an investigation in any employment setting?

MR. TEAGUE:   Objection.

THE WITNESS:   No.

Q   I think he answered right.   I think I heard no.

Dr. Colburn, have you ever been subject to any professional discipline as a result of any certification license that you've ever had?

MR. TEAGUE:   Objection to relevance.   You can answer.

THE WITNESS:   No.

Q   And, Dr. Colburn, I hope you're not offended by these next couple of questions.   These are asked to everybody.   Have you ever been convicted of a felony?

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                    24

A   No.

Q   Have you ever been convicted of a crime involving moral turpitude, meaning lying, cheating, or stealing?

A   No.

Q   Have you ever had any license suspended or revoked in Virginia?

A   No.

Q   Any other state?

A   No.

Q   Dr. Colburn, I know we're electronic so it's a little bit hard to see, but have you brought any records with you today for the deposition?  I think you said you had your report, but anything else?

A   No.  That's just it.

Q   Did you have a chance to review your expert report before the deposition today?

A   Yeah.  I looked over it, yes.

Q   Did you look at any other documents to prepare for today?

A   I did look at one thing, something I

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                              25

thought of after the report.  I was just kind of thinking through things.

Q  Do you recall what it was that you looked at?

A  Yeah.  I was curious -- I started thinking about whether or not Social Security payments should be included as -- potential Social Security payments could be included as part of an economic loss because sometimes you do that.  And I --

Q  Do you recall what you looked at?  Did you just kind of do a Google search?

A  I just looked at the Social Security laws. So someone who's been incarcerated can receive Social Security benefits if they meet the eligibility requirements of you need about ten years of work.  And I did not include that in my analysis.

Q  Dr. Colburn, did you meet with anybody to prepare for the deposition today?

A  No.

Q  Turning our attention more towards your report, generally speaking when you prepared your

report did you interview anybody to help you prepare that?

A   No.

Q   Did you talk to anybody other than Attorney Stephen Teague?

A   No.

Q   I want to show you a document that's been premarked as Exhibit 2, and if we can go ahead and have this formally marked.  And if I hadn't formally asked for Exhibit 1 to be marked I would do so at this time.  But Exhibit 2, I'll go ahead and share my screen.

(Colburn Exhibits 1 and 2 were marked for identification and retained by the court reporter.)

Q   I show you a document entitled Virginia Department of Corrections mental health services screening form.

A   Uh-huh.

Q   Dr. Colburn, did you discuss with anyone Mr. Hernandez' pre-incarceration work history?

A   No, no.  I looked through the report and

found that.  So that's how I came up with sheet metal.  But, no, I didn't talk about this -- I did not discuss with anybody, no.

Q  This document, this Exhibit 2 here, do you have this in front of you other than my share screen or is it just the share screen?

A  Just the shared screen.

Q  Okay.  Do you recognize this, Dr. Colburn, as something you reviewed prior to preparing your report?

A  Yes.

Q  You did review this?

A  Yeah.  Yes.

Q  So about a third of the way down kind of where my pointer is there is a line that reads, vocational history, paren, includes military, close paren:  Sheet metal, restaurant, and retail work, no military.  Do you see that there?

A  Yes, sir.

Q  Did you ask anybody what the phrase sheet metal meant?

A  No.  No, I did not.

Q   Do you have any idea how long Mr. Hernandez worked in the sheet metal industry?

A   No.

Q   Is it fair to say that we don't know how long he worked in the sheet metal industry?

MR. TEAGUE:  Objection to form.

MR. HERBERT:  What's the objection?

MR. TEAGUE:  I think your question was is it fair to say that we don't know.  I'm not sure who you're referring to.

MR. HERBERT:  Okay.  I'll try to rephrase it.

Q   So, Dr. Colburn, is it fair to say that you're not aware how long Mr. Hernandez worked in the sheet metal industry?

A   No, I do not know.

Q   Is it possible that he worked in the sheet metal industry for one day?

MR. TEAGUE:  Objection.  Calls for speculation.

Q   Go ahead.

MR. TEAGUE:  You can answer.

THE WITNESS:  Oh.  Is it possible?  Yeah. It could also be possible that he worked there for ten years, yeah.

Q  This form here, I am going to scroll down to the bottom of page 2 to the date.  Do you see that above my pointer there it reads date 1/30/02, do you see that?

A  Uh-huh.

Q  Do you know who completed this form, Dr. Colburn?

A  Do I know them personally?  I mean no. Mecklenburg Correctional Facility.  Yes, someone at Mecklenburg, yes.

Q  Okay.  And it's not necessarily a trick question.  It's merely does it appear that the name on the form is Karen K. Smiley?

A  Yes, it is.

Q  Do you see anywhere on here where Mr. Hernandez himself signed it?  I don't think I see that.  I guess the question is does it appear Karen K. Smiley signed this?

A  Yes.

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                           30

Q   And at the top of the form there where the pointer is do you see inmate name:  Damian Hernandez, do you see that?

A   Yes, sir, uh-huh.

Q   So going back to the vocational history line, Dr. Colburn, do you see it reads sheet metal, restaurant, and retail work?

A   Uh-huh.

Q   I think in your report you focused on the sheet metal industry and my question is what methodology did you use to determine that sheet metal work was an appropriate base upon which to gauge Mr. Hernandez' potential lost income?

A   Well, I was looking for something to identify what his skills might be.  And this report suggests that he had done work in the sheet metal industry.  So I did use this report and it's primarily what I based it upon, yes.

Q   Did you consider your -- doing an analysis based on him being employed in the restaurant industry?

A   No.  I just picked one.  I mean I didn't

choose one because I thought one was higher or lower.  I mean I saw that it was the first one and, you know, don't have much to go on so it just seemed like whoever this person here identified he had in my mind skills to be able to do sheet metal work.

Q  And similar question.  You may have already answered it.  Just so the record is clear, did you do an analysis based on the scenario of him doing retail work?

A  No.

Q  I think you said you choose sheet metal because it was the first one on the list.  Were there any other factors that went into you choosing sheet metal to use in your report for your calculations?

A  No, no.  It's just this person presumed or said that he had participated in this industry.  I mean so I chose it based upon this that I had at least some information of the type of job he did before.

Q  Do you have any other records or

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                    32

information that you reviewed prior to preparing the report that indicated that he had worked in the sheet metal industry?

A   No.  Just this.

Q   Just this.

I know you said you didn't run an analysis on him working in the restaurant industry but if you did do you have a general idea of whether or not your projections would have been higher or lower compared to the sheet metal projection?

A   Wow, that can be -- I would suspect the restaurant could be lower because so much of that as based upon tips based upon what he's doing.  So probably a little lower maybe.  I mean, you know, I guess I could have done that and maybe I should have done that from what you're asking, but the average restaurant is kind of difficult because the pay scales are so -- you know, they're set differently.

Q   Similar question on retail work.  Had you run an analysis and calculation of him being in the retail industry, do you have a sense of

whether or not the projection and calculation you did would have been higher or lower than the one for the sheet metal industry?

MR. TEAGUE:  I'm going to object to speculation.

Q  You can go ahead and answer.

A  Again, retail work could be higher or lower.  A lot of that is also based upon how hard you work.  So it could be higher or lower, for both the restaurant and the retail work could be higher or lower.  I don't know of any reason to think either one of them would be higher or lower than sheet metal.

Q  Dr. Colburn, did you explore or research what the hire rate for incarcerated persons is in the sheet metal industry?

A  For the higher rate?

Q  Yeah.  H-I-R-E, hire rate --

A  Oh.

Q  -- for formerly incarcerated persons in the sheet metal industry.

A  No.  No, I did not research that

information.

Q   Similar question.  Did you explore or research what the hire rate for incarcerated persons is in the trades generally?

A   In the trades.  What do you mean by the trades?  I mean I had in my report, I had the study that I cited of only 40 percent of formerly incarcerated people are working so I included that.  I mean but did I look at employment data in either of these and say what share of them are incarcerated?  No, I did not look at the data, if that's what you're asking.

Q   That is.

A   Okay.

Q   Dr. Colburn, do you know what Mr. Hernandez was incarcerated for?

A   No, not really.  I didn't -- don't really need to know that to do a loss projection.  So no.  I don't recall it anyway.  I may have briefly read the lawsuit or something but I do not know what he was incarcerated for, no.

Q   Okay.  And I can't tell if I'm still

sharing my screen or not.  I apologize.

A  You are.

Q  I am?  Okay.  Could I draw your attention to it looks like the second line there, instant offence:  Murder, attempted robbery --

A  There it is.

Q  -- firearms charge.

A  There it is.

Q  Does that refresh your recollection or are you sort of learning that for the first time what his offenses were that led to his incarceration?

A  I think I'm learning it for the first time.  I mean I might have seen it as I go through, but I didn't recall that being anything I can -- I can certainly say didn't influence me one way or the other.

Q  Just to make sure I'm clear, you didn't research what the hire rate was for persons who were formerly incarcerated for murder?

A  No.  I researched the hire rate of people that had been incarcerated.

Q  Okay.

A   I mean I'll just say I presumed that if you've left the system, you've left the system.

Q   And so if I'm understanding you right you also didn't research what the hire rate was for persons formerly incarcerated that have been convicted of a violent crime?

A   No.

Q   And did you just not think that was relevant to the inquiry of what you were doing?

A   Well, no, I mean I guess my thought is if someone has served their time and they're released and they have the opportunity to work, you know, I mean I don't presume -- I mean you'd be -- this is going down a slope of looking at potential discrimination in the labor markets and things like that that why would somebody not be employed.

So, no, I mean I presumed once someone is out of the system that they're standing there with a skill that I said was a sheet metal worker based upon this form and would have the opportunity to perhaps earn a living at that.

Q  Dr. Colburn, did you explore or research whether those hire rates, the data for hire rates would be available, that is to say hire rates for folks convicted of murder or a violent crime?

A  No, I didn't.

Q  Dr. Colburn, did you contemplate the recidivism rate in determining whether or not Mr. Hernandez might be re-incarcerated after his release and thus unable to work?

A  Well, it's my understanding that part of the calculation of the only 40 percent actually working is including recidivism rates.  So I mean that would be another reason not to be working.

Q  So your understanding is that 40 percent rate includes folks who have essentially gone back into incarceration, is that what you're saying?

A  I believe so, yeah.  Yeah.

Q  So specifically for Mr. Hernandez' case, was it that calculation that you just mentioned, that 40 percent, is that how you factored in potential recidivism in his case?

A  The question I was trying to answer was --

well, let me answer your question yes or no.  Is that how I addressed recidivism?  I guess indirectly, yes.  I mean because part of the reasons for him -- for people not to be employed is recidivism.  So I did not say -- but I did not say this fits him in particular, I just presumed it was, you know, the same on average.  Am I understanding your question?  Maybe I'm not understanding.

Q  I think you are.  Thank you for explaining that.

Dr. Colburn, did you research what the recidivism rates were for folks who are formerly incarcerated based on the nature of the crimes they were convicted of?  For example, murder or violent crime versus drug offenses, for example.

A  No.  No.  No.  I did not differentiate between the nature of any offenses.  I mean I am aware that there are differences, but the recidivism -- if I might explain.

Q  Please.

A  The recidivism rate is, you know, the rate

of going back into the system.  My concern is was he going to be employed.  So that's why I used from that report 60 percent would not find employment.  But there could be a host of reasons for not being employed to occur.

Q  I'll show you another document that was premarked as Exhibit 3, and I think we can go ahead and formally have this marked as Exhibit 3.

(Colburn Deposition Exhibit 3 was marked for identification and retained by the court reporter.)

Q  Dr. Colburn, this is a one-page internal incident report from the Virginia Department of Corrections.  Have you ever seen this document before or did you review this in preparation of your report?

A  Can I look at my report?  Did I refer to it directly?  I mean I can look at my report?

Q  Yes, you can look at your report.

A  So what is that again?  That is the --

Q  So this is an internal incident report dated July 16th of 2016.  You see it there where

my marker is.  And as a summary of what this document is you see where my pointer is.  It reads, offenders involved, Hernandez, Damian, Sears, David G.  And then the description of the incident several sentences down it reads, quote, that they both was engaged in a fight and will both be charged according to the DOP 861.

So it appears to me this is an incident report relating these to two offenders, one of which being Mr. Hernandez.  My question is, and it sounds like you haven't seen this report, did you look at this report for purposes of preparing your report?  Did you look at this incident report for purposes of coming up with your opinions?

A  Well, I don't believe so in the following sense that I was sent, you know, a whole list of things from the criminal file, or something like that, criminal record file of Damian Hernandez, and that was a packet of material and this could have been in it.  So I don't want to say I've never seen it.  I would be scrolling through because I was looking for particular things like

his possible employment history -- you know, employment.  I didn't glean anything from that. So I may have seen it, but I did not use it in any way, if that makes sense.

Q  Dr. Colburn, did you consider Mr. Hernandez' disciplinary history while he was incarcerated and you were preparing your report and calculations?

A  No.  No.

Q  So, for example, if an offenders release date got pushed back to a disciplinary issue would you agree that would affect the calculation?

MR. TEAGUE:  Objection.  Speculation and it goes beyond the scope of his report.  So I would advise you not to answer, Dr. Colburn.

MR. HERBERT:  You're going to instruct him not to answer, counsel?

MR. TEAGUE:  Yes.

MR. HERBERT:  His report -- let me get it in front of me.  And maybe I'm just not phrasing the question very well.  But, counsel, it looks like his conclusions, he's running this

calculation and he's also using -- I think he used a release date of 2040.  Yes.  On page 2 of the report Mr. Hernandez was expected to be released from incarceration in 2040.  So all I'm trying to ask him is if there's a disciplinary issue that results in his release date being pushed back let's say to 2041, would that impact the calculation that he had on page 3.  That's all I'm asking, if that would have an impact on his calculation.

MR. TEAGUE:  Well, my objection still stands because, one, he's already said that he doesn't recall whether he's seen this exhibit and so -- and he's already testified to the fact that he had not opined on whether a disciplinary history would have -- you know, how that would have affected his analysis.

So I would -- so he cannot be -- or answer questions about things he has not researched or considered in his report.  So I would instruct him not to answer.

In addition to that, I don't believe that

this would have been in any kind of -- in the criminal history file that I've received.

MS. REYNOLDS:  This is Nancy Reynolds on behalf of Meriam Kamara, defendant.  And, if I may, the paragraph 9 indicating Mr. Hernandez was expected to be released from incarceration in 2040 comes directly from the criminal record documents that he reviewed indicating that he would get an early release if he had essentially time off for good behavior.  The basis for the 2040 date has to do with him having time off for good behavior.  So that is fundamental to Dr. Colburn's opinions.  He had to have relied on that to come to the 2040 date.  And it is in those records that he cites, the criminal record file of Damian Hernandez.

So if we can --

MR. TEAGUE:  Go ahead, Nancy.

MS. REYNOLDS:  So if we can back up and start all over again and find out from Mr. Colburn where he came up with the 2040 date.

MR. HERBERT:  That's fine with me.

Q  Dr. Colburn, your report, let's go ahead

and have this marked.  This is the next one in the hopper here.  It should be on the share screen now.  This was premarked as Exhibit 4.  If we could have this marked as Exhibit 4 at this time.

(Colburn Exhibit 4 was marked for identification and retained by the court reporter.)

Q  I will scroll down -- Dr. Colburn, do you recognize this as the report that you prepared in this case?

A  Yes.

Q  I'm happy to scroll through it all the way.  And looking at page 2, it's number 9 here, quote, Mr. Hernandez was expect to be released from incarceration in 2043, end quote.  Where did you get that information to rely on?

A  Where did I get that?  Let me think.  When was he incarcerated, what was the year?

Q  I was going to ask you that a bit later on.  Unfortunately I can't answer any questions. It's got to be you.

A  Oh, I think he was on a 45-year sentence,

right, serving -- had been in prison, was expected to be released from incarceration in 2040.  I got it from somewhere.  Where did I get that from?

It's just not coming to me right now.  I'm sorry.

Q  So, Dr. Colburn, do you know if that date, that 2040 date, was based upon Mr. Hernandez getting credit, good time credit, for good behavior or not?

A  I'm not sure right now so I can't say.

Q  Dr. Colburn, are you aware if there are good behavior violations then the discharge date can be extended?  You're not aware of that?

A  No.  I did not know that was something -- it makes sense, of course, but I did not know that to be.

Q  Dr. Colburn, if that 2040 date right there changes that release date, would that change the calculations under your conclusion section of your report?

A  Oh, yes.  Yes.  Yes.  It would reduce them by -- when you say changes, are you saying up or

down?

Q   Thank you for asking me to clarify it.  If it changed in that it was extended to, let's say, something beyond 2040.

A   Yeah.  So it would --

MR. TEAGUE:  Objection.  Calls for speculation, but you can answer.

THE WITNESS:  Well, yeah, that would have been reducing by -- I mean if it was one year it would reduce it by whatever his earnings would be that year, yes, it would.

Q   Dr. Colburn, what materials did you rely upon to prepare your report?

A   What materials?  Well, I made a reference to them.

Q   And I can pull that up as Exhibit 1.  It does look like documents referenced there.  So --

A   And just my experience doing a few of these -- doing these things, yeah.  I see a typo in there, of course, on number 5.  It should be metal workers' salary instead of netal.

Q   So, Dr. Colburn, 1 through 6 here on

page 1 of Exhibit 1, did you in fact review these and rely upon these in preparing the report?

A  Yes.

Q  Did you rely upon these in formulating your opinions?

A  Yes.

Q  You mentioned you also relied upon your experience, I think, in creating, formulating your opinions and preparing your report; is that right?

A  Yes.

Q  Did you rely upon any other materials other than these six documents here in formulating your opinions?

A  Don't believe so.  That's why I referenced them.  I mean I've been doing this a long time and no fair amount of public finance and so -- but I put down the ones I think were most relevant to show how this process works.  So I guess I'll say no.  I'll say no.

Q  Dr. Colburn, how much time did you spend reviewing these materials in formulating your opinions?

A   How much time did I spend?

Q   Yes.

A   Let's see.  You want to go down each one or --

Q   You can lump them all together, all six. You don't have to break it down.  Just generally how much time did you spend reviewing these to formulate your opinions?

A   A few hours.  A couple hours.

Q   Dr. Colburn, have you asked for copies of any other materials that you think would be useful to your analysis?

A   Ask Stephen, is that what you mean?

Q   Or anyone.

A   No, no.

Q   Dr. Colburn, how many hours have you devoted to this case in total?

A   Oh, I think ten, 12, something like that.

