# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| **DELISA HERNANDEZ REID,** **ADMINISTRATOR OF THE** **ESTATE OF DAMIAN HERNANDEZ,** *Plaintiff,* **v.** **THE GEO GROUP, INC., et al.,** *Defendants.* | **Civil Action No. 3:24-cv-309** |

## MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE OPINIONS OF ALIX McLEAREN, Ph.D.

Defendants The GEO Group, Inc., Samuel Davis, Shirley Williams, Martre Powell, Tewanda Patton, Quinton Hawkes, Tanis Fritz, Connie Jones, Shakenna Turner, and Darrin Boyd (collectively, "these Defendants"), by counsel, state as follows in support of their Motion to Exclude the Opinions of Alix McLearen, Ph.D. ("Dr. McLearen").

## I.    FACTS IN SUPPORT OF MOTION TO EXCLUDE

Delisa Hernandez Reid (hereinafter, "Ms. Reid" or "Plaintiff") is the Administrator of the Estate of Damian Hernandez (hereinafter, "Mr. Hernandez" or "Decedent").  Ms. Reid brought suit under Virginia Code §§ 8.01-50, 8.01-25, and 42 U.S.C. § 1983 against thirteen named defendants, alleging they were negligent, grossly negligent, and violated Mr. Hernandez's Constitutional rights under the Eighth and Fourteenth Amendments, and also asserting liability under *respondeat superior*.  The actions relate to the alleged negligence from medical care in response to the suicide of Damian Hernandez, an inmate at Lawrenceville Correctional Center ("LCC").

Plaintiff sued the individuals of these Defendants for violation of his constitutional rights as well as various state tort claims.  GEO is sued under the theory of *respondeat superior* for the alleged improper actions of the individual Defendants: Samuel Davis, Shirley Williams, Martre

1

Powell, Tewanda Patton, Quinton Hawkes, Tanis Fritz, Connie Jones, Shakenna Turner, and Darrin Boyd (collectively, the "Individual Defendants").  The Individual Defendants were all correctional officers or other employees of GEO, apart from Shirley Williams, who was an LPN.  Shirley Williams is sometimes referred to in Plaintiff's Third Amended Complaint as a "Provider Defendant," while the remainder of the Individual Defendants are sometimes referred to as the "Correctional Officer Defendants".

On November 5, 2020 (a Thursday), at approximately 10:08 a.m., Mr. Hernandez submitted an Emergency Grievance, stating that he had blood coming from his rectum and he was "pissing blood." **Exhibit 1**.  He asked for medical help.  A little more than three hours later, Nurse Bonnie Russell responded. Id.  Nurse Russell completed a full nursing evaluation with a Nursing Evaluation Tool. **Exhibit 2**.  She noted that Mr. Hernandez complained of rectal bleeding and had dark urine the day before. Id.  She noted no vomiting, pain, fatigue, lethargy, or dizziness.  She listed that Mr. Hernandez did not have blood in his stool, had no history of GI bleed, and was not HIV positive.

Nurse Russell completed an examination where vital signs were normal. Id.  Nurse Russell referred Mr. Hernandez to the facility physician for the following Monday. Id.  She advised Mr. Hernandez to return if he had fever, increased pain, or dizziness.  She provided education on bowel movement and noted that Mr. Hernandez demonstrated an understanding of the nature of his medical condition and signs and symptoms for which they should seek additional medical attention.  At no time did Mr. Hernanez report any sexual assault or trauma or give any indication that he had been sexually assaulted.

In the early hours of the next morning, Mr. Hernandez committed suicide on November 6. Mr. Hernandez had no history of mental health issues, suicidal ideation, or self-harm.  Shirley

Williams, LPN, is the only medical practitioner named in the suit that was a GEO employee.  There have been no other GEO medical personnel identified in the suit or in discovery.  Ms. Williams' involvement was tertiary, and she only arrived on the scene later.

