

# Transcript of Alix M. McLearen, Ph.D.

**Date:** December 11, 2025
**Case:** Hernandez Reid/ Estate of Hernandez -v- The Geo Group, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

- - - - - - - - - - - - - x

DELISA HERNANDEZ          :

REID, ADMINISTRATOR       :

OF THE ESTATE OF          :

DAMIAN HERNANDEZ,         :

     Plaintiff,          :      Civil Action No.

  v.                      :        3:24-cv-309

THE GEO GROUP, INC.,      :

et al.,                   :

     Defendants.         :

- - - - - - - - - - - - - x

DEPOSITION OF ALIX M. McLEAREN, Ph.D.

(Conducted Virtually)

Thursday, December 11, 2025

3:31 p.m. EST

Job No.: 612387

Pages: 1 - 94

Reported By: Tracy Hand, RPR

Deposition of ALIX M. MCLEAREN, Ph.D., conducted virtually.


*** ALL PARTICIPANTS APPEARED VIRTUALLY ***


Pursuant to notice, before Tracy Hand, RPR, Notary Public in and for the Commonwealth of Virginia.

A P P E A R A N C E S


ON BEHALF OF THE PLAINTIFF:

    STEPHEN C. TEAGUE, ESQUIRE

    Law Office of Stephen C. Teague

    701 Town Center Drive, Suite 800

    Newport News, Virginia 23606

    (757) 317-0716

    stephen@teaguelawoffice.com


ON BEHALF OF DEFENDANTS GEO GROUP, INC.,

SAMUEL DAVIS, SHIRLEY WILLIAMS, MATRE POWELL,

TEWANDA PATTON, TANIS FRITZ, CONNIE JONES,

QUINTON HAWKES, SHAKENNA TURNER, AND DARRIN

BOYD:

    GREGORY S. BEAN, ESQUIRE

    Whiteford, Taylor & Preston L.L.P.

    1021 East Cary Street, Suite 2001

    Richmond, Virginia 23219

    (804) 977-1241

    gbean@whitefordlaw.com

A P P E A R A N C E S   C O N T I N U E D

ON BEHALF OF DEFENDANT DELISA JORDAN, LPN:

ANNA M. COTTO, ESQUIRE

Dillman Legal Group

295 Bendix Road, Suite 220

Virginia Beach, Virginia 23452

(757) 356-2300

amcotto@dillmanlegalgroup.com

ON BEHALF OF DEFENDANT MERIAM KAMARA, RN:

NANCY F. REYNOLDS, ESQUIRE

Kierman Trebach LLP

1108 East Main Street, Suite 801

Richmond, Virginia 23219

(757) 797-0932

nreynolds@kiermantrebach.com

ALSO PRESENT:

DeLisa Hernandez

A  My ...

Q  Your psychology license.

A  No.

Q  Okay.  Have you ever been a subject of an investigation from any administrative board regarding your psychology license?

A  No.

Q  I think you said you're not a licensed psychologist in Virginia.  Have you ever been one?

A  No.

Q  Have you ever practiced psychology in Virginia?

A  I do not.  I -- the only thing I do is what we talked about earlier.

Q  Okay.  So you've not brought any records with you today, it sounds like?

A  No.

Q  All right.  In preparing your report, did you interview anyone, apart from Mr. Teague?

A  No.  I don't know that I interviewed Mr. Teague, either.

Q  Okay.  Did you speak -- well, you spoke --

BY MR. BEAN:

Q  All right.  Paragraph 20, there's a statement in here that you agree that officers responded to the emergency call immediately, correct?  I'm just quoting from here.  "It is clear" --

A  I'm just looking at it.  Like I'm -- if we're going to be precise, let's be precise.  Yes, that is what I said, "... it is clear officers responded to the cell immediately."

Q  Okay.  And then it's also your expert opinion that medical staff were called right away and arrived within a few minutes?

A  Yes.  I don't believe that is a matter of opinion.

Q  Okay.  But that's a fact upon which you made your opinions?

A  That was very clear.

Q  So when you -- I'm going to scroll down.  And, actually, in Paragraph 20 it says, "... it took about ten minutes for Mr. Hernandez to be transported to the medical area.  During that

time, he was not provided medical care."

Upon what did you base that factual assertion?

A  The totality of the records, which included statements from the medical responders about what was done, other documents.

