IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

DELISA HERNANDEZ REID, Administrator )
of the Estate of Damian Hernandez, )
                                                 )
Plaintiff, )
                                                 )
v. )
                                                 )
THE GEO GROUP, INC.; et al., ) Civil Action No: 3:24-cv-309
                                                 )
Defendants. )

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE OR LIMIT TESTIMONY OF DEFENSE EXPERTS MICHAEL MCMUNN, DENNIS O'NEILL, BRIAN WAXLER, ALEXANDER MEAGHER, AND KAREN ALBERT**

Plaintiff Delisa Hernandez Reid, Administrator of the Estate of Damian Hernandez, pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), respectfully moves this Court to exclude or significantly limit the expert testimony of defense experts Dr. Michael McMunn, Dr. Dennis O'Neill, Dr. Brian Waxler, Dr. Alexander Meagher, and Dr. Karen Albert on the grounds that their proffered opinions fail to satisfy Rule 702's admissibility requirements.

**I. INTRODUCTION**

This wrongful death action arises from the death of Damian Hernandez on November 6, 2020, at Lawrenceville Correctional Center. At approximately 3:17 AM, Mr. Hernandez was discovered bleeding profusely from severe lacerations to both hands that partially transected his radial arteries. Despite remaining conscious and responsive for at least 35 minutes, he received grossly inadequate emergency care, and 911 was not called until 4:05 AM—a 48-minute delay. Mr. Hernandez was pronounced dead at 4:27 AM, never having reached a hospital.

1

Defendants have designated five expert witnesses whose testimony fails to meet Federal Rule of Evidence 702's requirements for admissibility. These experts offer opinions that are speculative and unsupported by evidence, exceed their demonstrated areas of expertise, constitute impermissible legal conclusions, and lack the transparent methodology required under *Daubert*. This motion seeks exclusion or significant limitation of their testimony to ensure the jury receives only reliable, helpful expert evidence within each expert's qualified domain.

**Defense Experts:**

**Dr. Michael McMunn, DNP, APRN, FNP-BC** (nurse practitioner) was separately designated by Defendants Kamara and Jordan. *See* Exhibits 4 & 5; Exhibit 14 (CV). He is currently employed by Southern Health Partners providing correctional healthcare services (23 years) and identifies as "Correctional Healthcare Expert Witness 2015 to Present." *Id.* He has testified in over 30 jurisdictions. *Id.* Compensation: $400-800/hour; $2,000 flat deposition fee; $5,000/day trial. *Id.*

**Dr. Dennis O'Neill, MD** (internal medicine physician, former Virginia Medical Examiner) was jointly retained by Defendants Kamara and Jordan. *See* Exhibit 1 (Report and CV). He has testified in five prior cases involving long-term care facilities. *Id.* Compensation: $250/hour review; $500/hour deposition; $2,000/day trial. *Id.*

**Dr. Alexander Meagher, MD, CCP** (family medicine physician) was retained by Defendants The GEO Group, Inc., et al. *See* Exhibit 8 (Report); Exhibit 12 (CV and fees). He is currently Medical Director of Travis County Jail (since 2014). *Id.* He also works as an "Expert Medical Services" provider for Teladoc/Best Doctors (since 2018). *Id.* Compensation: $475-600/hour; $5,000/day trial. *Id.*

**Dr. Brian Waxler, Psy.D., CCHP** (clinical psychologist) was retained by Defendants The GEO Group, Inc., et al. *See* Exhibit 6 (Report); Exhibit 13 (CV). He has testified in nine cases in the past five years, all for defendants, including at least three cases defending Wellpath, a major correctional healthcare corporation. *Id.* Compensation: $600-700/hour; $4,000/day trial. *Id.*

**Dr. Karen Albert, Ed.D.** (organizational leadership specialist) was retained by Defendants The GEO Group, Inc., et al. *See* Exhibit 10 (Report); Exhibit 15 (CV). She is not a licensed medical professional. *Id.* She has testified in at least 24 cases (2009-2024), all appearing to defend correctional facilities or healthcare providers. *Id.* Compensation: $275/hour; $3,000 deposition/trial. *Id.*

**Common Pattern:** Four of the five experts have zero publications in the past 10 years despite holding academic or clinical credentials. Three are currently employed in correctional healthcare or have recent correctional employment. All charge substantial hourly rates ($275-800/hour) with additional fees for depositions ($2,000-3,000) and trial testimony ($2,000-5,000/day).

## II. LEGAL STANDARD

Federal Rule of Evidence 702 provides that expert testimony is admissible only if: (a) the expert's specialized knowledge will help the trier of fact; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert reliably applied those principles and methods to the case facts.