Q   And do you know how much you've billed for your services total in this case so far?

A   I don't know.  Stephen can pull up my statement.  $2500, something like that.

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                          49

Q   What's your hourly rate for the case?

A   250.   250 an hour.

Q   Going back to Exhibit 4, your report, and draw attention to Section I, the second paragraph, you reference analyzing lost fringe benefits, lost retirement benefits, lost Social Security benefits in the amounts that you were calculating.  Did you actually include those figures in your calculations?

A   Well, I didn't see that he would have any. So that's kind of a general statement for all these things.  That's the type of things that you look at, and he would not have any lost fringe benefits or retirement benefits.  I mean at least I didn't provide any evidence that he had a job -- ever had a job to give him retirement benefits. The lost Social Security is what I was referring to earlier wondering if I could have rethought that.  But I still think that perhaps they should not be included.

Q   Okay.  And it's -- I'm just trying to figure out on page 3 the calculations that you

run, these numbers here under conclusions, do those numbers include any lost fringe benefits?

A    No.

Q    All right.   Do those numbers include any lost retirement benefits?

A    No.

Q    Do they include any lost Social Security benefits?

A    No.

Q    Dr. Colburn, did you take into account any schooling or training that Mr. Hernandez may need for reentry into the sheet metal industry?

A    I thought that he had a GED.   You know, it seemed to be a relatively low income job.   And so I didn't -- I just used that salary number I found.   So I did not think that he would necessarily have any retraining.

Q    Dr. Colburn, do you know when Mr. Hernandez was incarcerated, the initial date?

A    Was it 2002?

Q    2002, is that what you based your calculations on?

A  Yeah.

Q  So 2002 that's, what, 22 years ago.

A  So that -- wait a minute.  That was -- wait a minute.  That was the date -- the document for the -- that were referred to, that was -- was that 2002, 1/2002, the one you showed earlier?

Q  Yeah.  I'll pull that up.  This is Exhibit 2.  And it looks like that document was dated at the bottom there January 30th, 2002.

A  Oh, yes.  I see 30th.  And so can I -- can you scroll up?

Q  Sure.

A  Screening form.  Date of birth, sentence 45 years.  So I think 2002.

Q  Okay.  So going to Exhibit 4 here, for the record, this is your report.  On page 2, that first paragraph it reads in part, quote, Mr. Hernandez was incarcerated since 2007.  Do you see that?

A  Yeah.  It should be a typo.  It should be 2002.

Q  It's a typo.  Okay.

So for purposes of your -- go ahead.  I didn't mean to interrupt you.

A  I'm sorry.  I think that's right.  I mean I guess I'd have to look at that more.

Q  So, Dr. Colburn, for purposes of your report in formulating your opinions did you do any research on how the sheet metal industry may have changed from 2007 to the present day?

A  No, no, no.  I did not.

Q  Did you do any research on whether any licenses were required for the sheet metal industry?

A  No.

Q  Did you do any research on whether any training was necessary to enter that industry?

A  No.

Q  In your report, Dr. Colburn, you determine that funds would be adjusted to account for interest that could have been earned.  Could you explain your methodology for that, please?

A  Where are you referring to?

Q  I think it's Section I, paragraph 2,

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                53

quote, the lump-sum payment for the economic loss should also be adjusted to account for interest that could be earned if funds are invested in an essentially risk-free asset.  Do you see that there?

A  Yes.  So that's the discounting factor.

Q  Could you explain that for us?

A  Well, so a dollar today is worth more than a dollar in the future, and so we recognize that if you're going to get a payout let's say in 20 years of a dollar, you don't have to invest a dollar now.  So when you discount the future you're incorporating that.  So you're saying that if I owe you a dollar in 20 years and if I can get five percent on my interest rate, I probably have to set aside, I don't know, eighty cents, some number that would in 20 years have a dollar.

And so it would discount that back. That's why you discount it -- that's why you put in the calculations of the present value you use an interest rate.

Q  What was the interest rate that you used

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                54

in that calculation?

A  I believe I used the TIPS option rate 0.125 percent.  So that's .00125.

Q  Dr. Colburn, did you do any research or have any records about Mr. Hernandez' savings habits?

A  No.  No, I don't know why I would need that.  But, no, no.

Q  Dr. Colburn, you cited a 2010 Bureau of Job Statistics report.  It was hyperlinked in the prison policy article that you cited in your report.  There's the -- right there where my pointer is that prison policy article that you cited.  So I want to pull up and go ahead and have this marked as Exhibit 5.  This was premarked as Exhibit 5.  It is entitled employment of persons released from federal prison in 2010.

(Colburn Exhibit 5 was marked for identification and retained by the court reporter.)

Q  Dr. Colburn, it looks like it's 34 pages. I'm happy to scroll through this, but it was

hyperlinked in the article that you made a reference to in your report.  Did you review this report in formulating your opinions and preparing your report?

A  So this was the -- so this was hyperlinked in my report or hyperlinked in the reference I gave?

Q  It was hyperlinked -- and we can go ahead and mark this as Exhibit 6.  This was premarked as Exhibit 6.

(Colburn Exhibit 6 was marked for identification and retained by the court reporter.)

Q  This was the article that you cited in your report, prison policy initiative, new data on formerly incarcerated people's employment.

A  Uh-huh.

Q  New data on formerly incarcerated people's employment reveal labor data market injustices. This right there where my pointer is, that report --

A  Yeah.

Q  -- it brings up this report here.  So Exhibit 5 that's on the screen, did you have a chance to review that for purposes of formulating your opinions and preparing your report?

A  No, I don't think so.  I think I just looked at the report, the original report.  I see what you're asking.

Q  In your report, Dr. Colburn, did you indicate that only 40 percent of inmates find employment after incarceration?

A  Yeah.  I think wasn't that in that report?

Q  I'll pull it up.  So that 40 percent figure, Dr. Colburn, doesn't that mean it's more likely than not that the person is not going to be employed once they're released from incarceration?

A  Well, statistically yes, but that doesn't mean there's not a probability that they wouldn't earn some money.  So I mean anything over 50 percent would say there's a probability that they would not find employment.

Q  And, Dr. Colburn, that statistic you cited that 40 percent of inmates find employment after

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                              57

incarceration, that does not mean that folks who are released from incarceration are paid 40 percent less than the general population; is that right?

A  It does mean that they would have an expectation of getting 40 percent of what the earnings would be without incarceration.  What the earnings would be if they had the job full time.

Q  So could you walk us through the reason you used --

A  Sure.

Q  Let's take a step back.  So what's on the screen now, your report Exhibit 4, Section V, conclusions, can you walk us through the calculations that you did?

A  Sure.  Thank you.

Yeah.  Can I look at my report?

Q  Yes.  Absolutely.

A  So I used the salary of a sheet metal worker of $36,000 a year and I used what he was making inside the prison.  I think that turned out to be $1700, or something like that, a year.  He

got the $34 a week or something.  And I projected if he were to work until he was eligible for Social Security, which is kind of an arbitrary age, but at 67 then if you add up the earnings that he would have had had he had a job and worked until 67, that would be $109,000, which comes -- that's from employment outside of prison and the $31,000 lost while in prison.  So that's how I got the 140-.

So then I did the same type of calculation had he worked until 70, total loss of 218,528.  Of course, he had the same loss while in prison, $31,061, and then a larger loss employed.

And then recognizing that only 40 percent of the people incarcerated actually find post-employment, I looked at what he would be expected to get, and so the expectation is the wage times the likelihood of being employed.  And the likelihood of being employed would be 40 percent.  That's how I got the 74,000.

Q  Okay.  So you reduced it by 60 percent; is that right?

A   Yeah.   It doesn't look like it's exactly 60 percent because the amount of the -- the amount that he'd be in while incarcerated would be the same.   It's his post-employment number.   So it's not simply multiplying the number by 60 percent.

Q   Turning your attention to Exhibit 6, which was premarked.   This is the prison policy initiative article that you referenced in your report.   I want to scroll down to page 3.   Bear with me one second.

I'll read a portion of this.   So do you see where my pointer is, Dr. Colburn?

A   Uh-huh.

Q   Quoting from it, quote, for those who did find employment after release their earnings were lower than the general population:   The first few months of formerly incarcerated people were earning just 53 percent of the median U.S. workers wage.

A   Uh-huh.

Q   And after four years of seeking and obtaining a regular employment the studied

population was making less than $0.84 per every dollar of the U.S. median wage.

Dr. Colburn, did you factor that statistic there in your calculations in your report?

A  No, not directly.  No.

Q  Dr. Colburn, did you take into account Mr. Hernandez' race when you made these calculations?

A  No.  No.  I just looked at the statistics. I mean once -- no, again, I just found this statistic and used that.  I mean maybe I could have, but I did not, no.

Q  Okay.  Are you aware of what Mr. Hernandez' race was?

A  Not really, no.  No.

Q  Let me go back to Exhibit 2.

A  So, there it says African-American.

Q  Does that refresh your recollection or are you learning that for the first time?

A  I'm seeing that -- again, perhaps, but I didn't put that into my computations.

Q  Okay.  Back to Exhibit 6, I just want to read a portion from that.  This is on page 4 right

there where my pointer is.  Quote, earnings were lowest for black and Native American people released from federal prison.  In fact, racial and ethnic disparity in earnings seemed to grow over time.

So you didn't factor in Mr. Hernandez' race in the calculation?

A  No.  But let me just say you have to be a little bit careful when you start doing those types of things because you would need to have the race of the sheet metal workers match that racial profile, match any other data.  So it could be that there is more African-Americans in sheet metal working so then that would in part explain why that salary is what it is.

So I'm just trying to say that you have to -- you can go in and fine tune things a little bit but when you do that you have to be very careful that you're comparing the same populations, if that makes sense.

Q  Let me turn your attention to Exhibit 5 again, which was already marked.  I've got it on

the screen there.  This particular report, Dr.
Colburn, it separated out male and female subjects
and the data for those are different.  Did you
account for Mr. Hernandez' gender in your
calculations?

A  No.  Not specifically, no.  I mean I
freely admit I used the 40 percent because it
seemed like a broad number without getting more
specific.  Yeah.  So, no, I didn't -- so I guess I
should say -- I'm sorry, I'm babbling.  No, did I
not.

Q  So I'm scrolling down to page -- sorry, I
didn't mean to speak over you, Doctor.  Please
finish your thoughts.

A  That's okay.

Q  So I'm scrolling down to page 11 again,
Exhibit 5.  Look where my pointer is.  There is a
breakdown between male and female here.  There's
also a breakdown on ages.  Do you see that there?

A  Oh, yeah.  Yeah.

Q  Did you factor in Mr. Hernandez' age upon
his release from incarceration in your

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                                    63

calculations?

A  No.

Q  Would it surprise you that --

A  I could do that, yeah.

Q  Would it surprise you that inmates who are released, older inmates who are released have worse employment outcomes than younger inmates who are released?

A  Well, no, no.

Q  And do you see where the report also broke down the most serious offense and kind of gave data on the outcomes for those released persons, do you see that there?

A  Yes.

Q  Did you account for the nature of Mr. Hernandez' offenses in the calculations that you did?

A  No.  No.  As I said earlier, no, I did not.

Q  Would it surprise you if violent offenders were more unemployable than non-violent employers?

A  No, it would not.

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025

64

Q   Dr. Colburn, the data in this report, Exhibit 5, why did you not use these statistics in your report and calculations?

A   Well, because -- let me think a second.

My view of this is to look at the flow of funds that the individual could receive if they work and kind of a general what's the likelihood.

Now, certainly I could do that.  I think once you get into certain parts of these type of calculations then it gets kind of more and more specific to the person, where I'm trying to make a general statement here.  Certainly we are worried about the specific loss here, but what I'm trying to say is this set of external factors get more and more complicated, they get more and more off the mark.

Like, for example, let me just say people are working longer, you know.  Someone who would not have qualified as much for Social Security would likely work longer than past 67.  You can put that into the analysis and that changes the computations.

So there's is a whole host of factors that you can include, but my intent here was to make a general statement.  But I should say that doing that type of calculation what it would do would be to -- it certainly would change the numbers, probably reduce the numbers.

Q  Okay.  Dr. Colburn --

A  But, see, there's other things -- I guess let me just say that once you start going down a road of conjectures, that's when I kind of, you know, back away a little bit and say, you know, yeah, you have to match -- to do these things you have to match the distribution for the workers. So your statement about, well, older people work less, well, do older people in the sheet metal business work less?  So it's just the numbers, I guess you just have to be very careful.  So I kind of try to paint with a big brush to give a ballpark estimate is what I'm trying to do here.

Q  Dr. Colburn, in your report, and I'm going to share the screen again just so we've got in it in front of us here, on page 3, paragraph number

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                    66

2, you quote, I find that the average income of a sheet metal worker in Norfolk, VA, is $17.32 per hour in 2025.  This would suggest a yearly income of 36,067.20 per year post-incarceration.

How did you get that figure for the hourly wage for the sheet metal worker in Norfolk, Virginia?

A   That came from -- it was a typo, documents reference number 5.

Q   At the top?

A   Yeah.  Documents referenced, that came from there.

Q   Just for the record, I'm in Exhibit 1, number 5.  Is it -- is this what you're referring to?

A   Yeah, yeah.

Q   From indeed.com?

A   Yeah.

Q   And just going back to Exhibit 5, it looked like there was data in there, Table 6, median quarterly earnings of persons in the studied population who were employed during the

quarter of release or the 16 quarters after release from federal prison 2010.

Dr. Colburn, why did you make the decision to use that data on indeed.com compared to data that may have been in this report, Exhibit 5?

A   Well, had I used this data I wouldn't -- well, I was looking at what someone who was employed in the sheet metal industry would get. So that's what I was first using.  And then adjusting for this probability of not being able to work because of being in prison.

These numbers are post the event of being imprisoned.  So I guess -- so my answer is what I was trying to do is say, all right, here's what someone would get, you know, with, say, this skill and then here's the likelihood that they don't -- now incorporate the likelihood that they don't work.  But it sounds like what this would do is give me a post likelihood of employment number.

So, no, I did not do it that way.  So why didn't I do it that way?  Because my intent was to show what someone would be expected to get and

then incorporate just this 60 percent number we've been talking about.

Q   I show you one last document.  This was premarked Exhibit 7.

MR. HERBERT:  If we could please have this marked as Exhibit 7 at this time.

(Colburn Deposition Exhibit 7 was marked for identification and retained by the court reporter.)

Q   This is a Virginia Department of Corrections document entitled discharge inmate work history for Mr. Hernandez.  Dr. Colburn, I'll zoom out.  This is just one page.  Have you ever seen this document before?

A   Yeah, I did see this, yes.

Q   Would you agree Mr. Hernandez was not employed the entire time he was incarcerated, meaning there were gaps in his employment while he was incarcerated?

A   Yes, I guess it shows that, yes.

Q   And did you factor those gaps in employment while he was incarcerated in your

calculations that you did in your report?

A   No, no.  I just looked at what he had done most recent.  So, no, I did not.

Q   The calculations in your report, the component of the calculation that you did under conclusions includes a portion for alleged loss while he was incarcerated, right?

A   Yes, sir.

Q   And so when you calculated the incarcerated portion of that number it assumed employment the entire time of him being incarcerated; is that right?

A   For the rest of the time he's incarcerated.

Q   Right.  That is my question.  Did you assume he would be employed the rest of the time he was incarcerated?

A   Yeah.  At the same rate, yeah.  Yes.

Q   So just to confirm, gaps that are in Exhibit 7 showing gaps in employment were not factored into that calculation?

A   No.

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                    70

Q  And, Dr. Colburn, did your calculation also assume that Mr. Hernandez would be immediately employed after his release?

A  Yeah, I think I did, yes.

Q  And what data supports that assumption?

A  I guess just conjecture on my part so I'll just say -- I mean I didn't have -- I didn't look at -- I did not look at time between incarceration and first employment.

Q  Dr. Colburn, this Exhibit 7 that's on the screen, would you agree that this shows gaps in employment while Mr. Hernandez was incarcerated?

A  Yeah.  Yes.

Q  Going back to your report, Exhibit 4, you indicated there under Roman Numeral IV, paragraph 1, Mr. Hernandez earned $34.33 on average per week while incarcerated for the year 2020.

Where did you get that data?

A  I think that was from the -- is that the resident account summary?

Q  Is that your answer, Doctor?  I'm sorry.

A   Yeah, yeah.

Q   Do you have that with you or is that something that was provided to you?

A   That was provided.

Q   And that paragraph there mentions that was the average per week during the year of 2020.  Did you consider any other years or did you have any data for any other years?

A   No.  That was the most recent data.

Q   Did you not have data for any prior years before 2020?

A   I did, but I don't know why that's relevant, yeah.  I mean it might have been there.

Q   Do you know if the prior years were lower or higher than 34.33 per week on average?

A   No.  I just looked at the most recent. Again, I'm projecting forward, so the most recent would be the -- what I think would be the most relevant as an estimate of what he could do.

Q   Just a few more questions for you, Dr. Colburn.  Are all of your conclusions based on the assumptions that Mr. Hernandez would be able to

attain gainful employment after he finished his incarceration?

A  Yes and no.  I mean the part he earned while inside prison would not have been part of that.  But, yes, the part after prison, yes, I'm presuming he could gain employment at a probability that we discussed about earlier when somebody does adjustments.  But yes, yes.

Q  Are there any other -- I'm sorry, I didn't mean to cut you off.  Go ahead.

A  No.  I'm sorry, you did not.

Q  Are there any other assumptions you've made in coming to your conclusions?

A  No, not that I'm aware of.

Q  Do your models and calculations take into accounts fluctuating economic conditions?

A  That's what the interest rate is designed to do.  And that's why I used a real interest rate to, like, look at the real, long-term impact.  But in terms of -- I mean, so, yes, at the point of the event, which is why I used the real interest rate, that rate should include all the information

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                    73

of what people expect.

But do I -- and that's why using the real interest rate is desirable because you do not need to go ahead and make assumptions about what is the rate of inflation going to be, what is the employability of sheet metal workers in the future going to be.  A lot of it you can forecast out and start embedding more and more assumptions on top of it.  So I would say, yes, it includes current economic conditions because that's what you're supposed to do.

Q  Dr. Colburn, are there any other opinions you intend to give at trial in this matter that we haven't discussed today?

A  No.  The only thing I'm wondering about is the Social Security thing.  But, no, I can't think of anything.

Q  Dr. Colburn, have you understood all my questions today?

A  I believe so, yes.

MR. HERBERT:  Counsel, that's all I have for Dr. Colburn at this moment.  So I am happy to

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                    74

pass the baton to whoever wants to go next.