## II.    DR. McLEAREN's BACKGROUND, OPINIONS, AND DEPOSITION TESTIMONY

### a.  Dr. McLearen's lack of medical expertise and clinical experience

Dr. McLearen is not a medical practitioner.  While she has degrees in psychology (notably not medical degrees), she is not licensed in Virginia and has never practiced psychology in Virginia. See McLearen Deposition Transcript, **Exhibit 3**, 27:8-14. Her clinical experience in psychology ended in 2010, when she transitioned into administrative and consulting positions. See Curriculum Vitae, **Exhibit 4.** She has never been a licensed nurse, she has never provided clinical nursing care, and her only awareness of the standard of care applicable to nursing care is by supervising two nurses. Ex. 3, 87:10-88:2. During deposition, she could not describe the standard of care for nurses in a correctional setting. Id. 88:8-89:4.

### b.  Dr. McLearen's medical opinions in her report and deposition

Dr. McLearen makes several medical opinions in her report which she is not qualified to make. **Exhibit 5**. She proclaimed in her deposition that her opinions were not "evaluating [GEO staff's] ability to be nurses" but was "opining on the totality of the response to the situation," but strays from that path throughout her report. See Ex. 3, 89:15-90:1.

#### i.  Medical opinions regarding pre-incident screening

First, Dr. McLearen asserts an improper medical opinion that "PREA protocol requirements were not properly followed and an opportunity to intervene with Mr. Hernandez was missed" and "suicide prevention … standards were not properly followed." Ex. 5, ⁋ 56, 65.  Her criticism is of Nurse Russell. Ex. 3, 55:20-56:3. She stated that Nurse Russell saw Mr. Hernandez on the day of

his complaints, "but records reflect no documentation of a physical exam, and no indication he was questioned about sexual assault." Ex. 5, 19.  She supports her opinion relating to pre-incident medical care by citing Mr. Hernandez's emergency request related to rectal bleeding, stating that "[c]ertainly, this symptom can have many causes, and particularly in a correctional environment, sexual abuse is one possibility that should be thoroughly explored." Id. ¶ 53.  Without identifying any particular individual, she states that "GEO staff should have had ample information from training to suggest sexual assault as a potential cause for rectal bleeding." Id. She supports her opinion by noting that "no exam was performed, and PREA-type victimization questions were not documented." Id. 54. Ultimately, she states that "there is no indication that a PREA incident was ever considered."

During her deposition, she further expounded on the opinion, stating that, "My opinion is that the appropriate course of action when someone presents with rectal bleeding that you don't know the source of is that you should do some exploration of whether sexual assault occurred" and "if someone reports to medical with a rectal bleed, they should be examined, questioned about where that came from, including the possibility of sexual abuse," criticisms of Nurse Russell's care. Ex. 3, 57:3-19; 58:11-21.  When asked to describe all suicide prevention standards that were not followed, the only pre-incident individual she identified as committing wrongdoing was Nurse Russell. Id. 72:17-75:22.

Nurse Russell, a medical practitioner, is the only GEO employee identified who interacted with Mr. Hernandez relating to his complaints of rectal bleeding and discolored urine and the only pre-incident employee Dr. McLearen references in her report or in deposition.

4

### ii.  Medical opinions regarding care during incident response

Next, Dr. McLearen states her opinion that "emergency response standards were not properly followed." Ex. 5, ⁋ 65.  Dr. McLearen does not criticize the response time of the correctional officers. Ex. 3, 36:2-18.  She did, however, criticize the medical care provided by the medical staff and specifically limited her opinion to medical staff during deposition. Id. 63:17-22. She stated that "there was a period of time where medical staff could not identify the source of the bleeding and were focused on escorting or transporting Mr. Hernandez to medical … [D]uring that time, there was not care being provided." Id. 37:12-38:1.  She made clear that her criticism was of the medical staff that arrived at the cell, not the correctional staff. Id. 38:22-39:3.

Dr. McLearen also made medical opinions regarding the ease of access to equipment, oxygen not being hooked up, and difficulty with AED pads. Ex. 5, ⁋⁋ 61-62.  She again confirmed that she was criticizing medical staff for the perceived shortcoming. Ex. 3, 76:19-77:12; 80:21-83:2.  She did not make any specific opinion about Shirley Williams' conduct. Id. 83:3-15. Even so, during her deposition, she seemed to criticize GEO as an organization for not providing proper training, claims which are not at issue in this case as GEO is only named under the theory of *respondeat superior*. Id. 80:10-20.