Q  Okay.  And are you making the opinion that -- it looked like this is focused on the time during transport.  Is your opinion here that, during the transport, he was not provided medical care; that's accurate?

A  Yes.  And I -- I believe what I am trying to convey here, as I get up, you know, to the opinions, is that, yes, as you said, the medical staff came after they were called.  The correctional staff went to the cell immediately, but then there was a period of time where medical staff could not identify the source of the bleeding and were focused on escorting or transporting Mr. Hernandez to medical.  And, during that time, there was not care being provided.  So from the time that they arrived

there until the time they get to medical.

Q  Okay.  All right.  But you're not making the opinion that, prior to the transport, there was no medical care provided?

A  I don't think that's accurate.

Q  I think I did a double negative.

What is -- tell me what is not accurate. Do you think there was medical care provided prior to transport or not?

A  I -- officers report providing some kind of first aid when they initially got there. However, medical staff said that they did not know the source of the bleeding and did not provide care until he arrived in medical.

Therefore, even though correctional staff may have done something, once medical staff arrive and take control of the scene, yes, it was my opinion that they were not doing anything because they themselves said there was a lot of blood, and they didn't exactly know what was going on.  I mean, I paraphrased.

Q  Okay.  So that criticism would be of the

medical staff that arrived at the cell, not the correctional staff?

A   I believe that's a correct way of explaining that.

Q   Okay.  In your report there's a few paragraphs that talk about some background of the Lawrenceville correctional facility.

A   Uh-huh.

Q   They reference news reports, the Virginia Interfaith Center for Public Policy report.  And so this is 23, 24, 25, and then 26 talks about some private companies and for-profit prisons and their controversial nature.

What roles did these reports and news reports and administrative reports, what role did they play in coming to your opinion?

A   I don't know that I could quantify that. Very little, if any at all.  But these are things that I know or had heard about, and in, you know, an effort to be fully transparent, believed it was proper to cite them.

But my -- my opinions were based on the

records that I reviewed specific to this incident.

Q  Okay.  So these Paragraphs 23 through 26, they do not form a basis of your opinion but are, instead, background information; is that accurate?

A  I think that's fair.

Q  Okay.  In other words, if you didn't have the information in Paragraphs 23 through 26, you could still make the opinions you did?

A  Absolutely.

Q  What about, you reference a case in Paragraph 29, Estelle v. Gamble.  Did that -- did you base your opinion at all on Estelle v. Gamble?

A  In the most remote possible way maybe.  It was simply saying, wow, I'm not going to go into the legal landscape that -- it shapes the basis of modern corrections wherein we are responsible for providing treatment of all varieties, education, and a whole bunch of other things.  But that was beyond the scope of this report, but, hey, I'm aware of it I think is --

Q  Okay.

A  -- the best way I would describe that

paragraph.

Q  Okay.  So there's nothing from Estelle v. Gamble that you're relying upon to form your opinions; is that correct?

A  No.  I mean, yes, it's correct.

Q  Yes, you are not relying upon anything from Estelle v. Gamble to form your opinions?

A  Yes.

Q  Let's make that clear.  Let's make that clear.

Estelle v. Gamble is not a basis of your opinions.

A  That is correct.  It is -- like the others, it is information I know and have that is kind of a foundational thing in corrections.

Q  Okay.  Moving down to some specific PREA standards.  In Paragraph 33, you reference PREA standard Section 115.31 through 35.  How did those play into your opinions?

A  I am pretty familiar with PREA, given, you know, I sat on the working group for interpretation of the law and worked as a PREA

coordinator and all those things, but yet I will always go back and look at the exact wording because I want to be precise.

So I did review the standards just to look at exactly what they say about responses to potential sexual abuse.  And, in fact, you know, one of my opinions was that it -- that issue ought to have been more fully developed or explored.

So I think the PREA standards did play a role in forming my opinion.

Q  Okay.  Do you make an opinion that anybody in this incident violated any particular PREA standard?

A  I don't -- no, that's not how I phrased it in the report.

Q  Okay.  So, in other words, you're not going to cite any particular PREA standard and say, this PREA standard was violated?

A  No, that's not what I did.

Q  So is it more you believe the PREA was violated as a whole or the idea of PREA, or what exactly is the opinion regarding PREA and whether

it was violated?

A  Yes, I think it's the interplay between the standards that was violated.  PREA is about, you know, responding, detecting, preventing, investigating, all of the components.