The Supreme Court established in *Daubert* that trial courts must serve as gatekeepers, ensuring that expert testimony rests on "a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. This gatekeeping function extends to all expert testimony, whether based on

3

scientific knowledge or specialized experience. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

The Fourth Circuit requires that experts demonstrate not merely general credentials, but qualifications specifically in the discipline implicated by the challenged opinions. *See generally Sardis v. Overhead Door Corp.*, 10 F.4th 268 (4th Cir. 2021). Where an expert's opinion contains "an analytical gap between the data and the opinion proffered," exclusion is warranted. *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Courts exclude expert opinions that constitute impermissible legal conclusions, vouch for witness credibility, or usurp the jury's fact-finding function. *See* Fed. R. Evid. 702, 704; *Sardis v. Overhead Door Corp.*, 10 F.4th 268 (4th Cir. 2021); *United States v. Charley*, 189 F.3d 1251, 1267 (10th Cir. 1999). Experts must frame opinions in professional terms that assist the jury without dictating ultimate legal determinations.

## III. ARGUMENT

### A. Dr. Dennis O'Neill's Xylazine Theory Constitutes Unreliable Speculation Untethered From Any Evidentiary Basis and Must Be Excluded in Its Entirety

Dr. O'Neill opines that the 69 superficial puncture wounds on Mr. Hernandez's neck were created when he "injected himself with a form of muscle relaxant/pain-killing medication, such as Xylazine," a veterinary drug. *See* Exhibit 1 (O'Neill Expert Report). He claims this Xylazine injection "would explain why Mr. Hernandez's heart rate was 79, much lower than would be expected for someone who was hemorrhaging." *Id.* This opinion epitomizes the junk science *Daubert* was designed to exclude.

**Fatal Evidentiary Defects:**

First, **zero toxicological evidence supports this theory**. The autopsy toxicology testing detected only cannabis metabolites—no Xylazine, no sedatives, no muscle relaxants of any kind.

4

*See* Exhibit 2 (Autopsy Report). Dr. O'Neill admits in his report that Xylazine "would not necessarily show up in a toxicology exam" and attempts to explain away this absence by claiming it "typically becomes undetectable in a patient's system within thirty minutes to an hour." *See* Exhibit 1. This circular reasoning—positing a drug to explain observations, then excusing the drug's complete absence from testing—violates basic scientific methodology and renders the theory scientifically unfalsifiable.

Second, **no physical evidence supports injection**. No syringes, needles, or injection paraphernalia were found in Mr. Hernandez's cell. *See* Exhibit 2. The autopsy report describes the neck wounds as "superficial puncture wounds" that "likely represent attempted lethal cuts" with "no significant underlying injuries"—a description inconsistent with intravenous or intramuscular injection. *Id.*

Third, Dr. O'Neill **provides no scientific basis or methodology** for how he reached this theory. His report does not cite medical literature on Xylazine use patterns, pharmacokinetics, typical injection sites, expected physical findings, or any accepted framework for inferring drug use from wound patterns. *See* Exhibit 1. He offers no explanation for why these marks could not represent the "attempted lethal cuts" identified by the Medical Examiner. *See* Exhibit 2.

Fourth, the theory **employs impermissible circular reasoning**. Dr. O'Neill uses an assumed heart rate of 79 to infer Xylazine use, then uses the assumed Xylazine to explain the heart rate. *See* Exhibit 1. This bootstraps the conclusion into the premise, creating an unfalsifiable theory that cannot be tested or disproven. As Plaintiff's expert Dr. Fournier noted in his supplemental report, when questioned about the neck marks, Dr. Fournier stated he had "no opinion on what they mean" and called speculation about them "beyond speculative." *See* Exhibit 3 (Fournier Supplemental Report).

5

This represents precisely the analytical gap condemned in *Joiner*. Dr. O'Neill asks the jury to infer: neck marks → Xylazine injection → drug-facilitated self-harm, with zero evidentiary links connecting these logical leaps. 522 U.S. at 146. Speculation "untethered from the record" cannot satisfy Rule 702's reliability requirements and would mislead the jury with scientifically baseless conjecture.

**Relief Requested:** Complete exclusion of all Xylazine-related opinions, including any suggestion that Mr. Hernandez injected himself with muscle relaxants or that neck wounds represent injection sites rather than the Medical Examiner's finding of "attempted lethal cuts."