Thank you, Dr. Colburn.

THE WITNESS:  Thank you.

MS. REYNOLDS:  Anna, you go next.

MS. COTTO:  Absolutely.

BY MS. COTTO:

Q  Hello, Dr. Colburn.  My name's Anna Cotto.
I'm here on behalf of the defendant DeLisa Jordan.
I just have a few follow-up questions.
First I kind of wanted to go back to the point of
your report where you stated that Mr. Hernandez
earned on average 34.33 per week while
incarcerated looking at the year of 2020.  And I'd
like to confirm that -- I'm going to pull up a
document and share my screen for you.

Is this the document that you relied upon
to calculate that average?

A  Yes.  It looks familiar, yes.

Q  Okay.

MS. COTTO:  And I would like to -- this is
premarked as Exhibit 8.  I would like to mark this
as Exhibit 8 to the deposition.

(Colburn Exhibit 8 was marked for identification and retained by the court reporter.)

Q   And, if you could, do you see on this report multiple -- or this account summary where it says payroll transaction?

A   Uh-huh.  It's sort of -- I see it, yeah, I can.

Q   And I can -- this helps.

A   Oh, yes.  Thank you.

Q   You're welcome.  And going through the first payroll transaction that I see was on October 29th of 2020.  Would you agree with that?

A   Uh-huh.  3564.

Q   I'm sorry?

A   Yes.

Q   Okay.  And then going to the next payroll transaction would you agree that it occurred on September 29th of 2020?

A   Yes.

Q   Thank you.  And then going a little bit more down the next payroll transaction would have

occurred August 31st of 2020?  If you can see where my cursor --

A  Oh, 35 -- yes, I see it.  Yes.

Q  Okay.  And I'm sorry, maybe I should back up a little bit.  Going up to this October 29th payroll transaction would you agree that it was in the amount of $35.64?

A  Uh-huh.

Q  And then going to that September 29th, 2020, payroll transaction, that amount was $35.64?

A  Uh-huh.

Q  And then looking at this August 31st of 2020, that transaction, payroll transaction, was $35.64?

A  Uh-huh.

MS. REYNOLDS:  Excuse me, but could you say yes instead of uh-huh?

THE WITNESS:  Oh, I'm sorry.  Yes.  Thank you.  Sorry about that.  Yes.

MS. COTTO:  Thank you, Nancy.

Q  And then so the last one we were discussing was this August 31st of 2020 payroll

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                    77

transaction.  Would you agree that the previous payroll transaction before that would have been on July 29th of 2020?

     A  Yes.

     Q  And that would have been in the amount of $35.64?

     A  Uh-huh.  Yes.

     Q  And then still scrolling down before that August or, I'm sorry, that July payroll transaction, the previous one before then would have been July -- I'm sorry, June 30th of 2020 in the amount of $44.10?

     A  June 2020.  Yes.

     Q  And going to the next payroll transaction or I suppose the previous one before the June payroll transaction we're looking at May 28th of 2020, a payroll transaction in the amount of $34.02?

     A  Yes.  Uh-huh.

     Q  And then the payroll transaction before then would have been April 30th of 2020 in the amount of $37.26?

A   Uh-huh.   Yes.

Q   And before that one the previous payroll transaction would have been March 31st of 2020 in the amount of $22.58?

A   Yes.

Q   And just a few more.   If we go to the previous payroll transaction before then we're looking at February 28th of 2020 in the amount of $35.64?

A   Yes.

Q   And then looking at the previous payroll before that in 2020, we're looking at January 31st of 2020, a payroll transaction of $37.26?

A   Yes.

Q   And would you agree that based on this resident account summary that Mr. Hernandez was not being paid on a weekly basis, instead he was paid on a monthly basis?

A   Yes.

Q   And you've noted in your report that Mr. Hernandez earned $34.33 on average per week.   Are you now testifying that he was --

A   Oh, I see what you're saying.

Q   Are you now testifying that that average was actually per month?

A   Yes.

Q   And in that change in your testimony versus what was indicated in your report would you expect that Mr. Hernandez' yearly income that you calculated would be lower than what you designated in your report?

A   Thirty-four times 12.  Can I compute something real fast?  Do you mind?

Q   That's fine.

A   Yes.  You're right.  That's right.

Q   And would that impact all of your calculations that you had under your conclusion section where you factored in what he would have made while still incarcerated, while Mr. Hernandez was still incarcerated?

A   Yes, it would reduce that.  Yes, it would. That is correct.

Q   Okay.  And just a few more questions.  You note in your report that Mr. Hernandez was born on

June 14th of 1977 and that he was projected to be released in 2040.  Would you agree that based on those dates Mr. Hernandez would have been approximately 63 years old when he was released from prison?

A  So state the dates one more time, please.

Q  Sure.  In your report you note that Mr. Hernandez was born June 14, 1977, and projected to be released in 2040?

A  Yes.  That would make him 63.

Q  And would you be able to tell the jury with a degree of confidence that a 63-year-old would be able to obtain employment as a sheet metal worker given that his experience as a sheet metal worker prior to incarceration occurred over 30 years before his release?

A  I would say that was an opportunity that he could have but certainly there's, you know, age discrimination in the labor market and things that that could mitigate that, yes.

Q  And would you agree that based on your prior testimony there was a 60 percent chance that

Mr. Hernandez would not have been able to find any employment when he was released from prison?

A    Yes.

Q    Thank you, Dr. Colburn.  Those are all the questions I have for you.

BY MS. REYNOLDS:

Q    Good afternoon, Dr. Colburn.  My name is Nancy Reynolds.  I'm here on behalf of Miriam Kamara, one of the nurses in the case, and I just have a number of questions to follow up on what has already been asked and get clarification.

You had indicated in your prior testimony that you don't need to know what Mr. Hernandez was incarcerated for.  And my question for you is would you consider murder a violent offense?

A    Oh, yes.

Q    Would you agree that it's less likely for an employer to hire a murderer as opposed to a person who engaged in a non-violent offense?

A    Yes.

Q    You also -- your calculation related to the reduction of his post-incarceration earnings

by 40 percent, am I clear that you reduced his post-incarceration earnings to 40 percent?

A Yes. Yes.

Q Okay. And my question for you is just from a numeric common sense perspective, and I understand that I am numerically challenged, wouldn't it be the case that if you're among the 40 percent you get your income and if you're among the 60 percent you get nothing?

A On, yes. So that is why the number is an expectation.

Q So it's not -- it is not the case that you can say Mr. Hernandez would have actually earned that 40 percent?

A Well, if it's like -- if it's likely he would have earned the higher number and it's -- if it's 40 percent likely he would earn the higher number and it's --

Q Sixty percent likely --

A -- (indecipherable cross-talk) higher it's nothing, then the expectation is that 40 percent, yes.

Q  You indicated -- I'm sorry, I'm having trouble with my monitors and I don't have anything other than my laptop so I'm going to do the best I can.  You indicated that you were provided the criminal record file of Damian Hernandez.  Did you review that?

A  Yeah.  Yes.  That's what I went through just looking for something that might have indicated the job he had prior to incarceration.

Q  And so when you were going through that do you recall that you found a document that said that he had a release date of 9/24/40?

A  Yeah.  And so now I'm kind of wondering --

Q  Do you have that document in front of you?

A  No, I don't.  I'm kind of wondering where I found that.

Q  Do you have the criminal record file there with you?

A  I'd have to download it again.  So I think it was sent as an attachment.  So the big, long thing that's --

Q  That tells you what his release date is.

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                    84

A  I could try to find it.

Q  I wish you would, please, because all my monitors have gone dead.  So I can't pull it up for you.

A  I don't know how I would do that.  Let's see.  Let me just see here.  I'm actually on a different computer myself.  Sorry, did I lose you?

MR. TEAGUE:  We're still here.

THE WITNESS:  Sorry, I thought I lost you.

Let's see.  I really don't -- it's on my other computer.

Q  Let me ask you, do you recall looking at the sheets of paper that have his various incarceration dates on it?

A  Sheets of paper that have various incarceration dates.

Q  And it would be part of the criminal record file.

A  Yeah, I believe so, and I think that's maybe where I got the 2040 from perhaps.

Q  Okay.  Do you recall reading where it identified the 2040 date and it said, the above

anticipated dates are based on the assumption that you will continue to earn good time at your present earning level and that you will not have earned good time taken from you by an adjustment committee action as a result of misbehavior?  Loss of earning --

A  Yes.

Q  Do you remember seeing that?

A  Yeah.  I think that's probably where I got it from.  Something like that, yes.

Q  So it indicated that he could lose good time if he engaged in misbehavior?

A  Yeah.

Q  Okay.

MS. REYNOLDS:  Brett, do you have that, I think it's your exhibit, that indicates misbehavior?

MR. HERBERT:  Yes.  Let me flip through here.  Exhibit 3, the internal incident report, you want me to share my screen?

MS. REYNOLDS:  Yes, please.

MR. HERBERT:  Is that showing up?

MS. REYNOLDS: Yes.

Q So, Dr. Colburn, did you review his reports for misbehavior that would have affected his date of release?

A No. No, I don't think I did.

Q So you didn't calculate the change in his release date based on his misbehavior?

A No, no.

Q So is it very possible that he would not have been released in 2040 and it could have been later than that based on his misbehavior?

MR. TEAGUE: Objection. Calls for speculation.

MS. REYNOLDS: It's in the papers he reviewed and it is the basis of his 2040 opinion.

Q So I'm going to ask you again, Dr. Colburn. Would you agree that based on his -- that you did not evaluate his misbehavior when you came up with the 2040 date?

A Yes, that is true, I did not.

Q Those are all my questions. Thank you.

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                    87

BY MR. TEAGUE:

Q    All right, Dr. Colburn.  Okay.  So there's been a lot of questions regarding the 40 percent calculation.  I am going to pull up your -- what's been previously marked as Defendants' Exhibit 4. Let's see if I can share my screen.

MR. TEAGUE:  Can you all see my screen?

MS. REYNOLDS:  Yes.

MR. TEAGUE:  Okay.

Q    All right.  So this is on page 3 of your report in your conclusions.  You have here in item number 3, if I adjust Mr.  Hernandez' post-incarceration earnings to account for the expectation that only 40 percent of individuals find employment post-incarceration the loss falls to $43,646 if he would have worked until age 67, and so on and so forth.

Does this account for, this 40 percent in reduction, does this account for Mr. Hernandez' criminal history and the fact that he had been incarcerated?

A    Yes.  I think so, yes.  That's what the

study is designed to show, yes.

Q  All right.  You also were presented with the defendants' exhibit regarding federal prisons, incarcerated individuals being released from federal prison as one of the exhibits.  I believe it was Exhibit 5.  From your review of the materials was Mr. Hernandez in a state prison or a federal prison?

A  He was in a state prison, wasn't he?

Q  You also previously testified that between, you know, sheet metal worker, restaurant industry, and retail worker, those other two categories, restaurant worker -- restaurant industry and retail worker, that would -- his income could be higher or lower, correct, than the sheet metal worker?

A  Yes.

Q  All right.  And the profession of sheet metal worker that you based your analysis on would yield a projected income of about $36,000 a year; is that correct?

A  Yes.

Q   Would you consider that a low wage job?

A   Relatively low wage, yes.

Q   Okay.

A   I mean the wage rate, it's a little more than -- it's more than the minimum wage but not significantly more.

Q   Understood.  All right.

So let me move on to these questions. There was a lot of questions about Mr. Hernandez' race and his gender and all of those really, really, you know, specific characteristics of his. Is the way that you made your analysis and made your calculations, is that the commonly accepted way of doing a forensic analysis in a case like this?

A   I believe so, yes.  Yes.

Q   So would you agree that is not the industry practice or to go into the very granular details of a person's personal characteristics?

A   I would say people do it both ways.  And certainly you could find people that would -- different economists that might look at the

details of every specific factor.

So, you know, again, I try to look at this as kind of a ballpark estimate even though we're talking about someone in specifics, but the more you -- in my opinion the more and more you get down to being very specific, this age, this race, I mean you got to -- you're presuming -- you're starting to add more and more assumptions on top of it, like the age distribution of the metal workers is the same age distribution of people coming -- it's getting into a lot of assumption. So I guess I did try to make an assumption here that it's about 40 percent.

Q  Okay.  And would it be industry practice to get into every single possibility regarding Mr. Hernandez' personal characteristics to consider those every, you know, single possibility that could be -- that could affect his employment in a case like this or an analysis like this?

A  I think some people would and some people would be more general.  So, you know, there's an art to it as well, you know.  So this is how I do

it.

Q  Got it.  And is the way you do it, is that a commonly accepted methodology?

A  I believe so, yes.

Q  Okay.  In your report, going back to Exhibit 4, you give a few scenarios, or a couple scenarios at least.  What was your -- what was your rationale in providing those various scenarios in your report?

A  Well, because individuals are working longer, so that's why I put it in the 67 and 70. That's when people would generally qualify for Social Security.  I'm pretty sure he would qualify for Social Security if he were able to work for that many years.  Not if he doesn't get out until he's 63, so that would complicate things.  So I was just trying to give some ballpark estimates and try to show that it's not -- well, just tried to provide the Court with kind of a range of earnings.

Q  All right.  I'm going to show you now I guess this will be a new exhibit.  So it would be,

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025
92

I guess, Plaintiff's Exhibit 1.  This is from the Hernandez CCR file that you reviewed.  Do you see these dates here in the middle?  Can you see my screen?

A  Yes, I can.

Q  And there are different dates in 2040, correct?

A  Uh-huh.

Q  All right.  That seem to be expected release dates and then other possible release dates?

MS. REYNOLDS:  I'm going to object to leading.

Q  Do you see those different dates in 2040?

A  Yes.

Q  Okay.  And could this have been where you got your projection or projected release date from?

MS. REYNOLDS:  Object to leading.

Q  Or release year at least.

A  Yes.

Q  Okay.

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                        93

MR. TEAGUE:  So I would ask that this be admitted as Plaintiff's Exhibit 1.

(Plaintiff's Exhibit 1 was marked for identification and retained by the court reporter.)

MR. TEAGUE:  Let me just make sure I don't have anything else.

Those are all the questions I have.

MR. HERBERT:  This is Brett Herbert.  I just have one question following that if that's all right.

FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANTS

BY MR. HERBERT:

Q  Dr. Colburn, early on in plaintiff's counsel's examination of you just now you had mentioned -- and I'm going to share my screen for Exhibit 4, which is your report.  My recollection is that your testimony just now was that under conclusions, Roman Numeral V there, paragraph 3, these calculations that make reference to there being 40 percent factored in Mr. Hernandez' criminal history, was that your testimony?

A   Factored in his criminal history.

MR. TEAGUE:  I'm going to object to mischaracterizes his testimony.

Q   Go ahead, Dr. Colburn.

A   That's a tough -- I would say that that 40 percent does not include demographic statistics associated with Mr. Hernandez --

Q   Okay.

A   -- that are different than those in the report, the 40 percent, if that makes sense.  So the report includes all these different people in there, you know.  So some of Mr. Hernandez' experiences are in that report, in that number, if that makes sense.  But did I go in and look at the specifics of Mr. Hernandez' demographics that you alluded to when you pulled up that report, no, I did not do that.

Q   How about his -- I just want to make sure I'm clear.  How about his criminal charges convictions, were those factored into that calculation?

A   No.  No.  That he was a violent offender,

no.  I just looked at his sentence.

Q  I think that's all I have.  Thank you.

MS. COTTO:  I have no further questions, Dr. Colburn.

MS. REYNOLDS:  Nor do I.

MR. TEAGUE:  Thank you, Dr. Colburn.

MR. HERBERT:  Thank you, Dr. Colburn.

Steve, do you want to tell him about reading or waiving?

MR. HERBERT:  Sure.

Dr. Colburn, so, as you know, this deposition has been transcribed by the court reporter, Ms. -- I believe that would be Ms. Taylor.  Is it Taylor or is it Tayloe?

THE COURT REPORTER:  Tayloe.

MR. TEAGUE:  Tayloe.  By Ms. Tayloe. Sorry about that.  She is a certified court reporter.  You have the option of, you know, trusting that she took down everything accurately or you have the option to read the transcript -- you know, a draft of the transcript to ensure, you know -- you can't make major changes or anything

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                    96

like that but you can draft -- you can read it to

ensure that you believe that it was an accurate --

THE WITNESS:  I'll waive it.  I'm fine.
I'm fine with it.

MR. TEAGUE:  You're going to waive.  Okay.
Thank you.

THE WITNESS:  Sure.

(Off the record at 3:10 p.m. EST.)

CERTIFICATE OF SHORTHAND REPORTER- E-NOTARY PUBLIC

I, Carol M. Tayloe, RMR, CMRS, CCR and E-Notary Public, the officer before whom the foregoing deposition was taken remotely, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my supervision; that reading and signing was not requested; and that I am neither counsel for or related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 10th day of December 2025, Norfolk, Virginia. My commission expires December 31, 2026.