### iii.  Opinions regarding calls to 911

Dr. McLearen does not in her report opine that the timing of the call to 911 was outside the appropriate standard of care. See Ex. 5.  She only reports that "[i]t is not clear when emergency services outside the facility (911) were called because records do not align," and noted potential calls at 3:25 a.m. and 4:05 a.m. Id. ⁋⁋ 20, 59.  She indicated that Master Control was to call 911. Id. ⁋ 43. She testified that "there was significant information supporting that the officers made an effort to have 911 called." Ex. 3, 69:10-19.  She admitted that the officers first on the scene were

5

not tasked with calling 911. Id. 70:2-11. Neither were Officer Jones or Turner, who were working the control booth. Id. 71:9-72:4.  She could not say whether the final individual GEO Defendant, Nurse Shirley Williams, should have called 911. Id. 72:5-15.

### iv.  Dr. McLearen's medical opinions on causation

Dr. McLearen admitted during her deposition that she could not make an opinion that, if PREA standards had been followed, the outcome would have been different. Ex. 3, 62:15-63:9.

### c.  Dr. McLearen's opinions on investigation of the incident and remedial measures

Dr. McLearen makes the wholly irrelevant opinion that "follow-up standards were not properly followed in the aftermath of Mr. Hernandez's death." Ex. 5, ¶ 69.  She states that there was no analysis of other possible causes of death, it is unknown how the cell was secured, there was no discussion of substances or contraband found in the cell, and there was no mental health or leadership after-action and only a medical review some time after the incident. Id. ¶¶ 67-68. She admitted during deposition that completion of these after-incident protocols would not have changed the outcome of Mr. Hernandez's suicide. Ex. 3, 48:6-13; 54:3-7.

### d.  Irrelevant portions of Dr. McLearen's report

During her deposition, Dr. McLearen admitted that paragraphs 23-26 and 29 played "very little, if any [role] at all" in her opinions, stating that her opinions were based on the records reviewed specific to the incident. Ex. 3, 39:5-41:15.  Dr. McLearen further testified that, while she cited a specific PREA standard in her report in paragraph 33, she did not intend to cite any specific PREA standard at trial, but instead would cite PREA conceptually, as a whole. Id. 41:16-44:12. She could not during deposition explain the content of certain ACA standards she cited in paragraph 38 of her report and could not state whether she intended to have those standards at the time of her trial testimony; she did not rely on the specific language of the standards to come to

her opinions. Id. 45:17-12; 47:13-20; 49:5-7; 50:1-10.  Dr. McLearen admitted that she is not asserting that any party violated the NCCHC, as referenced in paragraph 41 of her report. Id. 50:11-52:10.

## III.    LEGAL ARGUMENT

### a.  Dr. McLearen does not have the necessary clinical practice required by Virginia law for her to testify as a medical expert, and her opinions are otherwise non-compliant with Federal law

Pursuant to Virginia Code Section 8.01-581.20, "A witness [in any action against a … health care provider to recover damages alleged to have been caused by medical malpractice]" may only testify "… if he has had active clinical practice in either the defendant's specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of the action." Medical experts opining on standard of care must be engaged in the actual performance of the procedure at issue within one year of the alleged negligent conduct. *Hinkley v. Koehler,* 269 Va. 82, 87, 606 S.E.2d 803, 806 (2005). The active clinical practice requirement combats proposed expert testimony by individuals who have not recently engaged in the performance of the procedures in issue; the clinical care must be in the same context as the alleged wrongdoing of the defendant. *Perdieu v. Blackstone Family Practice Center, Inc.,* 264 Va. 408, 419, 568 S.E.2d 703, 710 (2002). The Virginia Supreme Court has routinely excluded expert testimony that does not fit the requirement. *See Hinkley, supra*; *Peridieu, supra*; *Fairfax Hospital System, Inc. v. Curtis*, 249 Va. 531, 537, 457 S.E.2d 66, 70 (1995).