And, while I -- training is a piece as well, and while I didn't, like, look at their training curriculum, they should -- staff should be trained that, if somebody is bleeding from their rectum, that sexual abuse should be explored because -- because there's a reason we have the Prison Rape Elimination Act, because sexual abuse is a concern and something that is prevalent in correctional facilities.

And that's why I kind of cite several of them.  If there is a suspicion, it should be explored.  And then there are multiple standards throughout about what you do when there is a suspicion and, because nothing was done at the beginning, none of those were done throughout. The course of these events and the final report, there was always no PREA, no PREA, no PREA.  So

you could, in theory, go back and point to multiple standards, so I just went with the overarching standards as a whole.

Q   Okay.  But you're not going to -- when you testify, you're not going to cite a specific PREA standard; you're going to cite PREA as a concept, as a whole, correct?

A   At this time that's where I am.  I have no idea what additional information may come, but at the time I wrote the report, that's where my head was.

Q   Okay.  Thank you.

You don't make an opinion as to whether there was inadequate training, correct?  I think you just mentioned that.

A   You are correct.  I didn't have the opportunity to review curriculum, so I -- I don't know what training they got.

Yes, there are some records that say people took courses or -- on certain topics, but no details.

Q   Is there a PREA standard that talks about

how to detect and respond to potential sexual abuse?

A  Yes.

Q  Okay.  And did you -- you didn't cite that in your report, though, unless I'm missing it.

A  You know what?  Without pulling them all up, I can't tell you which ones I cited.  I cited some general things about detecting, responding, what you would do, how to get trained, preserving.

But there are a great number of standards that talk about what to do in different situations and with different people and at intake, so I'm not sure I have a precise answer for you on that one.

Q  Okay.  We'll get a little bit more into it later during your opinions.

So, moving down to Paragraph 38, you make the opinion -- or you make the statement, "ACA standards include standards related to prevention of and response to suicidal behavior."  And then you list a few direct citations to the ACA.

A  Yes.

time, but I understand that, if there's specific language that I want to quote, then I should make sure it is with me or admitted as an exhibit.

Q  Okay.  And are you going to quote specifically from this ACI standard?

A  I don't know at this time.

Q  Okay.  All right.

You say that this standard mandates a suicide prevention plan.  You don't -- you're not making an opinion that there was not a suicide prevention plan in place, correct?

A  That's correct.

Q  Okay.  ACI standard -- or ACA standard 5-ACI-6A-36, you say that that requires a leadership after-action review and a psychology autopsy.

Are you asserting that that was violated in this instance?

A  I am asserting that I saw no such documents.

Q  If those -- you'll agree with me, though, if that was completed, the leadership after-action

Transcript of Alix M. McLearen, Ph.D.
Conducted on December 11, 2025                48

or a psychology autopsy, that would not have changed the outcome of Mr. Hernandez's death, correct?

A  I'm not sure I understand.  This is a hypothetical.

Q  Well, you're criticizing the correctional officers in the facility for not completing a leadership after-action review and a psychological autopsy, but if those were completed, it would not have saved Mr. Hernandez's life.

A  If somebody does something after someone has become deceased, it does not bring them back to life, if that's what you're asking.

Q  I am.  It's an obvious question, but it's one that needs to be asked.

A  Okay.

Q  All right.  5-ACI-6D-02, you say, "... similar requirements are described for medical providers."

So does that standard say that there should be an after-action review and a psychological autopsy?

Transcript of Alix M. McLearen, Ph.D.
Conducted on December 11, 2025          49

A  I don't think it says a psychological autopsy because that wouldn't fall in there, but those are the two standards that discuss what to do after someone dies by suicide.

Q  Okay.  Are you going to utilize the text and language of these specific standards at trial?

A  I don't know.

Q  Do you have any opinions that rely upon the specific language of these provisions outside of what's in your report?

A  I don't think I -- could you say that somehow differently?  I'm not sure I understand.

Q  Yeah.  Is there anything within these standards that you did not include in your report upon which you relied to make your opinions?

A  I ... I was giving examples here of very specific provisions from PREA as well as from ACA. But those are two things that with which I have familiarity, which is why I kind of cite the PREA law as a whole and the ACA organization and what its standards do as a whole, because I can't unknow what I know.

Q  I understand.  Let me try and rephrase that question.