**B. Dr. Michael McMunn's "Less Than 1% Statistic" Constitutes Fabricated Data Disguised as Expertise and Must Be Excluded**

Dr. McMunn opines: "In my correctional healthcare education and experience, less than 1% of all rectal bleeds in long term prison settings are due to sexual assault." *See* Exhibit 4 (McMunn Expert Report - Kamara); Exhibit 5 (McMunn Expert Report - Jordan). He deploys this statistic to dismiss sexual assault as a plausible cause of Mr. Hernandez's November 5, 2020 complaint of rectal bleeding and blood in urine. *Id.*

This opinion fails *Daubert* because **Dr. McMunn provides no source, study, or data foundation** for this purported statistic. His report cites no peer-reviewed literature, epidemiological studies, correctional health databases, or institutional data supporting this "less than 1%" figure. *See* Exhibits 4 & 5. It appears nowhere in published correctional medicine literature. Dr. McMunn characterizes this as arising from his "education and experience," but provides no explanation of what experience generated this specific percentage, what sample size it reflects, or how he arrived at this numerical conclusion. *Id.*

**Why This Fails Rule 702:**

6

A statistic presented as fact requires a disclosed factual basis. When an expert testifies that a phenomenon occurs in "less than 1%" of cases, the expert must identify the population studied, the methodology used to generate that percentage, and the data sources consulted. Dr. McMunn provides none of this. His "statistic" is indistinguishable from litigation-driven speculation manufactured to support the defense narrative that sexual assault need not be considered despite classic presenting symptoms.

Merely listing materials reviewed or asserting conclusions based on undisclosed "experience" does not fulfill Rule 702's reliability requirements. *Kumho Tire*, 526 U.S. at 157. An expert who offers a specific numerical conclusion must disclose the analytical process that produced that number. Dr. McMunn's failure to do so renders this opinion inadmissible ipse dixit.

By contrast, Plaintiff's experts cite specific regulatory authorities (PREA protocols, NCCHC standards), published correctional health literature, and federal regulations with transparent explanations of how those authorities inform their conclusions. *See* Exhibit 6 (Fournier Expert Report); Exhibit 7 (McLearen Expert Report). The stark methodological difference demonstrates Dr. McMunn's departure from accepted expert practice.

**Relief Requested:** Exclude the "less than 1%" statistic and any opinion that rectal bleeding in correctional settings rarely indicates sexual assault, unless Dr. McMunn can provide the study, dataset, or published authority supporting this claimed percentage.

### C. Dr. Michael McMunn and Dr. Alexander Meagher's Cannabis/Synthetic Cannabinoid Theories Constitute Unsupported Speculation and Must Be Excluded

Both Dr. McMunn and Dr. Meagher speculate that marijuana detected in Mr. Hernandez's system may have been "adulterated" with synthetic cannabinoids, and that this contributed to his

presentation or suicidal ideation. *See* Exhibits 4 & 5 (McMunn Reports); Exhibit 8 (Meagher Report).

**Dr. McMunn** states: "It is common for marijuana and marijuana variants in correctional settings to be adulterated by additional mind-altering substances. It is more likely than not that Mr. Hernandez's decision to ingest or inhale these substances contributed to his presentation." *See* Exhibits 4 & 5.

**Dr. Meagher** opines: "A more plausible reason than a sexual assault for Mr. Hernandez' suicidal ideations were due to his recent marijuana or possibly even synthetic marijuana use. Synthetic marijuana was not labeled in his autopsy report, though can often go undetected and is commonly laced into marijuana supplies." *See* Exhibit 8.

**Fatal Defects:**

First, **no toxicological evidence supports synthetic cannabinoid presence**. The autopsy detected only THC metabolites—no synthetic cannabinoids, no adulterants, no other psychoactive substances. *See* Exhibit 2.

Second, **neither expert cites scientific literature** connecting cannabis metabolites at the detected levels to increased suicide risk or altered presentation. They offer no pharmacological analysis, no dose-response data, no causal mechanism. *See* Exhibits 4, 5, 8.

Third, **both opinions are speculative ipse dixit**. Claiming substances "can often go undetected" or are "commonly laced" without any case-specific evidence that Mr. Hernandez ingested adulterated drugs violates *Daubert*'s requirement that expert opinions rest on facts, not possibilities.

Fourth, **both experts commit the classic *post hoc ergo propter hoc* fallacy**. They observe that: (1) Mr. Hernandez had cannabis metabolites in his system, and (2) Mr. Hernandez

8

died by suicide. They therefore conclude cannabis "contributed to his presentation" and was "more plausible" than sexual assault as causing suicidal ideation. This reasoning—"he had drugs and died, therefore drugs caused death"—is the logical fallacy courts routinely reject. Without pharmacological analysis, dose-response data, or temporal relationship analysis, the mere presence of THC metabolites cannot support a causal conclusion. *See Joiner*, 522 U.S. at 146.

Fifth, Plaintiff's expert Dr. Fournier directly rebutted this theory, testifying that marijuana "creates a sense of euphoria" and that cannabis use does not typically cause suicidal ideation. *See* Exhibit 9 (Fournier Deposition). When asked how he ruled out marijuana as causing suicide, Dr. Fournier stated there's "no evidence of any other substance" and "it's not a usual consequence of marijuana use." *Id.*

**Relief Requested:** Exclude all opinions that marijuana was adulterated with synthetic cannabinoids or that cannabis contributed to suicidal ideation, unless supported by toxicology evidence and published scientific literature.