_____

E-NOTARY PUBLIC IN AND FOR THE

COMMONWEALTH OF VIRGINIA

REGISTRATION NUMBER 210292

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025

98

| A | accurately | african-americans | 13:20, 16:3, |
|---|---|---|---|

**a&m**
14:15
**able**
31:5, 67:10,
71:22, 80:11,
80:13, 81:1,
91:14
**about**
7:8, 13:10,
13:21, 15:14,
16:5, 16:12,
17:1, 17:14,
18:8, 21:4,
21:5, 21:22,
25:6, 25:15,
27:2, 27:14,
42:19, 54:5,
64:13, 65:14,
68:2, 72:7,
73:4, 73:15,
76:19, 88:20,
89:9, 90:4,
90:13, 94:18,
94:19, 95:8,
95:17
**above**
29:6, 84:22
**absolutely**
57:18, 74:5
**academic**
16:3
**accepted**
89:13, 91:3
**according**
40:7
**account**
5:17, 50:10,
52:18, 53:2,
60:6, 62:4,
63:15, 70:21,
75:5, 78:16,
87:13, 87:18,
87:19
**accounts**
72:16
**accurate**
17:9, 96:2

**accurately**
95:19
**action**
1:7, 85:5
**active**
21:8
**actually**
18:6, 37:11,
49:8, 58:15,
79:3, 82:13,
84:6
**add**
58:4, 90:8
**addition**
42:22
**additional**
17:14
**address**
11:21, 11:22
**addressed**
38:2
**adjust**
87:12
**adjusted**
52:18, 53:2
**adjusting**
67:10
**adjustment**
85:4
**adjustments**
72:8
**administrator**
1:6
**admit**
62:7
**admitted**
93:2
**advise**
41:15
**affect**
41:12, 90:18
**affected**
42:17, 86:3
**affirmed**
6:3
**affixed**
97:15
**african-american**
60:16

**african-americans**
61:13
**after**
25:1, 37:8,
56:10, 56:22,
59:15, 59:21,
67:1, 70:3,
72:1, 72:5
**afternoon**
81:7
**again**
11:3, 21:22,
33:7, 39:20,
43:19, 60:9,
60:19, 61:22,
62:16, 65:21,
71:17, 83:19,
86:16, 90:2
**age**
58:4, 62:21,
80:18, 87:16,
90:6, 90:9,
90:10
**ages**
62:19
**ago**
15:11, 15:12,
51:2
**agree**
41:12, 68:16,
70:11, 75:13,
75:18, 76:6,
77:1, 78:15,
80:2, 80:21,
81:17, 86:17,
89:17
**ahead**
11:14, 21:3,
21:17, 26:8,
26:11, 28:21,
33:6, 39:8,
43:17, 43:22,
52:1, 54:14,
55:8, 72:10,
73:4, 94:4
**al**
1:12, 7:3
**all**
11:1, 11:10,

13:20, 16:3,
16:18, 18:7,
42:4, 42:8,
43:19, 44:12,
48:5, 49:11,
50:4, 67:14,
71:21, 72:22,
73:18, 73:21,
79:14, 81:4,
84:2, 86:21,
87:2, 87:7,
87:10, 88:2,
88:18, 89:7,
89:10, 91:21,
92:9, 93:8,
93:11, 94:11,
95:2
**alleged**
69:6
**alluded**
94:16
**along**
6:10
**already**
31:8, 42:12,
42:14, 61:22,
81:11
**also**
4:16, 6:19,
29:2, 33:8,
36:4, 42:1,
47:7, 53:2,
62:19, 63:10,
70:2, 81:21,
88:2, 88:10
**always**
9:3, 18:19
**american**
15:20, 15:22,
61:2
**among**
82:7, 82:8
**amount**
47:16, 59:2,
76:7, 76:10,
77:5, 77:12,
77:17, 77:22,
78:4, 78:8

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                                      99

| | | | |
|---|---|---|---|
| **amounts**<br>49:7<br>**analysis**<br>25:17, 30:19,<br>31:9, 32:6,<br>32:21, 42:17,<br>48:12, 64:21,<br>88:19, 89:12,<br>89:14, 90:19<br>**analyzing**<br>49:5<br>**anna**<br>4:3, 6:19,<br>74:4, 74:7<br>**another**<br>20:5, 20:10,<br>37:13, 39:6<br>**answer**<br>8:15, 8:20,<br>9:6, 9:10, 9:13,<br>10:3, 10:14,<br>21:2, 21:3,<br>21:16, 22:11,<br>23:17, 28:22,<br>33:6, 37:22,<br>38:1, 41:15,<br>41:17, 42:18,<br>42:21, 44:20,<br>46:7, 67:13,<br>70:22<br>**answered**<br>23:11, 31:8<br>**anticipate**<br>10:9<br>**anticipated**<br>85:1<br>**any**<br>7:8, 7:20,<br>10:11, 11:10,<br>12:10, 15:5,<br>15:8, 15:13,<br>21:7, 21:11,<br>22:3, 22:4,<br>22:15, 22:21,<br>23:4, 23:7,<br>23:14, 24:6,<br>24:9, 24:13,<br>24:20, 28:1, | 31:14, 31:22,<br>33:11, 38:18,<br>41:3, 43:1,<br>44:20, 47:11,<br>48:11, 49:10,<br>49:13, 49:15,<br>50:2, 50:4,<br>50:7, 50:10,<br>50:17, 52:6,<br>52:10, 52:14,<br>54:4, 54:5,<br>61:12, 71:7,<br>71:8, 71:10,<br>72:9, 72:12,<br>73:12, 81:1,<br>97:11<br>**anybody**<br>25:18, 26:1,<br>26:4, 27:3,<br>27:20<br>**anyone**<br>26:20, 48:14<br>**anything**<br>10:7, 24:15,<br>35:14, 41:2,<br>56:18, 73:17,<br>83:2, 93:7,<br>95:22<br>**anyway**<br>34:19<br>**anywhere**<br>29:18<br>**apologize**<br>17:17, 17:21,<br>35:1<br>**appear**<br>17:6, 17:8,<br>29:15, 29:20<br>**appearance**<br>18:11<br>**appears**<br>40:8<br>**appreciate**<br>9:20<br>**appropriate**<br>30:12<br>**approximately**<br>16:9, 80:4 | **approximation**<br>13:17<br>**april**<br>77:21<br>**arbitrary**<br>58:3<br>**aren't**<br>7:20<br>**art**<br>90:22<br>**article**<br>5:15, 54:11,<br>54:13, 55:1,<br>55:14, 59:8<br>**arts**<br>14:12<br>**aside**<br>21:8, 53:16<br>**asked**<br>10:14, 13:7,<br>23:21, 26:10,<br>48:10, 81:11<br>**asking**<br>9:11, 32:16,<br>34:12, 42:9,<br>46:2, 56:7<br>**asset**<br>53:4<br>**assistant-ship**<br>14:21<br>**associate**<br>14:3<br>**associated**<br>14:20, 94:7<br>**association**<br>15:20, 15:22<br>**assume**<br>10:4, 69:16,<br>70:2<br>**assumed**<br>69:10<br>**assumption**<br>10:5, 70:5,<br>85:1, 90:11,<br>90:12<br>**assumptions**<br>71:22, 72:12,<br>73:4, 73:8, 90:8 | **attachment**<br>83:20<br>**attain**<br>72:1<br>**attempted**<br>35:5<br>**attention**<br>25:21, 35:3,<br>49:4, 59:6,<br>61:21<br>**attorney**<br>6:9, 13:18,<br>21:8, 21:12,<br>26:5<br>**august**<br>20:7, 76:1,<br>76:12, 76:22,<br>77:9<br>**authored**<br>12:7<br>**available**<br>37:3<br>**avenue**<br>12:2<br>**average**<br>32:17, 38:7,<br>66:1, 70:17,<br>71:6, 71:15,<br>74:12, 74:17,<br>78:21, 79:2<br>**aware**<br>21:18, 23:5,<br>28:14, 38:19,<br>45:11, 45:13,<br>60:12, 72:14<br>**away**<br>65:11<br>**B**<br>**b-i-n-g-h-a-m**<br>11:18<br>**babbling**<br>62:10<br>**bachelor's**<br>14:11<br>**back**<br>15:2, 21:21,<br>22:14, 30:5, |

37:15, 39:1,
41:11, 42:6,
43:18, 49:3,
53:18, 57:12,
60:15, 60:21,
65:11, 66:19,
70:14, 74:10,
76:4, 91:5
**background**
14:10, 14:17
**ballpark**
65:19, 90:3,
91:17
**base**
30:12
**based**
30:18, 30:20,
31:9, 31:19,
32:13, 33:8,
36:20, 38:14,
45:7, 50:21,
71:21, 78:15,
80:2, 80:21,
85:1, 86:7,
86:11, 86:17,
88:19
**basic**
8:4, 22:11
**basis**
43:10, 78:17,
78:18, 86:15
**baton**
74:1
**beach**
4:6
**bean**
6:11
**bear**
59:9
**because**
14:18, 17:14,
25:9, 31:1,
31:13, 32:12,
32:17, 38:3,
40:22, 42:12,
59:2, 61:10,
62:7, 64:4,
67:11, 67:21,

73:3, 73:10,
84:2, 91:10
**been**
8:19, 10:14,
14:19, 15:1,
15:10, 22:13,
22:18, 23:3,
23:6, 23:13,
23:21, 24:2,
25:13, 26:7,
32:9, 33:2,
35:21, 36:5,
40:20, 43:1,
45:1, 46:9,
47:15, 52:19,
67:5, 68:2,
71:13, 72:4,
77:2, 77:5,
77:11, 77:21,
78:3, 80:3,
81:1, 81:11,
86:10, 87:3,
87:5, 87:20,
92:16, 95:12
**before**
2:9, 8:5, 9:7,
14:22, 15:2,
24:18, 31:21,
39:15, 68:14,
71:11, 77:2,
77:8, 77:10,
77:15, 77:20,
78:2, 78:7,
78:12, 80:16,
97:3
**begins**
17:20
**behalf**
3:2, 3:9, 4:2,
4:9, 43:4, 74:8,
81:8
**behavior**
43:10, 43:11,
45:9, 45:12
**being**
6:3, 6:17,
10:2, 20:20,
20:21, 22:17,

30:20, 32:21,
35:14, 39:5,
40:10, 42:6,
58:18, 58:19,
67:10, 67:11,
67:12, 69:11,
78:17, 88:4,
90:6, 93:21
**believe**
20:5, 21:20,
22:11, 22:16,
37:17, 40:15,
42:22, 47:14,
54:2, 73:20,
84:19, 88:5,
89:16, 91:4,
95:13, 96:2
**bendix**
4:5
**benefits**
25:14, 49:5,
49:6, 49:14,
49:16, 50:2,
50:5, 50:8
**best**
9:5, 9:19, 83:3
**between**
38:18, 62:18,
70:8, 88:11
**beyond**
41:14, 46:4
**big**
65:18, 83:20
**billed**
48:19
**bingham**
1:16, 2:1, 6:2,
11:17
**birth**
51:13
**bit**
7:6, 7:7, 9:1,
20:4, 24:12,
44:19, 61:9,
61:18, 65:11,
75:21, 76:5
**black**
61:2

**book**
15:3
**born**
79:22, 80:8
**both**
33:10, 40:6,
40:7, 89:20
**bottom**
17:19, 29:5,
51:9
**box**
3:5
**boyd**
3:11, 6:16
**break**
10:12, 10:15,
48:6
**breakdown**
20:18, 62:18,
62:19
**brett**
3:12, 6:9,
85:15, 93:9
**briefly**
34:19
**brings**
56:1
**broad**
62:8
**broke**
63:10
**brought**
12:15, 24:13
**brush**
65:18
**bureau**
54:9
**business**
11:21, 65:16

---
**C**
---
**c-h-r-i-s-t-o-p--
h-e-r**
11:18
**c-o-l-b-u-r-n**
11:19
**calculate**
74:17, 86:6

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025

101

**calculated**
69:9, 79:8
**calculating**
49:7
**calculation**
32:21, 33:1,
37:11, 37:19,
41:12, 42:1,
42:8, 42:10,
54:1, 58:10,
61:7, 65:4,
69:5, 69:21,
70:1, 81:21,
87:4, 94:21
**calculations**
31:16, 41:8,
45:19, 49:9,
49:22, 50:22,
53:20, 57:15,
60:4, 60:7,
62:5, 63:1,
63:16, 64:3,
64:10, 69:1,
69:4, 72:15,
79:15, 89:13,
93:20
**calls**
28:19, 46:6,
86:12
**came**
14:22, 27:1,
43:20, 66:8,
66:11, 86:19
**can't**
11:11, 34:22,
44:20, 45:10,
73:16, 84:3,
95:22
**cannot**
42:18
**careful**
61:9, 61:19,
65:17
**carol**
1:22, 2:9, 97:2
**cary**
3:15
**case**
6:12, 11:2,

12:20, 13:6,
13:10, 13:11,
13:18, 21:13,
23:4, 37:18,
37:21, 44:10,
48:17, 48:20,
49:1, 81:9,
82:7, 82:12,
89:14, 90:19,
97:12
**cases**
17:10, 18:5,
18:8, 18:16,
19:7, 19:15,
19:16, 19:18,
19:19, 20:6,
20:19, 21:8,
21:11, 22:1,
22:3, 22:5,
22:12, 22:20
**categories**
88:13
**ccr**
1:22, 5:19,
92:2, 97:2
**center**
3:14
**cents**
53:16
**certain**
64:9
**certainly**
35:15, 64:8,
64:12, 65:5,
80:18, 89:21
**certificate**
97:1
**certification**
23:15
**certifications**
15:6, 15:8
**certified**
15:10, 15:16,
95:17
**certify**
97:5
**challenge**
9:15

**challenged**
82:6
**challenges**
9:1
**chance**
7:9, 8:22,
24:17, 56:3,
80:22
**change**
45:18, 65:5,
79:5, 86:6
**changed**
46:3, 52:8
**changes**
19:20, 45:18,
45:22, 64:21,
95:22
**characteristics**
89:11, 89:19,
90:16
**charge**
35:7
**charged**
40:7
**charges**
94:19
**cheating**
24:4
**choice**
16:1
**choose**
31:1, 31:12
**choosing**
31:15
**chose**
31:19
**christopher**
1:16, 2:1, 5:2,
6:2, 11:17,
20:6, 22:21
**circulated**
7:10
**cited**
34:7, 54:9,
54:11, 54:14,
55:14, 56:21
**cites**
43:14

**civil**
1:7
**clarification**
81:11
**clarify**
46:2
**cleaned**
20:15
**clear**
18:11, 31:8,
35:17, 82:1,
94:19
**clearly**
8:15
**close**
27:17
**cmrs**
1:22, 97:2
**co-defendants**
6:19
**colburn's**
43:12
**colleague**
6:11
**com**
66:17, 67:4
**come**
22:14, 22:17,
43:13
**comes**
6:21, 43:7,
58:6
**coming**
40:14, 45:4,
72:13, 90:11
**commission**
97:17
**committee**
85:5
**common**
82:5
**commonly**
89:13, 91:3
**commonwealth**
2:10, 97:21
**compared**
32:10, 67:4
**comparing**
61:19

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025

102

completed
29:9
complicate
91:16
complicated
64:15
component
69:5
computations
60:20, 64:22
compute
13:7, 79:10
computer
84:7, 84:11
concern
39:1
conclusion
45:19, 79:15
conclusions
41:22, 50:1,
57:14, 69:6,
71:21, 72:13,
87:11, 93:19
conditions
72:16, 73:10
conducted
1:17, 2:2
confidence
80:12
confirm
8:17, 69:19,
74:14
confusing
9:18
conjecture
70:6
conjectures
65:10
connie
6:15
consider
30:19, 41:5,
71:7, 81:15,
89:1, 90:16
considered
42:20
consultant
14:5, 16:7,

21:13
consulting
16:11
contacted
12:20
contemplate
37:6
continue
85:2
continued
4:1
conversation
9:15
conversations
13:17
convicted
23:22, 24:2,
36:6, 37:4,
38:15
convictions
94:20
copies
48:10
copy
17:9
correct
13:13, 79:20,
88:15, 88:21,
92:7, 97:6
correctional
29:12
corrections
26:17, 39:14,
68:11
cotto
4:3, 5:4, 6:19,
74:5, 74:6,
74:7, 74:20,
76:20, 95:3
could
9:9, 9:10,
13:22, 14:9,
14:16, 15:21,
25:8, 29:2,
32:12, 32:15,
33:7, 33:9,
33:10, 35:3,
39:4, 40:19,

44:4, 49:18,
52:19, 53:3,
53:7, 57:9,
60:10, 61:12,
63:4, 64:6,
64:8, 68:5,
71:19, 72:6,
75:4, 76:16,
80:18, 80:20,
84:1, 85:11,
86:10, 88:15,
89:21, 90:18,
92:16
counsel
6:6, 12:21,
16:18, 41:17,
41:21, 73:21,
86:22, 93:12,
97:10
counsel's
93:15
couple
20:11, 22:12,
23:20, 48:9,
91:6
course
45:15, 46:20,
58:12
court
1:1, 7:1, 9:16,
11:16, 16:17,
26:14, 39:10,
44:6, 54:19,
55:12, 68:8,
75:2, 91:19,
93:4, 95:12,
95:15, 95:17
created
12:10
creating
47:8
credit
45:8
crime
24:2, 36:6,
37:4, 38:16
crimes
38:14

criminal
40:17, 40:18,
43:2, 43:7,
43:15, 83:5,
83:17, 84:17,
87:20, 93:22,
94:1, 94:19
cross-talk
82:20
curious
25:5
current
13:22, 73:9
currently
15:16
cursor
76:2
cut
72:10
cv
5:10, 13:20,
16:16, 17:9,
17:16, 17:19

D

dallas
15:3, 15:4
damian
1:8, 10:18,
10:19, 10:21,
30:2, 40:3,
40:18, 43:15,
83:5
darrin
6:16
data
34:9, 34:11,
37:2, 55:15,
55:18, 55:19,
61:12, 62:3,
63:12, 64:1,
66:20, 67:4,
67:6, 70:5,
70:19, 71:8,
71:9, 71:10
date
29:5, 29:6,
41:11, 42:2,

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025

103

42:6, 43:10,
43:14, 43:20,
45:6, 45:7,
45:12, 45:17,
45:18, 50:19,
51:4, 51:13,
83:12, 83:22,
84:22, 86:4,
86:7, 86:19,
92:17

**dated**
11:2, 11:5,
39:22, 51:9

**dates**
80:3, 80:6,
84:14, 84:16,
85:1, 92:3,
92:6, 92:10,
92:11, 92:14

**david**
40:4

**davis**
3:10, 6:13

**day**
28:18, 52:8,
97:15

**dead**
84:3

**december**
1:18, 97:16,
97:17

**decision**
67:3

**defendant**
4:2, 4:9,
18:13, 18:17,
20:22, 43:4,
74:8

**defendants**
1:13, 3:9, 6:6,
6:12, 19:11,
19:13, 87:5,
88:3, 93:12

**degree**
80:12

**delisa**
1:5, 4:16, 74:8

**demographic**
94:6

**demographics**
94:15

**department**
5:14, 26:17,
39:13, 68:10

**deposed**
18:19

**deposition**
1:16, 2:1, 5:9,
5:18, 6:17,
6:22, 8:5, 8:12,
8:21, 9:3, 10:9,
10:17, 11:4,
18:10, 24:14,
24:18, 25:19,
39:9, 68:7,
74:22, 95:12,
97:4