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the

product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

As noted by the Fourth Circuit Court of Appeals, this rule "establishes the criteria for admitting the testimony of an expert witness," and a "district court's job [is] to 'decide any preliminary question about whether a witness is qualified.'" *Le Doux v. W. Express, Inc.*, 126 F.4th 978, 983–84 (4th Cir. 2025) (alteration added) (quoting Fed. R. Evid. 104(a)). Given that "[e]xpert evidence can be both powerful and quite misleading," *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993), a district court is charged with performing "a special gatekeeping obligation," *Nease v. Ford Motor Co.*, 848 F.3d 219, 230 (4th Cir. 2017), to "ensure that the expert is qualified and that the expert's testimony is both relevant and reliable." *United States v. Smith*, 919 F.3d 825, 835 (4th Cir. 2019).

Dr. McLearen's opinions relating to the medical care provided at the facility do not comply with these strict standards. She does not have the requisite experience or expertise to make any medical opinions whatsoever. Her report and deposition testimony make this clear.

Further, Dr. McLearen has never provided nursing care in any context, let alone a correctional facility. She only ever had a clinical practice in psychology, which she ceased in 2010 to pursue non-clinical areas of work. This case involves an emergent response to an inmate with severe blood loss and screening of an inmate by a nurse for possible sexual assault, for which Dr. McLearen has no experience at all, let alone recent relevant clinical experience. Dr. McLearen made eminently clear throughout her deposition that her opinions were limited to the conduct of Nurse Russell prior to the incident and "medical staff" thereafter. Even so, she could not identify any wrongdoing on the part of the single GEO medical staff individually named in the lawsuit, Shirley Williams. Otherwise, she occasionally criticized GEO as an institution, despite there being no claims against GEO in that context. Further compounding the issue, Dr. McLearen testified that, even if pre-

8

screening was completed, there is no telling if that would have changed the outcome.  Because the great bulk of Dr. McLearen's opinions are medical (and the others are irrelevant), she does not meet the qualifications for a medical malpractice expert in Virginia and must be excluded.

**b.  Dr. McLearen's initial report was non-compliant with the Federal Rules of Civil Procedure regarding calling 911, and her opinions on the same are insufficiently explained**

Federal Rule of Civil Procedure 26(a)(2)(B) requires a retained expert to provide a written report containing a complete statement of all opinions and the basis and reasons for them. "[T]he expert report should be written in a manner that reflects the testimony the expert witness is expected to give at trial." *Sharpe v. United States*, 230 F.R.D. 452, 458 (E.D. Va. 2005). "A failure to disclose the information required by Rule 26(a)(2)(B) results in an exclusion of the expert testimony at trial." *Id.*; see Fed.R.Civ.P. 37(c)(1).  Experts must include within their reports their rational for conclusions. *Id.*  An expert report must provide an "analytical bridge" and "outline a line of reasoning arising from a logical foundation." *Goodrich v. John Crane, Inc.*, No. 4:17CV9, 2018 WL 10562401, at *6 (E.D. Va. Aug. 10, 2018). "Merely listing the universe of information consulted prior to preparing the report … does not fulfill Rule 26's requirement of stating the facts and data considered by the witness in forming the opinions." *Id.*

Dr. McLearen's initial report makes no concrete opinions regarding the timing of the call to 911 and does not make any specific criticism of the same.  She does not state that any delay in the call to 911 fell below the standard of care, nor does she state that the purported delay caused any adverse effects on Mr. Hernandez's care.  During deposition, she exonerated each individually named GEO Defendant and did not cite any other person that may have violated any supposed standard of care regarding the same.

Expert reports must furnish the analytical bridge between identified facts and the ultimate opinions. Reports that merely state conclusions without meaningful explanation or analytical support fail Rule 26(a)(2)(B)'s requirement for bases and reasons and are subject to exclusion. Because Dr. McLearen's initial opinions regarding the call to emergency services lack the required detail, methodology, and factual linkage, Dr. McLearen should not be allowed to testify on this subject.