This 5-ACI-6A-36, for example, that has text that you did not verbatim put in your report. Is there a --

A  That is correct.

Q  Is there a portion of that text that you relied upon to make your opinions that is not included in the report?

A  I don't think so.

Q  Okay.  The National Commission on Correctional Healthcare, you cite that in Paragraph 41.  You indicate that the "NCCHC recommends screening for suicide during primary care visits ..."

Now, the visit with Nurse Russell, that was not a primary care visit, correct?

A  I think different people could probably categorize that different ways.

Q  How do you categorize it?  Do you categorize it as a primary care visit?

A  I didn't necessarily categorize it as any

one or another.  Again, I'm giving an example here of the importance of screening for suicide when you have contact with an individual.

Q  Are you making an opinion that any party violated the NCCHC by not doing a screening during a primary care visit?

A  I don't believe that I stated that anywhere.

Q  Okay.  And are you making any opinion that any party violated the NCCHC by not having cross-discipline response training exercises?

A  I'm not sure that these -- this line of questioning lends itself well to yes-and-no answers, so I'm trying to give you my best answer, which is, in all of these cases, I am giving samples of things that I know about that are best practices in corrections from different places that suggest things that could be done that then I am able to also combine with my experience and knowledge to make an overall opinion.

So these are pieces of things, but they're not necessarily, aha, it says this exact word here

and that means this.  There's no way for me to parse that out.

Q  Okay.  Are you making the opinion that any person violated the standards of the NCCHC?

A  Well, that's not what I said in my report.

Q  Okay.  So the answer is no.

A  Well, it's not what I said in my report, so I -- I'm going --

Q  I understand.

A  -- to leave it there.

Q  I know, but I'm asking you what opinions you're going to make, and if you're going to make an opinion outside your report, I should know that.  But I assume you're not going to make -- let me say this:  You're not going to make any opinions that are not in your report -- that might be the better question -- is that correct?

A  I'm comfortable with the opinions that I've written in the report --

Q  Okay.

A  -- but elaborating on them and explaining them, you know, sometimes means we use different

Transcript of Alix M. McLearen, Ph.D.
Conducted on December 11, 2025    54

kind of give some background on follow-up

standards.

Again, even if all follow-up standards

were followed 100 percent, that would not change

the outcome and bring Mr. Hernandez back to life,

correct?

A  Nothing anywhere will bring Mr. Hernandez

back to life.

Q  All right.  In Paragraph 53, you say

Mr. Hernandez complained of rectal bleeding.  You

say, "Certainly, this symptom can have many

causes, and particularly in a correctional

environment, sexual abuse is one possibility that

should be thoroughly explored."

So that's your -- that's an opinion you

make, "sexual abuse is one possibility that should

be thoroughly explored."  Upon what do you base

that opinion?

A  I'm not sure that I would categorize that

as an opinion.  I think it is a good correctional

practice based on my understanding of sexual abuse

taking place in prison, PREA, policies and

trainings of other places, that it's exactly what I said. There are all kinds of reasons somebody could have that kind of a symptom, but given that you're in a correctional environment, and given the incredible amount of training that should be devoted to detecting sexual assault, it -- it is an oversight not to explore what might have led to that.

People suffer from shame and all kinds of things, especially men when they have been sexually assaulted, so it ought to be asked about.

Q  Must it be asked about?  Is it a standard that is required?

A  I am not familiar with a specific standard applicable to the facility we are talking about that said you must ask about rectal bleeding.

Q  You must ask --

A  You must ask about PREA if there's rectal bleeding, I'm sorry.

Q  Okay.  So your opinion, though, is that Nurse Russell's conduct fell below the standard of care when she did not explore PREA; is that your

Transcript of Alix M. McLearen, Ph.D.
Conducted on December 11, 2025                56

opinion?

A   I don't know if those are the exact words I used, but I think that is a reasonable summary.

Q   Okay.  So in this -- we'll talk about Nurse Russell specifically in a second, but here you say, "Under PREA law and company policy, GEO staff should have had ample information from training to suggest sexual assault as a potential cause for rectal bleeding."

Is that opinion made simply because there was rectal bleeding, or are there other factors that support your opinion that there was ample evidence that sexual assault was a potential cause for Mr. Hernandez's rectal bleeding?

A   I am not sure I understand your question.

Q   Let me see if I can rephrase it.  Is there anything, apart from the rectal bleeding and the fact that Mr. Hernandez was in a correctional facility setting, that led you to the opinion that they should have used PREA screening?