### D. All Defense Experts Offer Impermissible Legal Conclusions That Invade the Jury's Province

Multiple defense experts repeatedly cross the line from providing specialized knowledge into pronouncing ultimate legal determinations reserved for the jury.

**Dr. McMunn:** *See* Exhibits 4 & 5.

- "Nurse Kamara complied with the standard of care"

- "The nurse referenced herein was **not negligent** and did not deviate from the applicable standard of care"

- "Did not violate standards of care"

- "Did not violate NCCHC standards"

9

**Dr. O'Neill:** *See* Exhibit 1.

- "Nurses Jordan and Kamara **fully complied with the standard of care** in all respects"

- "Did not violate the standard of care regarding calling 911"

- "The care they provided **did not cause** his death"

**Dr. Albert:** *See* Exhibit 10.

1. "The entirety of medical care...were reasonable, appropriate, and **within the standard of care**"

2. "Standards of care were followed consistent with emergency response"

3. "**There is no indication that staff failed to act appropriately** or without concern"

**Dr. Meagher:** *See* Exhibit 8.

1. Opinions on whether conduct was "reasonable" and "appropriate"

2. Determinations that staff met "standard of care"

While Rule 704 permits opinions on ultimate issues, courts exclude opinions framed in legal terminology that tell the jury what verdict to reach. *Elliott v. Carter*, 292 Va. 603, 618 (2016). The proper role for experts is describing professional standards in technical terms, allowing the jury to determine whether those facts satisfy legal elements.

The defense experts' repeated use of legal conclusions like "not negligent," "complied with standard of care," and "did not violate" substitute their judgment for the jury's determination. This is particularly problematic when experts opine that care "did not cause" death—a proximate causation determination that is quintessentially for the jury.

**Dr. Albert's Credibility Vouching:**

Dr. Albert goes further, testifying "there is no indication that staff failed to act appropriately or without concern." *See* Exhibit 10. This improperly vouches for staff credibility

10

and character—determinations reserved exclusively for the jury after observing witnesses and evaluating evidence.

**Dr. Waxler's Attack on Plaintiff's Experts:**

Dr. Waxler labels Plaintiff's experts' opinions as "hindsight bias" and "false causal link," stating: "Drs. Fournier and McLearen's opinions appear to fall victim to 'hindsight bias' and 'false causal link.'" *See* Exhibit 11 (Waxler Report). This constitutes an improper expert-on-expert credibility attack rather than scientific analysis. Dr. Waxler provides no methodological critique demonstrating why Plaintiff's experts' approaches are unreliable—he simply applies pejorative labels to dismiss their conclusions.

**Relief Requested:** Strike all legal conclusion language, including "negligent," "violated/complied with standard of care," "did not cause," "reasonable," and "appropriate." Require experts to rephrase opinions in technical, professional terms describing what standards require and what occurred, without legal characterizations. Exclude Dr. Albert's credibility vouching and Dr. Waxler's attacks on Plaintiff's experts' methodology.

## E. Dr. Karen Albert Lacks Medical Credentials to Opine on Medical Standard of Care

Dr. Albert holds a doctorate in Education with a focus on Organizational Leadership. *See* Exhibit 10; Exhibit 15 (Albert CV). She has over 40 years of experience in correctional administration but **is not a licensed nurse, physician, or any medical professional**. *Id.* Despite this, she offers extensive opinions on whether medical care met standards.

**Impermissible Medical Opinions:** *See* Exhibit 10.

1. "Care was taken to support Mr. Hernandez in the exam room as both health care staff and custody staff attended to Mr. Hernandez"

11

2. "Standards of care were followed consistent with emergency response"

3. Medical staff's November 5, 2020 evaluation of rectal bleeding was adequate

4. "The threshold for reasonable suspicion of sexual assault was not met" (medical/clinical determination)

The Fourth Circuit requires that expert qualifications match the specific subject matter of challenged opinions. An expert who concedes ignorance of the relevant professional standard cannot satisfy Rule 702's qualification requirement. Here, Dr. Albert lacks any medical training or licensure qualifying her to evaluate whether clinical assessments, physical examinations, or medical interventions met applicable standards of care.

**Medical vs. Operational Testimony:**

Plaintiff does not dispute Dr. Albert can describe correctional operational protocols, emergency response procedures, and administrative policies within her demonstrated expertise. But evaluating whether **medical assessment and treatment** were clinically adequate requires medical expertise she lacks. Opinions outside an expert's demonstrated qualifications are not sufficiently tied to the facts and cannot aid the jury.

**Relief Requested:** Exclude all medical standard-of-care opinions, including whether medical staff's clinical assessments were adequate, whether physical examinations met standards, or whether medical presentation warranted specific clinical responses. Limit testimony to correctional operational procedures within her demonstrated expertise.