**depositions**
9:2

**depository**
15:3

**description**
40:4

**designated**
79:8

**designed**
72:17, 88:1

**desirable**
73:3

**details**
89:19, 90:1

**determine**
30:11, 52:17

**determining**
37:7

**devoted**
14:5, 48:17

**differences**
38:19

**different**
62:3, 84:7,
89:22, 92:6,
92:14, 94:9,
94:11

**differentiate**
38:17

**differently**
32:19

**difficult**
32:17

**dillman**
4:4

**directly**
39:18, 43:7,
60:5

**discharge**
45:12, 68:11

**disciplinary**
41:6, 41:11,
42:5, 42:15

**discipline**
23:14

**discount**
53:12, 53:18,
53:19

**discounting**
53:6

**discrimination**
19:19, 20:1,
36:15, 80:19

**discuss**
26:20, 27:3

**discussed**
72:7, 73:14

**discussing**
76:22

**disparity**
61:4

**distribution**
65:13, 90:9,
90:10

**district**
1:1, 1:2, 7:1,
7:2

**division**
1:3

**doc**
5:12

**doctor**
20:17, 62:13,
70:22

**document**
16:16, 18:8,
18:21, 20:4,
26:7, 26:16,
27:4, 39:6,

39:14, 40:2,
51:4, 51:8,
68:3, 68:11,
68:14, 74:15,
74:16, 83:11,
83:14

**documents**
24:20, 43:7,
46:17, 47:12,
66:8, 66:11

**doing**
9:20, 30:19,
31:10, 32:13,
36:9, 46:18,
46:19, 47:15,
61:9, 65:3,
89:14

**dollar**
53:8, 53:9,
53:11, 53:12,
53:14, 53:17,
60:2

**dominion**
14:3, 14:22

**done**
11:2, 14:19,
19:12, 19:19,
19:20, 21:19,
30:16, 32:15,
32:16, 69:2

**dop**
40:7

**down**
18:1, 20:3,
27:14, 29:4,
36:14, 40:5,
44:8, 46:1,
47:17, 48:3,
48:6, 59:9,
62:12, 62:16,
63:11, 65:9,
75:22, 77:8,
90:6, 95:19

**download**
83:19

**dozen**
19:7, 20:11

**dr**
6:8, 7:13, 8:3,

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025

104

9:4, 9:22,
10:16, 11:11,
12:4, 13:20,
15:6, 16:5,
16:19, 17:3,
18:1, 19:15,
20:8, 21:7,
21:21, 22:21,
23:3, 23:6,
23:13, 23:19,
24:11, 25:18,
26:20, 27:8,
28:13, 29:9,
30:6, 33:14,
34:15, 37:1,
37:6, 38:12,
39:12, 41:5,
41:15, 43:12,
43:22, 44:8,
45:6, 45:11,
45:17, 46:12,
46:22, 47:20,
48:10, 48:16,
50:10, 50:18,
52:5, 52:17,
54:4, 54:9,
54:21, 56:8,
56:13, 56:21,
59:12, 60:3,
60:6, 62:1,
64:1, 65:7,
65:20, 67:3,
68:12, 70:1,
70:10, 71:20,
73:12, 73:18,
73:22, 74:2,
74:7, 81:4,
81:7, 86:2,
86:16, 87:2,
93:14, 94:4,
95:4, 95:6,
95:7, 95:11
**draft**
95:21, 96:1
**draw**
35:3, 49:4
**drug**
38:16

**duly**
6:3
**during**
66:22, 71:6

**E**

**e-mail**
7:12
**e-notary**
2:10, 97:1,
97:3, 97:20
**each**
9:4, 9:17,
18:14, 48:3
**earlier**
7:11, 49:18,
51:6, 63:18,
72:7
**early**
12:22, 13:2,
43:9, 93:14
**earn**
36:22, 56:18,
82:17, 85:2
**earned**
14:12, 14:13,
14:14, 52:19,
53:3, 70:16,
72:3, 74:12,
78:21, 82:13,
82:16, 85:4
**earning**
59:18, 85:3,
85:6
**earnings**
13:7, 46:10,
57:7, 57:8,
58:4, 59:15,
61:1, 61:4,
66:21, 81:22,
82:2, 87:13,
91:20
**easier**
7:6
**east**
12:2
**eastern**
1:2, 7:2

**economic**
25:8, 53:1,
72:16, 73:10
**economics**
14:2, 14:12,
14:13, 14:14,
15:22, 18:3,
19:5, 22:2
**economists**
15:21, 89:22
**education**
14:20
**educational**
14:10
**eight**
16:13
**eighty**
53:16
**either**
18:10, 33:12,
34:10
**electronic**
24:11
**eligibility**
25:15
**eligible**
58:2
**else**
24:15, 93:7
**embedding**
73:8
**employability**
73:6
**employed**
30:20, 36:17,
38:4, 39:2,
39:5, 56:15,
58:13, 58:18,
58:19, 66:22,
67:8, 68:17,
69:16, 70:3,
97:11
**employer**
81:18
**employers**
63:21
**employment**
14:17, 19:19,

20:1, 23:7,
34:9, 39:4,
41:1, 41:2,
54:16, 55:16,
55:19, 56:10,
56:20, 56:22,
58:7, 59:15,
59:22, 63:7,
67:19, 68:18,
68:22, 69:11,
69:20, 70:9,
70:12, 72:1,
72:6, 80:13,
81:2, 87:15,
90:18
**end**
44:15
**ended**
13:15
**engaged**
40:6, 81:19,
85:12
**ensure**
95:21, 96:2
**enter**
52:15
**entire**
68:17, 69:11
**entitled**
26:16, 54:16,
68:11
**esquire**
3:3, 3:12, 4:3,
4:10
**essentially**
37:15, 43:9,
53:4
**est**
1:19, 96:8
**estate**
1:7
**estimate**
13:16, 18:15,
19:9, 65:19,
71:19, 90:3
**estimated**
16:5
**estimates**
91:17

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025

105

estimating
19:20
estimation
20:18
et
1:12, 7:3
ethnic
61:4
evaluate
86:18
even
21:13, 90:3
event
67:12, 72:21
ever
8:4, 9:22,
10:7, 14:19,
15:1, 15:8,
21:11, 23:3,
23:6, 23:13,
23:15, 23:21,
24:2, 24:6,
39:14, 49:16,
68:13
every
60:1, 90:1,
90:15, 90:17
everybody
11:14, 16:20,
23:21
everything
14:19, 95:19
evidence
49:15
exactly
59:1
examination
5:2, 6:6,
86:22, 93:12,
93:15
examined
6:5
example
38:15, 38:16,
41:10, 64:17
exchange
9:9
excuse
76:16

exhibit
5:9, 5:10,
5:11, 5:12,
5:13, 5:14,
5:15, 5:16,
5:17, 5:18,
5:19, 16:17,
18:2, 20:4,
26:8, 26:10,
26:11, 27:4,
39:7, 39:8,
39:9, 42:13,
44:3, 44:4,
44:5, 46:16,
47:1, 49:3,
51:8, 51:15,
54:15, 54:16,
54:18, 55:9,
55:10, 55:11,
56:2, 57:13,
59:6, 60:15,
60:21, 61:21,
62:17, 64:2,
66:13, 66:19,
67:5, 68:4,
68:6, 68:7,
69:20, 70:10,
70:14, 74:21,
74:22, 75:1,
85:16, 85:19,
87:5, 88:3,
88:6, 91:6,
91:22, 92:1,
93:2, 93:3,
93:17
exhibits
7:10, 26:13,
88:5
expect
44:14, 73:1,
79:7
expectation
57:6, 58:17,
82:11, 82:21,
87:14
expected
42:3, 43:6,
45:1, 58:17,

67:22, 92:9
experience
46:18, 47:8,
80:14
experiences
94:13
expert
12:5, 14:5,
16:7, 16:10,
18:2, 19:5,
20:6, 21:13,
22:2, 22:20,
23:4, 24:18
expires
97:17
explain
38:20, 52:20,
53:7, 61:14
explained
13:9
explaining
38:10
explore
33:14, 34:2,
37:1
extended
45:13, 46:3
external
64:14

**F**

facility
29:12
fact
42:14, 47:1,
61:3, 87:20
factor
53:6, 60:3,
61:6, 62:21,
68:21, 90:1
factored
37:20, 69:21,
79:16, 93:21,
94:1, 94:20
factors
31:14, 64:14,
65:1
fair
10:5, 28:4,

28:9, 28:13,
47:16
falls
87:15
familiar
8:11, 8:16,
74:18
far
10:16, 48:20
fast
79:11
faster
7:7
february
78:8
federal
54:17, 61:3,
67:2, 88:3,
88:5, 88:8
fee
17:9
feel
22:4
felony
23:22
female
62:2, 62:18
few
19:6, 19:7,
19:12, 20:1,
46:18, 48:9,
59:16, 71:20,
74:9, 78:6,
79:21, 91:6
fight
40:6
figure
49:22, 56:13,
66:5
figures
49:8
file
5:19, 40:17,
40:18, 43:2,
43:15, 83:5,
83:17, 84:18,
92:2
finance
47:16

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025

106

**financial**
97:12
**find**
39:3, 43:19,
56:9, 56:20,
56:22, 58:15,
59:15, 66:1,
81:1, 84:1,
87:15, 89:21
**fine**
10:13, 12:17,
43:21, 61:17,
79:12, 96:3,
96:4
**finish**
9:11, 62:14
**finished**
14:22, 72:1
**firearms**
35:7
**firm**
6:10
**first**
6:3, 7:9,
12:19, 22:1,
31:2, 31:13,
35:10, 35:12,
51:17, 59:16,
60:18, 67:9,
70:9, 74:10,
75:12
**fits**
38:6
**five**
14:7, 16:6,
16:12, 18:6,
53:15
**flip**
85:18
**flow**
64:5
**fluctuating**
72:16
**focused**
30:9
**folks**
37:4, 37:15,
38:13, 57:1

**follow**
81:10
**follow-up**
74:9
**following**
40:15, 93:10
**follows**
6:5
**forecast**
73:7
**foregoing**
97:4, 97:5
**forensic**
15:21, 18:3,
19:5, 22:2,
89:14
**form**
5:11, 26:18,
28:6, 29:4,
29:9, 29:16,
30:1, 36:21,
51:13
**formally**
26:9, 26:10,
39:8
**formerly**
22:6, 33:20,
34:7, 35:19,
36:5, 38:13,
55:16, 55:18,
59:17
**formulate**
48:8
**formulating**
47:4, 47:8,
47:12, 47:21,
52:6, 55:3, 56:3
**forth**
12:6, 87:17
**forward**
71:17
**found**
23:3, 27:1,
50:16, 60:9,
83:11, 83:16
**four**
13:19, 18:6,
59:21

**free**
22:4
**freely**
62:7
**fringe**
49:5, 49:13,
50:2
**fritz**
3:10, 6:15
**front**
7:18, 16:20,
17:3, 27:5,
41:20, 65:22,
83:14
**full**
11:15, 57:8
**fully**
9:6
**fundamental**
43:12
**funds**
52:18, 53:3,
64:6
**further**
20:4, 93:12,
95:3
**future**
53:9, 53:12,
73:6

---
**G**
---

**gain**
72:6
**gainful**
72:1
**gaps**
68:18, 68:21,
69:19, 69:20,
70:11
**gauge**
30:13
**gave**
55:7, 63:11
**ged**
50:13
**gender**
62:4, 89:10
**general**
18:15, 19:8,

32:8, 49:11,
57:3, 59:16,
64:7, 64:12,
65:3, 90:21
**generally**
8:11, 25:22,
34:4, 48:6,
91:12
**geo**
1:11, 3:9,
6:12, 7:3
**getting**
14:21, 45:8,
57:6, 62:8,
90:11
**give**
11:11, 14:9,
14:16, 49:16,
65:18, 67:19,
73:13, 91:6,
91:17
**given**
16:17, 80:14,
97:6
**glean**
41:2
**go**
7:4, 7:6, 7:19,
11:14, 15:2,
18:14, 21:3,
21:17, 26:8,
26:11, 28:21,
31:3, 33:6,
35:13, 39:7,
43:17, 43:22,
48:3, 52:1,
54:14, 55:8,
60:15, 61:17,
72:10, 73:4,
74:1, 74:4,
74:10, 78:6,
89:18, 94:4,
94:14
**goes**
41:14
**going**
6:18, 7:4,
7:12, 7:19,

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                                107

8:17, 8:21, 9:5,
9:13, 10:4,
10:9, 10:17,
11:4, 17:7,
17:13, 18:14,
20:3, 21:21,
21:22, 29:4,
30:5, 33:4,
36:14, 39:1,
39:2, 41:16,
44:19, 49:3,
51:15, 53:10,
56:14, 65:9,
65:20, 66:19,
70:14, 73:5,
73:7, 74:14,
75:11, 75:17,
75:21, 76:5,
76:9, 77:14,
83:3, 83:10,
86:16, 87:4,
91:5, 91:21,
92:12, 93:16,
94:2, 96:5
**gone**
37:15, 84:3
**good**
43:10, 43:11,
45:8, 45:12,
81:7, 85:2,
85:4, 85:11
**goodness**
8:8
**google**
25:11
**granular**
89:18
**great**
7:17, 8:17,
10:7, 11:10
**greg**
6:11
**group**
1:11, 3:9, 4:4,
6:13, 7:3,
20:18, 22:1
**grow**
61:4

**guess**
11:22, 13:19,
21:6, 22:11,
29:20, 32:15,
36:10, 38:2,
47:18, 52:4,
62:9, 65:8,
65:17, 67:13,
68:20, 70:6,
90:12, 91:22,
92:1

### H

**h-i-r-e**
33:18
**habits**
54:6
**hand**
97:15
**happen**
17:3
**happened**
13:12
**happy**
22:8, 44:12,
54:22, 73:22
**hard**
24:12, 33:8
**hawkes**
3:10, 6:14
**head**
22:17
**health**
26:17
**hear**
6:18
**heard**
23:12
**held**
15:8
**hello**
74:7
**help**
26:1
**helps**
75:9
**herbert**
3:12, 5:3, 6:7,

6:9, 28:7,
28:11, 41:16,
41:19, 43:21,
68:5, 73:21,
85:18, 85:22,
93:9, 93:13,
95:7, 95:10
**here**
9:15, 12:5,
15:1, 18:1,
19:8, 20:5,
22:2, 27:4,
29:4, 29:18,
31:4, 44:2,
44:13, 46:22,
47:12, 50:1,
51:15, 56:1,
62:18, 64:12,
64:13, 65:2,
65:19, 65:22,
74:8, 81:8,
84:6, 84:8,
85:19, 87:11,
90:12, 92:3
**here's**
67:14, 67:16
**hereby**
97:4
**hereunto**
97:14
**hernandez**
1:5, 1:8, 3:2,
4:16, 7:3,
10:18, 10:19,
10:20, 10:21,
13:13, 13:14,
26:21, 28:2,
28:14, 29:19,
30:3, 30:13,
34:16, 37:8,
37:18, 40:3,
40:10, 40:18,
41:6, 42:3,
43:5, 43:15,
44:14, 45:7,
50:11, 50:19,
51:18, 54:5,
60:7, 60:13,

61:6, 62:4,
62:21, 63:16,
68:12, 68:16,
70:2, 70:12,
70:16, 71:22,
74:11, 78:16,
78:21, 79:7,
79:17, 79:22,
80:3, 80:8,
81:1, 81:13,
82:13, 83:5,
87:12, 87:19,
88:7, 89:9,
90:16, 92:2,
93:21, 94:7,
94:12, 94:15
**higher**
31:1, 32:9,
33:2, 33:7,
33:9, 33:11,
33:12, 33:17,
71:15, 82:16,
82:17, 82:20,
88:15
**himself**
29:19
**hire**
33:15, 33:18,
34:3, 35:18,
35:20, 36:4,
37:2, 37:3,
81:18
**history**
5:16, 26:21,
27:16, 30:5,
41:1, 41:6,
42:16, 43:2,
68:12, 87:20,
93:22, 94:1
**hold**
15:5
**home**
11:22, 12:1
**hope**
23:19
**hopefully**
7:6, 8:15
**hopper**
44:2

**host**
39:4, 65:1
**hour**
49:2, 66:3
**hourly**
49:1, 66:5
**hours**
10:11, 48:9,
48:16
**hyperlinked**
54:10, 55:1,
55:5, 55:6, 55:8

**I**

**idea**
16:8, 28:1,
32:8
**identification**
26:14, 39:10,
44:6, 54:19,
55:12, 68:8,
75:2, 93:4
**identified**
31:4, 84:22
**identify**
30:15
**immediately**
70:3
**impact**
42:7, 42:9,
72:19, 79:14
**imprisoned**
67:13
**inc**
1:11, 6:13
**incarcerated**
22:6, 22:18,
23:1, 25:13,
33:15, 33:20,
34:3, 34:8,
34:11, 34:16,
34:21, 35:19,
35:21, 36:5,
38:14, 41:7,
44:18, 50:19,
51:18, 55:16,
55:18, 58:15,
59:3, 59:17,

68:17, 68:19,
68:22, 69:7,
69:10, 69:12,
69:14, 69:17,
70:12, 70:17,
74:13, 79:17,
79:18, 81:14,
87:21, 88:4
**incarceration**
35:11, 37:16,
42:4, 43:6,
44:15, 45:2,
56:10, 56:15,
57:1, 57:2,
57:7, 62:22,
70:8, 72:2,
80:15, 83:9,
84:14, 84:16
**incident**
5:12, 39:13,
39:21, 40:5,
40:8, 40:13,
85:19
**include**
25:16, 49:8,
50:2, 50:4,
50:7, 65:2,
72:22, 94:6
**included**
25:7, 25:8,
34:8, 49:20
**includes**
27:16, 37:15,
69:6, 73:9,
94:11
**including**
6:12, 37:12
**income**
16:9, 22:5,
22:22, 30:13,
50:14, 66:1,
66:3, 79:7,
82:8, 88:15,
88:20
**incorporate**
67:17, 68:1
**incorporating**
53:13

**indecipherable**
82:20
**indeed**
66:17, 67:4
**indicate**
56:9
**indicated**
7:11, 32:2,
70:15, 79:6,
81:12, 83:1,
83:4, 83:9,
85:11
**indicates**
85:16
**indicating**
43:5, 43:8
**indirectly**
38:3
**individual**
64:6
**individuals**
87:14, 88:4,
91:10
**industry**
28:2, 28:5,
28:15, 28:18,
30:10, 30:17,
30:21, 31:18,
32:3, 32:7,
32:22, 33:3,
33:16, 33:21,
50:12, 52:7,
52:12, 52:15,
67:8, 88:12,
88:14, 89:18,
90:14
**inflation**
73:5
**influence**
35:15
**information**
31:20, 32:1,
34:1, 44:16,
72:22
**initial**
50:19
**initially**
13:10