### c. Dr. McLearen should be precluded from testifying regarding remedial measures or investigations

Federal Rule of Evidence 407 precludes introduction of "measures … taken that would have made an earlier injury or harm less likely to occur."  Further, Plaintiff did not plead any sort of "negligent investigation" claim, nor is such a viable cause of action in Virginia. *See Porter v. Woods,* 96 Va. Cir. 280 at *4 (2017). Evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice or its likelihood to confuse or mislead the trier of fact. Fed. R. Evid. 403.

Dr. McLearen's opinion that "follow-up standards were not properly followed in the aftermath of Mr. Hernandez's death" is wholly irrelevant to Plaintiff's claims and has no bearing on liability.  Dr. McLearen testified that, even if followed, such post-incident standards would not have changed the outcome.  Admission of such testimony would only confuse the jury and potentially lead to a prejudicial outcome to the defendants named in the suit (for example if the jury conflates any improper investigation to wrongdoing in the context of the wrongful death/survival action).  Thus, Dr. McLearen should be precluded from making this opinion at trial.

**d. Dr. McLearen should be precluded from testifying regarding irrelevant portions of her report**

Dr. McLearen testified that the news reports, studies, and many of the standards cited in her report did not have any bearing on her opinions.  Thus, if Dr. McLearen is allowed to testify on those subjects, it would only tend to confuse the jury.  Specifically, those items contained in paragraphs 23-26, 29, 33, 38 and 41 of her report, in addition to any other standard which she could not adequately explain during deposition, should be excluded and Dr. McLearen should not be allowed to testify as to the same.

## IV.    <u>CONCLUSION</u>

For the reasons stated herein, in these Defendants' Motion to Exclude Opinions of Alix McLearen, Ph.D., and in any further memoranda or argument, these Defendants respectfully request that the Court grant their Motion and exclude the opinions of Dr. McLearen or, in the alternative, limit her testimony as otherwise requested herein.

Respectfully Submitted, **THE GEO GROUP, INC., SAMUEL DAVIS, SHIRLEY WILLIAMS, MARTRE POWELL, TEWANDA PATTON, QUINTON HAWKES, TANIS FRITZ, CONNIE JONES, SHAKENNA TURNER, AND DARRIN BOYD**

/s/ Gregory S. Bean
Gregory S. Bean (VSB No. 80119)
Whiteford, Taylor & Preston L.L.P.
1021 E. Cary Street, Suite 2001
Richmond, Virginia 23219
Telephone: (804) 977-1241
Facsimile: (804) 977-3299
gbean@whitefordlaw.com
*Attorneys for Defendants The GEO Group, Inc., Samuel Davis, Shirley Williams, Martre Powell, Tewanda Patton, Quinton Hawkes, Tanis Fritz, Connie Jones, Shakenna Turner and Darrin Boyd*

11

**CERTIFICATE OF SERVICE**

I hereby certify that on December 31, 2025, I sent a true and accurate copy of the foregoing **MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE OPINIONS OF ALIX McLEAREN, Ph.D.** through the ECF system to the following:

Rodney S. Dillman, Esq. (VSB #46803)
Anna M. Cotto, Esq. (VSB # 99970)
DILLMAN LEGAL GROUP
295 Bendix Road, Suite 220
Virginia Beach, VA 23452
Telephone: 757-356-2300
Facsimile: 757-356-2341
rsdillman@dillmanlegalgroup.com
amcotto@dillmanlegalgroup.com
*Counsel for DeLisa Jordan, LPN*

Nancy F. Reynolds, Esq. (VSB #38236)
Kiernan Trebach LLP
1108 E Main Street, Suite 801
Richmond, VA 23219
Telephone: 757-797-0932
nreynolds@kiermantrebach.com
*Counsel for Meriam Kamara, R.N.*

Stephen C. Teague Esq.
LAW OFFICE OF STEPHEN C. TEAGUE
PO Box 706
Newport News, VA 23607
Telephone: 757-317-0716
Facsimile: 757-215-2974
stephen@teaguelawoffice.com
*Counsel for Plaintiff*

/s/ Gregory S. Bean
Counsel

12