A   I understand now.  No, I am saying pretty much what I think you stated, and I will restate

Transcript of Alix M. McLearen, Ph.D.
Conducted on December 11, 2025        57

it, that we have PREA for a reason, because sexual assault occurs in these locations.

So if somebody comes to you without a history of this symptom that you know comes from somewhere else, it is worthwhile to ask those questions.  It is more than worthwhile.  It is incumbent upon you.

Q  All right.  So then your opinion would be, any time an inmate presents with rectal bleeding, PREA must be -- there must be PREA screening?

A  I don't -- I mean, that puts words in my mouth.  That's not -- I didn't say exactly that.

Q  Isn't that the implication, though?

A  I'm not writing policy for the world at this time.  My opinion is that the appropriate course of action when someone presents with rectal bleeding that you don't know the source of is that you should do some exploration of whether a sexual assault occurred.

Q  And your opinion is that is required.

A  Again, that's putting a word in my mouth. I already --

Transcript of Alix M. McLearen, Ph.D.
Conducted on December 11, 2025                58

Q  Sure.

A  -- agreed that there isn't a specific standard that I am aware of that says you have to do this if this.  PREA is not that specific, and I didn't see anything in their policies that was, either.

Q  And the reason I'm pressing is because you're using the term worthwhile.  Worthwhile and required are different because you're --

A  I switched to the word incumbent.

Q  Okay.  So you would say it is incumbent upon medical practitioners, when receiving an inmate with rectal bleeding of an unknown source, it is incumbent upon them to do PREA screening.

A  To find out -- I'm just not comfortable with my words -- me agreeing to words I didn't say.

Yes, if someone reports to medical with a rectal bleed, they should be examined, questioned about where that came from, including the possibility of sexual abuse.

Q  Okay.  Now, you read the nursing

could have occurred during the physician visit, correct?

A  I have no idea.

Q  Are there any -- regarding the fact that -- or your opinion that Nurse Russell should have completed a PREA screening, are there any other bases, reports, standards that you relied upon to come to that opinion that we haven't discussed, whether or not in your report?

A  Are there any things that I didn't talk about in my report that I used to come to that decision; that's the question?

Q  Correct.

A  No.

Q  Now, you can't make an opinion, right, that, if PREA standards had been followed, the outcome would have been different?

A  I -- I didn't talk about hypotheticals. No, I don't think anybody can say, if this, then that.  I believe I said something along the lines of possibly outcomes could have been different if these things were addressed, but no one can know

what could have or would have or might have in scenarios that are not real.

Q  So, in other words, if Nurse Russell had complied with all appropriate standards, the outcome could have been the same?

A  Maybe.

Q  It's true, though, right?  It could have been the same.  That's a possible scenario?

A  Sure.

Q  All right.  In Paragraph 58 you say, "Records reveal there was a large amount of blood on the scene, but there is no indication in the video, logs, or notes that first aid or CPR are performed or that medical staff communicate about such needs until Mr. Hernandez arrives in the medical area at 3:30 a.m."

You will agree with me, though, that each of the correctional officers indicate that there was first aid performed?

A  The correctional officer, yes.  I'm speaking specific to medical care and medical staff here.  I think we clarified that before.

Transcript of Alix M. McLearen, Ph.D.
Conducted on December 11, 2025          69

A   My report did not focus on the individual. You know, I don't want to try to recall their names here because I won't be able to.

My report really focused on the system response, although I did in places, as we talked about, kind of differentiate between medical and nonmedical staff.

So I don't know these people's names.  I'm not able to give you a good answer.

Q   Okay.  But you did read their discovery responses where several of them indicated that they either radioed master to call 911 or they heard others radio master to call 911?

A   Absolutely.  I do not dispute -- and I want to be very clear about that:  I do not dispute that several officers made statements that -- there was significant information supporting that the officers made an effort to have 911 be called.

Q   And so those officers that are on the ground that have indicated that they understood 911 was called, did they violate policy by not

calling 911?

A  Again, I -- I'm not comfortable getting into the who because I don't know all the names of the individuals, and it's not what I focused on. So let me phrase that in a way that I'm comfortable with.

The officers that responded and stayed with Mr. Hernandez were responsible for notifying medical, for saying somebody needs to call 911, those kinds of statements.  They were not the people tasked with calling 911.