### F. Dr. Karen Albert's Causation Opinion Lacks Any Disclosed Methodology

Dr. Albert opines: "Mr. Hernandez's unfortunate death was not caused by The GEO Group's staff failure to provide appropriate and industry accepted preventative and emergency

12

response measures." *See* Exhibit 10. This negative causation conclusion—that staff failures **did not cause** death—lacks any disclosed analytical methodology.

**Methodological Deficiencies:**

Dr. Albert's report provides no explanation of: *See* Exhibit 10.

1.  What analytical framework she used to determine causation

2.  What alternative causes she considered and ruled out

3.  What medical outcome would have occurred with earlier 911 activation

4.  What survival probability analysis supports her conclusion

5.  What hemorrhage timing or physiology analysis informed her opinion

Instead, she offers only: "Based on my experience working with many agencies, and participating in countless emergency responses, the actions of the staff were consistent with applicable standards of care." *Id.* This is quintessential ipse dixit—a conclusion based solely on the expert's say-so without transparent reasoning. An expert's opinion must furnish the analytical bridge between identified facts and ultimate opinions. Dr. Albert provides no such bridge.

**Negative Causation Requires Rigorous Methodology:**

Opining that "delay was not outcome-determinative" or "earlier intervention wouldn't have mattered" requires particularly rigorous analysis because the expert must affirmatively prove the negative. The expert must demonstrate through hemorrhage timing analysis, survival probability calculations, and medical literature that earlier EMS activation could not have altered the outcome. Dr. Albert provides none of this—just a conclusory assertion that death "was not caused by staff failure." *See* Exhibit 10.

**Relief Requested:** Exclude Dr. Albert's causation opinion unless she can demonstrate the transparent analytical methodology connecting her conclusion to objective medical data and accepted causation frameworks.

### G. Dr. Alexander Meagher's Negative Causation Opinions Lack Transparent Timing and Physiological Analysis and Fail to Conduct Required Differential Diagnosis

Dr. Meagher opines that calling EMS earlier would not have changed the outcome, stating: "It is speculative to conclude that Mr. Hernandez would have survived had EMS been called at the initial discovery of the emergency" and "it is impossible to conclusively determine that he would have survived, even if the suggested treatments had been performed immediately." *See* Exhibit 8 (Meagher Report).

**Missing Analytical Components:**

Dr. Meagher's report discloses no analysis of: *See* Exhibit 8.

1. Estimated blood loss rate or total volume lost

2. Time to exsanguination from bilateral partial radial artery transections

3. Mr. Hernandez's physiological reserve and compensatory mechanisms

4. Survival probability with earlier EMS activation and hospital arrival

5. What specific interventions (IV fluids, transfusion, surgical repair) would have accomplished at specific timepoints

6. Medical literature on survival rates for comparable hemorrhagic injuries with varying intervention timing

Instead, he offers conclusions—"speculative," "impossible to conclusively determine"—without showing his analytical work. *Id.* This violates *Daubert*'s requirement that methodology be transparent and testable.

14

**Failure to Conduct Differential Diagnosis:**

Reliable medical causation opinions require systematic differential analysis that considers and rules out alternative explanations. Courts exclude medical causation testimony that fails to explain why alternative mechanisms were rejected. Dr. Meagher offers no differential analysis explaining:

1. Why earlier EMS activation wouldn't have enabled earlier surgical intervention

2. Why IV fluid resuscitation wouldn't have maintained perfusion during transport

3. Why tourniquet application wouldn't have slowed blood loss

4. What alternative causal pathways he considered and rejected

5. What medical mechanisms of harm he ruled out

Instead, he offers a conclusory statement that survival was "speculative"—precisely the type of unsupported causation opinion *Daubert* prohibits.

**Asymmetry in Causation Standards:**

Courts recognize that negative causation opinions ("delay didn't matter") require more rigorous proof than affirmative causation ("delay caused harm"). The expert asserting earlier intervention would not have helped must rule out all plausible mechanisms of benefit through systematic differential analysis. Dr. Meagher offers no such analysis. His conclusory statements that survival "cannot be conclusively determined" substitute speculation for rigorous methodology.

**Contrast With Plaintiff's Expert:**

By contrast, Plaintiff's expert Dr. Fournier employs standard medical causation methodology: identify the breach (no IV fluids, no tourniquets, 48-minute delay) → explain physiological mechanism (continued blood loss, hypovolemic shock, organ hypoperfusion) →

15

state that with reasonable medical probability, proper treatment would have prevented death. *See* Exhibit 6. Dr. Fournier identifies specific missing interventions, explains why each was medically indicated, and grounds his analysis in accepted hemorrhage treatment standards. *Id.* This transparent analytical framework satisfies *Daubert*. The methodological disparity is stark.