**initiative**
55:15, 59:8
**injury**
19:16, 19:18,
20:1
**injustices**
55:19
**inmate**
30:2, 68:11
**inmates**
56:9, 56:22,
63:5, 63:6, 63:7
**inquiry**
36:9
**inside**
57:21, 72:4
**instant**
35:4
**instead**
46:21, 76:17,
78:17
**institutions**
16:3
**instruct**
41:16, 42:20
**instructions**
7:5, 8:4
**intend**
73:13
**intent**
65:2, 67:21
**interest**
52:19, 53:2,
53:15, 53:21,
53:22, 72:17,
72:18, 72:21,
73:3, 97:12
**interesting**
14:19, 19:21
**internal**
39:12, 39:21,
85:19
**interrupt**
52:2
**interview**
26:1
**invest**
53:11

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025

109

**invested**
53:3
**investigation**
23:7
**involve**
22:5
**involved**
21:14, 22:13, 40:3
**involving**
22:22, 24:3
**issue**
41:11, 42:5
**item**
87:11
**iv**
70:15

**J**

**james**
3:14
**january**
51:9, 78:12
**job**
1:20, 31:20, 49:15, 49:16, 50:14, 54:10, 57:8, 58:5, 83:9, 89:1
**jones**
3:11, 6:15
**jordan**
4:2, 74:8
**july**
39:22, 77:3, 77:9, 77:11
**jump**
9:7, 9:14, 11:14
**jumping**
8:3, 13:20
**june**
77:11, 77:13, 77:15, 80:1, 80:8
**jury**
80:11
**justice**
5:14

**K**

**kamara**
4:9, 43:4, 81:9
**karen**
29:16, 29:21
**keirman**
4:11
**kind**
9:1, 14:18, 19:21, 25:1, 25:11, 27:14, 32:17, 43:1, 49:11, 58:3, 63:11, 64:7, 64:10, 65:10, 65:17, 74:10, 83:13, 83:15, 90:3, 91:19
**know**
9:12, 9:13, 10:8, 10:13, 16:1, 17:6, 21:18, 21:20, 22:3, 22:4, 24:11, 28:4, 28:9, 28:16, 29:9, 29:11, 31:3, 32:6, 32:14, 32:18, 33:11, 34:15, 34:18, 34:20, 36:12, 38:7, 38:22, 40:16, 41:1, 42:16, 45:6, 45:14, 45:15, 48:19, 48:21, 50:13, 50:18, 53:16, 54:7, 64:18, 65:11, 67:15, 71:12, 71:14, 80:18, 81:13, 84:5, 88:11, 89:11, 90:2, 90:17, 90:21, 90:22, 94:12, 95:11, 95:18,

95:21, 95:22

**L**

**labor**
36:15, 55:19, 80:19
**laptop**
83:3
**larger**
58:13
**last**
68:3, 76:21
**later**
44:19, 86:11
**law**
3:4, 6:9
**laws**
25:12
**lawsuit**
6:22, 34:20
**lawyers**
6:16, 8:21
**leading**
92:13, 92:19
**learning**
35:10, 35:12, 60:18
**least**
31:20, 49:14, 91:7, 92:20
**leave**
17:13
**led**
35:11
**left**
36:2
**legal**
4:4, 14:6, 16:8, 16:11
**less**
57:3, 60:1, 65:15, 65:16, 81:17
**let's**
11:14, 14:7, 15:20, 16:12, 19:4, 42:7, 43:22, 46:3,

48:3, 53:10, 57:12, 84:5, 84:10, 87:6
**level**
85:3
**license**
23:15, 24:6
**licensed**
15:16
**licenses**
15:5, 15:9, 52:11
**likelihood**
58:18, 58:19, 64:7, 67:16, 67:17, 67:19
**likely**
56:14, 64:20, 81:17, 82:15, 82:17, 82:19
**line**
27:15, 30:6, 35:4
**list**
20:6, 20:10, 22:20, 31:13, 40:16
**listed**
20:19
**little**
7:6, 7:7, 24:12, 32:14, 61:9, 61:17, 65:11, 75:21, 76:5, 89:4
**living**
36:22
**llp**
3:13, 4:11
**long**
10:10, 28:1, 28:5, 28:14, 47:15, 83:20
**long-term**
72:19
**longer**
64:18, 64:20, 91:11

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025

110

**look**
7:10, 7:14,
12:13, 19:2,
22:4, 24:20,
24:22, 34:9,
34:11, 39:17,
39:18, 39:19,
40:12, 40:13,
46:17, 49:13,
52:4, 57:17,
59:1, 62:17,
64:5, 70:7,
70:8, 72:19,
89:22, 90:2,
94:14
**looked**
8:8, 24:19,
25:3, 25:10,
25:12, 26:22,
56:6, 58:16,
60:8, 66:20,
69:2, 71:16,
95:1
**looking**
30:14, 36:14,
40:22, 44:13,
67:7, 74:13,
76:12, 77:16,
78:8, 78:11,
78:12, 83:8,
84:12
**looks**
17:1, 17:9,
17:18, 19:6,
20:10, 35:4,
41:21, 51:8,
54:21, 74:18
**lose**
84:7, 85:11
**loss**
25:9, 34:18,
53:1, 58:11,
58:12, 58:13,
64:13, 69:6,
85:5, 87:15
**lost**
13:7, 30:13,
49:5, 49:6,

49:13, 49:17,
50:2, 50:5,
50:7, 58:8, 84:9
**lot**
21:19, 33:8,
73:7, 87:3,
89:9, 90:11
**lots**
9:2
**low**
50:14, 89:1,
89:2
**lower**
31:2, 32:10,
32:12, 32:14,
33:2, 33:8,
33:9, 33:11,
33:12, 59:16,
71:14, 79:8,
88:15
**lowest**
61:2
**lump**
48:5
**lump-sum**
53:1
**lying**
24:3

**M**

**made**
46:14, 55:1,
60:7, 72:13,
79:17, 89:12
**main**
4:12
**major**
95:22
**make**
7:6, 7:22,
12:13, 35:17,
64:11, 65:2,
67:3, 73:4,
80:10, 90:12,
93:6, 93:20,
94:18, 95:22
**makes**
41:4, 45:15,

61:20, 94:10,
94:14
**making**
57:21, 60:1
**male**
62:2, 62:18
**many**
8:7, 13:17,
18:6, 22:15,
48:16, 91:15
**march**
78:3
**mark**
55:9, 64:16,
74:21
**marked**
26:9, 26:10,
26:13, 39:8,
39:9, 44:1,
44:4, 44:5,
54:15, 54:18,
55:11, 61:22,
68:6, 68:7,
75:1, 87:5, 93:3
**marker**
40:1
**market**
55:19, 80:19
**markets**
36:15
**martre**
6:14
**master**
14:12
**master's**
14:21
**match**
61:11, 61:12,
65:12, 65:13
**material**
40:19
**materials**
46:12, 46:14,
47:11, 47:21,
48:11, 88:7
**matter**
73:13
**matters**
14:6, 16:8,

16:11
**maybe**
20:15, 32:14,
32:15, 38:8,
41:20, 60:10,
76:4, 84:20
**mean**
17:21, 20:12,
29:11, 30:22,
31:2, 31:19,
32:14, 34:5,
34:6, 34:9,
35:13, 36:1,
36:10, 36:13,
36:18, 37:12,
38:3, 38:18,
39:18, 46:9,
47:15, 48:13,
49:14, 52:2,
52:3, 56:13,
56:17, 56:18,
57:1, 57:5,
60:9, 60:10,
62:6, 62:13,
70:7, 71:13,
72:3, 72:10,
72:20, 89:4,
90:7
**meaning**
24:3, 68:18
**meant**
27:21
**mecklenburg**
29:12, 29:13
**median**
59:18, 60:2,
66:21
**meet**
25:14, 25:18
**member**
15:19, 15:21,
15:22, 16:2
**mental**
26:17
**mentioned**
37:19, 47:7,
93:16
**mentions**
71:5

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                    111

merely
29:15
meriam
43:4
metal
27:2, 27:17,
27:21, 28:2,
28:5, 28:15,
28:18, 30:7,
30:10, 30:12,
30:17, 31:5,
31:12, 31:15,
32:3, 32:10,
33:3, 33:13,
33:16, 33:21,
36:20, 46:21,
50:12, 52:7,
52:11, 57:19,
61:11, 61:14,
65:15, 66:2,
66:6, 67:8,
73:6, 80:14,
80:15, 88:11,
88:16, 88:19,
90:9
methodology
30:11, 52:20,
91:3
middle
92:3
might
8:13, 15:10,
20:12, 30:15,
35:13, 37:8,
38:20, 71:13,
83:8, 89:22
military
19:21, 27:16,
27:18
mind
31:5, 79:11
mine
14:18
minimum
89:5
minute
17:16, 51:3,
51:4

miriam
81:8
misbehavior
85:5, 85:12,
85:17, 86:3,
86:7, 86:11,
86:18
mischaracterizes
94:3
misconstrue
17:21
misconstrued
17:17
mitigate
80:20
models
72:15
moment
73:22
money
56:18
monitors
83:2, 84:3
month
79:3
monthly
78:18
months
59:17
moral
24:3
more
16:13, 25:21,
52:4, 53:8,
56:13, 61:13,
62:8, 63:21,
64:10, 64:14,
64:15, 71:20,
73:8, 75:22,
78:6, 79:21,
80:6, 89:4,
89:5, 89:6,
90:4, 90:5,
90:8, 90:21
most
47:17, 63:11,
69:3, 71:9,
71:16, 71:17,

71:18
move
89:8
much
16:9, 31:3,
32:12, 47:20,
48:1, 48:7,
48:19, 64:19
multiple
75:5
multiplying
59:5
mumble
8:16
murder
35:5, 35:19,
37:4, 38:15,
81:15
murderer
81:18
myself
84:7

**N**

name
6:8, 11:15,
29:16, 30:2,
81:7
name's
74:7
nancy
4:10, 6:17,
43:3, 43:17,
76:20, 81:8
native
61:2
natural
9:12
nature
13:10, 38:14,
38:18, 63:15
necessarily
7:18, 21:14,
29:14, 50:17
necessary
52:15
need
10:11, 20:15,

25:15, 34:18,
50:11, 54:7,
61:10, 73:3,
81:13
needs
20:15
neighborhood
8:10
neither
97:10
netal
46:21
networks
21:19
never
40:21
new
55:15, 55:18,
91:22
newport
3:6
news
3:6
next
9:7, 23:20,
44:1, 74:1,
74:4, 75:17,
75:22, 77:14
non-violent
63:21, 81:19
none
22:16
norfolk
12:2, 66:2,
66:6, 97:16
normal
9:14
notarial
97:15
note
79:22, 80:7
noted
78:20
nothing
6:4, 15:13,
82:9, 82:21
notice
2:9

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                                    112

noticed
20:14
november
11:3, 11:5,
11:7, 12:7,
12:11, 12:22,
13:2
number
9:2, 44:13,
46:20, 50:15,
53:17, 59:4,
59:5, 62:8,
65:22, 66:9,
66:14, 67:19,
68:1, 69:10,
81:10, 82:10,
82:16, 82:18,
87:12, 94:13,
97:22
numbers
50:1, 50:2,
50:4, 65:5,
65:6, 65:16,
67:12
numeral
70:15, 93:19
numeric
82:5
numerically
82:6
nurses
81:9

O

oath
8:19, 8:20
object
33:4, 92:12,
92:19, 94:2
objection
21:1, 21:15,
23:9, 23:16,
28:6, 28:7,
28:19, 41:13,
42:11, 46:6,
86:12
obtain
12:5, 80:13

obtaining
59:22
obviously
8:19
occupation
13:22
occur
39:5
occurred
13:15, 75:18,
76:1, 80:15
ocean
12:2
october
75:13, 76:5
offence
35:5
offended
23:20
offender
94:22
offenders
40:3, 40:9,
41:10, 63:20
offense
63:11, 81:15,
81:19
offenses
35:11, 38:16,
38:18, 63:16
office
3:4, 11:21,
11:22, 12:1
officer
97:3
often
18:16
oh
8:8, 29:1,
33:19, 44:22,
45:21, 48:18,
51:10, 62:20,
75:10, 76:3,
76:18, 79:1,
81:16
okay
8:2, 8:7, 9:8,
18:20, 19:15,

21:7, 21:21,
27:8, 28:11,
29:14, 34:14,
34:22, 35:3,
35:22, 49:21,
51:15, 51:22,
58:21, 60:12,
60:21, 62:15,
65:7, 74:19,
75:17, 76:4,
79:21, 82:4,
84:21, 85:14,
87:2, 87:9,
89:3, 90:14,
91:5, 92:16,
92:22, 94:8,
96:5
old
14:2, 14:22,
80:4
older
63:6, 65:14,
65:15
once
36:18, 56:15,
60:9, 64:9, 65:9
one
6:17, 9:2, 9:7,
15:14, 18:5,
18:14, 19:21,
21:9, 24:22,
28:18, 30:22,
31:1, 31:2,
31:13, 33:2,
33:12, 35:15,
40:9, 42:12,
44:1, 46:9,
48:3, 51:6,
59:10, 68:3,
68:13, 76:21,
77:10, 77:15,
78:2, 80:6,
81:9, 88:5,
93:10
one-page
39:12
ones
47:17

only
34:7, 37:11,
56:9, 58:14,
73:15, 87:14
opined
42:15
opinion
86:15, 90:5
opinions
12:6, 40:14,
43:12, 47:5,
47:9, 47:13,
47:22, 48:8,
52:6, 55:3,
56:4, 73:12
opportunity
36:12, 36:21,
80:17
opposed
81:18
option
54:2, 95:18,
95:20
organizations
15:18
original
56:6
other
6:16, 8:20,
9:4, 9:17,
12:10, 12:11,
12:18, 21:7,
24:9, 24:20,
26:4, 27:5,
31:14, 31:22,
35:16, 47:11,
47:12, 48:11,
61:12, 65:8,
71:7, 71:8,
72:9, 72:12,
73:12, 83:3,
84:11, 88:12,
92:10
otherwise
97:13
out
13:3, 17:5,
17:22, 18:22,

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025

113

20:2, 36:19,
43:19, 49:22,
57:21, 62:2,
68:13, 73:7,
91:15
**outcome**
97:13
**outcomes**
63:7, 63:12
**outside**
58:7
**over**
7:4, 9:4, 9:5,
9:17, 9:20,
24:19, 43:19,
56:18, 61:4,
62:13, 80:15
**owe**
53:14

**P**

**packet**
40:19
**page**
5:2, 5:9, 8:1,
29:5, 42:2,
42:8, 44:13,
47:1, 49:22,
51:16, 59:9,
60:22, 62:12,
62:16, 65:22,
68:13, 87:10
**pages**
1:21, 17:1,
17:7, 20:19,
54:21
**paid**
57:2, 78:17,
78:18
**paint**
65:18
**paper**
84:13, 84:15
**papers**
86:14
**paragraph**
43:5, 49:4,
51:17, 52:22,

65:22, 70:16,
71:5, 93:19
**paren**
27:16, 27:17
**part**
25:8, 37:10,
38:3, 51:17,
61:14, 70:6,
72:3, 72:4,
72:5, 84:17
**part-time**
12:1
**participated**
31:18
**particular**
38:6, 40:22,
62:1
**particularly**
10:10
**parties**
97:11
**parts**
64:9
**pass**
74:1
**passed**
13:8
**passing**
13:15
**past**
22:12, 64:20
**patton**
3:10, 6:14
**pausing**
22:10
**pay**
32:18
**payment**
53:1
**payments**
25:6, 25:8
**payout**
53:10
**payroll**
75:6, 75:12,
75:17, 75:22,
76:6, 76:10,
76:13, 76:22,

77:2, 77:9,
77:14, 77:16,
77:17, 77:20,
78:2, 78:7,
78:11, 78:13
**pending**
7:1
**people**
9:3, 9:17,
22:13, 34:8,
35:20, 38:4,
58:15, 59:17,
61:2, 64:17,
65:14, 65:15,
73:1, 89:20,
89:21, 90:10,
90:20, 91:12,
94:11
**people's**
55:16, 55:18
**percent**
14:7, 16:6,
16:12, 16:13,
19:13, 21:5,
21:6, 34:7,
37:11, 37:14,
37:20, 39:3,
53:15, 54:3,
56:9, 56:12,
56:19, 56:22,
57:3, 57:6,
58:14, 58:20,
58:21, 59:2,
59:5, 59:18,
62:7, 68:1,
80:22, 82:1,
82:2, 82:8,
82:9, 82:14,
82:17, 82:19,
82:21, 87:3,
87:14, 87:18,
90:13, 93:21,
94:6, 94:10
**percentage**
14:4, 19:9,
19:10, 20:20
**perfectly**
9:12, 9:14

**performed**
12:10
**perhaps**
36:22, 49:19,
60:19, 84:20
**periodically**
10:17
**person**
31:4, 31:17,
56:14, 64:11,
81:19
**person's**
89:19
**personal**
19:16, 19:18,
19:22, 89:19,
90:16
**personally**
29:11
**persons**
22:6, 22:7,
23:1, 33:15,
33:20, 34:4,
35:18, 36:5,
54:16, 63:12,
66:21
**perspective**
82:5
**ph**
1:16, 2:2, 5:2,
6:2, 14:13,
14:14, 15:1,
20:7, 22:21
**phrase**
27:20
**phrasing**
41:20
**picked**
30:22
**plaintiff**
1:9, 3:2, 5:18,
12:20, 18:13,
18:17, 19:10,
20:21, 86:22
**plaintiff's**
12:20, 92:1,
93:2, 93:3,
93:14