Q  That was master control.

A  We don't have a policy, but, yes, I believe master control is what they call the control center.  I don't -- I don't want to misuse their terms.

Q  Okay.

A  Because other people -- I call it the control center, but I think they have more than one.

Q  Right.  Right.  So is your understanding that -- and I probably know more about the

Transcript of Alix M. McLearen, Ph.D.
Conducted on December 11, 2025                71

facility than you do, but I assume you know some about it -- that there was a control booth within each unit and then there was a separate master control?

A  That's what it sounded like --

Q  Okay.

A  -- from the different logs, and so that was -- that was my understanding.

Q  Okay.  So we already talked about the correctional officers who were on the ground responding to the cell.

With respect to Officer Jones and I believe it was Patton -- or, excuse me, yeah, Officer Jones and Turner who were in the control booth in the unit, do you have opinions regarding whether they violated the standard of care relating to calling 911?

A  I'm going to refer back to what I said previously.  The people who were not responsible or trained to call 911 wouldn't have called 911.

The order was given to call 911, and that -- again, I think the word is master control,

but I don't want to misuse it, but policy assigns that responsibility to a particular entity, which I think is called master control.  So that would not be the people working at the unit.

Q  Okay.  And then Shirley Williams, she's kind of the lone medical provider that's been named as a GEO defendant, she would also fall outside of that scope of who should be calling 911; is that right?

A  I -- I'd like to stay away from individuals.  I believe the institution policy states that the master control -- look, we're using the word master control, and if I'm wrong, I would like that to get corrected, but we all know what I'm talking about, right?

Q  Yeah.  I understand.  We can move on.

All right.  I want to go to Paragraph 65. It says, "It is my opinion that suicide prevention and emergency response standards were not properly followed."

Describe all suicide prevention standards that were not followed.

A   In this particular sentence, "standards" I would best categorize as a synonym for "best practices," which is why I reviewed various things and said that, you know, we're really looking at the totality of, not only my own experience, but what other systems do.  I hadn't intended that to be, and if you read Number 45.8, it means this.

Q   Understood.

A   It is really back to what I --

Q   Okay.

A   -- thought I had already described, that people should have been properly trained to respond to this, which would include all the things we've already talked about, and providing care on the scene and having no delays.

Q   So let's focus -- I think we can help clarify this.  So with respect to suicide prevention, it sounds like -- we've already talked about Nurse Russell.  It sounds like your opinions are focused on Nurse Russell and what should have happened during that exam; is that --

A   Wait, that --

Transcript of Alix M. McLearen, Ph.D.
Conducted on December 11, 2025                    74

Q  -- correct?

A  Sexual assault.  I thought you said suicide prevention.  I'm confused.

Q  Yeah, so your opinion, it says, "It is my opinion suicide prevention standards were not properly followed."

So we've already talked about Nurse Russell.  But I'm asking, are there any other suicide prevention standards that were not properly followed and, if so, what are they?

A  Okay.  And what I -- perhaps I'm not following you.  I thought we spoke about Nurse Russell with regard to her exam.

Q  You're right.

A  Okay.

Q  So when I think about suicide prevention, I'm thinking, prior to someone attempting suicide, what are you doing?

But it sounds like you're defining suicide prevention standards differently.  Are you talking about a response to a suicide attempt?

A  Both.  So, for example, if someone has had

a sexual assault, we have places where sexual assault is a risk factor for suicide, and we will never know that because it wasn't explored.

So, yes, that plays into this.  But, also, you know, breaking the sentence up word by word makes it less sensible.  Suicide prevention and emergency response, they -- my intention is that they are taken together.

So, yes, there was a ball dropped there, and once things were happening, you can still prevent a suicide when an attempt has occurred.

Q  Understand.  Okay.

But there's no opinions outside your report -- you've included all your opinions regarding suicide prevention and emergency response, those are all within your report?

A  I believe so.  I mean, we can certainly break them down and expand them and explain them --

Q  Okay.

A  -- but I --

Q  Yeah, understood.

A -- don't have some other secret document with other opinions.

Q Okay. Well, I have to explore that because I don't want to be surprised by anything.

A I understand.

Q So let's talk about Paragraph 61 and 62. You talk about access to and use of medical supplies.

So 61 you say ... see, the needed materials were not easy to obtain, let me see. I think that's at -- here we go: "Needed materials were not easy to obtain."