**Relief Requested:** Exclude Dr. Meagher's opinions that earlier EMS activation or different interventions would not have changed the outcome, unless he provides transparent hemorrhage timing analysis, survival probability calculations, and systematic differential analysis grounded in medical literature with explanations of why alternative causal mechanisms were ruled out.

### H. Dr. Alexander Meagher's Speculative Drug Theory Must Be Excluded

Dr. Meagher opines that "a more plausible reason than a sexual assault for Mr. Hernandez' suicidal ideations were due to his recent marijuana or possibly even synthetic marijuana use," claiming that "synthetic marijuana...can often go undetected and is commonly laced into marijuana supplies." *See* Exhibit 8.

This opinion suffers the same evidentiary defects as Dr. O'Neill's Xylazine theory: **no toxicology evidence** detected synthetic cannabinoids (*see* Exhibit 2); **no scientific literature** cited connecting cannabis at these levels to suicide; **pure speculation** about what "commonly" happens without case-specific evidence Mr. Hernandez ingested synthetic drugs.

Dr. Meagher admits "we have no way to determine why Mr. Hernandez committed suicide" yet confidently pronounces drug use more probable than sexual assault. *See* Exhibit 8. This represents results-driven theorizing untethered from the record. The theory is scientifically unfalsifiable—every absence of evidence is explained away as "can often go undetected."

16

**Relief Requested:** Exclude speculation that marijuana was adulterated or that cannabis contributed to suicidal ideation absent toxicological evidence of synthetic cannabinoids and published scientific support for the claimed causal link.

### I. All Defense Experts' Opinions Contain Ongoing Financial Bias Warranting Jury Instructions and Weight Considerations

While expert bias typically goes to weight rather than admissibility, *Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir. 1999), the **structural financial conflicts** here materially undermine Rule 702's reliability requirements and warrant careful scrutiny.

**Dr. Alexander Meagher:** *See* Exhibit 8; Exhibit 12 (Meagher CV).

1. **Current Medical Director of Travis County Jail** (since 2014)

2. Ongoing employment depends on maintaining relationships with correctional facilities

3. Defending the exact type of medical judgment calls he makes daily

4. Fee structure: $475-600/hour, $5,000/day trial

5. **Zero publications in last 10 years** despite academic credentials

**Dr. Brian Waxler:** *See* Exhibit 11; Exhibit 13 (Waxler CV).

1. **Former Chief Psychologist at Cook County Jail** (2019-2023)

2. **Chaired Suicide Prevention Committee**—now defending suicide prevention systems he administered

3. Created institutional compliance audit tools he's now asked to apply

4. Testified in **9 cases in past 5 years, all for defendants** (particularly Wellpath, a major correctional healthcare corporation)

5. Fee structure: $600-700/hour, $4,000/day trial

6. **Non-refundable deposition fees** even if canceled

7. **Zero publications in last 10 years**

**Dr. Michael McMunn:** *See* Exhibits 4 & 5; Exhibit 14 (McMunn CV).

1. **Currently employed by Southern Health Partners** providing correctional healthcare services

2. "Correctional Healthcare Expert Witness 2015 to Present"—professional witness designation

3. Testified across **30+ jurisdictions** in extensive cases

4. Fee structure: $400-800/hour depending on deadline, **$2,000 flat deposition fee**, $5,000/day trial

5. **"Zero balance required for all verbal reports, documents, deposition appearances"**—demands prepayment

6. **Non-refundable deposition fees; unpaid invoices paid by retaining counsel**

7. **Zero publications in last 10 years, no formal presentations**

**Dr. Karen Albert:** *See* Exhibit 10; Exhibit 15 (Albert CV).

1. Criminal justice consultant whose business depends on correctional facility clients

2. **Last publication 1995**—30 years ago

3. Consistent defense-side testimony pattern

**Contrast With Plaintiff's Experts:**

**Dr. Arthur Fournier:** *See* Exhibit 6; Exhibit 16 (Fournier CV).

1. Retired Professor Emeritus—no ongoing practice income

2. **Donates 100% of expert fees to charity (HealthShare Global)**—zero financial interest

3. Testified in only 2 prior cases vs. defense experts' dozens

4. Fee: $600/hour (lower than most defense experts)

5. Extensive recent publications—active scholar, not professional witness

**Dr. Alix McLearen:** *See* Exhibit 7; Exhibit 17 (McLearen CV).

1. Former federal corrections executive who **advocated FOR inmates**

2. Created trauma-informed care protocols, championed prisoner rights

3. Testified for government **defending inmate rights** (transgender accommodations, abortion access)

4. New to expert work (first cases 2024-2025, both plaintiff-side)

5. Fee: $500/hour through Eagle Security Group

**Dr. Christopher Colburn:** *See* Exhibit 18 (Colburn CV).

1. **Tenured full professor** at Old Dominion University—primary income from teaching

2. Fee: $250/hour, $750 deposition, $1,500 trial (lowest of all experts)

3. Economist with no corrections industry ties

The financial disparity and employment patterns reveal defense experts with ongoing dependency on corrections industry relationships and substantial expert witness income, while Plaintiff's experts are academics, retirees, and former public servants with minimal financial stakes.