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025

114

plaintiffs
19:12, 19:14
please
11:15, 11:20,
14:1, 14:17,
38:21, 52:20,
62:13, 68:5,
80:6, 84:2,
85:21
point
7:20, 72:20,
74:10
pointer
27:15, 29:6,
30:2, 40:2,
54:13, 55:20,
59:12, 61:1,
62:17
pointing
17:22, 18:22
policy
54:11, 54:13,
55:15, 59:7
population
57:3, 59:16,
60:1, 66:22
populations
61:20
portion
19:5, 59:11,
60:22, 69:6,
69:10
possibility
90:15, 90:17
possible
15:15, 28:17,
29:1, 29:2,
41:1, 86:9,
92:10
post
67:12, 67:19
post-employment
58:16, 59:4
post-incarcerati-
on
66:4, 81:22,
82:2, 87:13,
87:15

potential
9:4, 25:7,
30:13, 36:14,
37:21
powell
3:10, 6:14
practice
89:18, 90:14
pre-incarceration
26:21
predominantly
19:17
preliminary
7:5, 8:4
premarked
16:17, 26:8,
39:7, 44:3,
54:15, 55:9,
59:7, 68:4,
74:21
preparation
39:15
prepare
24:21, 25:19,
26:2, 46:13
prepared
25:22, 44:9
preparing
9:16, 27:9,
32:1, 40:12,
41:7, 47:2,
47:9, 55:3, 56:4
present
4:16, 15:19,
52:8, 53:20,
85:3
presented
88:2
preston
3:13, 6:10
presume
36:13
presumed
31:17, 36:1,
36:18, 38:6
presuming
72:6, 90:7
pretty
91:13

previous
77:1, 77:10,
77:15, 78:2,
78:7, 78:11
previously
87:5, 88:10
primarily
19:12, 19:18,
19:22, 30:18
print
17:5
prior
27:9, 32:1,
71:10, 71:14,
80:15, 80:22,
81:12, 83:9
prison
13:12, 13:14,
22:13, 45:1,
54:11, 54:13,
54:17, 55:15,
57:21, 58:7,
58:8, 58:12,
59:7, 61:3,
67:2, 67:11,
72:4, 72:5,
80:5, 81:2,
88:5, 88:7,
88:8, 88:9
prisons
88:3
probability
56:17, 56:19,
67:10, 72:7
probably
8:9, 19:14,
20:11, 21:6,
32:14, 53:15,
65:6, 85:9
problem
7:22, 10:1
proceed
8:18
process
7:8, 7:20,
8:12, 47:18
produced
16:16

profession
88:18
professional
14:4, 15:18,
16:6, 23:14
professor
14:2, 14:3
profile
61:12
program
14:21
projected
58:1, 80:1,
80:8, 88:20,
92:17
projecting
71:17
projection
32:10, 33:1,
34:18, 92:17
projections
22:5, 22:22,
32:9
provide
49:15, 91:19
provided
71:3, 71:4,
83:4
providing
91:8
public
2:10, 16:1,
47:16, 97:1,
97:3, 97:20
pull
7:14, 46:16,
48:21, 51:7,
54:14, 56:12,
74:14, 84:3,
87:4
pulled
94:16
purposes
40:12, 40:14,
52:1, 52:5, 56:3
pursuant
2:9
pushed
41:11, 42:6

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025

115

**put**
22:15, 47:17,
53:19, 60:20,
64:21, 91:11

**Q**

**qualified**
23:4, 64:19
**qualify**
91:12, 91:13
**quarter**
67:1
**quarterly**
66:21
**quarters**
67:1
**question**
9:6, 9:11,
9:22, 10:3,
10:4, 10:14,
11:13, 18:7,
20:17, 22:19,
28:8, 29:15,
29:20, 30:10,
31:7, 32:20,
34:2, 37:22,
38:1, 38:8,
40:10, 41:21,
69:15, 81:14,
82:4, 93:10
**questions**
7:8, 8:14,
8:18, 8:20,
8:22, 13:21,
17:14, 23:20,
42:19, 44:20,
71:20, 73:19,
74:9, 79:21,
81:5, 81:10,
86:21, 87:3,
89:8, 89:9,
93:8, 95:3
**quickly**
16:15, 16:19,
17:2, 17:8
**quinton**
6:14
**quote**
40:5, 44:14,

44:15, 51:17,
53:1, 59:14,
61:1, 66:1
**quoting**
59:14

**R**

**race**
60:7, 60:13,
61:7, 61:11,
89:10, 90:6
**racial**
61:3, 61:11
**range**
91:19
**rate**
33:15, 33:17,
33:18, 34:3,
35:18, 35:20,
36:4, 37:7,
37:15, 38:22,
49:1, 53:15,
53:21, 53:22,
54:2, 69:18,
72:17, 72:18,
72:22, 73:3,
73:5, 89:4
**rates**
37:2, 37:3,
37:12, 38:13
**rationale**
91:8
**re-incarcerated**
37:8
**reached**
13:3
**reaches**
20:2
**read**
34:19, 59:11,
60:22, 95:20,
96:1
**reading**
84:21, 95:9,
97:9
**reads**
27:15, 29:6,
30:6, 40:3,

40:5, 51:17
**real**
72:18, 72:19,
72:21, 73:2,
79:11
**really**
34:17, 60:14,
84:10, 89:10,
89:11
**reason**
7:17, 11:10,
13:6, 22:9,
33:11, 37:13,
57:9
**reasons**
38:4, 39:4
**recall**
12:19, 13:3,
13:9, 25:3,
25:10, 34:19,
35:14, 42:13,
83:11, 84:12,
84:21
**receive**
25:13, 64:6
**received**
43:2
**recent**
15:13, 69:3,
71:9, 71:16,
71:17
**recidivism**
37:7, 37:12,
37:21, 38:2,
38:5, 38:13,
38:20, 38:22
**recognize**
27:8, 44:9,
53:9
**recognizing**
58:14
**recollection**
35:9, 60:17,
93:17
**record**
31:8, 40:18,
43:7, 43:15,
51:16, 66:13,

83:5, 83:17,
84:18, 96:8,
97:6
**records**
24:13, 31:22,
43:14, 54:5
**reduce**
45:21, 46:10,
65:6, 79:19
**reduced**
58:21, 82:1,
97:8
**reducing**
46:9
**reduction**
81:22, 87:19
**reentry**
50:12
**refer**
10:17, 10:19,
11:4, 11:6,
39:17
**reference**
46:14, 49:5,
55:2, 55:6,
66:9, 93:20
**referenced**
46:17, 47:14,
59:8, 66:11
**referral**
21:19
**referred**
7:15, 21:11,
51:5
**referring**
7:21, 10:20,
11:7, 12:16,
28:10, 49:17,
52:21, 66:14
**refresh**
35:9, 60:17
**regarding**
87:3, 88:3,
90:15
**registration**
97:22
**regular**
59:22

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025

116

**reid**
1:6, 3:2, 4:16, 7:3
**related**
11:2, 81:21, 97:11
**relates**
12:6, 16:7
**relating**
40:9
**relatively**
50:14, 89:2
**release**
37:9, 41:10, 42:2, 42:6, 43:9, 45:18, 59:15, 62:22, 67:1, 67:2, 70:3, 80:16, 83:12, 83:22, 86:4, 86:7, 92:10, 92:17, 92:20
**released**
36:11, 42:3, 43:6, 44:14, 45:2, 54:17, 56:15, 57:2, 61:3, 63:6, 63:8, 63:12, 80:2, 80:4, 80:9, 81:2, 86:10, 88:4
**relevance**
21:1, 21:15, 23:16
**relevant**
36:9, 47:17, 71:13, 71:19
**relied**
43:13, 47:7, 74:16
**rely**
44:16, 46:12, 47:2, 47:4, 47:11
**remember**
85:8

**remotely**
97:4
**repeats**
20:12
**rephrase**
10:2, 28:11
**report**
5:12, 5:13, 5:14, 7:15, 11:1, 11:2, 11:5, 11:6, 11:8, 12:7, 12:12, 12:15, 12:16, 13:8, 24:14, 24:18, 25:1, 25:22, 26:1, 26:22, 27:10, 30:9, 30:16, 30:17, 31:15, 32:2, 34:6, 39:3, 39:13, 39:16, 39:17, 39:18, 39:19, 39:21, 40:9, 40:11, 40:12, 40:13, 41:7, 41:14, 41:19, 42:3, 42:20, 43:22, 44:9, 45:20, 46:13, 47:2, 47:9, 49:3, 51:16, 52:6, 52:17, 54:10, 54:12, 55:2, 55:3, 55:4, 55:6, 55:15, 55:21, 56:1, 56:4, 56:6, 56:8, 56:11, 57:13, 57:17, 59:9, 60:4, 62:1, 63:10, 64:1, 64:3, 65:20, 67:5, 69:1, 69:4, 70:14, 74:11, 75:5, 78:20,

79:6, 79:9, 79:22, 80:7, 85:19, 87:11, 91:5, 91:9, 93:17, 94:10, 94:11, 94:13, 94:16
**reported**
1:22
**reporter**
9:16, 11:16, 16:18, 26:15, 39:11, 44:7, 54:20, 55:13, 68:9, 75:3, 93:5, 95:13, 95:15, 95:18, 97:1
**reports**
12:11, 18:3, 18:18, 19:1, 19:6, 19:11, 22:3, 86:3
**represent**
6:11, 6:20
**represents**
6:19
**requested**
97:10
**required**
52:11
**requirements**
25:15
**research**
33:14, 33:22, 34:3, 35:18, 36:4, 37:1, 38:12, 52:7, 52:10, 52:14, 54:4
**researched**
35:20, 42:19
**resident**
70:21, 78:16
**rest**
69:13, 69:16
**restaurant**
27:17, 30:7,

30:20, 32:7, 32:12, 32:17, 33:10, 88:11, 88:13
**restroom**
10:12
**result**
16:10, 23:14, 85:5
**results**
42:6
**retail**
27:17, 30:7, 31:10, 32:20, 32:22, 33:7, 33:10, 88:12, 88:14
**retained**
13:6, 18:12, 18:16, 20:21, 26:14, 39:10, 44:6, 54:19, 55:12, 68:8, 75:2, 93:4
**retaining**
19:10, 19:11
**rethought**
49:18
**retirement**
49:6, 49:14, 49:16, 50:5
**retraining**
50:17
**return**
9:21
**reveal**
55:19
**review**
24:17, 27:12, 39:15, 47:1, 55:2, 56:3, 83:6, 86:2, 88:6
**reviewed**
27:9, 32:1, 43:8, 86:15, 92:2
**reviewing**
47:21, 48:7

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025

117

| | | | |
|---|---|---|---|
| **revoked**<br>24:7<br>**reynolds**<br>4:10, 5:5,<br>6:18, 43:3,<br>43:18, 74:4,<br>76:16, 81:6,<br>81:8, 85:15,<br>85:21, 86:1,<br>86:14, 87:8,<br>92:12, 92:19,<br>95:5<br>**richmond**<br>1:3, 3:16, 4:13<br>**right**<br>8:3, 11:1,<br>11:10, 11:14,<br>13:20, 16:4,<br>18:18, 23:11,<br>36:3, 45:1,<br>45:4, 45:10,<br>45:17, 47:9,<br>50:4, 52:3,<br>54:12, 55:20,<br>57:4, 58:22,<br>60:22, 67:14,<br>69:7, 69:12,<br>69:15, 79:13,<br>87:2, 87:10,<br>88:2, 88:18,<br>89:7, 91:21,<br>92:9, 93:11<br>**risk-free**<br>53:4<br>**rmr**<br>1:22, 97:2<br>**road**<br>4:5, 65:10<br>**robbery**<br>35:5<br>**roman**<br>70:15, 93:19<br>**run**<br>32:6, 32:21,<br>50:1<br>**running**<br>41:22<br><br>**S**<br><br>**said**<br>10:3, 24:14, | 31:12, 31:18,<br>32:6, 36:20,<br>42:12, 63:18,<br>83:11, 84:22,<br>97:7<br>**salary**<br>46:21, 50:15,<br>57:19, 61:15<br>**same**<br>8:1, 9:10,<br>9:20, 11:3,<br>21:4, 38:7,<br>58:10, 58:12,<br>59:4, 61:19,<br>69:18, 90:10<br>**samuel**<br>6:13<br>**savings**<br>54:5<br>**saw**<br>31:2<br>**say**<br>9:12, 14:7,<br>17:16, 18:18,<br>19:13, 21:4,<br>22:15, 23:2,<br>28:4, 28:9,<br>28:13, 34:10,<br>35:15, 36:1,<br>37:3, 38:5,<br>38:6, 40:20,<br>42:7, 45:10,<br>45:22, 46:3,<br>47:18, 47:19,<br>53:10, 56:19,<br>61:8, 61:16,<br>62:10, 64:14,<br>64:17, 65:3,<br>65:9, 65:11,<br>67:14, 67:15,<br>70:7, 73:9,<br>76:17, 80:17,<br>82:13, 89:20,<br>94:5<br>**saying**<br>13:14, 37:16,<br>45:22, 53:13,<br>79:1 | **says**<br>18:2, 60:16,<br>75:6<br>**scales**<br>32:18<br>**scenario**<br>31:9<br>**scenarios**<br>91:6, 91:7,<br>91:9<br>**schedule**<br>17:10<br>**scheduled**<br>10:10<br>**school**<br>15:3, 15:4<br>**schooling**<br>50:11<br>**science**<br>14:11<br>**scope**<br>41:14<br>**screen**<br>7:19, 7:21,<br>16:19, 16:21,<br>17:13, 19:8,<br>20:8, 21:22,<br>26:12, 27:6,<br>27:7, 35:1,<br>44:2, 56:2,<br>57:13, 62:1,<br>65:21, 70:11,<br>74:15, 85:20,<br>87:6, 87:7,<br>92:4, 93:16<br>**screening**<br>5:11, 26:18,<br>51:13<br>**scroll**<br>17:2, 18:1,<br>18:21, 20:3,<br>22:1, 22:7,<br>29:4, 44:8,<br>44:12, 51:11,<br>54:22, 59:9<br>**scrolling**<br>40:21, 62:12,<br>62:16, 77:8 | **seal**<br>97:15<br>**search**<br>25:11<br>**sears**<br>40:4<br>**second**<br>18:21, 22:20,<br>35:4, 49:4,<br>59:10, 64:4<br>**section**<br>18:20, 20:5,<br>45:19, 49:4,<br>52:22, 57:13,<br>79:16<br>**security**<br>25:6, 25:7,<br>25:12, 25:14,<br>49:6, 49:17,<br>50:7, 58:3,<br>64:19, 73:16,<br>91:13, 91:14<br>**see**<br>14:7, 15:20,<br>16:12, 16:21,<br>17:5, 18:2,<br>20:7, 24:12,<br>27:18, 29:5,<br>29:7, 29:18,<br>29:19, 30:2,<br>30:3, 30:6,<br>39:22, 40:2,<br>46:19, 48:3,<br>49:10, 51:10,<br>51:18, 53:4,<br>56:6, 59:12,<br>62:19, 63:10,<br>63:13, 65:8,<br>68:15, 75:4,<br>75:7, 75:12,<br>76:1, 76:3,<br>79:1, 84:6,<br>84:10, 87:6,<br>87:7, 92:2,<br>92:3, 92:14<br>**seeing**<br>60:19, 85:8<br>**seeking**<br>59:21 |

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025

118

| | | | |
|---|---|---|---|
| **seem**<br>92:9<br>**seemed**<br>31:4, 50:14,<br>61:4, 62:8<br>**seems**<br>12:22<br>**seen**<br>35:13, 39:14,<br>40:11, 40:21,<br>41:3, 42:13,<br>68:14<br>**sense**<br>32:22, 40:16,<br>41:4, 45:15,<br>61:20, 82:5,<br>94:10, 94:14<br>**sent**<br>19:2, 40:16,<br>83:20<br>**sentence**<br>44:22, 51:13,<br>95:1<br>**sentences**<br>40:5<br>**separate**<br>18:20<br>**separated**<br>62:2<br>**september**<br>75:19, 76:9<br>**series**<br>8:18<br>**serious**<br>63:11<br>**served**<br>21:12, 36:11<br>**service**<br>16:10<br>**services**<br>26:17, 48:20<br>**serving**<br>14:5, 16:7,<br>45:1<br>**set**<br>12:6, 32:18,<br>53:16, 64:14,<br>97:14 | **setting**<br>23:8<br>**seven**<br>16:12<br>**several**<br>6:11, 17:7,<br>18:5, 40:5<br>**shakeenna**<br>6:15<br>**share**<br>7:19, 7:21,<br>16:18, 21:22,<br>26:12, 27:5,<br>27:6, 34:10,<br>44:2, 65:21,<br>74:15, 85:20,<br>87:6, 93:16<br>**shared**<br>27:7<br>**sharing**<br>35:1<br>**sheet**<br>27:1, 27:17,<br>27:20, 28:2,<br>28:5, 28:15,<br>28:17, 30:6,<br>30:10, 30:11,<br>30:16, 31:5,<br>31:12, 31:15,<br>32:3, 32:10,<br>33:3, 33:13,<br>33:16, 33:21,<br>36:20, 50:12,<br>52:7, 52:11,<br>57:19, 61:11,<br>61:13, 65:15,<br>66:2, 66:6,<br>67:8, 73:6,<br>80:13, 80:14,<br>88:11, 88:16,<br>88:18<br>**sheets**<br>84:13, 84:15<br>**shirley**<br>6:13<br>**shortcut**<br>10:19<br>**shortcuts**<br>10:16 | **shorthand**<br>97:1<br>**shortly**<br>6:18<br>**should**<br>8:8, 25:7,<br>32:15, 44:2,<br>46:20, 49:19,<br>51:20, 53:2,<br>62:10, 65:3,<br>72:22, 76:4<br>**show**<br>16:15, 26:7,<br>26:16, 39:6,<br>47:18, 67:22,<br>68:3, 88:1,<br>91:18, 91:21<br>**showed**<br>51:6<br>**showing**<br>69:20, 85:22<br>**shows**<br>68:20, 70:11<br>**signature-1apgj**<br>97:18<br>**signed**<br>29:19, 29:21<br>**significantly**<br>89:6<br>**signing**<br>97:9<br>**similar**<br>20:17, 22:19,<br>31:7, 32:20,<br>34:2<br>**similarly**<br>20:10<br>**simply**<br>59:5<br>**since**<br>15:1, 51:18<br>**single**<br>90:15, 90:17<br>**sir**<br>27:19, 30:4,<br>69:8<br>**six**<br>18:6, 47:12, | 48:5<br>**sixty**<br>82:19<br>**skill**<br>36:20, 67:15<br>**skills**<br>30:15, 31:5<br>**slip**<br>16:1<br>**slope**<br>36:14<br>**smiley**<br>29:16, 29:21<br>**smiling**<br>14:18<br>**social**<br>25:6, 25:7,<br>25:12, 25:14,<br>49:6, 49:17,<br>50:7, 58:3,<br>64:19, 73:16,<br>91:13, 91:14<br>**society**<br>16:2<br>**some**<br>7:5, 8:3,<br>13:21, 15:11,<br>17:14, 19:19,<br>19:20, 20:12,<br>20:16, 22:13,<br>31:20, 53:16,<br>56:18, 90:20,<br>91:17, 94:12<br>**somebody**<br>36:16, 72:8<br>**someone**<br>13:8, 22:17,<br>25:13, 29:12,<br>36:11, 36:18,<br>64:18, 67:7,<br>67:15, 67:22,<br>90:4<br>**something**<br>10:12, 13:12,<br>13:15, 16:13,<br>24:22, 27:9,<br>30:14, 34:20,<br>40:17, 45:14, |