In 62 you state that there was -- oxygen was not hooked up. 23 minutes into the video from the medical unit, staff can be heard saying oxygen is not hooked up. Staff also noted difficulty with the AED pads.

A Okay.

Q So, with respect to materials not being easy to obtain, oxygen not being hooked up, and difficulty with AED pads, are those criticisms you're making of the correctional staff, or is

that limited to the medical staff?

A  I've tried valiantly, I think, to make clear that I looked at GEO as an entity because I don't know who was employed by what and exactly -- you know, yes, there was some job duty descriptions for certain posts, but I spoke generally about GEO staff in my report.

Q  Okay.

A  However, when we are talking about medical treatment outside of initial first responses that all staff should be trained on, primarily, yes, I'm talking about medical staff.

Q  Okay.  So when you say oxygen is not hooked up, needed materials were not easy to obtain, and there was difficulty with AED pads, is -- would that be within the standard of care for correctional staff to be making sure oxygen is hooked up, making sure AED pads are used correctly, or is that limited to medical?

A  Everybody should know how to use an AED in corrections.  They should be placed on the unit. It is a standard practice across systems to be

are drilling time and time again to make sure these things occur so you would know who is responsible within medical to have the oxygen machines be working or the masks be accessible. Those are things that you would be checking on in the event of an emergency.

So I can't tell you it was Bob, he was responsible, because I don't know all their staff.

Q  Okay.

A  I am saying that the facility, GEO, whomever, is responsible for training on how to respond to an event like this, and if that were well done, you wouldn't have somebody that a medical provider needs to give oxygen and yet they can't find the mask and then, after they put it on, it seems like it's not properly hooked up because you should have practiced those things.

And, if you are trying to save a life, the functioning and know-how to use those machines and equipment and tools and techniques is critical.

Q  Okay.  And part of the reason I have to drill down into individuals is because there have

Transcript of Alix M. McLearen, Ph.D.
Conducted on December 11, 2025                    81

been individuals that have been sued.

So, for example, Quinton Hawkes has been sued as a correctional officer.  Do you have -- I have to ask the question, do you have an opinion whether he didn't provide oxygen or was obligated to provide oxygen?  So that's why --

A  I don't have an opinion on that.

Q  Yeah, and that's why I asked.  Do you have any opinion whether any of the correctional officers should have been the ones to make sure oxygen was hooked up?

A  I do not have opinions on the specific correctional officers that were in the room in medical providing CPR.

It is my broad opinion that everyone at the facility ought to know how to use an AED, and I already stated that.

Q  Okay.

A  That is a -- a standard training.

Q  Okay.

A  But I would not expect a correctional officer to know how to give oxygen, and I didn't

talk about that because that wasn't part of what I was attempting to convey as my opinion here.

Q  Okay.  Understood.

Now, do you have any specific criticisms for any of these particular correctional officers for difficulty using the AED pads?

A  Not at this time.  I would need to go back.  I mean, honestly, that is just not something that I expected to have to answer is who was having trouble with the AED pads, so I'd probably have to go back and re-watch the video.

Q  Okay.  That's fine.

And then obtaining medical materials, do you criticize any of the correctional facility officers specifically for materials not being easy to obtain?

A  Again, I'm talking about the failed system response in my opinion.

Q  So that is a no then, you don't cite -- you don't have any criticisms of these --

A  I'm not pointing to the correctional officers in any way about medical care.  I'm just

reserving that piece about, you know, everyone should be trained on first aid and AED.

Q  Okay.  I understand.

What about Shirley Williams, who was a medical practitioner, did you make any specific opinions about her care and whether it fell below the standard of care?

A  No, I don't -- I'm sorry, I just can't remember the different medical practitioners, so ....

Q  I know.  I understand.  So you didn't -- but you didn't specifically single out Shirley Williams and identify whether her standard of care fell below?

A  I did not.

Q  Okay.  All right.  Let's talk about Paragraph 66.  This is a correct statement of your opinion, that suicide behavior was likely.

A  Where are you?

Q  In 66.

A  Oh, I'm sorry.  Yes.

Q  Did you make an opinion as to whether you

time.  Unless you're going to prorate me and discount me, by my clock, I have about 20 more minutes, so I'm happy to open up questions to defense counsel, any other defense counsel if they want to ask any questions, Anna or Nancy.