**Relief Requested:** The Court should consider these structural biases when evaluating reliability under Rule 702(b)-(d), and at minimum, permit Plaintiff to fully explore these conflicts during cross-examination with appropriate limiting instructions advising the jury of each expert's ongoing industry employment, testimony patterns, and financial arrangements.

**J. Negative Causation Opinions Require Rigorous Methodology That Defense Experts Fail to Provide**

Both Dr. Meagher and Dr. Albert opine that earlier interventions or EMS activation would not have changed Mr. Hernandez's outcome. *See* Exhibits 8 & 10. These negative causation opinions—stating that delay was **not** outcome-determinative—require particularly rigorous methodology.

**Standard for Negative Causation:**

To reliably conclude that earlier intervention wouldn't have mattered, an expert must:

1. Quantify the hemorrhage (blood loss rate, total volume, arterial vs. venous bleeding)

2. Calculate time to exsanguination based on wound characteristics

3. Determine what interventions were available at what timepoints

4. Assess survival probability with each intervention scenario

5. Rule out all plausible mechanisms by which earlier care could have helped

6. Ground analysis in published trauma/hemorrhage literature

**What Defense Experts Actually Provide:**

**Dr. Meagher:** "It is speculative to conclude...he would have survived"—conclusory statement without supporting analysis. *See* Exhibit 8.

**Dr. Albert:** "Based on my experience working with many agencies...the actions of staff were consistent with applicable standards"—pure ipse dixit. *See* Exhibit 10.

Neither expert discloses the analytical process connecting record evidence to their negative causation conclusions. This represents the exact "analytical gap" condemned in *Joiner*. 522 U.S. at 146. Merely listing the universe of information consulted does not fulfill an expert's obligation to demonstrate how materials support conclusions.

20

**Contrast With Plaintiff's Expert's Transparent Methodology:**

Dr. Fournier employs standard medical causation methodology: identify the breach (no IV fluids, no tourniquets, 48-minute delay) → explain physiological mechanism (continued blood loss, hypovolemic shock, organ hypoperfusion) → state that with reasonable medical probability, proper treatment would have prevented death. *See* Exhibit 6. Dr. Fournier:

1. Identifies specific clinical standards (IV fluids for hemorrhage, tourniquets for arterial bleeding)

2. Explains physiological mechanism linking breach to harm

3. Uses standard medical causation language ("reasonable medical probability")

4. Grounds opinions in accepted medical literature and clinical practice

Defense experts, by contrast, offer generic "experience" without identifying decision rules, analytical frameworks, or the reasoning process connecting observations to conclusions. This transparent analytical framework satisfies *Daubert* while defense experts' conclusory assertions do not.

**Relief Requested:** Exclude all opinions that earlier EMS activation, IV fluid administration, or tourniquet application would not have altered Mr. Hernandez's outcome, unless the expert provides hemorrhage timing analysis, survival probability calculations, and systematic differential analysis grounded in accepted medical methodology.

### K. Defense Experts' Reports Violate Rule 26(a)(2)(B) By Failing to Provide Complete Statement of Bases and Reasons

Federal Rule of Civil Procedure 26(a)(2)(B) requires expert reports to contain "a complete statement of all opinions to be expressed and the basis and reasons therefor." The report must provide an "analytical bridge" and "outline a line of reasoning arising from a logical

21

foundation." *Goodrich v. John Crane, Inc.*, No. 4:17CV9, 2018 WL 10562401, at *6 (E.D. Va. Aug. 10, 2018). "Merely listing the universe of information consulted...does not fulfill Rule 26's requirement of stating the facts and data considered by the witness in forming the opinions." *Id.*

Expert reports that provide only conclusions without explaining the reasoning process fail Rule 26(a)(2)(B) and should be excluded. *Campbell v. United States*, 470 F. App'x 153, 157 (4th Cir. 2012). Rule 26(a)(2)(B) was specifically designed to prevent experts from offering conclusory opinions and then filling in the reasoning at deposition or trial. *Id.*

**Dr. Meagher's Report:** *See* Exhibit 8.

- **States conclusion:** "It is speculative to conclude Mr. Hernandez would have survived"

- **Missing:** What hemorrhage timing analysis led to this conclusion? What survival probability framework was used? What medical literature supports this?

- Lists "materials reviewed" but provides no "analytical bridge" explaining how those materials connect to causation conclusions

**Dr. Albert's Report:** *See* Exhibit 10.

- **States conclusion:** "Death was not caused by staff failure"

- **Missing:** What causation framework was applied? What differential analysis ruled out delay as contributing factor?