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025

119

46:4, 48:18,
48:22, 57:22,
58:1, 71:3,
79:11, 83:8,
85:10
**sometimes**
21:20, 25:9
**somewhere**
8:9, 14:8, 45:3
**sorry**
6:8, 21:22,
45:5, 52:3,
62:10, 62:12,
70:22, 72:9,
72:11, 75:15,
76:4, 76:18,
76:19, 77:9,
77:11, 83:1,
84:7, 84:9,
95:17
**sort**
7:19, 17:2,
35:10, 75:7
**sounds**
8:12, 15:15,
40:11, 67:18
**speak**
62:13
**speaking**
25:22
**specific**
62:9, 64:11,
64:13, 89:11,
90:1, 90:6
**specifically**
37:18, 62:6
**specifics**
90:4, 94:15
**speculation**
28:20, 33:5,
41:13, 46:7,
86:13
**spell**
11:15
**spend**
47:20, 48:1,
48:7
**st**
76:1, 76:12,

76:22, 78:3,
78:12
**standing**
36:19
**stands**
42:12
**start**
9:17, 19:4,
43:19, 61:9,
65:9, 73:8
**started**
7:5, 25:5
**starting**
7:9, 90:8
**state**
11:15, 24:9,
80:6, 88:7, 88:9
**stated**
74:11
**statement**
17:19, 48:22,
49:11, 64:12,
65:3, 65:14
**states**
1:1, 7:1
**statistic**
56:21, 60:3,
60:10
**statistical**
15:11
**statistically**
56:16
**statistics**
54:10, 60:8,
64:2, 94:6
**stealing**
24:4
**stenographically**
97:7
**step**
57:12
**stephen**
3:3, 3:4, 13:4,
19:2, 21:8,
21:12, 21:14,
26:5, 48:13,
48:21
**steve**
95:8

**steven**
13:18
**still**
16:2, 34:22,
42:11, 49:19,
77:8, 79:17,
79:18, 84:8
**street**
3:15, 4:12
**studied**
59:22, 66:22
**study**
34:7, 88:1
**stuff**
15:11
**styled**
7:2
**subject**
23:7, 23:13
**subjects**
62:2
**suggest**
66:3
**suggests**
30:16
**suite**
4:5, 4:12
**summary**
5:17, 14:9,
14:16, 17:10,
40:1, 70:21,
75:5, 78:16
**supervision**
97:9
**supplemental**
12:11
**supplements**
12:18
**supports**
70:5
**suppose**
77:15
**supposed**
73:11
**sure**
7:21, 7:22,
12:13, 12:14,
28:9, 35:17,

45:10, 51:12,
57:11, 57:16,
80:7, 91:13,
93:6, 94:18,
95:10, 96:7
**surprise**
63:3, 63:5,
63:20
**suspect**
32:11
**suspended**
24:6
**sworn**
6:3, 8:19
**system**
15:4, 36:2,
36:19, 39:1

**T**

**table**
66:20
**take**
7:10, 9:2,
10:11, 10:15,
50:10, 57:12,
60:6, 72:15
**taken**
8:5, 18:11,
85:4, 97:4, 97:7
**talk**
9:5, 9:19,
26:4, 27:2
**talking**
9:4, 9:17,
68:2, 90:4
**tanis**
6:15
**tayloe**
1:22, 2:9,
95:14, 95:15,
95:16, 97:2
**taylor**
3:13, 6:10,
95:14
**teague**
3:3, 3:4, 5:6,
7:11, 13:4,
13:18, 21:1,

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025

120

21:8, 21:12,
21:14, 21:15,
23:9, 23:16,
26:5, 28:6,
28:8, 28:19,
28:22, 33:4,
41:13, 41:18,
42:11, 43:17,
46:6, 84:8,
86:12, 87:1,
87:7, 87:9,
93:1, 93:6,
94:2, 95:6,
95:16, 96:5
**tell**
6:20, 7:7,
10:1, 11:20,
13:5, 13:22,
34:22, 80:11,
95:8
**tells**
83:22
**ten**
8:9, 25:15,
29:3, 48:18
**terms**
72:20
**testified**
6:5, 17:11,
42:14, 88:10
**testify**
6:3
**testifying**
78:22, 79:2
**testimony**
11:11, 12:5,
79:5, 80:22,
81:12, 93:18,
93:22, 94:3,
97:6, 97:7
**tewanda**
6:14
**texas**
14:14
**th**
39:22, 51:9,
51:10, 75:13,
75:19, 76:5,

76:9, 77:3,
77:11, 77:16,
77:21, 78:8,
80:1, 97:15
**thank**
11:20, 17:22,
18:22, 38:10,
46:2, 57:16,
74:2, 74:3,
75:10, 75:21,
76:18, 76:20,
81:4, 86:21,
95:2, 95:6,
95:7, 96:6
**thereafter**
97:8
**thing**
11:3, 12:2,
24:22, 73:15,
73:16, 83:21
**things**
7:15, 25:2,
36:15, 40:17,
40:22, 42:19,
46:19, 49:12,
61:10, 61:17,
65:8, 65:12,
80:19, 91:16
**think**
7:11, 10:10,
16:2, 16:3,
16:5, 18:7,
18:20, 19:22,
20:14, 22:12,
23:11, 24:14,
28:8, 29:19,
30:9, 31:12,
33:12, 35:12,
36:8, 38:10,
39:7, 42:1,
44:17, 44:22,
47:8, 47:17,
48:11, 48:18,
49:19, 50:16,
51:14, 52:3,
52:22, 56:5,
56:11, 57:21,
64:4, 64:8,

70:4, 70:20,
71:18, 73:16,
83:19, 84:19,
85:9, 85:16,
86:5, 87:22,
90:20, 95:2
**thinking**
15:10, 22:10,
25:2, 25:5
**third**
27:14
**thirty-four**
79:10
**thought**
25:1, 31:1,
36:10, 50:13,
84:9
**thoughts**
62:14
**three**
13:19, 18:5
**through**
7:19, 17:2,
17:7, 18:14,
22:4, 22:7,
25:2, 26:22,
35:14, 40:21,
44:12, 46:22,
54:22, 57:9,
57:14, 75:11,
83:7, 83:10,
85:18
**throughout**
11:4
**time**
6:21, 10:11,
10:15, 14:4,
16:6, 26:11,
35:10, 35:13,
36:11, 43:9,
43:11, 44:4,
45:8, 47:15,
47:20, 48:1,
48:7, 57:8,
60:18, 61:5,
68:6, 68:17,
69:11, 69:13,
69:16, 70:8,

80:6, 85:2,
85:4, 85:12
**times**
8:7, 58:18,
79:10
**tips**
32:13, 54:2
**today**
6:17, 7:11,
8:11, 11:11,
12:5, 24:13,
24:18, 24:21,
25:19, 53:8,
73:14, 73:19
**together**
48:5
**told**
15:14, 18:7
**took**
95:19
**top**
17:18, 22:17,
30:1, 66:10,
73:8, 90:8
**total**
48:17, 48:20,
58:11
**tough**
94:5
**towards**
25:21
**trades**
34:4, 34:5,
34:6
**training**
15:12, 50:11,
52:15
**transaction**
75:6, 75:12,
75:18, 75:22,
76:6, 76:10,
76:13, 77:1,
77:2, 77:10,
77:14, 77:16,
77:17, 77:20,
78:3, 78:7,
78:13
**transcribed**
95:12

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025

121

**transcript**
9:16, 95:20, 95:21, 97:5
**trebach**
4:11
**trial**
18:11, 73:13
**trick**
11:13, 29:14
**tried**
91:18
**trouble**
83:2
**true**
17:8, 86:20, 97:5
**trusting**
95:19
**truth**
6:4, 6:5
**truthful**
11:11
**try**
8:15, 9:9, 9:19, 10:2, 28:11, 65:18, 84:1, 90:2, 90:12, 91:18
**trying**
19:22, 37:22, 42:4, 49:21, 61:16, 64:11, 64:13, 65:19, 67:14, 91:17
**tune**
61:17
**turn**
61:21
**turned**
57:21
**turner**
3:11, 6:15
**turning**
25:21, 59:6
**turpitude**
24:3
**two**
3:14, 6:16,

9:1, 10:10, 18:5, 40:9, 88:12
**type**
31:20, 49:12, 58:10, 64:9, 65:4
**types**
19:15, 61:10
**typewriting**
97:8
**typo**
46:19, 51:20, 51:22, 66:8

**U**

**uh-huh**
16:22, 18:4, 26:19, 29:8, 30:4, 30:8, 55:17, 59:13, 59:20, 75:7, 75:14, 76:8, 76:11, 76:15, 76:17, 77:7, 77:19, 78:1, 92:8
**unable**
37:9
**under**
8:19, 8:20, 22:2, 45:19, 50:1, 69:5, 70:15, 79:15, 93:18, 97:8
**understand**
10:1, 10:8, 10:20, 11:7, 12:4, 82:6
**understanding**
13:5, 36:3, 37:10, 37:14, 38:8, 38:9
**understood**
10:4, 20:3, 22:19, 73:18, 89:7
**unemployable**
63:21

**unfortunately**
44:20
**united**
1:1, 7:1
**university**
14:3, 14:15
**until**
9:11, 58:2, 58:6, 58:11, 87:16, 91:15
**use**
30:11, 30:17, 31:15, 41:3, 53:20, 64:2, 67:4
**useful**
48:11
**using**
42:1, 67:9, 73:2
**usually**
20:2

**V**

**va**
3:6, 3:16, 4:6, 4:13, 66:2
**value**
53:20
**various**
84:13, 84:15, 91:8
**versus**
7:3, 18:17, 20:21, 38:16, 79:6
**view**
12:2, 64:5
**violations**
45:12
**violent**
36:6, 37:4, 38:16, 63:20, 81:15, 94:22
**virginia**
1:2, 2:11, 4:6, 7:2, 12:3, 24:7, 26:16, 39:13,

66:7, 68:10, 97:16, 97:21
**virtually**
1:17, 2:2
**vocational**
27:16, 30:5

**W**

**wage**
19:20, 58:18, 59:19, 60:2, 66:6, 89:1, 89:2, 89:4, 89:5
**wait**
9:6, 9:10, 17:16, 51:3, 51:4
**waive**
96:3, 96:5
**waiving**
95:9
**walk**
57:9, 57:14
**want**
15:2, 26:7, 40:20, 48:3, 54:14, 59:9, 60:21, 85:20, 94:18, 95:8
**wanted**
74:10
**wants**
74:1
**way**
13:13, 22:16, 27:14, 35:16, 41:4, 44:13, 67:20, 67:21, 89:12, 89:14, 91:2
**ways**
89:20
**we're**
7:22, 12:4, 24:11, 77:16, 78:7, 78:12, 84:8, 90:3
**we've**
9:15, 65:21,

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025

122

68:1
**wednesday**
1:18
**week**
58:1, 70:17,
71:6, 71:15,
74:12, 78:21
**weekly**
78:17
**welcome**
75:11
**went**
31:14, 83:7
**whatever**
10:14, 46:10
**whereof**
97:14
**whereupon**
6:1
**whether**
18:12, 18:15,
25:6, 32:8,
33:1, 37:2,
37:7, 42:13,
42:15, 52:10,
52:14
**whiteford**
3:13, 6:10
**whoever**
31:4, 74:1
**whole**
6:4, 7:20,
40:16, 65:1
**williams**
3:10, 6:13
**wish**
84:2
**without**
57:7, 62:8
**witness**
14:6, 16:8,
16:10, 18:2,
19:5, 20:6,
22:20, 23:4,
23:10, 23:18,
29:1, 46:8,
74:3, 76:18,
84:9, 96:3,

96:7, 97:14
**witnesses**
22:2
**wondering**
22:10, 49:18,
73:15, 83:13,
83:15
**work**
5:16, 25:16,
26:21, 27:18,
30:7, 30:12,
30:16, 31:6,
31:10, 32:20,
33:7, 33:9,
33:10, 36:12,
37:9, 58:2,
64:7, 64:20,
65:14, 65:16,
67:11, 67:18,
68:12, 91:14
**worked**
15:3, 28:2,
28:5, 28:14,
28:17, 29:2,
32:2, 58:5,
58:11, 87:16
**worker**
36:20, 57:20,
66:2, 66:6,
80:14, 80:15,
88:11, 88:12,
88:13, 88:14,
88:16, 88:19
**workers**
46:21, 59:18,
61:11, 65:13,
73:6, 90:10
**workforce**
22:14
**working**
32:7, 34:8,
37:12, 37:13,
61:14, 64:18,
91:10
**works**
8:12, 47:18
**worried**
64:12

**worse**
63:7
**worth**
53:8
**wouldn't**
56:17, 67:6,
82:7
**wow**
18:9, 32:11
**written**
18:19

---
**Y**
---

**yeah**
8:14, 12:14,
14:11, 17:12,
17:18, 20:1,
20:9, 20:13,
20:14, 21:6,
24:19, 25:5,
27:13, 29:1,
29:3, 33:18,
37:17, 46:5,
46:8, 46:19,
51:1, 51:7,
51:20, 55:22,
56:11, 57:17,
59:1, 62:9,
62:20, 63:4,
65:12, 66:11,
66:16, 66:18,
68:15, 69:18,
70:4, 70:13,
71:1, 71:13,
75:7, 83:7,
83:13, 84:19,
85:9, 85:13
**year**
16:9, 44:18,
44:22, 46:9,
46:11, 57:20,
57:22, 66:4,
70:17, 71:6,
74:13, 88:20,
92:20
**year-old**
80:12
**yearly**
66:3, 79:7

**years**
15:11, 15:12,
25:16, 29:3,
51:2, 51:14,
53:11, 53:14,
53:17, 59:21,
71:7, 71:8,
71:10, 71:14,
80:4, 80:16,
91:15
**yield**
88:20
**younger**
63:7
**yourself**
23:6

---
**Z**
---

**zoom**
68:13

---
**$**
---

**$0.84**
60:1
**$109,000**
58:6
**$17.32**
66:2
**$1700**
57:22
**$22.58**
78:4
**$2500**
48:22
**$31,000**
58:8
**$31,061**
58:13
**$34**
58:1
**$34.02**
77:18
**$34.33**
70:16, 78:21
**$35.64**
76:7, 76:10,
76:14, 77:6,
78:9

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025

123

| | | | |
|---|---|---|---|
| **$36,000**<br>57:20, 88:20<br>**$37.26**<br>77:22, 78:13<br>**$43,646**<br>87:16<br>**$44.10**<br>77:12 | **16**<br>17:1, 17:7,<br>39:22, 67:1<br>**1977**<br>80:1, 80:8<br>**1980**<br>14:12, 15:2<br>**1982**<br>14:13<br>**1988**<br>14:14 | **2040**<br>42:2, 42:4,<br>43:6, 43:10,<br>43:13, 43:20,<br>45:2, 45:7,<br>45:17, 46:4,<br>80:2, 80:9,<br>84:20, 84:22,<br>86:10, 86:15,<br>86:19, 92:6,<br>92:14 | **30**<br>29:6, 51:9,<br>51:10, 77:11,<br>77:21, 80:16<br>**309**<br>1:8<br>**31**<br>76:1, 76:12,<br>76:22, 78:3,<br>78:12, 97:17 |

**.**

**.00125**
54:3

**0**

**0.125**
54:3
**00**
1:19
**02**
29:6
**0716**
3:7
**0932**
4:14

**1**

**1**
1:19
**10**
96:8, 97:15
**1021**
3:15
**11**
62:16
**1108**
4:12
**12**
8:9, 48:18,
79:10
**13**
20:19
**14**
20:19, 80:1,
80:8
**140**
58:9
**15**
20:20

**2**

**20**
39:22, 53:11,
53:14, 53:17
**2002**
50:20, 50:21,
51:2, 51:6,
51:9, 51:14,
51:21
**2007**
51:18, 52:8
**2010**
54:9, 54:17,
67:2
**2016**
39:22
**2020**
70:18, 71:6,
71:11, 74:13,
75:13, 75:19,
76:1, 76:10,
76:13, 76:22,
77:3, 77:11,
77:13, 77:17,
77:21, 78:3,
78:8, 78:12,
78:13
**2022**
20:7
**2025**
1:18, 11:3,
11:5, 11:8,
12:8, 12:12,
13:1, 13:2,
66:3, 97:16
**2026**
97:17

**2041**
42:7
**2043**
44:15
**210292**
97:22
**218,528**
58:11
**22**
51:2
**220**
4:5
**2300**
4:7
**23219**
3:16, 4:13
**23452**
4:6
**23518**
12:3
**23607**
3:6
**24**
1:8, 83:12
**250**
49:2
**26**
5:10, 5:11
**28**
77:16, 78:8
**29**
75:13, 75:19,
76:5, 76:9, 77:3
**295**
4:5

**3**

**3**
96:8

**317**
3:7
**3178**
12:2
**3306**
3:17
**34**
54:21
**34.33**
71:15, 74:12
**35**
76:3
**356**
4:7
**3564**
75:14
**36**
18:8
**36,067.20**
66:4
**39**
5:12
**3:-cv**
1:8

**4**

**40**
34:7, 37:11,
37:14, 37:20,
56:9, 56:12,
56:22, 57:2,
57:6, 58:14,
58:20, 62:7,
82:1, 82:2,
82:8, 82:14,
82:17, 82:21,
83:12, 87:3,
87:14, 87:18,

Transcript of Christopher Bingham Colburn, Ph.D
Conducted on December 3, 2025                    124

90:13, 93:21,
94:6, 94:10
**44**
5:13
**45**
44:22, 51:14

**5**

**50**
56:19
**53**
59:18
**54**
5:14
**55**
5:15

**6**

**60**
39:3, 58:21,
59:2, 59:5,
68:1, 80:22,
82:9
**611257**
1:20
**63**
80:4, 80:10,
80:12, 91:16
**67**
58:4, 58:6,
64:20, 87:16,
91:11
**68**
5:16

**7**

**70**
58:11, 91:11
**706**
3:5
**74**
5:4, 5:17
**74,000**
58:20
**757**
3:7, 4:7
**797**
4:14

**8**

**801**
4:12
**804**
3:17, 4:14
**81**
5:5
**86**
5:6
**861**
40:7

**9**

**90**
19:13, 21:5,
21:6
**93**
5:3, 5:19
**97**
1:21
**977**
3:17
**9th**
11:3, 11:7,
12:7