MS. REYNOLDS:  Anna, if you have any, go ahead.

EXAMINATION

BY MS. COTTO:

Q  Sure, I just have, you know, a handful of questions.

You have never been licensed as a registered nurse or a licensed practical nurse; is that correct?

A  That's correct.

Q  And you would not be aware of the standard of care applicable to LPNs and RNs?

A  I'm not sure that I would say that.  I supervised two nurses before, and that would include evaluating their performance, so ... but I'm not a nurse.

Q  Would you agree that you've never provided

Transcript of Alix M. McLearen, Ph.D.
Conducted on December 11, 2025                    88

clinical nursing care?

A  Yes, I would absolutely agree to that.

MS. COTTO:  Those are all the questions I have.

MS. REYNOLDS:  Okay.  My turn.

EXAMINATION

BY MS. REYNOLDS:

Q  Dr. McLearen, what is the standard of care for nurses in a correctional setting?

A  I'm -- that's a very broad question, so --

Q  It's a very specific question, actually. There's a legal standard of care.  Can you provide that for us?

A  No.  I'm not an attorney and I don't know what you're referencing.

Q  Okay.  You -- actually, in your report you indicate, in Paragraph 2, "I have been asked to provide my opinion on whether GEO Group, Inc. staff at the Lawrenceville correctional facility complied with standards of care regarding their treatment of and response to the death of Mr. Damian Hernandez."

Is it the case that your opinions are on the standard of care for the correctional facility staff?

A  I think so, if I understand your question.

Q  It's very specific in your -- in Paragraph 2.

A  I got it.  I know what I said.  But I'm not sure I understand what you're asking me other than did I say that.

Q  Are your opinions with regard to GEO staff?

A  Yes.

Q  So you're not --

A  People who worked at the facility.

Q  You're not rendering any opinions on the nursing standards for the nurses, Meriam Kamara or DeLisa Jordan, correct?

A  I'm not sure that that's accurate.  I would consider those amongst the GEO staff, the people that worked at the facility.

I'm not evaluating their ability to be nurses.  I am opining on the totality of the

Transcript of Alix M. McLearen, Ph.D.
Conducted on December 11, 2025                89

Is it the case that your opinions are on the standard of care for the correctional facility staff?

A  I think so, if I understand your question.

Q  It's very specific in your -- in Paragraph 2.

A  I got it.  I know what I said.  But I'm not sure I understand what you're asking me other than did I say that.

Q  Are your opinions with regard to GEO staff?

A  Yes.

Q  So you're not --

A  People who worked at the facility.

Q  You're not rendering any opinions on the nursing standards for the nurses, Meriam Kamara or DeLisa Jordan, correct?

A  I'm not sure that that's accurate.  I would consider those amongst the GEO staff, the people that worked at the facility.

I'm not evaluating their ability to be nurses.  I am opining on the totality of the

Transcript of Alix M. McLearen, Ph.D.
Conducted on December 11, 2025                    90

response to this situation.

Q  Are you aware of why it took ten minutes for the facility or the correctional facility staff to get from Mr. Hernandez's cell to the medical unit?

A  I -- I don't know how to answer that question.

Q  Okay.  Let me be specific.  Are you aware that Mr. Hernandez's cell was in a completely different building across the yard from the medical unit?

A  Yes, yes, I do understand that he had to be moved, I believe, down some stairs and across the facility.

Q  So it would have taken some time for them to get from his cell all the way over to the medical unit?

A  It would have, for sure.

Q  And you're aware that they were not able to locate his wounds because of the amount of bleeding on his body?

A  I -- that was in their statements.  It

COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

I, Tracy D. Hand, RPR, a Notary Public for the Commonwealth of Virginia at Large, of qualification in the Circuit Court of the City of Virginia Beach, Virginia, whose commission expires April 30, 2026, do hereby certify that the within deponent, ALIX M. McLEAREN, Ph.D., appeared before me virtually; and after being first duly sworn by me, was examined upon her oath by counsel; that her examination was recorded in stenotype by me and reduced to typescript under my direction; and that the foregoing transcript constitutes a true, accurate, and complete transcript. I further certify that I am not related to nor otherwise associated with any party or counsel to this proceeding, nor otherwise interested in the event thereof. Given under my hand and notarial seal at Virginia Beach, Virginia, this 26th day of December, 2025.

Tracy D. Hand, Notary Public

Registration Number 193795