- Offers only: "Based on my experience...actions were consistent with standards"— textbook ipse dixit with no disclosed reasoning

**Dr. McMunn's Report:** *See* Exhibits 4 & 5.

- **States:** "Less than 1% of all rectal bleeds...are due to sexual assault"

- **Missing:** What data source? What sample size? What study methodology? What research?

- Provides no explanation connecting "education and experience" to this specific numerical conclusion

- Generic reference to "review of records" without explaining how records support opinions

**Dr. O'Neill's Report:** *See* Exhibit 1.

- **States:** Mr. Hernandez injected himself with Xylazine

- **Missing:** What scientific literature on Xylazine injection supports this? What forensic analysis of injection sites? What toxicology framework?

- Lists only generic "review of records, autopsy report" without explaining analytical process

These deficiencies violate Rule 26(a)(2)(B)'s core requirement that expert reports disclose not just conclusions but the reasoning supporting those conclusions. When an expert's report fails to provide bases and reasons, the opinion is inadmissible because opposing counsel cannot adequately prepare to challenge it, and the court cannot assess reliability without understanding the expert's analytical process.

**Contrast With Plaintiff's Experts' Rule 26 Compliance:**

**Dr. Fournier's Report** provides transparent bases: *See* Exhibit 6.

- Identifies specific clinical findings from records

- Explains how each finding supports each opinion

- Cites PREA standards by regulation number with explanation of applicability

- Describes medical principles underlying causation analysis

- Anyone reading the report can follow the reasoning from facts to conclusions

**Dr. McLearen's Report** cites specific authorities: *See* Exhibit 7.

- PREA §115.31-35 with explanation of each provision's requirements

- ACA Standards with specific section numbers and operational requirements

- Describes BOP protocols from her 22 years implementing them

- Transparent methodology allowing verification and challenge

The stark difference between Plaintiff's detailed, reasoned reports and defense experts' conclusory statements demonstrates the latter's Rule 26 violations.

**Relief Requested:** Exclude or strike portions of expert reports and testimony that constitute unsupported conclusions lacking disclosed bases and reasons, unless defense experts can provide supplemental disclosures explaining the analytical bridge between reviewed materials and stated opinions.

## IV. CONCLUSION

The defense experts' testimony fails multiple independent requirements of Federal Rule of Evidence 702. Their opinions include pure speculation unsupported by any physical or toxicological evidence (Xylazine theory, synthetic cannabinoid theory), fabricated statistics lacking any disclosed data source ("less than 1%"), impermissible legal conclusions and credibility assessments ("not negligent," "complied with standards," "no indication staff failed"), medical opinions by non-medical experts (Dr. Albert on clinical standards), negative causation conclusions lacking any transparent analytical methodology, and expert reports violating Rule 26(a)(2)(B)'s requirement to disclose bases and reasons for opinions.

Plaintiff does not seek wholesale exclusion of all defense experts. Rather, Plaintiff requests targeted exclusion of specific unreliable opinions that would mislead the jury, with appropriate limitations confining each expert to their demonstrated area of expertise and requiring professionally-framed testimony that assists rather than dictates jury determinations.

For the foregoing reasons, Plaintiff respectfully requests that this Court:

1. **Exclude entirely:** Dr. O'Neill's Xylazine injection theory; Dr. McMunn's "less than 1%" statistic; all synthetic cannabinoid speculation;

2. **Limit scope:** Dr. Albert to correctional operations (excluding medical standard-of-care opinions);

3. **Strike language:** All legal conclusions ("not negligent," "complied with standard of care," "did not cause"); all credibility vouching and expert attacks;

4. **Require methodology:** For any permitted negative causation testimony, require disclosure of hemorrhage timing analysis, survival probability calculations, and systematic differential analysis with explanation of why alternative causal mechanisms were ruled out;

5. **Exclude or strike:** All opinions that constitute conclusions without disclosed bases and reasons in violation of Rule 26(a)(2)(B), unless supplemented with transparent analytical bridges connecting reviewed materials to stated opinions; and

6. **In the alternative:** If the Court declines to exclude these opinions, provide clear limiting instructions to the jury regarding each expert's financial relationships with the corrections industry, ongoing employment creating potential bias, and the distinction between expert opinion and ultimate legal/factual determinations reserved for the jury.

**DELISA HERNANDEZ REID, ADMINISTRATOR OF THE ESTATE OF DAMIAN HERNANDEZ**

By Counsel:

*/s/ Stephen Teague*
Stephen C. Teague (VSB No. 81006)
Law Office of Stephen C. Teague
P.O. Box 706
Newport News, Virginia  23607
757-317-0716 - Phone
757-215-2974 - Fax
stephen@teaguelawoffice.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of December 2025, I electronically filed the foregoing, which will send notice to all counsel of record.

_/s/ Stephen Teague_
Stephen C. Teague, Esq.

27