IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Richmond Division)

| | |
|---|---|
| DELISA HERNANDEZ REID, : <br> Administrator of the Estate : <br> of Damian Hernandez, : <br> Plaintiff, : <br> : <br> v. : <br> : <br> : <br> THE GEO GROUP, INC., et al., : <br> Defendants. : <br> : | Civil Action No. <br> 3:24-cv-309 |

VIDEOTAPED
DEPOSITION UPON ORAL EXAMINATION
**ARTHUR FOURNIER, MD**

December 19, 2025 - 10:00 a.m.

Exmore, Virginia

Reported By:  Shannon Crittenden-Mann, CSR

Old Dominion Reporting
Telephone:  (757) 620-6836

APPEARANCES:          **LAW OFFICE OF STEPHEN C. TEAGUE**
                      **By:  Stephen C. Teague, Esquire**
                      PO Box 76
                      Newport News, Virginia 23607
                      stephen@teaguelawoffice.com
                      counsel for the Plaintiff.




                      **KIERNAN TREBACH, LLP**
                      **By:  Nancy F. Reynolds, Esquire**
                      7400 Beaufont Springs Drive
                      Suite 200
                      Richmond, Virginia 23225
                      (504)797-0932
                      nreynolds@kiernantrebach.com
                      counsel for Meriam Kamara, RN, Defendant.




                      **DILLMAN LEGAL GROUP**
                      **By:  Anna Cotto, Esquire**
                      295 Bendix Road
                      Suite 220
                      Virginia Beach, Virginia 23452
                      amcotto@dillmanlegalgroup.com
                      counsel for Nurse DeLisa Jordan, LPN,
                      Defendant.




                      **WHITEFORD, TAYLOR & PRESTON, LLP**
                      **By:  Gregory Scott Bean, Esquire**
                      1021 E. Cary Street
                      Suite 2001
                      Richmond, Virginia 23219
                      gbean@whitefordlaw.com
                      counsel for CEO Group, Inc., Nurse S.
                      Williams, Sgt. Tewanda Patton, Sgt. Martre
                      Powell, Sgt. Tanis Fritz, Sgt. Samuel Davis,
                      Officer Quinton Hawkes, Officer Darrin Boyd,
                      Officer Shakeenna Turner and Officer C.
                      Jones, Defendants.  (Virtual)

ALSO PRESENT:    **BRIDGES LEGAL VIDEO**
                 **By:  Joshua Bridges, Videographer**
                 1001 Minden Road
                 Virginia Beach, Virginia 23464
                 (757)348-0837
                 Josh@BridgesLegalVideo.com


                 Delisa Hernandez Reid, Plaintiff.   (Virtual)

**EXAMINATION**

**ARTHUR FOURNIER, MD**                                    **PAGE**


Examination by Ms. Reynolds . . . . . . . . .   7


Examination by Ms. Cotto. . . . . . . . . .  79


Examination by Mr. Bean . . . . . . . . . .  91


Examination by Mr. Teague . . . . . . . . . 143


Examination by Ms. Reynolds . . . . . . . . 165


Examination by Ms. Cotto. . . . . . . . . . 168


Examination by Mr. Bean . . . . . . . . . . 169


Examination by Mr. Teague . . . . . . . . . 172


Examination by Ms. Reynolds . . . . . . . . 174


Examination by Mr. Bean . . . . . . . . . . 175

**EXHIBIT INDEX**

**FOURNIER DEPOSITION EXHIBIT**                                    **PAGE**

**No. 1** -- Expert Report of Dr. Arthur Fournier          9

**No. 2** -- Nursing Evaluation Tool                       44

**No. 3** -- Control Log                                   48

**No. 4** -- Health Services Complaint and Treatment
              Form                                         58

**No. 5** -- Health Services Complaint and Treatment
              Form                                         59

**No. 6** -- Copy of Photographs                           76

**No. 7** -- Event Log                                     145

**No. 8** -- Chemistrip Urinalysis                         173

Videotaped deposition upon oral examination of Arthur Fournier, MD, taken before Shannon A. Crittenden-Mann, a Notary Public for the Commonwealth of Virginia at Large, pursuant to Notice and Agreement, commencing at 9:57 a.m. on December 19, 2025, at The Hampton Inn, 429 Lankford Highway, Exmore, Virginia, and these in accordance with the Federal Rules of Civil Procedure.

THE VIDEOGRAPHER:  We're on the record at 9:57 a.m.  This is the videotaped deposition of Dr. Arthur Fournier.  We're here in the matter of -- is it Delisa Hernandez Reid, Administrator of the Estate of Damian Hernandez versus the GEO Group, Incorporated, et al., Case Number 3:24-cv-309.  This -- this is pending in the United States District Court for the Eastern District of Virginia in the Richmond Division.  Today's date is December 19th, 2025.  We're currently located at 4129 Lankford Highway in Exmore, Virginia.

My name is Josh Bridges with Bridges Legal Video.  I'm the video specialist.  The court reporter is Shannon Mann with Old Dominion Reporting.

Will counsel please introduce themselves

for the record and state who they represent?

MR. TEAGUE:  I'm Stephen Teague.  I represent the plaintiff Delisa Hernandez Reid as administrator of the estate of Damian Hernandez.

MS. COTTO:  I'm Anna Cotto, and I'm here on behalf of defendant DeLisa Jordan, LPN.

MS. REYNOLDS:  This is Nancy Reynolds on behalf of Meriam Kamara, RN.

MR. BEAN:  This is Greg Bean.  I represent the remaining of the defendants, the GEO Group, Inc., Nurse Shirley Williams and eight correctional officers.

THE COURT REPORTER:  Would you raise your right hand?

**ARTHUR FOURNIER, MD,** called as a witness on discovery, after having been first duly sworn, was examined and testified as follows:

BY MS. REYNOLDS:

Q    Dr. Fournier, I'm going to be asking questions first and then Ms. Cotto will ask you questions and then Mr. Teague will ask you -- or Mr. Bean will ask you questions and then Mr. Teague,

and so first we start off with our ground rules. Have you had your deposition taken before?

A    Yes, I have.

Q    Okay.  So you know that if I ask you questions that you do not understand or make no sense to you please let me know and I will rephrase the question in a better way.  Otherwise, I will take it to mean that if you respond you understood the question and you are proceeding forward with an answer.  Do you understand that?

A    Yes, I do, although I can't possibly imagine that you would ask me a question that I wouldn't understand.

Q    Well -- well -- well, it's probably my fault so -- so when I ask you questions please use words rather than uh-huh, uh-uh, head shaking or head nodding so that we will understand your response when we read the transcript.  That's second rule.  Third rule is I will -- allow me to complete my question before you start answering and I will do you the same courtesy of allowing you to complete your response before I move on or -- or respond to your questions so that the court reporter isn't trying to take us down at the same time talking. Okay?

A    Agreed.

(Expert Report of Dr. Arthur Fournier was marked as Fournier Deposition Exhibit Number 1.)

BY MS. REYNOLDS:

Q    Okay.  Great.  Thank you.  Okay.  So Dr. Fournier, I want to start off with Exhibit 1 to your deposition, and I am handing that to you.  It's been premarked.  Do you recognize that document?

A    Yes, I do.

Q    Okay.  Is this your expert report with your CV?

A    Yes, it is.

Q    And then when you -- when you go back a few pages from the back it also has your supplemental expert report.  Do you see that?

A    Yes, I do.

Q    Okay.  Great.  My first question -- questions will be on your CV so if we can focus on that, which is about three or four pages back.

A    Certainly.

Q    Okay.  For your CV do you have any changes you want to make to it?

A    No.

Q    Okay.  All right.  Let's look first at your education.  You have on here an -- an MD from Tufts University completed in 1973; is that right?

A    That's correct.

MS. REYNOLDS:  Okay.  And, Stephen, I'm going to lead him just a little bit just to get through this stuff fast.

MR. TEAGUE:  Yeah.  Yeah, that's fine.

BY MS. REYNOLDS:

Q    Okay.  And then you have your -- your internal medicine residency completed in 1976; is that correct?

A    That is correct.

Q    Okay.  Is that the extent of your formal medical education?

A    Yes.

Q    All right.  And you were -- you indicate in your certification and licensure, State of Florida.  Are you licensed in Virginia?

A    Yes, I am.

Q    Okay.  How long have you been licensed in Virginia?

A    Since about 2014 to present.

Q    So you're currently licensed in Virginia?

A    Yes, ma'am.

Q    Okay.  Any reason why that's not on here?
Just --

A    Gee, I -- I -- an oversight.  My -- my
apologies.

Q    So we need to -- we need to change your --
we need to update your CV; right?

A    If it's not here, yes, we do.

Q    Okay.

A    I thought it was -- I thought I had it listed.
There's -- there's a -- a place here other than higher
education where we go through licensure.

Q    Okay.  We'll -- we'll get to that.

A    Yeah.

Q    Okay.  Front to back, let's do front to
back.  Okay.  So for your experience on -- on the
next page it's number -- you identify it as
Number 13.  Academic, you break it down there and
then you have hospital appointments and then you
have non-academic and then military for experience.
Okay.  So we're going to be focusing on that right
now.  I'm looking at your experience.  It -- it
looks like it's all academic; is that correct?

A    Well, yes, but a very atypical academic career.

Q    So -- so we're -- we're going to go

through each one of those so you can comment on that.

A    Sure.

Q    Okay?

A    Yeah.

Q    For your experience it starts July 1978?

A    Uh-huh.

Q    And your internal medicine residency ended in 1976.  Can you tell us what you were doing in that two-year time frame?

A    Yes, I was here as a -- a national service corps volunteer.  I was the first doctor for Eastern Shore Rural Health.

Q    Okay.

A    There's a critical shortage of physicians here and --

Q    When you say "here," you're talking about Exmore?

A    Actually it was Accomack County which qualified -- there was a hospital in Northampton County so there were physicians and surgeons who worked the hospital.  The shortage area was Accomack County.  There were basically no doctors for 30,000 people.

Q    Okay.  Okay.  Let me ask you, have you ever been a physician serving in a correctional

center?

A    Yes.

Q    Can you tell us when -- when in your -- in your -- on your CV it indicates that?

A    Sure.  So actually I brought a prop.  This is my -- one of my books that I -- I write the -- I write books to support my work in Haiti and this is --

Q    Is -- that has to do with service at a correctional facility?

A    Yeah.  Yeah.

Q    Okay.

A    Okay.  So it turns out that my -- my -- the medical -- the -- the -- the faculty of the medical school at Miami were responsible for corrections health and for all the Miami-Dade County prisoners and I -- during my internship and residency we covered the prison medical ward in something called Ward D, which I give reference to on Page 78.  "The world of an intern revolves around the emergency room divided by medical and surgical sides.  In a separate place in the back of the emergency room was Ward D, the prison medical ward.  Ward D was enormously popular as a hangout for the house staff on call.  It was close to the emergency room and the prison guards, eager for non-felon company, always has a fresh pot of coffee brewing."

Q    Okay.  So between what years were you serving in that capacity?

A    Well, as an intern -- for the three years I was an intern, but also when I returned on the faculty we -- we also continued to support the prison medical services, and all patients admitted to Jackson Memorial Hospital from the prisons were admitted to our service.

Q    Okay.  So -- so when we're talking about -- it's important to know what years you did this.  Okay?

A    Sure.

Q    So when we're looking at Number 13, academic, can you kind of pinpoint it in any of those academic assignments?

A    Sure.  From 1978 until I retired in 2014 I was part of the faculty that was responsible for covering the jails in Miami-Dade County.

Q    Okay.

A    And sick patients were admitted to our teams.

Q    Okay.  So -- so ever been a physician in an emergency department at a hospital?

A    Well, yes, all of our patients were admitted through the emergency room in the hospital.

Q    At Miami at -- at the -- at the --

A    Jackson Memorial Hospital.

Q    Got you.

A    I also served in -- I cover the emergency room here for the two years I was here also.

Q    And when was that?

A    '76 through '78.

Q    Okay.  Ever been a physician in a standard primary care office?

A    Yes.

Q    When was that?

A    Again, the same period of time.

Q    '76 through '78?

A    Yes.  I was responsible for the primary care offices of our faculty.

Q    Would you agree that correctional center medical unit care is different from a hospital emergency department medical unit?

A    Yes.

Q    Would you agree that a correctional center medical unit care is different from a standard primary care office?

A    Yes.

Q    Okay.  Okay.  So let's -- let's look at -- take these academic appointments.  So we're going to go through this now.  1978 through '84 assistant professor of medicine University of Miami, and I

would say that's Florida; right?

A    Yes.

Q    Okay.  Tell us what you -- I -- you are assistant professor.  So what did you teach?

A    I taught both internal medicine and family medicine, both outpatient care and inpatient care.  Back in those days I attended on the wards at Jackson Memorial Hospital six months out of the year, and the rest of the time I was -- when I wasn't on the wards I was supervising the interns and residents in the medical clinics.

Q    So then that includes clinical teaching rather than just didactic?

A    Oh, yeah.  It was all clinical teaching.

Q    Okay.  And so would you say that you had patients?

A    Yes, lots of patients.

Q    Did you teach any courses at that time during that '78 through '94 period on care in correctional facilities?

A    Not specifically courses in that regard.  Although, as I said earlier, patients from the prisons and the jails in Miami-Dade County were admitted to our service.

Q    So they came from the prisons and they

were admitted to the hospital and that's where you saw them?

A    It went both ways, and forgive me for -- my CV was written for -- as a traditional CV.  There are a lot of details that aren't included in it.  So you can fact check me on this.  Telehealth was invented by our program director Dr. Jay Sanders -- he's known as the father of telehealth -- so we could cover the nurse practitioners who were in the jails.  They moved out of Ward D in the '80s and moved in to the courthouse -- the Miami-Dade Courthouse about three blocks away, but the medical service was still responsible for covering the prisoners in the jail.  So faculty supervised the nurse practitioners in the jail for the entire time that I was on the faculty there.

Q    Why would the faculty supervise nurse practitioners in the jail?

A    Well, because back in those days it was the public service.  It was the -- it was the teaching hospital in Miami-Dade County that provide the supervision of the nurse practitioners.

Q    Did they --

A    It was not privatized at that time.

Q    Right.  And did the nurse -- I'm sorry. Did the nurse practitioners require supervision?

A     Yes.

Q     Okay.  Is there a difference between a nurse practitioner and a nurse?

A     Yes, absolutely.

Q     So what's the difference?

A     A nurse practitioner has training in -- in physical diagnosis and prescription of medicines to treat medical conditions.  Back in that day they had to have a physician overseeing them.  Since then -- and I can't tell you the exact year -- the law has changed.  So they can now serve as independent practitioners, but they are providers of care as opposed to providers of nursing care.

Q     Okay.  Would an RN or an LP be just a provider of nursing care?

A     I would not use the word "just" --

Q     "Just."  All right.  But --

A     With that one exception, yes.

Q     Okay.  Would -- would -- would administering IVs require physician oversight or physician order?

A     No.  Well --

Q     Is that -- is that the same in fifty states?

A     I don't know the answer to that.  However, I

would say in emergent situations -- so on routine situations doctors write orders for IVs to be started. They're frequently started by the nurses, and they're monitored by the nurses. They count the drips and they put the medicines in the bottle and they change the bottles when they run out, etc., etc. In emergency situations nurses are empowered to start the IVs while they're waiting for the medical response team to arrive.

Q   And is that the same in every state?

A   I do not know the answer to that.

Q   Okay. When you were -- okay. So let's go to July '87 through '94, associate professor of family medicine, that was at -- was that at University of Miami?

A   Yes.

Q   You say "secondary appointment." Does that mean it's an additional appointment at University of Miami?

A   That's a technical matter. My primary appointment I was originally hired by the Department of Medicine because I did my internship in medicine. Family medicine was actually invented at the University of Miami, modern family medicine. The first residency program was started by Dr. Lynn Carmichael in Miami in 1967. So in 1970 -- actually in 1978 when I joined the

faculty I also took the family medicine residents under my wing and taught them inpatient care, and then in 1970 -- in 1987 I also started teaching them in the outpatient department too.

Q    So did -- did the -- did your position at University of Miami '87 to '94 as an associate professor of family medicine, was that any different from your prior assistant professor --

A    I had tenure.

Q    You had tenure, okay.  That's a good difference.  Okay.

A    A big difference, yes.  I think I was the last generalist ever to get tenure at the University of Miami actually.

Q    So July '87 through 20 -- 20 -- 2012 associate professor of nursing, where was that?

A    At University of Miami.

Q    Tell us what your job was as an associate professor of nursing.

A    I taught nurse practitioners physical diagnosis and physical assessment and treatment of common medical conditions.

Q    Did you ever teach not nurse practitioners but RNs or LPNs?

A    I didn't teach them, but I did set up programs

for them to learn.  For instance, so I -- I wrote a lot of grants, and my grants were intended to recruit, retain and train health professionals in underserved communities.  So I funded programs in school health that -- that -- that trained nurses and nurse -- and nurse -- LPNs and RNs and nursing assistants in how to work in a school health environment, and I funded Miami-Dade County -- excuse me -- Miami-Dade Community College in setting up programs in -- in nursing care.

Q    In school health?

A    Both in school health and also in hospice care interestingly enough.

Q    Okay.  And when you say "school health" what do you mean?

A    We were actually very innovative.  We pioneered school health.  We used family doctors to supervise nurse practitioners as nurses and nursing assistants and dental students and -- and social workers in providing comprehensive primary care, nursing care, dental care and mental -- or behavioral health services to eight thousand kids in Miami-Dade County schools.

Q    So was that public -- the public schools like grade schools?

A    The public schools, yeah.  Well, grade schools.  Actually we -- we -- we adapted it to the feeder pattern

so we started in kindergarten and we followed them through 12th grade, continuity of care. It was a very innovative program actually.

Q    Okay. So that's K through 12; right?

A    Yes.

Q    Okay. July 1988 through 2012 Associate Dean for Community Health Affairs, tell us what that is.

A    So, again, I had this gift for writing grants, and I got major grants for -- basically I brought in 17 million bucks for the medical school to teach in -- in -- move the medical -- move training of health professionals out of the medical center and into the community. It made no sense to try and teach primary care at a -- in a trauma center or in a -- in a -- in an acute care hospital. So I established contracts with homeless clinics, with community health centers, with the schools to train people in the community, and so the dean was so pleased with that -- it was a special feature of the school -- that he made me an associate dean to execute those programs.

Q    And did you -- did you set up --

A    Let me elaborate a little bit more. So in medical school structure you have departments which are for medicine, surgery, OB-GYN, psychiatry, etc., etc.,

and then you have dean's offices, which are multi-disciplinary.  So because I was doing multi-disciplinary work with behavioral health, dental care, nursing and primary care they made me an associate dean.

Q    Okay.  And so did you set up any of these programs in prisons?

A    No.

Q    Okay.  And as of July --

A    However -- however, we worked very closely with the prison services because a major part of our work was with the homeless, and there was -- and because of the AIDS epidemic, which I was very involved with and the revolving door of prisons, homelessness, behavioral health things, we worked closely with the prisons, but I did not set up any clinics in the prisons per se.

Q    Okay.

A    We took care of prisoners though.

Q    Pardon?

A    And we took care of prisoners and -- and patients that were discharged from the prison.

Q    In the -- in the hospital?

A    Yes.

Q    Okay.  July '24 -- I'm sorry.  July --

A    I'm actually still -- I'm still doing that

actually.  This year one of the community health centers that I still have an affiliation with in Miami wrote a grant, and Judge Leifman in Miami is well known for being a very enlightened judge with regard to trying to treat -- keep the mentally ill out of the jails and to give them primary care in the community rather than keeping them in jail.  So I helped get a grant for what's called Street Medicine for one of our community health centers.  I'm still actively involved in that.

Q    Okay.  July 1994 through 1995 Associate Professor of Family Medicine, is that -- that's a promotion?  No?

A    Yes.  Actually that should be -- oh --

Q    It's the same as July 1987 to '94?

A    Yeah, I think that's a -- I think that's a misprint.

Q    Okay.

A    Forgive me.

Q    That's okay.

A    Yeah.

Q    We need to update your CV.  Okay.

A    Well, I'm retired and it's hard.  I used to have the best administrative assistants.  Now I'm all by myself typing with one finger.

Q    July 1995 Professor -- Professor --

A    That should be -- so -- so what's lost here is I was promoted to full professor somewhere around 1988.

Q    Okay.

A    Okay.

Q    July 1995 through present, Professor -- through present, Professor Emeritus of Family Medicine and Community Health Professor of Internal Medicine.  Is this Miami -- University of Miami?

A    Yes, it is.

Q    Okay.  What's a profession emeritus?

A    That's a professor who no longer works for full time but still does things with the medical school.  I'm retired so I'm not a full-time faculty any longer, but I'm emeritus, which means I still am involved with the University of Miami.

Q    Okay.  And -- and that started in July 1995?

A    Is that about -- let's see.

Q    Was that when you retired?

A    No.  That's not correct.  I retired in -- again, I need to update this for you.  This is not correct.  I retired in 2014.  So that would be -- professor emeritus would be 2014 to present.

Q    Okay.  So as a professor emeritus 2014 to the present, have you done any like clinical work

through the --

A    Yes.  Yes.

Q    -- through the university?

A    Yes.

Q    And what -- what has that clinical work been?

A    Actually taking medical students down to Haiti and supervising them while they do community health experiences, working in our mobile clinics, working in our prenatal care and maternity care centers.  Excuse me for one second.  Now, I had to stop doing that in 2021 because of the turmoil down in Haiti and the fact that travel is prohibited by the state department, but I still teach the students about global health and as soon as the things and situation -- the situation in Haiti improves I will be taking the students back down there.  It's a passion of mine.

Q    Did you do it during the pandemic?

A    No.  We -- we had to stop during the pandemic too.

Q    Okay.  When you had to stop during the pandemic --

A    The pandemic and the -- the current turmoil are simultaneous.  It's a one-two punch.

Q    When you had to stop during the pandemic,

can you tell me about what years that was?

A    2021 through 2023.

Q    Not -- it wasn't in 2020?

A    No.  I was still -- I still took students down in 2020.  I don't think we realized the impact of what the pandemic was going to turn into in 2020.  So it really -- we -- the -- the prohibition of traveling to Haiti was 2021.

Q    Okay.  So when you took the students down to Haiti for -- for clinical work tell us -- and you'd -- you'd identified maternity care.  What other kind of care?

A    Well, we screened the kids for malnutrition. We did prenatal care the old-fashion way, diagnosed twins with a stethoscope rather than an ultrasound.  We treated common conditions like tuberculosis.  We did screening for HIV.

Every night we would get together and the students would present the patients they saw to me, and we would have discussions about the global health conditions that they were dealing with in Haiti.  We had a peculiar thing.  A lot of our patients there had this unusual condition -- please forgive me -- called Marfan syndrome, which leads to a dissecting aneurysm of the heart.  They have long

extremities and I think there was -- in our particular community there was this gene pool of people who intermingled, and from the history of Haiti is the slaves ran away and they went into the mountains.  And if one or two people from Africa end up in the mountains and intermarried you'd have a very high penetrance of this particular syndrome. So we actually had a hundred of patients of -- with Marfan Syndrome that we followed.  We referred for cardiac examinations.  We treated kids with asthma. We did primary care.

Q    Did you do emergency medical care?

A    Yes.  There was another aspect, however, of my treatment in my work in Haiti that does not show up in my CV, which relates directly to this case and that's after the earthquake.  The University of Miami's finest hour was after the earthquake, and it was a result of Project Medishare, my charity, having had a track record there having community health workers we could rely on helping us set up.  So we set up a -- a M.A.S.H unit.

Q    A what kind of unit?

A    A M.A.S.H. unit.

Q    Mass?

A    M.A.S.H. unit.

Q    Oh, M.A.S.H.  Oh.

A    After the earthquake we set up a -- a trauma center in tents.  It was -- forgive the pun -- intensive care where we treated patients with the gangrene, crushed pelvises, hemorrhage, broken -- severed limbs, arteries. The trauma surgeons treated the -- the trauma, and I did the medical -- I and other people from the Department of Medicine and Family Medicine did the -- the medical followup.  So we managed the IV therapy and we participated in resuscitation efforts.  We treated more -- we did more amputations than the US Army did for the Vietnam War in Haiti after the earthquake.

Q    When -- what -- what years were that -- was that?

A    That was 2010 I think.  Let me just see.  I've got it in my -- this -- I write to raise money for my things in Haiti, but a lot of things I am telling you are actually documented in my books.  So the earthquake story is in this one "Vodou -- Vodou Saints" and it was -- the earthquake itself was January 12th, 2010 at 5:24 p.m. the earthquake started.

Q    And so you --

A    We were down -- I -- I -- so my colleague Dr. Barth Green, neurosurgeon who founded Project Medishare with me, he went down there.  He got a private plane to take him down the day after the earthquake along

with a trauma surgeon and an orthopedic surgeon and two surgical residents. I went down there on day three and I ended up spending two months down there doing the medical management of the patients after their trauma care.

Q   So that -- you have been down there January through March of 2010?

A   Yeah.

Q   Okay.

A   I actually came home for a week to -- to do my laundry and to assure my wife that I was alive and then I went back. Life experience.

Q   Oh, okay. So you have July '97 to present, Adjunct Professor of Family Medicine and Community Health at Dartmouth?

A   Yeah.

Q   So I will tell you, Doctor, that I -- I Googled you for Dartmouth and they don't have you listed on their faculty. Can you -- can you explain how your --

A   I can't explain that.

Q   Okay.

A   But so it turns out that the -- the chair of Dartmouth was very close with the chair of family medicine in Miami. The chair of family medicine at Dartmouth was very close to the chair of family medicine

at Miami, and he despaired that Dartmouth did not have the diversity of patients that his medical students needed to see.  So the medical students at Dartmouth actually rotated down to Miami, and I set them up in working in our community health centers and our homeless clinics and that went on for the entire time that I was down there.

Q    Okay.

A    We -- we had Dartmouth students come down there.  Why it's not on their web page, I can't tell you.

Q    Okay.  So it says July 1997 to present -- present, and you said the entire time you were down there.  Is there an end to there as in not present?

A    Yeah, actually -- well, actually I don't know whether they continued it after I retired, but -- but I am still -- I guess what I probably am, and it's getting into the weeds a little bit, I'm probably a professor emeritus at Dartmouth because I'm retired.

Q    And you retired in 2014?

A    Yes.

Q    Okay.  Then you have July '98 to present, Professor Emeritus for Community Health, Department of Family Medicine and Community Health.  Is that what --

A    Yeah, that's a misprint.  That should be 2014

also.

Q    Oh, to not present?  Should be 2014?

A    Well, no.  2014 until present.

Q    Oh, okay.

A    I still advise the faculty at the Department of Family Medicine and help them write grants and help them choose their new chair.

Q    So it's an administrative function?

A    Yeah.

Q    Would you say that all of your professor emeritus work is primary administrative?

A    With the exception of the work I do down in Haiti.

Q    Okay.  November 2008, Director of Global Institute for Community Health and Development, University of Miami Miller School of Medicine.  Now, is this the -- is this the work -- does this cover the work that you do in Haiti?

A    Yes.

Q    Okay.

A    And actually that should be co-director. Dr. Green and another faculty member Dr. Liz Gregg are all co-directors.

Q    When --

A    We started that so the -- so we had a

partnership between the medical school and our -- our NGO, which is Project Medishare, and we needed to have at the medical school some sort of organizational structure in global health, and that's the institute, Global Institute.

Q   Okay.  You have on your CV hospital appointments none.  Can --

A   That's at present.

Q   None at present?

A   At present.  I obviously had hospital affiliation with Jackson Memorial Hospital the entire time I was on the faculty.

Q   And that would be -- have been until you retired?

A   Yes.

Q   You make me have to look this up again. In --

A   2014.

Q   -- 2014.  So other than the work that you've done in Haiti, the clinical work was up until 2014?

A   Correct.

Q   And the 1976 through '78 practice, National Health Services Corps, Onley, Virginia, what is that?

A    That was being the doctor here in Accomack County.

Q    Okay.

A    Primary care serving as the first doctors in our community health centers out here.

Q    You are a retired lieutenant commander in the military?

A    Yes.

Q    What -- what branch is that?

A    US Public Health Service.  Back in those days the National Health Service Corps was funded through the US Public Health Service.  Subsequently they're funded through the Department of Health and Human Services directly to the community health centers, but I was actually a GS-13.

Q    Okay.  For your publications -- for all of your publications, any on correctional -- correctional facility nursing?  To help you out, I looked through it all and I couldn't find any.

A    Probably not, no.

Q    Okay.  So can -- can I move on to the next question?

A    Please.

Q    Okay.  I didn't know if you were still looking.  Okay.  What were you doing between the --

the years of 2019 through 2021 professionally?

A    Well, I was raising funds for my project down in Haiti.  I was serving on the Board of Eastern Shore Rural Health advising them with regard to initiating -- well, recruiting and retaining physicians here and also initiating a school health program similar to the one we did down in Miami, and I was -- the years again are 2000?

Q    2019 through '21.

A    Yeah, I've taken students down to Haiti.  We would take twenty students at a time two or three times a year, and they would do primary care in an extremely impoverished community.  We -- we actually were responsible for a hundred thousand people in Haiti.  I'm very proud of my work down there.

Q    Did you do work in correctional facilities down there?

A    The correctional facilities were -- this is an interesting story.  No, but I know the person who did.  His name is Dr. John May, and he actually was an American who went down there and actually treated all the patients who were HIV positive in Haiti, but I did not work in correctional facilities in Haiti.  I may not have escaped the head.

Q    Okay.  You had of been disappeared, okay.  So I want to ask you some questions about your

expert work.  Okay?

A    Sure.

Q    Okay.  Tell us how many cases per year you have -- you do in expert work?

A    It varies from year to year.  I -- I'm not affiliated with any expert witness company.  It's all by word of mouth.  I do it to raise funds for my charity down in Haiti, but the two ways I raise money for my charity in Haiti are, A, I write books and, B, I do expert witness cases.

I would say from the beginning of my tenure -- my first case expert witness was very -- actually it was a -- a story that made the headlines.  It was Brother Louv and the Ethiopian Zion Coptic Church using marijuana.  They were busted down in Miami, and they sent me down to do physical exams on them.  That was in 1980.  I would say since then rather than averaging out I would just sort of say I've probably done between 50 and 75 expert witness cases.

Q    And so how much money do you raise per year for your charity in doing expert work?

A    It varies from year to year.  I think the highest was 70 -- around $75,000 a year and the lowest was probably maybe 20,000.

Q    Okay.  Tell us kind of the breakdown on plaintiff side versus defense side.

A    Over my entire career it's about 50/50. Recently by word of mouth plaintiff's attorneys in correctional health think I do a good job.  So that seems to have swayed the pendulum a little bit in favor of the plaintiffs, but over all my career is 50/50.

Q    Okay.  And you have identified in your CV one case having to do with Armor Correctional Health Services, Inc.  Is that a prison case?  It's --

A    No.  It's a jail case.

Q    A jail case?

A    Yeah.

Q    It's on Page 16 of your -- you have --

A    Yeah.

Q    You have that there of your CV?

A    It's a jail case.  I'm sure of it.

Q    Okay.  Are jail cases and prison cases different?

A    Actually correction.  This is not on my CV.  I was asked to provide cases that I provided expert witness.  So it's kind of a separate -- it is not really part of my CV, but these are all jail cases, yes.

Q    The Number 30 and Number 31 on Page 16 are both jail cases?

A    Yes.

Q    Okay.  Were you testifying for the jail or were you testifying for the plaintiff?

A    In both of these cases I was testifying for the plaintiffs.

Q    Can you give us a year on each of these cases?

A    I think 2020 and 2021.

Q    And so 2020 would be Glassman v. Okaloosa, and 2021 would be Williamson v. Armor Correctional?

A    Yes.  Yes.

Q    Okay.  And you say these are prison cases.

A    No.  These were jail cases.

Q    Oh, jail cases.  I'm sorry.  Jail cases. Can you tell us the attorneys you worked with in -- in each of those cases?

A    I could tell you I don't remember in Glassman. I do remember in Williams it was a fellow in Pensacola, Florida, Zar -- Zarzaur I think was his name.

Q    Does that start with a Z?

A    Yeah.

Q    And can you tell us where each of these cases was venued?  What court?

A    Well, they were -- the north Florida -- they were in north Florida counties.  I think -- I think

Okaloosa County clearly is the case of Glassman. I think Williams -- Williamson was Santa Rosa County.

Q    Okay. Were they in federal court or state court?

A    I think they were state court. They were in the county courthouses I remember.

Q    Okay.

A    And my apologies for not having, you know, the exact details. I was instructed early on that I'm supposed to destroy these cases after they settled. So I don't have the actual records any longer so I'm a little fuzzy on the dates and --

Q    That's fine.

A    Yeah.

Q    I just am asking you what you remember.

A    Yeah. I try and do the best I can, but that's -- it's all coming from my memory.

Q    From a factual perspective, what do you remember about the Glassman case?

A    I don't remember anything about the Glassman case. The Williamson case I remember.

Q    Okay. So let's -- let me just focus on Glassman just for a second. You say that was in a prison?

A    No, a jail.

Q    Oh, I'm sorry.  Jail, okay.  So it was in a jail?

A    Yes.

Q    Did it have to do with medical care provided in the jail?

A    Yes.

Q    Okay.  Do -- do you -- do you have any recollection of who the medical -- what the medical care providers were as in physicians, nurses, whatever other kind of health professionals?

A    It was the medical director and the nurse practitioner or physician assistant who was caring for the patient.

Q    Okay.  And then --

A    And the healthcare deliverer, they -- the company, which I think -- and don't hold me to this, but I think it was Armor again.

Q    Okay.

A    But it might have been Care One.  Those are the two big care providers in Florida.

Q    Okay.  Tell us what you remember about the Williamson case in the way of the facts.

A    Yeah.  She had a -- she had a bad florid horrible pneumonia.  It affected five lobes.  It had cavities.  That's one of the reasons I remember.  It was

such a graphic case.  I remember the x-ray.  I can see it in front of my eyes, big cavities of pneumonia, and basically they didn't do a good physical examination. They didn't order a chest x-ray, and she died of pneumonia.

Q    And when you say "they," who are you talking about?

A    The correctional health services, Armor Correctional Health Services' medical staff.

Q    And what -- what -- what medical staff are you focusing on?

A    Well, the medical director, turns out he was on vacation.  So it was a nurse practitioner who didn't have medical backup who was principal person I testified against.

Q    Okay.  Now, you said you have other either jail or prison cases.

A    Yeah, I was asked to provide the cases that I recalled that either I served at deposition or trial. These were the two that I remember, again, realizing that I destroy the cases after I -- but there are other cases that did not come to trial that were settled, and most of them were in Florida.  There was one other case in Virginia, and forgive me for not remembering the name of it.

Q    How long ago was the case in Virginia?

A    Gee, maybe two or three years ago.

Q    And in these cases did you render opinions on standard of care?

A    Yes.

Q    Okay.

A    Causation and standard of care.

Q    Okay.  Have you -- have you ever had any cases with Mr. Teague?

A    I think this is -- I think this is the only case I have with you.  Do -- do --

Q    He can't answer.

A    There's another case I think was in Virginia, and, again, forgive me because I don't think this went to trial, and I don't know whether he was involved, but there's a -- the name was Jernigan.  I don't know whether that's his case or not.  Forgive me but --

Q    Where is that case pending?

A    I -- I think it never came to trial.

Q    Oh, never came to trial?

A    Yeah.  It was decided it didn't have merit.

Q    What -- you don't know that Mr. Teague was involved?  Were there any other attorneys involved?

A    I -- I don't recall.

Q    How long ago was that?

A   Again, I -- I -- it's relatively recent. Probably within the last couple of years, but forgive me.

Q   Tell us what you were asked to do in this case.

A   I was asked to render my opinion as to whether -- with regard to causation and standard of care in the treatment of Mr. Hernandez.

Q   Okay.  And tell us what you reviewed to come to your opinions.

A   I reviewed the medical records of the Lawrence Correctional Facility for Mr. Hernandez.  I reviewed the video interviews of the correctional staff and Nurse Kamara and Nurse Jordan.  I reviewed the CPR video.  I reviewed the expert witness deposition -- statements that -- that you provided.  I think it was Dr. O'Neill and Dr. McMunn, and there was a third one whose name I'm escaping right now -- is escaping me right now, but I reviewed their records.  And then last night I reviewed the record of Ms. Williams, which was just provided to me yesterday evening, and they wanted me to review just in case it had any relevance this morning.

Q   Did you review any of the prison records like the -- the -- the control log or the, you know, how things are done at the prison or anything like that?

A    I did not review the control log.  I did see that the control log was referenced in Nurse Jordan's statement.

Q    Okay.

A    But to reach opinions on the standard of care -- oh, and I also -- I reviewed the medical examiner's report too.

Q    Okay.  I'm going to ask you some -- so we're going to on to questions about your opinions.  Okay?

A    Sure.

MS. REYNOLDS:  Okay.  First off, does anybody need a break because this would be a good place to stop?

MR. TEAGUE:  I don't.

MS. REYNOLDS:  Okay.  Do you need a break?

THE WITNESS:  Thank you.

MS. REYNOLDS:  All right.

THE WITNESS:  Yes.

(Nursing Evaluation Tool was marked as Fournier Deposition Exhibit Number 2.)

BY MS. REYNOLDS:

Q    I'm going to hand you what has been

premarked as Exhibit Number 2 to your deposition, and I'll just for the record state that this is the Nursing Evaluation Tool of November the 5th, 2020 on a GI bleed complaint.  Okay?

A    Yes.

Q    So you have some opinions related to the care provided on November the 5th, 2020?

A    Yes.

Q    And my question for you -- and we can cut through a lot of this.  In looking at your rebuttal designation, your supplemental designation am I correct, and if not tell me I'm not correct, that it is not your opinion that Nurse Kamara and Nurse Jordan did -- are not accountable for what occurred on November the 5th, 2020 because they were not there?

A    That is correct.

Q    Okay.

A    I agree with your expert.

Q    Okay.  So for your opinions on the second page of your designation I'm just going to go through the top three here and get confirmation of that.  The medical team failed to consider the possibility of sexual assault to explain the patient's blood from his rectum and blood in his

urine.  You are not holding Nurses Kamara and Nurse Jordan accountable for that?

A    Correct.

Q    They also failed to do an appropriate physical examination, including a rectal examination and rape protocol.  You are not holding Nurses Kamara or Nurse Jordan accountable for that?

A    That is correct.

Q    And there was also a failure to assess the patient's risk for suicide.  You are not holding Nurses Kamara and Nurse Jordan accountable for that?

A    That is correct.

Q    Okay.  So let's move on then to your opinions on the -- the care provided on the morning of November the 6th, 2020.

A    Question --

Q    What?

A    Should I hold on to this or should I give this back to you?

Q    Actually all of this goes to the court reporter so I'll just take it, sit it right here.

Now, refresh my recollection.  Have you ever worked in a medical unit in a correctional center?

A    No.  Well, no, that's not correct.  Yes, I did.

In Ward D as an intern and a resident we worked there, and I supervised the medical corrections unit in the jail when I was faculty at University of Miami.

Q    Did you work in the medical unit -- I mean, in the -- in the correctional center medical unit when you supervised?

A    Via telehealth, yes.

Q    Okay.  And when you were in Ward D as an intern and a resident that was --

A    1973 through '70 --

Q    Six?

A    Six.

Q    Okay.  Are you aware, Doctor, that the medical staff in a correctional center is not permitted to have cell phones while they're working in the correctional center?

A    I am not aware of that one way or the other, nor would it be an issue that I would have been asked my opinion with regard because it doesn't affect my opinions with regard to standard of care or causation.

Q    But that's not the question you've been asked.  Okay.  Are you aware that the medical staff is not permitted to have cell phones while they're working in the correctional center?

MR. TEAGUE:  Objection, asked and

answered.  You can answer.

A    I am not aware of the rules and regulations with regard to Lawrenceville and my -- my guess is that it varies from center to center.

BY MS. REYNOLDS:

Q    You -- you indicate that an emergency was called at 3:18 a.m. and the nurses arrived at 3:21 a.m.  Would you agree that that's a pretty short period of time?

A    Yes.

Q    Okay.  It's not a violation of the standard of care that they took three minutes to get there; is it?

A    Not at all.

Q    Okay.  Can you tell me where you got those numbers from?

A    I think they were from the interrogatories.

(Control Log was marked as Fournier Deposition Exhibit Number 3.)

BY MS. REYNOLDS:

Q    I'm going to hand you what's been marked as Exhibit Number 3.  It's the control log.

A    Right.

Q    Have you seen this before, Doctor?

A    No, I have not.

Q    Okay.  You want me to tell you what this is just so it gives us a frame of reference?

A    I would ask you to tell me what this is.

Q    Okay.  This is a listing -- it's -- it's documentation of what happens in the prison.  You know, it's --

A    Made by the corrections officers.

Q    Yes.  Yes.

A    Okay.

Q    Okay.  Did -- do you want some time to look at that and then I'll ask you some questions?

A    Yes, please.

Q    Okay.  Let me ask you first while we're looking at it to focus on page -- it's -- page numbers are at the bottom right GEO and then a number.

A    Yeah.

Q    And 0198 is the one I'm going to ask you questions about.

A    Okay.  I have a question.  I assume that these numbers on the very left of the page here are military time; yes?

Q    Yes.

A    Okay.  Okay.

Q    Are you ready?

A    Yes.

Q    Okay.  So first, Doctor, did you know that the medical unit at Lawrenceville is in a different building from Mr. Hernandez's building?

A    Yes.

Q    Okay.  Do you know it's across the yard from Mr. Hernandez's building?

A    I didn't know exactly where it is, but I do know it was -- he was in a different location.

Q    And on Page GEO 0198 of Exhibit 3 you see the -- the times on the left column?

A    Yes.

Q    You see the -- the -- I don't know if that's 0321 or 0324.  Can you read what's next to that?

A    Nurse Jordan and Nurse Kamara something to 71. I --

Q    With a stretcher?

A    Something with a stretcher, yes.

Q    Okay.

A    Thank you.

Q    Do you see the next line down?  Can you

tell us what the time is there?

A    3:25.

Q    What does it say there?

A    9OD call 911 dash something.

Q    Okay.  Okay.  Doctor, are you aware that 911 was -- was to be called at 3:25?

MR. TEAGUE:  Objection.  Assumes facts not in evidence.

MS. REYNOLDS:  It's not a -- this is not a hearing.

BY MS. REYNOLDS:

Q    Are -- are you aware of that?

A    Well, again, this is the first time I've seen this document.  I've seen other documents that say that 911 was called at different times.

Q    Okay.  So based on what you've indicated in your expert report the nurses arrived at 3:21 a.m.  If 911 had been called at 3:25 would that be within the standard of care?

A    Yes.

Q    And then the next line down at 3:30 Hernandez, the prisoner number, entered the medical on stretcher.  Do you see that?

A    Yes.

Q    Okay.  So taking him -- the nurses arriving at 3:21 a.m. and getting him to medical across the yard in nine minutes would you say that's within the standard of care?

A    I'm sorry I'm going to be kind of hesitant in answering that, but it may or may not be within the standard of care depending on what other things they're doing at the time.

Q    The question is not what -- the question is not about what other things they were doing at the time because I'm going to ask you about that, but just the amount of time to get him from one location to the other within nine minutes is that within the standard of care?

A    Yes.

Q    Okay.  Okay.  Now, between arrival in the cell and arrival at the medical unit, is it your opinion they should have stopped what they were doing and locate a phone to call?

A    I have no opinion on that.

Q    Are you aware that in Lawrenceville Correctional Center calls to the outside world must be made from a central unit?

A    I am aware of that.

Q    Doctor, did you -- were you aware that

there was no elevator system in Mr. Hernandez's building?

A     I did read that somewhere, yes.

Q     So -- so are you aware that they had to get him out of the cell, put him on a stretcher, take him downstairs and across the unit and then across the yard to get him to medical?

A     Yes.

Q     And they did that in nine minutes.  That's within the standard of care?

A     I don't think that's the standard of care issue.

Q     Well, it's just a timing issue.  It's not what's going on.  It was just a timing issue?

A     Well, but here's my point, okay, the guy was -- the patient was exsanguinating, okay.  The standard of care is to treat that as promptly as possible.  Now, there's lots of logistics here.  Let's not lose the forest through the trees.  We have a fellow who's bleeding out, and one way or the other treatment needed to be started in a prompt way.  That's my opinion with regard to standard of care.

Q     Got it.

A     Now, I don't have an opinion as to -- I -- I just don't have an opinion as to whether that time is a

standard of care issue or not.  That's -- that's my opinion.

Q    Well, if it took him half an hour to get there that would be a violation of the standard of care; wouldn't it?

MR. TEAGUE:  Objection.  Calls for speculation.

A    Yes.

BY MS. REYNOLDS:

Q    Okay.  Okay.  So -- so when they were -- when they arrived at the -- at Mr. Hernandez's cell, do you know what they were told in the emergency call as to what the emergency was?

A    My recollection is they were told that we had a -- had a patient who was found in a pile of blood or in a lot of blood.

Q    Where did you find that?

A    That's my recollection.

Q    Okay.  Well, if they had known Mr. Hernandez was in a pile of blood, what do you think they should have taken with them to the cell?

A    And -- and don't hold me to -- don't hold me to the word "pile."  He was found with a lot of blood. The -- I think the exact words that were used is the

patient was bleeding excessively or something to that effect.

Q    Can you locate that in the control logs?

A    No.  Well, I've never seen the control logs before.  Okay.

Q    Right.  Okay.  And --

A    I think -- I think my recollection of that is from the -- the video statement that they made, that they arrived there and they found him in --

Q    A pile?

A    A lot of blood.

Q    When they arrived there they had found him in a lot of blood.  Before they arrived how would they have known that he had -- he was a bleeding patient?

A    I think that was the complaint that was called in by his cellmate.

Q    And how do you know that that complaint got back to the medical unit?

A    I don't know.

Q    Okay.  So if -- if they did not know that he was a bleeding patient, what would they have brought with them to the cell?

MR. TEAGUE:  Objection.  Calls for speculation.

A    Well, again, that's not the issue.  The issue is once they find him bleeding what do they do.

BY MS. REYNOLDS:

Q    So once they find him bleeding if they don't know that he's a bleeding patient how would they have the necessary equipment to respond to that?

A    Well, I think it's -- it's imperative that once they see him bleeding to the extent that he is that as quickly as possible.  Now, I don't have an opinion whether they should have treated him there in the cell. I don't know enough about how they would transport a crash cart there versus the medical unit, etc., etc.  My opinion, however, is this was a critical situation.  He was bleeding out and they needed to respond as quickly as possible, both the things that they did and they needed to get fire rescue there as quickly as possible too to get him to the hospital.

Q    Would -- would you agree that applying pressure to a -- a patient who is bleeding is within the standard of care?

A    In this case, no.  It was totally ineffective. The pressure did not stop his bleeding.  In fact, if you look at -- if you look at the video it's very disturbing

in two regards.

First of all, although they stated they were applying pressure, as I look at the video what they really have is they have his hands behind his back. They're restraining him. I don't see any pressure being applied at all, okay, but even if it were, okay, it's not effective because a few minutes later in the video what you can see is he's totally pale. He's like a white sheet. He's -- he's as white as the paper here in front of me, and there's a pile of blood on the gauze pads saying that he was soaking through the gauze pads. So the pressure was not effective. He's arterial bleeding. He needed tourniquets placed, and they didn't do that.

Q    Okay. We'll get to that part of your opinion. We're not there yet. Okay?

A    Okay.

Q    Okay. Would you agree that a response to bleeding is applying pressure generally?

A    I think it's one -- it's one thing that can be done, yes.

Q    Would you agree that applying gauze to encourage clotting is among responses that you can make for bleeding?

A    Yes.

Q    Okay.  And in certain instances that is --
those are within the standard of care; right?

A    In certain instances, yes.


     (Health Services Complaint and Treatment Form was
     marked as Fournier Deposition Exhibit Number 4.)


BY MS. REYNOLDS:

Q    Okay.  Let me provide you with Exhibit
Number 4.  Have you seen Exhibit Number 4?

A    Yes, I have seen this.

Q    Okay.  I want to go down to the last four
lines of the first page, please.

A    All right.

Q    You see where -- I'm going to read this.
"I attempted to get vitals but offender was
resisting."  Doctor, have you ever had a -- a
patient resisting treatment?

A    I'm not sure what -- that's a fair
interpretation of this.  My interpretation is the patient
was delirious.  I mean, clearly he's under great stress
and he may have been flailing about and be incoherent,
but I don't think he was like being combative or -- or --
I did not see any evidence that this fellow was
combative, at least in the video that I saw.  He was just

confused and -- and -- and -- and frightened.

Q   Where does it say in here that he was delirious?

A   It doesn't.  That's my interpretation.

Q   Okay.  If you have a patient who's resisting care does it make it harder to provide care?

A   In the hypothetical of a patient resisting care does it make it more difficult, yes.

Q   You've had patients who've resisted care?

A   Yes.

(Health Services Complaint and Treatment Form was marked as Fournier Deposition Exhibit Number 5.)

BY MS. REYNOLDS:

Q   I want you to hold on to these because I'm going to be asking questions between some of these. Let me show you Exhibit Number 5.  I want to ask you if you've seen that before?

A   Yes.

Q   And this is, just for the record, Health Services Complaint and Treatment Form 11/06/2020. You see on the -- the right column, going down the right column in the -- it says, "We secured the

bleeding."  What's your interpretation of that?

A    I can't interpret that.  I don't know what that means.

Q    Okay.  So it would be up to Nurse Kamara to interpret that?

A    No.  I -- I -- I -- I don't think we'll ever know.  I mean, clearly the bleeding wasn't secured -- the bleeding wasn't stopped.  Why the -- why she chose the word "secured," I can't make any sense out of that.  So you're asking me to make sense out of something I can't make any sense out of.

Q    So you don't agree with Nurse Kamara's statement that the bleeding was secured?

A    Well, clearly it wasn't.  He was hemorrhaging. He -- he exsanguinated.  I mean, he lost all of his blood.  So, no, I disagree with that.

Q    In his cell?

A    He was in the process in the cell, yeah. Started in his cell.

Q    And -- and one, two, three, four -- five lines down from that it says, "He got non-responding and we gave him Narcan at 3:35."  So he arrived in medical unit at 3:30 and he became non-responsive within five minutes.  Would you agree with that time line?

A    It seems to me I think I read somewhere, and forgive me for not anticipating this, that he was a -- he -- he -- he was conscious for longer than just five minutes after he got to the nurses.  I thought -- my recollection was about 15 minutes.  I'd have to spend some the time looking through the -- the records to see where I got that opinion, but that was my understanding was that he was still awake and alert -- he wasn't awake -- he wasn't alert, but he was -- he was conscious for approximately 15 minutes after he got to the nursing unit.

Q    So -- wait a minute.  Okay.  So we're -- if he was responsive for 15 minutes like you say after he arrived in medical --

A    Yeah.

Q    -- go down to the -- the -- the two lines down.  Well, no.  Let's stay on that line.  Said, "We gave him Narcan at 3:35"?

A    Yeah.

Q    Why do you give somebody Narcan?

A    One gives Narcan because one thinks a patient may have overdosed on a narcotic.

Q    Is Narcan also given to revive?

A    I'm not sure I understand your question.

Q    Do you know -- reviving a patient?

A   It's only given to revive a patient who has suffered from a narcotic overdose.

Q   Okay.  So the purpose is to revive?

A   That's the intent.

Q   Okay.  So -- so they -- they gave him Narcan at 3:35 and you -- you go down two more lines, "Second Narcan given five minutes after," and then the bottom line, "Started CPR at 3:40."  How can he be alert 15 minutes -- during 15 minutes after arriving when he arrived at 3:30?

A   I think we have at least ten minutes that he -- so they started the CPR when he lost consciousness and so whether you call it ten minutes or 15 minutes, there was a period of time where -- there was a window of an opportunity to treat him between when he was found and when he -- the code was called that would have made a difference in his survival and -- and --

Q   So you're not answering the question.

A   Well, I'm -- I'm trying to answer it the best I can.  I'm trying to understand what you're trying to ask me.  So please ask me again.

Q   Okay.

A   And I'll try and do a better job.

Q   Thank you.  Okay.  So he arrived in the medical unit at 3:30.  Between -- according to

Ms. Kamara's note, between 3:30 and 3:35 she indicates that he became non-responsive.  They gave him Narcan.  Five minutes later they gave him another dose of Narcan and at 3:40 they started CPR.  Okay.

A    Well --

Q    You indicated that he was alert and oriented for 15 minutes after arrival?

A    I didn't say alert and oriented.  I said he was conscious.

Q    Okay.  Well, do you give Narcan and -- and administer CPR?

A    So thank you -- thank you for clarifying, okay.  My opinion is shaped by the fact that I watched the video.  When they gave him the Narcan he was still conscious.  And am I allowed to voice an opinion now or should we wait until later to voice my opinion about giving him Narcan?

Q    Is -- is this an opinion different from what you've designated?

A    No.

Q    Oh, okay.  Go ahead.

A    Giving him Narcan -- clearly the patient was hemorrhaging.  He was exsanguinating.  Why in the world they were thinking of giving him Narcan is beyond me.

It's like rearranging the deck furniture on the Titanic. I mean, there's something called Occam's Razor, which was a rule of logic that we use in medicine all the time. Sir William Occam, 14th century philosopher, don't multiply causes unnecessarily. We've got a patient who's clearly hemorrhaging. That's the cause of his altered mental state. You don't have to look for another one. There was no reason to suspect that he -- I mean, the Narcan was useless, and why they were spending any time giving it to him or why they're including that as an explanation for why he was not responding or why they responded to his altered mental state is by giving him Narcan when clearly he's hemorrhaging. As I said, it's -- it's a violation of Occam's Razor.

Q    So you -- you think they should not have tried to keep -- to keep his heart and -- going while -- during that process?

A    That's a different question. I don't think they should have given him -- they wasted their time giving him Narcan. It was a -- it was an assessment that was spurious and probably -- well, I don't -- I don't know. I can't -- I can't speculate on why they gave him Narcan, but I wouldn't have given it to him.

Q    Okay.

A    Okay. I would have treated the hemorrhage.

Q    Would you have given him O2?

A    You know that's a good question.  Yeah, I probably would have, but I would have -- but their interpretation of his pulse oximetry results was incorrect.

Q    Why do you believe that?

A    I'm going to explain.

Q    Okay.

A    Most of the time when you see a -- this -- first of all, this is an extraordinarily low pulse oximetry.  We rarely see a patient survive with a pulse oximetry of -- of eighty and the reason why it was -- so normally you see a low pulse oximeter because it's a problem with the lungs.  Patient's had a pulmonary embolus, they've got an asthma attack, they've got bad chronic bronchitis or something like that.

In this case it was because he bled so much.  He had no oxygen carrying -- he had no hemoglobin to carry that oxygen, and that's why his oxygen capacity was so low.  So I think most people would have given him oxygen but wouldn't have expected it to have a result, and certainly there was no reason to give him more oxygen later on in the course because what he really needed was blood.

Q    So he needed blood, not IV fluids?

A    No.  He needed blood and IV fluids and not oxygen.

Q    Okay.  Would you agree it was within the standard of care to administer CPR?

A    Yes.

Q    Would you agree it was within the standard of care to use the defibrillator?

A    Well, we need to expound on that a little bit. The defibrillator that you're referring to is actually a cardiac monitor and that is appropriate to get a cardiac monitor.  I'm not sure that from what I saw there was ever a rhythm to be defibrillated.  The rhythm that we defibrillate is ventricular defibrillation and from what I heard is the machine kept saying, "Don't shock.  Keep doing compression."  So is it correct to hook him up to a monitor and to defibrillate him if the machine tells you so?  Yes, but I didn't hear the machine ever say "defibrillate."  So, again, it sounds like a fine point, but I try and be as accurate as I can.

Q    But if you -- if the machine had said to defibrillate that would be within the standard of care?

A    Absolutely.

Q    Is it your opinion that the nurses should have been trying to locate IV equipment rather than

administering CPR or the defibrillator?

A    Why should it be either/or.  There was enough people there they could do both.

Q    Is it -- do you believe that medical units in prisons all have IV equipment?

A    This unit did.

Q    And -- and where do you get that information from?

A    Nurse Kamara said that she -- first of all, they had a crash cart there.  Crash carts almost always have IV fluids.  I don't know of any crash cart I've ever seen that didn't have IV fluids, but -- but Nurse Kamara on her video deposition said, "There were IV fluids.  We just didn't use them."

Q    Okay.  How do you know there was a crash cart there?

A    Well, if they had a defibrillator, the defibrillator is on the crash cart.  Where did the defibrillator come from if not the crash cart?

Q    Would it surprise you that the nurses say there was no crash cart?

A    It would surprise me.

Q    It would?

A    Yes.

Q    And -- and what's the purpose of a crash

cart?

A    To carry the equipment necessary to do a resuscitation, equipment and supplies necessary to do --

Q    Do all crash carts have the same stuff in them?

A    I don't know the answer to that with assurity.

Q    Would it -- would it be the case that crash carts in prison medical units may be different from crash carts in like a hospital emergency department?

A    Is it possible?  Yes.  Did this crash cart have IV fluids?  Yes.

Q    You -- you indicated that the nurses took Mr. Hernandez's heart rate by conventional pulse. How do you know that?

A    They record his pulse as 79.  I suspect if they had done an apical heart -- I suspect that that's a falsely low reading because the patient was clearly hemorrhaging, and normally what you see is an increase in the heart rate in that situation.  I would have checked his apical heart rate, and my strongly held opinion is his apical heart rate would have been much higher than 79.

Q    Would -- would -- would you agree that use of an oximeter for pulse rate is -- would be

accurate?

A    No.

Q    Do you know who at -- at Lawrenceville Correctional Facility provided supplies during the emergency?

A    Please help me with getting you the correct answer that you're looking for.  Are you talking about the company responsible for providing the supplies or are you talking about the person?

Q    Person.

A    As I understand it, Nurse Kamara was the person responsible for providing the supplies.  She brought the supplies.

Q    Do you know if she brought IV?

A    She said she did.

Q    And you got that from the -- the statements, the recorded statements?

A    Yes.  Yes.

Q    Okay.  Were you aware that Nurse Jordan and Nurse Kamara were contract nurses for the night shift at the correctional center?

A    Yes.

Q    Would you expect them to know where all of the standard supplies were that would -- they would use regularly?

A    Yes.

Q    Okay.  Do you -- is it your opinion that IVs and IV fluids are supplies regularly used at a correctional facility?

A    The supplies and equipments which are used in resuscitation and that the -- even contract nurses should know where they are, yes.

Q    So you agree that they are regularly used supplies at a correctional facility?

A    Yes.

Q    Would you agree that --

A    Could I -- could I change that with one word?

Q    What?

A    They're regularly stored supplies.

Q    Okay.  Regularly stored?

A    They may not be used all that often because there aren't that many emergencies, but they are regularly stored.

Q    And how would you know whether or not there aren't that many emergencies if you haven't worked physically in a -- in the medical unit of a -- of a correctional facility except for your internship and residency?

A    Please repeat the question.

Q    How would you know if they are -- whether

or not they're regularly used or regularly stored at a medical unit in a correctional facility when you haven't worked in one since your residency and internship?

A   In my testimony as expert witnesses in other cases I have a general sense that emergencies are rare, that most of the care they provide is primary care or referrals.  So that's the basis of my opinion.

Q   Okay.  Would you agree that starting an IV requires a physician's order in Virginia?

A   No, not under critical conditions like this.

Q   Are there settings --

A   However, I do have the -- the counterpoint to that is why was a physician not called?  Who was the physician responsible to be medical backup and why weren't they called?

Q   So when do you -- when do you figure in that the -- the physician should have been called when they're dealing with the emergency and trying to keep Mr. Hernandez alive?

A   I think as soon as they see that he's critical they should call him.

Q   And when you make a call out who does that?

A   I would not know the answer to that question in

this particular facility.

Q    Are there settings in which administering IV fluids would not be standard of care because of the circumstances surrounding the bleed?

A    That's too vague a question to be able to answer.

Q    Okay.  Well, so if the blood loss was extreme or severe would you agree that IV fluids would not be the standard of care but plasma would?

A    In this setting if plasma is not available and IV fluids are there, the standard of care is to give IV fluids.

Q    So would you agree that --

A    I mean, I could take it one step further. Yeah, if they had blood there would I prefer they give him blood then, but all they had was IV fluids and IV fluids will increase his -- his circulation and his blood pressure and allow him to not go into shock until they can get him to the emergency room.

Q    Would it -- would it allow his -- would the IV fluids allow his organs to be perfused or would it dilute?

A    It will allow his organs to be perfused, not as well as blood or plasma, but it will allow his organs to be perfused.

Q    Would you agree that the records -- medical examiner's records and the -- the -- the facility chart do not contain an account of hemoglobin -- hemoglobin and hematocrit?

A    Yes.

Q    So you really don't know how depleted he was; do you?

A    Even if we had a hemoglobin and hematocrit, in the setting of acute hemorrhage like this the percentage of red blood cells may be the same but the volume is down.  So it was only after he had his volume restored that you'd actually see a drop in his hemoglobin and hematocrit.

Q    Are you aware that Nurse Jordan and Nurse Kamara were not certified in November 2020 to administer IVs in Virginia?

A    I know that Nurse Jordan was certified to administer IVs when she was licensed in Ohio.  I would imagine that's a skill she didn't lose.  In an emergency situation, again, one would expect her to respond to the emergency.  Likewise, Nurse Kamara being an RN, I would imagine she knows how to start an IV, and in an emergent situation regardless of what the rules are if a patient's life is in jeopardy you do the things you need to do to save his life.

Q So is it your opinion they should have administered IV therapy in violation of Virginia nursing regulations?

A It's my opinion they should have administered IV therapy.

Q In violation of Virginia nursing regulations?

A That's not my opinion. My opinion is they should have started IV therapy. Don't put words in my mouth, please.

Q Well -- well, what if it was in violation of Virginia nursing regulations?

A I don't care.

MR. TEAGUE: Objection to speculation.

A I don't care. There's a higher calling.

BY MS. REYNOLDS:

Q Okay. Do you know what the Virginia nursing regulations are related to IV therapy?

A No.

Q Already done that. Okay. I want to ask you questions about tourniquets. When do you think tourniquets should have been used?

A As soon as they could be applied.

Q If they were not able to locate the

bleeding in the cell where would they administer a tourniquet as a part of the body?

A    Well, I think they knew that the bleeding was coming out of his lower -- his lower upper extremities, and I would apply the tourniquets up high in his armpits.

Q    How do you know that they knew it was in his lower upper extremities?

A    I -- I think it must have been obvious.  They were applying the gauze pads to his lower extremities -- I mean --

Q    When were they applying --

A    Yeah.  I mean, they -- they say they put -- they say they saw the bleeding and they put the gauze pads on the bleeding.  So they must have known where the bleeding was coming from.

Q    Where were they putting the gauze pads on?

A    On his -- on the dorsum of his hands.

Q    I'm sorry.  I was not clear.  Where were -- where were they located?  Was it in the cell or was it in the medical unit?

A    You know, I -- I don't remember.  I can't -- I can't say with authority that I recall whether they started the -- the gauze pads in the -- in his cell or -- or when they got to the medical unit.  I -- I don't remember.

Q    Well, if they didn't know what kind of a medical emergency they were responding to how would they know to take gauze pads with them?

A    I -- I'm not sure I'm understanding your question.  Forgive me.

Q    If they didn't know what kind of a medical emergency they were responding to how would they know to take the gauze pads with them?

A    But -- but they did know.  They were told that there was a patient in the cell who was hemorrhaging blood or bleeding excessively.

Q    Who -- who told them that?

A    I think that was the message they got from the corrections officer.

Q    And where did you find that?

A    I think in the video report.

Q    If -- if the methods that were used to stop the bleeding within the five minutes they were in the medical unit were successful would tourniquets have been necessary?

A    No.

(Copy of Photographs were marked as Fournier Deposition Exhibit Number 6.)

BY MS. REYNOLDS:

Q   I have a -- our -- the final exhibit of mine for you is Exhibit 6.  I have a couple questions about that Exhibit 6.

A   Okay.  Yeah.

Q   Have you seen that?

A   Yes, I have.

Q   Okay.  There are four pages -- four -- no, sorry -- three pages of photographs of Mr. Hernandez's bunk.

A   Uh-huh.

Q   And -- and looking at each of these three, are there any signs of like coagulation, like clots?

A   Yeah, there are clots.  There's a clot right there.

Q   Right.  That's what I thought, but how long does it take a clot like that to develop?

A   Oh, couple minutes.  Few minutes.

Q   Can they develop outside the body?

A   Well, yeah.  Blood will clot outside the body, yes.

Q   Now, how long does it take for it to clot outside the body?

A   Well, I can't give you an exact time, but, you know, it might depend on such variables as room

temperature for all I know.  I just don't know.

Q    Okay.  Doctor, would you agree that there can be a security risk of taking tourniquets and IV supplies into the cell units where the other inmates are?

A    Hypothetically, yes.

Q    Okay.  You have causation opinions, and I just have a question for you on your causation opinions, which are on Page 2 of your -- here, let's clear all this.  Let me have that back.  Okay. Page 2 of that.

A    Page 2 of this?

Q    Yes.  Your causation opinions I'm going to read them.  "With reasonable medical probability the patient's complaints on November 5 were the result of sexual assault."  You would agree that Nurse Kamara and Nurse Jordan had nothing to do with the complaints on November 5?

A    I agree.

Q    Okay.  "In all likelihood this sexual assault contributed to his suicidal ideations." Would you agree that Nurse Kamara and Nurse Jordan didn't have anything to do with that?

A    I agree.

Q    Okay.  And your opinion is he died of

self-inflicted wounds?

A    Yes.

Q    Is that the same thing as suicide?

A    Yes.

MS. REYNOLDS:  Okay.  Those are my questions for you.  Thank you so much, Doctor. I appreciate your patience.  I know other attorneys will have questions.  Do we want to take a break?  Does anybody need a break?

MR. TEAGUE:  Yes, I think so.

MS. REYNOLDS:  Okay.

MS. COTTO:  Yes, please.

THE WITNESS:  Yeah.

THE VIDEOGRAPHER:  We're -- we're going off the record.  This is the end of Media 1 at 11:36 a.m.

(There was a short break, after which, testimony continues as follows:)

THE VIDEOGRAPHER:  This is the beginning of Media 2.  We're back on the record at 11:52 a.m.

BY MS. COTTO:

Q    Hello, Dr. Fournier.  Again, my name is Anna Cotto, and I'm representing DeLisa Jordan, LPN, in this case.  I just have a few follow-up questions, as Nancy touched on a lot of the things I was going to ask you.

First, are you aware of what the standard of care is for nurses under Virginia law.

A    I am familiar with the standard of care, what reasonable people do in similar circumstances.  I assume that Virginia law is the same as other states with regard to that criteria.

Q    Okay.  And you would agree that your expert report does not mention DeLisa Jordan, LPN, by name, instead it gathers or it categorizes medical staff as a whole?

A    Yes.

Q    And from -- specifically focusing on the 2019 through 2021 time frame did you ever personally respond to a medical emergency involving a hemorrhaging patient?

A    Yes.

Q    Can you tell us about that?

A    Yeah, down in Haiti after the -- after the earthquake we had tons of hemorrhaging patients.

Q    Well, I'm talking about 2019 to 2021.  I

believe you said your work in Haiti was a three-month span in 2010?

A    Oh, 19 -- no.  In those years, no.

Q    Okay.

A    Okay.

Q    When were you first contacted regarding this case?

A    I don't recall.

Q    Was it within the past six months?

A    Might be a little bit longer than that.

Q    Longer than that.  Past year?

A    Yeah.  Let's say in the past year.

Q    About how many hours have you spent reviewing this case so far?

A    My rough estimate is about ten.  I can find out for you if you need to know.  I can ask my part-time administrative assistant who handles all of that details, but I think it's about ten hours roughly.

Q    Okay.  And you're charging 600 an hour for your review; is that correct?

A    That's correct.

Q    Okay.  And would you agree that Mr. Hernandez had no documented history of depression?

A    I would agree.

Q   And would you agree that he had no formal mental health diagnoses at any time prior before his death?

A   That's correct.

Q   And would you agree that the scope of practice of a medical doctor is different than the scope of practice for a licensed practical nurse or a registered nurse?

A   Absolutely.

Q   And would you agree that the scope of practice for a licensed practical nurse is different than a registered nurse?

A   Yes.

Q   So I would like to go back to Exhibit 4, which I believe was already handed to you.  And I want to bring your attention to that first highlighted portion where it says, "Placed him on the backboard and was carried down the stairs. Placed on stretcher and told officer to have 911 called."  And for clarity, this is DeLisa Jordan's nursing note from November 6th, 2020?

A   Uh-huh.

Q   Would you agree that it was reasonable for Nurse Jordan to direct correctional staff to call emergency medical services?

A    Yes.

Q    And do you -- would you agree that Nurse Jordan complied with the standard of care by directing correctional staff to make that call?

MR. TEAGUE:  Objection.  Calls for speculation.

A    That's one way for her to -- the standard of care is 911 needed to be called.  Somebody needed to call them and that didn't happen here.  Whether it's Nurse Jordan's responsibility or the -- the -- the correctional people or the -- the call center, I'm not sure I got the exact name for that, but I have no opinion one way or the other.  My -- my opinion is purely what is the standard of care, and the standard of care is patient needed to have 911 get there pretty quick.

BY MS. COTTO:

Q    So would you agree that Nurse Jordan complied with the standard of care by directing correctional staff to call 911?

MR. TEAGUE:  Objection -- objection, calls for speculation.

A    Yeah.  Again, I hate to be a fussbudget, but the system of which she was part of -- in fact, that may have been why I used the term "the medical team."  She's

part of the team so she bears responsibility as part of the team.  Sorting out who -- who is the person who should have called, I don't have an opinion on that. Whether it was her, Nurse Kamara or the corrections officer, I don't have an opinion on that.  The standard of care is 911 needed to be called and they needed to get there quick.

BY MS. COTTO:

Q    Well, I believe you just said it was reasonable for her to direct correctional staff to call emergency medical services, but is it your testimony that that did not comply with the standard of care?

A    No, I'm saying that was reasonable, but I'm also saying she's part of a team that fell -- the team fell below the standard of care, and it's not my job to tease apart within the team -- you asked me specifically did she meet the standard of care.  Well, she may or may not have, but the team did not is what I'm saying.

Q    What --

A    And I know that sounds like I'm splitting hairs, but just to be precise those are my opinions.

Q    Well, Nurse Jordan is specifically named as a defendant and you've been designated as an

expert to testify against her.  So it is important to know whether or not Nurse Jordan specifically complied with the standard of care and not whether a global team did because she's being sued individually.  So can you, please, you know -- I would ask you again did Nurse Jordan specifically comply with the standard of care by directing a correctional officer to call 911?

A    Yes.

Q    And --

A    That's what other nurses in similar situations would do.

Q    Would direct somebody else, correctional staff, to make that call?

A    Particularly if they didn't have a cell phone with them themselves or if that was the policy and procedure that they were working under, yes.

Q    Okay.

A    That's what other reasonable people under similar circumstances would do.

Q    Okay.  And going back to your testimony regarding Nurse Jordan's IV certification under her Ohio license.

A    Uh-huh.

Q    You would agree that you don't know the

scope or limitations of Ms. Jordan's IV certification?

A    That's correct.

Q    And is it within an LPN's scope of practice to unilaterally administer IV fluid therapy absent an order from a physician?

A    The actual order of what the fluid should be should come from a physician and a physician should have been called, and it didn't happen.  That's why, again, I was referring to the team failed this patient.

Q    Are you aware of any standing orders at the facility that would have directed or allowed nurses to administer IV fluid therapy?

A    I am not aware of those.

Q    Now, going to your opinions regarding tourniquet use.  If Mr. Hernandez was resisting treatment would that have made it difficult for nursing staff to provide him with a tourniquet?

A    No.

Q    Can you please explain how that wouldn't?

A    Very easy to put on tourniquets.

Q    Even if somebody is moving their arms around or resisting treatment?

A    Yeah, it's easy.  It's easy to do.

Q    Do you have an opinion as to how long

Mr. Hernandez was bleeding in his cell before being discovered?

A   No.

Q   Do you have any opinion about the amount of blood that he lost in his cell before being discovered?

A   A lot.

Q   I'd like to discuss the puncture marks that were on Mr. Hernandez's neck.

A   Uh-huh.

Q   What is your explanation as to how those -- how he received those puncture marks?

A   I have no idea.

Q   Would you agree that those puncture marks would be consistent with a needle puncture?

A   I don't know.  They could be consistent with a fork puncture.  I -- I just don't know.  I have no opinion on the -- on -- on those.  It's a bazaar thing, and it would be -- it would be beyond speculative on my part to tell you what -- what -- what they were there for.

Q   I think my question was the marks that you saw, are those consistent with a needle mark in your experience as a doctor?  I'm sure you've seen marks left after a needle use.  Were those consistent with

those same type of marks you've seen in your experience?

A   Again, I have no opinion on that.  I mean, I don't think they were over a vein.  I -- they're just little dots on his neck.  I mean, that's all I can tell you.  I have no opinion on what they mean other than that, and they -- they certainly weren't part of the major medical emergency that we're dealing with here, which is hemorrhage.

Q   Would you agree that illegal drugs are commonly consumed in prisons?

A   Yes.

Q   And would you agree that on numerous occasions before Mr. Hernandez's death he tested positive for illegal substances while he was incarcerated?

A   I think the only substance he tested positive for was marijuana.  I don't think he tested for any other substance.

Q   Would you agree that muscle relaxers can have an impact on someone's heart rate?

A   Not usually, no.

Q   Assuming that Mr. Hernandez's heart rate was accurately taken and that 79 was correct, given the amount of blood that he lost, and I believe you

said it was a lot, would you have expected his heart rate to be much higher?

A    Again, I don't think that that was an accurate heart rate.  So, yes, I do expect his heart rate was much higher, and had they taken an apical heart rate they would have found it to be much higher with reasonable medical probability.

Q    And you testified earlier that you agreed that DeLisa Jordan was not -- her name -- you did not name her by name in your expert report.  And would you agree that that's because when you drafted this report you did not have any particular opinions that Ms. Jordan herself was negligent?

A    Please repeat that question.

Q    So earlier you testified that your expert report did not mention DeLisa Jordan, LPN, by name.  Would you agree that the reason for that was because when you drafted this report you did not have any opinion that Nurse Jordan herself was negligent?

MR. TEAGUE:  Objection to form, but you can answer.

A    Yeah.  Again, I chose my words because at that point in time when I reviewed it I felt that the negligence was the part of -- that the team structure did not meet the needs of the emergency, and I didn't feel I

should put all of the blame on anyone particular but on the team.  So that's why I framed the words the way I did.  I'm answering as best I can.

BY MS. COTTO:

Q   So you would agree that you have no specific opinions that DeLisa Jordan, LPN, herself was negligent in the treatment of Mr. Hernandez?

MR. TEAGUE:  Objection to form.

A   Well, I -- I think somebody in the team, and the two people who responded there were -- were Nurse Jordan and -- and Nurse Kamara, one or the other or both, were responsible for responding and the -- the -- the treatment was not adequate for the patient's need.  There was a window of opportunity to resuscitate him if an IV had been started and tourniquets had been placed and -- and either she or Nurse Kamara, one or both of them, should have taken responsibility to do that.  I mean, that -- that's as honest an answer as I can give you. Okay.

BY MS. COTTO:

Q   Again -- but, again, you did not -- in your report you have no particular opinions specific to DeLisa Jordan?

A    Well, I --

MR. TEAGUE:  Objection.  Mischaracterizing the testimony.

A    My opinion was she's part of the team, yes.

MS. COTTO:  I believe those are all the questions I have.

(There was an off-the-record discussion, after which, testimony continues as follows:)

THE VIDEOGRAPHER:  Let's take a quick break.  We'll get him fixed up.  We're going off record at 12:07 p.m.

(There was a short break, after which, testimony continues as follows:)

THE VIDEOGRAPHER:  We're back on the record at 12:08 p.m.

BY MR. BEAN:

Q    All right.  Dr. Fournier, can you hear me now?

A    I can.  Good noontime.

Q    Okay.  I appreciate it.  All right.  If

Old Dominion Reporting
Telephone:  (757) 620-6836

you -- if for any reason I break up or you don't understand my question or we lose connection I'll -- I'll do my best to get back on and restate my question.

So I represent a few parties as I indicated at the first of the deposition.  I represent GEO Group, Inc. as a company.  I represent one medical practitioner, Shirley Williams, and I represent eight correctional officers.  You are not making any opinions regarding whether the correctional officers acted within the appropriate standard of care; correct?

A    That is correct.

Q    Okay.  Regarding Nurse Shirley Williams, I understand you were able to read her discovery responses last night; correct?

A    Yes, I was.

Q    All right.  Do you make any criticisms as to Shirley Williams' care that she provided?

A    No.

Q    So when I'm looking at the report then you do make criticisms of Nurse Bonnie Russell's care though the day before Mr. Hernandez passed?

A    That is correct.

Q    Okay.  And so just to clarify, with

respect to Ms. Shirley Williams, you make opinions regarding tourniquets, IV, 911 and other medical care. You're not ascribing any of those failures to Ms. Williams?

A   No, she was really on the periphery. She wasn't really involved in the actual provision of care.

Q   Okay. Do you know what the Prison Rape Elimination Act is?

A   Yes.

Q   PREA?

A   Yes, I do.

Q   Can you tell me what your experience is with PREA?

A   Well, PREA is a response to the growing awareness that rape in prison is a huge issue and my awareness of this started very early on in my involvement in the AIDS epidemic when -- it's a long involved story. I don't want to bore you with it, but I work very closely for a project called the AIDS Education and Training Center, and the federal officer I was working with was very concerned about the issue of -- of sex in prisons, both consensual and non-consensual, and, in fact, that -- that work led to the changing of the designation of risk factors from homosexual to men having sex with men. The men having sex with men predominately came from the

experiences within prisons, both consensual sex and forced sex, which is very, very, very common.  So in learning how to deal with that and how to educate other physicians, I had to study, as the course evolved and PREA and the steps that were made to raise awareness amongst practicing physicians and nurse practitioners with regard to the prevalence of sexual assault in jails and prisons.

Q    Do you utilize --

A    So -- so I am familiar with it.  The short answer is I'm -- I was there in the beginning.  I followed the evolution of it and I am quite aware of it and it's relevant to this case.

Q    Do PREA standards form the basis of any of your opinions?

A    Yes.

Q    And which standards?

A    Well, I -- I think that the -- the history and the lack of physical examination and the lack of probing questions with regard to Nurse Bonnie -- help me with the last name again.  Is it Pernell; is that her last name?

Q    I think you're looking for Russell.

A    Russell.  Yes, Nurse Russell showed a lack of understanding and sensitivity of PREA -- of the PREA guidelines.  I don't want to call it standards.  They're

guidelines, yeah.

Q   And what specific PREA guidelines are you -- are you speaking of?  Is there a -- is there a section that house -- houses those?

A   I -- I cannot quote you a specific section off the top of my head, no, but they clearly do refer to this, that -- that healthcare providers need to be sensitive to the fact that this happens and that -- that probing questions need to be asked and patients need to be -- excuse me -- practitioners need to be very sensitive and aware of how frequently this occurs in corrections facilities.

Q   And you'll agree with me that you don't mention PREA or the PREA standards in your initial report as a basis for your opinion; correct?

A   That's correct.

Q   Okay.  Do you have any experience, clinical or otherwise, with mental health?

A   Yes.

Q   Okay.  What's your clinical experience with mental health?

A   Well, as I said earlier, we -- both in my work here in Virginia when I was the only doctor here, basically I was the only psychiatrist here.  We prescribed Thorazine and Haldol and -- and medicine for

depression, and throughout my career there's a lot of mental health issues that primary care doctors have to deal with.  But over and above that, my work in the schools we integrated primary care, mental health and -- and dental services because they're all interrelated. You can't just -- you know, if -- if you have a toothache and you're depressed it's the worst toothache of your life and it's not going to get better until the depression is treated.  So we did a good job of integrating mental health and -- and physical health, and that's been a major part of my -- my academic teaching.

Q   Okay.  I want to focus on your report, the initial report, and starting with causation and I want to run through the -- the few opinions that you make and have some questions regarding them.  The first one says, "With reasonable -- with reasonable medical probability the patient's complaints on November 5th were the result of sexual assault." Where in your initial report do you state the basis for the reasoning for this opinion?

A   Do we have my -- my report here?

Q   It's Exhibit 1.  So Exhibit 1 is quite lengthy, but your report is the first three pages.

A   Okay.

Q   So I'll repeat the question.  Where in

your initial report do you state the basis or reason for your opinions that the complaints were the result of sexual assault?

MS. REYNOLDS:  It's Page 22.

A    My reason for opinion was based on review of the record, the autopsy report and knowledge of corrections health issues.

BY MR. BEAN:

Q    Okay.  So review of the records, your experience and -- in correctional facility and the autopsy report -- the autopsy --

A    And the patient's complaints.  The only way I can explain the patient's complaint of blood in his urine and rectal bleeding is through sexual assault.  I mean, you can list -- we can spend a lot of time going through the differential diagnoses of rectal bleeding and the differential diagnoses of -- of blood in -- a complaint of hematuria, but the only way I can link the two together in a patient who is previously healthy as an acute thing is with sexual assault with reasonable medical probability.

Q    Okay.  Did you consider diverticulitis?

A    No.

Q    Did you consider ulcerative colitis?

A    No.

Q    Did you consider kidney stones?

A    No.

Q    Did you consider hemorrhoids?

A    No.

Q    Coagulopathy?

A    No.

Q    Inflammatory processes?

A    No.

Q    Infection?

A    Well, infection, yeah.  That urinalysis -- so -- so what happened the patient complained of -- of bloody bowel movements and blood in his -- when he passed his urine.  Now, the nurse ordered a urinalysis, which because it didn't show red cells she wrote off the whole complaint of hematuria, but I don't think -- you know, unless you think he's lying -- and I don't think he's lying -- you can't just brush it off, but that white count -- men don't get white cells in the urine.  So where did that come from?  Either he had prostatitis or a sexually transmitted infection from his rape and that was totally missed.

Q    Where -- where do you explain that in your initial report?

A    I did it in my supplemental report I think.

Q    Sure, but where is it in your initial report?

A    I -- it was not here in my initial report. That -- that -- that came about as a result of further review when I read the -- the -- the entire medical records.

Q    Okay.  Did you consider fissure?

A    No.  Again, all those things can cause abdominal pain or they might cause some rectal bleeding, but there's no way you can tie the urinary system and the GI system together in a guy in jail without putting at the top of your list -- in fact, the top ten things in your list, sexual assault.

Q    Okay.  What about co-morbidities?  Did you consider co-morbidities?

A    Please explain what you mean by co-morbidities.

Q    Where they're not linked.  He has rectal bleeding and blood in the urine from disparate diagnoses?

A    Well, again, Occam's razor.  If you've got more than one possible cause choose the simplest.  The simplest explanation is sexual assault.

Q    Okay.  But is it fair to say that he could have had two different issues that manifested at the same time?

A    That would be very unusual.  It's not probable.
It's not probable.  What -- what condition would -- and
I'm not asking this as a rhetoric question.  I'm asking
this as a -- as a clinician skilled in the differential
diagnoses.  What things would cause both urinary symptoms
and rectal symptoms of -- of bleeding and then
subsequently show white cells?  The only way I can
explain this all with one diagnosis is sexual assault.

Q    And how does sexual assault cause rectal
bleeding and blood in the urine?

A    Trauma and the manipulation of the genitals
or -- or the other possibility, and this is worth
spending a minute and forgive me for getting into the
medical weeds, but since you asked.  Okay.  So I'm old
school.  We used to really do a complete history.  They
got a lot more information than they currently get by
history.  So we used to ask -- when patients complained
of blood in the urine we usually asked whether it's at
the start of urination, at the end of urination or
whether it was entirely during urination.  Those
questions weren't asked here, but they're relevant
because if the bleeding starts -- if the bleeding occurs
at the start of urination and then clears that's the
prostate.  If it happens at the end of urination it's
coming from the kidneys, and if it happens all through

the whole thing it's coming from the bladder.  So those questions weren't asked but my suspicion is the reason why he complained of blood in his urine but there was no blood in his urinalysis is because his prostate was affected by the rape.  He had prostatitis from the rape.

Q    What about autoerotica?

A    That can cause blood in the urine, yeah.  It can, but it's not going to cause rectal bleeding.  So again --

Q    Why -- why couldn't -- why couldn't it cause rectal bleeding, autoerotica?

A    Because the pain would stop somebody from -- I mean, you really have to traumatize yourself and I mean, we -- I cannot -- I can tell you I have had patients complain of blood in the urine after masturbation.  I've never had a patient complain of blood in their bowel movements from anal manipulation.

Q    Is it clinically possible?

A    It's possible but not probable.

Q    Okay.  How did you rule out autoerotica as a -- as a reasonable medical prognosis?

A    Well, again, the -- the patient complained of significant passing of -- the patient comes in complaining of both rectal bleeding and -- and blood and he's in prison, okay.  So, again, go to PREA, okay.

The -- the number one thing on my list is sexual assault. Is auto --

Q   So what -- what methodology do you use --

A   Is -- is auto -- is autoerotic -- autoerotic -- is masturbation possible?  Yes.  Is it probable in this case?  No.

Q   So what methodology did you do to rule out autoerotica?

A   Clinical judgment.

Q   Mr. Hernandez did not report the level of his rectal bleeding; correct?

A   Correct.

Q   Okay.  And so it could have been a lot? It could have been a little?  We don't know?

A   Well, more questions should have been asked by the -- by the nurse and she should have done a rectal examination.  Now, again, you get in the questions of whether it's sexual assault or whether it's autoerotica. We need to know whether there are bruises in the perianal area, whether there's scratch marks, whether there was trauma, whether there were hemorrhoids or not.  All of that was not done because nurses aren't trained to do physical diagnosis, and that's a failure of the system, okay.  The doctor should have -- should have been consulted early on, and no doctor was ever involved in

this guy's care on the 5th or the 6th.

Q    Okay.  So Nurse Russell was not qualified --

A    Except for the one that pronounced him.

THE COURT REPORTER:  What was your answer?
What did you just --

BY MR. BEAN:

Q    So Nurse Russell was not qualified to do a rectal exam; is that what you're telling me?

A    No.  I said she didn't do a rectal examination.
She -- she made -- she made a diagnosis without doing the appropriate physical examination because she's not trained to do that.  System failure.

Q    Okay.  So it wouldn't -- so it wouldn't have been -- it would not have been within the standard --

MR. TEAGUE:  Greg -- Greg.

MR. BEAN:  Oh, sorry.

MR. TEAGUE:  The -- the court reporter is having trouble transcribing the -- the proceedings because of the, you know, back and forth and overlapping voices.  So I think she had a question before and then --

THE COURT REPORTER:  Okay.  Just you

dropped off.  Your tail end of your question dropped off.  Do you have anything to add back to --

THE WITNESS:  Read what I said that when I dropped off.

(The court reporter read back, after which, testimony continues as follows:)

BY MR. BEAN:

Q    So it was not within the standard of care for Nurse Russell to provide a rectal exam; correct?

A    Someone should have provided a rectal examination and that did not happen, okay.  And she made a diagnosis without doing the proper complete history and physical examination.  She's put in a position where she was asked to act above her pay grade basically.

Q    Okay.  Let's focus a little bit more on this opinion about sexual assault.  What are some other reasons someone could have blood in their urine?

A    Well, you mentioned some of them.  Kidney stone would be one.  Urinary tract infections, A, usually don't present with hematuria and they usually don't present in male.  So I would not put a urinary tract infection high

on my list to explain this.  Cancers can certainly cause blood in the urine, but this guy had no other symptoms of cancer.  I wouldn't suspect that.  He was healthy, middle-aged male.  Let's see.  What else can cause blood in the urine?  I mentioned kidney stones I think.  It's a -- it's a fairly short list.

Q   Can any of those also cause blood in the rectum?

A   No.

Q   Okay.  What are some other reasons someone might have blood in their rectum?

A   Well, bleeding in the GI tract, hemorrhoids. The inflammatory conditions that you present -- usually don't present with blood.  They present with -- with pain or fever or tenderness in -- in the abdomen.  They -- they won't cause frank blood to be seen.  So they're relatively unusual.  So the -- the most benign thing would be hemorrhoids and the more serious things are GI bleeding either from in the lower GI tract a cancer or an AV malformation or in the upper GI tract from esophageal varices or ulcers or gastritis.

Q   Okay.  What about fissures?  Fissures can cause anal bleeding or rectal bleeding; right?

A   They usually cause pain and pus.  They don't usually cause bleeding, and if they did cause bleeding it

would be bleeding with pus.

Q    Okay.  So independent -- if there was only one or the other, blood in the urine or rectal bleeding, would you be able to determine with a reasonable degree of medical probability that they were the result of sexual assault?

A    Not without a good physical examination.

Q    And I think you testified that your reasoning for determining -- for coming to a differential diagnosis of sexual assault was based on these two presentations and your clinical judgment?

A    And experience, yes.

Q    Okay.  There's no other symptomology or presentation that leads you to believe this?

A    In this individual you mean?

Q    Correct.

A    Yes.

Q    Okay.  What are other common symptoms of sexual assault?

A    Depression.

Q    What else?

A    Anxiety, lots of mental health symptoms as a result of -- of being sexually assaulted, fear.  Now, sexual dysfunction after the assault, reluctance to

engage in sex ever again.  Pain with defecation is another one.  Fistula formation can happen, urinary discharge.

Q    Okay.  What about vomiting?

A    I've not seen vomiting as being a prominent symptom of -- of -- of sexual assault.  I have not.

Q    Fatigue?

A    Well, fatigue related to depression, yeah. The -- the -- the constellation of mental health symptoms of being violated.

Q    Lethargy?

A    Yes.

Q    Dizziness?

A    I -- I would -- dizziness is a very vague symptom.  It can mean a lot of different things to different people so you'd have to refine dizziness a little bit more.  Light-headedness, yeah, maybe, but actually vertigo, no.

Q    And Nurse Russell ruled out fatigue, lethargy and dizziness; correct?

A    I don't recall.  I'd have to look at my -- I'd have to look at the records.

Q    Hernandez indicated that he was suffering from diarrhea.  That's not associated with sexual assault; is it?

A    I didn't see that he said he had diarrhea.  She assumed he had diarrhea to explain his rectal bleeding, but I -- I did not see him complain of diarrhea.  He complained -- he complained of bleeding when he passed his urine and -- and rectal bleeding.

Q    So if you look at Exhibit 2 -- if you can -- if you can retrieve Exhibit 2, which is the Nursing Evaluation Tool.

A    Yeah, I have it.

Q    Kind of a third of the way down the page on the right it says, "Wednesday diarrhea times one."  Do you see that?

A    Uh-huh.

Q    So that -- that would be an indication that he was -- he reported diarrhea?  That's not an assumption Nurse Russell was making?

A    I don't know one way or the other.

Q    Okay.  So how do you -- why do you think that that's an assumption Nurse Russell was making as opposed to a -- a report?

A    As I said, I don't know one way or the other, I have no opinion on that.  She checked the box.

Q    Okay.  You'll agree with me though that it's in the -- it's in the historical portion, the -- the complaint portion of the Nursing

Evaluation Tool?

A     Yes.

Q     Okay.  So is diarrhea -- I'll ask the question again.  Diarrhea is not a symptom associated with sexual assault; correct?

A     Not usually, no.

Q     Okay.  But it is associated with other gastrointestinal issues?

A     Correct.

Q     Okay.  Some of them that also have symptomology of rectal bleeding?

A     Diarrhea usually is not associated with frank rectal bleeding, no.

Q     There's no diagnoses that have both of those, rectal bleeding and diarrhea?

A     Not commonly, no.

Q     But there -- but there are?

A     There may be.  I'm having difficulty thinking of any.

Q     Okay.  Nurse Russell checked vital signs; correct?

A     Yes, she did.

Q     Okay.  And vital signs were normal?

A     Yes.

Q     Abnormal vital signs, those can be a sign

of sexual assault; correct?

A   It depends on the timing.  If they're done immediately after the assault, yes.  If there's -- some time has elapsed the heart rate comes down, the blood pressure comes down.  So I -- I wouldn't put a lot of weight on that one way or the other.

Q   Okay.  Nurse Russell assessed Mr. Hernandez's general appearance; correct?

A   Yes.

Q   He was in no acute distress?

A   That's the box she checked, yes.

Q   And as you indicated, distress can be a sign of sexual assault?

A   Yes.

Q   What about -- so when she noted -- she could have marked a box called "unable to stand erect."  Could -- could inability to stand erect, could that be a sign of sexual assault?

A   I'm not sure that's how we usually think of it.

Q   Sure.

A   I mean, I -- I can imagine a circumstance where the assault might be so severe that you'd have difficulty standing up after it, but it's not a sine qua non of sexual assault.

Q   Nurse Russell did an abdominal exam;

correct?

A    Well, she checked off the box that she did an abdominal exam, yes.  Now, how competent that exam was is another story.  She did not do a rectal exam, which, you know, the -- the patient definitely needed a rectal exam and she didn't do that.

Q    Okay.  So can an abdominal exam reveal signs of sexual assault?

A    It might show some suprapubic tenderness but it's not -- it's not -- again, it's not the main stay of diagnosis.

Q    Okay.  I note you don't talk about prostatitis in your original report; correct?

A    That's correct.

Q    Okay.  I want to ask a couple of questions about prostatitis.

A    Uh-huh.

Q    What -- what are some other causes of prostatitis as opposed to sexual assault?

A    Yeah.  So it's interesting.  Actually that's been studied.  There's two categories of prostatitis. One is a sexually transmitted infection, and the other is like a -- almost the equivalent of a urinary tract infection except in a male, usually in -- in older patients.  Older men get prostatitis from just getting

old and getting an infection from the GI tract. Younger men it's almost invariably a sexually transmitted infection.

Q And what's the age cutoff older versus younger?

A Sixty-five.

Q Does it occur in younger people, the --

A Rarely. Rarely.

Q Okay. But -- but it is -- it is a reported diagnosis?

A Yes.

Q Okay. Can E. coli cause prostatitis?

A Yes. That's what you see in older men.

Q Okay. What about nerve damage?

A I'm not sure I understand the question. Be -- could you flesh that out a little bit?

Q Yeah. If you -- if you have damage -- if you have damage to the nerves in the area can it result in prostatitis?

A Not that I'm aware of.

Q Okay. What about chemical irritation?

A Again, what kind of chemicals? I'm not sure I understand the --

Q Any kind? Any kind? Is there documented -- is there documented that chemical

irritation of any sort can cause prostatitis?

A    I'm sure there may be a case report here or there.  It's not a common thing.

Q    Okay.  What about stress?  Can stress cause prostatitis?

A    Not that I'm aware of.

Q    What about non-sexual assaults?

A    Not that I'm aware of.

Q    What did you do to rule out the possibility -- well, let's talk about urethritis. When you use the word "urethritis" is that what you're -- is that how you're -- is that what you're speaking about blood in the urine?

A    No.  Urethritis would explain the white cells and it would be related to a sexually transmitted infection, either chlamydia or gonorrhea.

Q    E. coli can cause urethritis though too; correct?

A    No, not in men.

Q    Never?

A    Well, very, very rarely.  I'm sure there are case reports, but it's not a common thing.

Q    Okay.  Can females suffer urethritis?

A    Yes.

Q    And do women suffer urethritis --

Old Dominion Reporting
Telephone:  (757) 620-6836

A    Yes.

Q    -- with E. coli?

A    Yes.

Q    Okay.  So how did you rule out the possibility that Mr. Hernandez suffered prostatitis from E. coli?

A    It's not my job to rule in or out anything. It's my job to express my opinions.  I mean, if one wanted to rule out E. coli one would have to send a culture.  No culture was sent.  I render my opinion based on the information that I'm given, and given the information I'm given I formulate an opinion with reasonable probability this was sexual assault.  That's my opinion.

Q    But in order to make that -- that opinion to a reasonable degree of medical probability you would have to rule out all other possibilities; correct?

A    No, that's not true.

Q    Okay.  So -- so it's possible that to a reasonable degree of possibility he could have suffered from prostatitis secondary to E. coli?

A    That's highly improbable.

Q    Okay.  But it's possible that that --

A    It's possible but improbable.

Q    And -- and you don't -- you didn't have the data in order to -- to definitively rule out E. coli?

A    That's -- that's correct.

Q    So with Nurse Russell is it your testimony then --

A    But -- but, again, you know, let's not lose the forest through the trees, okay.  E. coli wouldn't explain his rectal bleeding.  So, again, you're violating Occam's razor.  You're multiplying causes unnecessarily.

Q    Okay.  Your second -- your next opinion says, "In all likelihood this sexual assault contributed to his suicidal ideation."

A    Yeah.

Q    And where in your initial report do you state the basis or reasons for this opinion?  Is it the same, review of record, autopsy report --

A    Same review, yes.  Same, yes.

Q    Knowledge of correctional issues?

A    Yes.

Q    Okay.  And what in the records led you to believe to make this opinion?

A    He committed suicide.

Q    Okay.  So we know -- we know the records say he committed suicide, but what in the records

assists you in opining that in all likelihood the sexual assault contributed to the suicidal ideation?

A    Because that's what happens all the time in prisons.  That's why they have -- that's why the PREA things were written up so people would be sensitized to this fact.  People get assaulted and they -- they -- they're either afraid that they're going to get murdered or they're depressed or they somehow blame themselves or a whole bunch -- or they feel the world is hopeless. Frequently it's hopelessness that -- that drives them to suicide.  So -- so, again, this is not an uncommon thing. This happens all the time, and Nurse Russell should have been sensitive to that or she should have consulted a physician and asked the physician to -- to talk with him some more.  Again, there was no consideration of sexual assault at all.

Q    Okay.

A    And it should have been --

Q    So I'm --

A    And it should have been -- you interrupted me. And it should have been at the top of the list.

Q    Sure.  What I'm focusing on now is just the causation opinions.  So with respect to this opinion, "In all likelihood this sexual assault contributed to his suicidal ideation," you do not

state this to a reasonable degree of medical probability; correct?

A    I don't think I stated that in my expert opinion, but it is my opinion, yes.

Q    Okay.  You said that it contributed to his suicidal ideation.  Do you think that other things contributed to his ideation?

A    It may have.  Again, I don't know.  We don't have a detailed psychiatric history here.  Again, he's in jail for a long time.  Whoever assaulted him may have been a -- perceived as a constant threat that was going to come back, kind of like in The Shawshank Redemption. I don't know whether you saw that movie or not.  There was a whole thing about the -- the principal character was repeatedly assaulted there.  So I -- I don't know. We just don't have that information, but clearly they should have been sensitized to the fact that people who are sexually assaulted have mental health issues as a consequence of it, and suicidal depression is one of them.

Q    Okay.  Now, you would agree with me your initial report you don't expound upon, for example, the -- the linkage between rectal bleeding and urine -- and blood in the urine, how that relates to your opinion on sexual assault; correct?

A    I thought I did, yes.

Q    Can you tell me where that is in your initial report?

A    "Concerning standard of care:  The medical team failed to consider the possibility of sexual assault to explain the patient's blood from his rectum and blood in his urine."

Q    I mean, the medical -- the medical opinion about the relationship between blood in the urine and -- and the rectum and how that leads you to believe that it was sexual assault?

A    Well, again, I stated it.  Now, whether I made a -- a form mistake with regard to not putting that under causation, but it states right here, number one under -- under standard of care, "The medical team failed to consider the possibility of sexual assault to explain the patient's blood from his rectal and blood in his urine." Again, in my mind the two are related, okay, and needed to be explained how -- how one disease -- or one thing could cause both of those things.

Q    Can being incarcerated itself lead to suicidal ideation?

A    Yes.

Q    Marijuana, is that associated with an increased risk in suicide?

A    I'm sure there are reports of that, but I would question their validity.  I think the -- the -- the general pharmacology teaching about marijuana is it creates a sense of you euphoria.  It's -- but, of course, the studies about marijuana are really terribly biased by the political climate we live in so I -- I don't know what to make of those reports.  I really don't.

Q    Is it fair to say that marijuana in prisons is often ameliorated with other illegal substances?

A    I'm not sure you want to use the word "ameliorated."  It's frequently mixed with other substances.

Q    And those substances can cause altered mental states?

A    Yes.

Q    They can cause increased suicidal ideation?

A    They can, yes, hypothetically.

Q    So you understand Mr. Hernandez tested positive for marijuana in the autopsy; correct?

A    Correct.

Q    How did you rule out the possibility that marijuana and other substances mixed in may have caused an increase in suicidal ideation?

A    Well, first of all, there's no evidence of any other substance.  So the only substance that was found was marijuana, and, again, it's not a usual consequence of marijuana use.  Marijuana usually is euphoric.

Q    What did you do to rule out other possible things that may have increased his risks for suicide, such as interactions with other prisoners, threats of assault, interactions with family members?

A    Those are -- those are possibilities.  I -- I don't rule them out.  All -- all I'm saying is his risk for suicidal ideation was not assessed.  That's my opinion.

Q    Right.  But your -- your opinion --

A    I -- I would agree with you.  I think all those things should be considered and talked about, and they weren't done.

Q    So but in your opinion where you say, "In all likelihood the sexual assault contributed to his suicidal ideation," let me try and clarify that. You're not making an opinion that the sexual assault caused his suicidal ideation; correct?

A    I think it -- I think I chose my words -- I attempted to be careful.  I think it contributed to his suicidal ideation.  In a person who is incarcerated for a

long period of time and may have had a sense of hopelessness that he was ever going to get out of jail and he was going to be faced with this -- this assault or for the foreseeable future.

Q   Can you state to a reasonable degree of medical probability that if Mr. Hernandez was not sexually assaulted he would not have taken his own life?

A   I cannot say that with certainty one way or the other.  I -- I don't know, but I think, you know, when we talk about cause there's ultimate cause and there's immediate cause.  There's proximate cause.  So I think the proximate cause in this case was his sexual assault, but there may have been ultimate -- ultimate causes intertwined, which we just don't have enough information to make an opinion one way or the other.

Q   But the answer to my question is you cannot state one way or the other?

A   Yes, I agree.

Q   Okay.  All right.  I'd like to talk -- move on then to the standard of care issues.  So starting with 50 -- or excuse me.  Starting with paragraph one of your report it says, "The medical team failed to consider the possibility of sexual assault to explain the patient's blood from his

rectum and blood in his urine."  In your report you don't assert that this was a violation of applicable standard of care; correct?

A    I don't know that I said that explicitly, but that is my opinion.

Q    Okay.

A    If it comes to a jury trial that is what I will tell the jury.

Q    What makes you think that Nurse Russell did not consider the possibility of sexual assault?

A    She didn't do a rectal exam for one thing.  I mean, that's first on the list.  Secondly, there's no mention of sexual assault in her note.  Third, she didn't recommend suicide precautions.

Q    So when you're saying "consider," it's not just in her mind she thought about it?  It's she didn't take action as a result?

A    Correct.  Yeah, that's correct.

Q    Now, I don't see in your report that you assert that this failure had any effect one way or the other on Mr. Hernandez's likely outcome.  Do you make an opinion as to whether if Ms. Russell had considered the possibility of sexual assault it would have changed the outcome?

A    Yes.

Q    And where is that in your report?

A    There was also a failure to assess the patient's failure risk for suicide.  Obviously if they had assessed his risk for suicide that would have changed the outcome.  He committed suicide.

Q    Where do you say -- where do you say in -- where do you say in your report that it would have changed the outcome?

A    I do not say it would change the outcome as I read it here, but, again, that is my opinion.

Q    With respect to Nurse Russell's exam itself, apart from her -- your opinion that she needed to do further exam, was her preliminary exam appropriate?

A    No.

Q    And what was inappropriate about her preliminary exam?

A    She didn't do a rectal exam.

Q    Apart from not doing a rectal -- rectal exam and screening for sexual --

A    She didn't -- she didn't test the stool for blood either or note the color of the stool.  If you're going to -- if you're going to raise the question of upper GI bleeding, acid on blood from the stomach turns it black.  It has a very peculiar texture and color,

which can be seen if you get a sample of the stool.

Q    Where in your initial report do you say that she should have got a stool sample?

A    I would consider that part of the rectal exam. It's implied in the rectal exam.

Q    But it's not really though; right?  I mean, you don't --

A    Oh, no.  Oh, yeah.  Whenever I do a rectal exam I always test it for -- for blood, yeah, absolutely.

Q    Okay.  And is that -- is that the clinical standard of -- that's -- in a rectal exam --

A    Yeah.  Yes.  Regardless of whether it's a patient coming into my office or whether it's a prisoner in jail.  If you do a rectal exam you test it for blood, test the stool for blood.  It's simple to do.  It gives you information.

Q    So let's talk about all the things Nurse Russell should have done.  She should have done a rectal exam.  She should have done a rape protocol. She should have done a stool sample, a suicide screening?

A    Uh-huh.

Q    She should have analyzed the white blood cells?

A    Cultures for sexually transmitted infections.

That's part of the rape protocol I'm pretty sure, but just to be explicit, okay.

Q    Are any of those things Nurse Russell was not trained to do?

A    Yeah, she was not -- that's exactly my point. She was not trained to do it, and that's a -- that's why, again, I said that the team failed in part.  You know, not to get into it -- I'm trying to restrict my opinions with regard to causation standard of care of the providers but the organizational -- the organization itself, having nurses doing things they're not trained to do, nurses are not trained to do rectal examinations and yet that was what the standard of care required given the patient's complaints.  So, you know, my sympathies go out to Nurse Russell.  They really do, but she's the person on the front line.  Where's the medical backup?  I don't know -- I don't even -- I don't even know that there was medical backup.

Now, again, this happened during the workday.  There had to be a medical backup if she had had the -- had the thought to call them.  What happened at 3:00 in the morning, that's a whole 'nother thing we don't need to go back to, you know, or -- or -- forgive me.  It's been a long day.

Q    Yeah, that's okay.

A     Anyway.

Q     So -- so your criticism of Nurse Russell to me it sounds like is she did not promptly refer the patient to a clinician that could have performed all these additional measures?

A     In the context of she did not appreciate the possibility of the seriousness of his complaints and the possibility that it might have been a result of sexual assault.

Q     Okay.  You are aware that Nurse Russell did refer Mr. Hernandez to a physician; correct?

A     Yes.

Q     Okay.  And I think it was going to be within a -- a couple of days?

A     I don't remember the exact time frame, yeah, but it was -- it was to follow up on her assessment that the cause of this was diarrhea, which, again, there's no way that diarrhea would explain his urinary symptoms or his urinary findings.

Q     So Nurse Russell, her examination took place 1335 and Mr. Hernandez committed suicide at 3:00 a.m. in the morning.  So is it your testimony that Nurse Russell and the care team breached the standard of care because they did not perform these assessments within that 12 or so hours?

A     No.  My -- my opinion is the standard of care is defined as what other reasonable people in similar circumstances would do and what other reasonable people in similar circumstances would do is do a rectal examination and consult a physician.  How that relates to outcome or not, that's not my opinion with regard to standard of care, okay.  It's just what other reasonable people do.

Now, it's up to you all to decide whether that affected his -- his ability to -- to survive and what kind of judgment might come, etc., etc.  My opinion is strictly with regard to what other physicians in similar circumstances or other nurses or other nurse practitioners in similar circumstances would do, and that's what the opinions I've stated.

Q     If -- if these rape protocol screenings and rectal examinations, etc. happened the following day would that have been within the standard of care?

A     That's a good question.  I think the rectal examination should have been done when the patient came in and then that would have probably beget doing GC cultures and chlamydia cultures.  Those may have been done the next day, but I -- I think the initial

assessment was inadequate and needed to have more done than was done on that day.  Some of the tests could have been done the following day, but -- but there was a standard of care issue with regard to what was done that day and should not have been postponed.

Q    This was not -- the presentation of Mr. Hernandez does not warrant transfer -- transport to emergency care though; correct?

A    Not on the 5th, no.

Q    Okay.  So in order to -- for you to opine that the care team fell below the standard of care you must have the opinion that they needed to complete one or more of these treatments within the next -- before Mr. Hernandez committed suicide.  So between 1:35 on the afternoon of the 5th and 3:00 a.m. of the following morning.  So of the things you have criticized the care team of doing previous to the -- to the suicide what do you think fell below the standard of care within that time frame?

MR. TEAGUE:  Objection to form.

A    They should have considered sexual assault as the cause of his complaints and recognized the possible consequences of sexual assault.

BY MR. BEAN:

Q    And there's no leeway to -- to wait a day to do that?

A    Please repeat that.

Q    There's no leeway to wait even 24 hours to do that?

A    No.

Q    The next opinion, "They failed to do an appropriate physical examination, including a rectal examination and protocol."  Again, in your report you do not specifically state that the failure to do this breached the standard of care; correct?

A    Well, yes.  It says concerning standard of care, and then I say those exact words, yes.  I mean, this is --

Q    Okay.  All right.  But you don't include an opinion as to whether if they had followed the standard of care it would have changed the outcome; correct?

MR. TEAGUE:  Objection.  Asked and answered.

A    Please repeat that question again.

BY MR. BEAN:

Q    Sure.  I've asked it with respect to the first opinion, but with respect to the second

opinion, there's no opinion in your initial report that if the care team had done an appropriate physical examination it would have changed the outcome?

A    That is correct.  It is not stated in my initial report.  However, that is my opinion.

Q    With respect to the third opinion, "There was also a failure to assess the patient's risk for suicide."  Same question on that.  You do not have in your initial report any opinion that if the care team had assessed Mr. Hernandez's risk for suicide the outcome would have been different?

A    Correct, I did not state that.

Q    What in the record triggered a duty on the part of Nurse Russell to assess Mr. Hernandez's risk for suicide?

A    The symptoms of rectal bleeding and urinary passing blood.

Q    Anything else that we haven't discussed?

A    The fact that he's in jail or -- correction.  The fact that he's in prison.  There's a difference.

Q    So is it your opinion then that all -- that all correctional setting nurses that have this presentation of a patient must conduct a suicide risk assessment?

A    Yes.

Q    And if they do not they are in breach of the applicable standard?

A    Yes.

Q    And if there's an adverse action based on not considering or not conducting a suicide risk assessment the nurse should be liable for the damages?

A    Yes.

Q    The next opinion says, "There was an unacceptable delay in calling emergency medical services to transfer this patient to a facility capable of providing emergency and resuscitative care."  What -- you talk about how there was a window of opportunity.  Is it fair to say that that window of opportunity was opened between 3:20 a.m. when they first arrived at the cell and 3:40 a.m. when Mr. Hernandez became unconscious?

A    There's some question as to when he became unconscious, but I would say the window of opportunity certainly -- and, again, I'll let you all decide when he went unconscious, but as I watched the video certainly he was conscious when he got the Narcan and probably if we look at the video we can get the exact amount of time he went unconscious, but the -- the window of opportunity

was while he was still conscious before he -- before they called the code.

Q    Isn't it also possible though that the window had already closed by the time medical practitioners arrived at his cell?

A    Not with reasonable medical probability.  We see patients in the emergency room from whatever the cause of hemorrhage, if they're conscious we'll pull them through.  Traffic accidents, GI bleeding, suicide attempt, whatever, if they make it into the emergency room and they're still conscious we'll get them through.

Q    But there have been times when people are conscious but don't make it through; right?

A    Yes, but with reasonable medical probability he would have made it through.

Q    Okay.  And how did you form that opinion?

A    My experience.

Q    And what -- tell me what experience would tell you that in particular situation that calling --

A    Well, again, patients -- patients with hemorrhage -- we actually --

Q    Hold on.

THE COURT REPORTER:  Let him finish his question.

THE WITNESS:  I'm sorry.

BY MR. BEAN:

Q    You just got to let me finish my question.

A    I'm -- my apologies.

Q    That's okay.  So what in your clinical experience allows you to make the opinion that if 911 had been called earlier Mr. Hernandez would not have died?

A    Again, having treated innumerable numbers of patients with hemorrhage from numerous causes, the fact that -- what consciousness says is that there's enough blood supply getting to the brain and to the heart that -- that you can survive this if treated appropriately, and we actually use that kind of criteria when we're evaluating the quality of -- of care in emergency rooms.  The rough rule of thumb is if they get there within 20 minutes of -- of -- of the hemorrhage and they're still conscious they'll make it through.  So now in this case because he's in jail I'm not sure the 20-minute rule rules, but the level of consciousness does.

Q    Okay.  And how long did you -- you said within -- if they get to the ER within how -- 20 minutes, is that what you said?

A    In training programs what they use is 20 minutes.

Q    Okay.

A    Okay.

Q    Okay.  How far away -- how long did it take EMS to get there when they were called?

A    I don't know.

Q    Okay.  Was it 12 to 17 minutes, somewhere in that time frame?

A    I -- I don't know.  You'd have to ask somebody else that question.

Q    Okay.  So if you know how long it took EMS to get there how could you make the statement that if 911 was called earlier his life would have been saved?

A    Because by the time they did get there he had already coded and there was a lot of time that went by, anywhere from half an hour to 40 minutes that went by between when he was found bleeding but still conscious and when he coded.

Q    Do you know how far away the closest hospital was?

A    I've been told it's about 20 miles.

Q    Okay.  Does that affect your opinion?

A    No.

Q    Do you know what skill and training the EMS providers had?

A    In Lawrenceville, no.

Q    Do you know what equipment they had onboard?

A    No.

Q    So can you say to a reasonable degree of medical probability that if EMS had gotten there earlier they would have had the skill, equipment and wherewithal to save Mr. Hernandez's life?

A    I would assume, and perhaps I'm incorrect in this, but I would assume that they had the training to get an IV started, to get fluids going, to communicate with the doctor so that they would notify the emergency room so that when they got there he'd get a transfusion of universal donor blood and his life would have been saved.

Q    Assuming 911 was called immediately and it took them 12 minutes to get there, 20 minutes to get to the hospital, wouldn't that be outside your 32 -- your 20-minute window to save the person's life?

A    Again, that 20-minute thing is an apple and that has to do with medical centers and trauma centers and patients coming in off the street from fire/rescue. This is an orange.  This is a correctional facility so

I -- I can't take an opinion on one -- on the apple and turn it into an opinion on the orange.

Q   Okay.  So if we assume that it took 12 minutes for EMS to get there -- I think it took 17, but -- but we can give a little leeway.  Took them 12 minutes to get there and the hospital is 20 minutes away that means it would have taken 32 minutes to get Mr. Hernandez to a hospital.  Can you claim within a reasonable degree of medical certainty that if he had gotten to an ER within 32 minutes that it would have saved his life?

A   If they -- if they -- if they had started an IV and put on tourniquets, yes.

Q   The records show that at -- that at 80 percent or -- excuse me -- his O2 was at 80 percent at 3:32.  Is that your recollection?

A   Yes, sir.

Q   Isn't that an indication that the window has already closed on saving this person's life?

A   No.

Q   Have you, in your clinical experience, had an individual arrive in -- with those -- with that symptomology of O2 at 80 percent where they pulled through?

A   Yes.

Q    I'm going to talk a little bit about your rebuttal report.  Have you -- you've not provided a report rebutting the opinions of Dr. Alexander Meagher; correct?

A    Which expert was Dr. Meagher?

Q    Dr. Meagher was retained by GEO and the GEO defendants.

A    A medical doctor, nurse practitioner, organization?

Q    He's a -- he's a medical doctor.  He's a medical doctor.

A    I think I did in my supplemental.  I said I agree with him that the cause of death was suicide and that I had some differences of opinion with regard to standard of care.

Q    So when I'm looking at your rebuttal report I don't -- and you're free to look at it.

A    Yes, sir.

Q    I don't see any mention of Alexander Meagher or Brian Waxler.  I could be mistaken, but I don't think I saw those.  Tell me if I'm incorrect.

A    The supplemental report is on Page 5.

Q    I think it's pretty deep into Exhibit 1, but it's called Supplemental Expert Report of Dr. Arthur Fournier.

A    Yes, I have it.

Q    And you'll agree with me that you --

A    I did not see -- I did not see a report for Dr. Meagher.  I saw Dr. O'Neill, who's the medical person whose opinion I reflected.  I saw the doctor of nurse practice Michael McMunn and I saw Dr. Albert's expert report who was talking about the systems aspect of things.

Q    Okay.

A    I did not -- I did not get a report on Dr. Meagher.

Q    Okay.  And neither did you rebut a report from Dr. Brian Waxler; correct?

A    No, I did not.

Q    A couple of your opinions in here you talk about the digital rectal exam inspection of the -- I'm probably saying it wrong -- perineal I think it is.

A    Perianal.

Q    Well, actually perianal, which is different from the perineal.  The perianal and genitals or performance of a test for blood in the stool.  You'll agree with me that those specific recommendations were not in your original report?

A    Not specifically, no.

Q    You also provide the opinion that a doctor or nurse practitioner was not consulted.  You'll agree with me that was not in your original report; correct?

A    Correct.

Q    You said Nurse Russell also should have consulted her medical backup regarding the differential diagnosis of the patient's complaints and interpretation of laboratory tests.  That was not in your original report; correct?

A    Well, it's kind of implied in that the medical team failed to consider the possibility of sexual assault.

Q    You say there's no interpretation of white blood cells found in the patient's urine.  That's in your supplemental report.

A    Yes.

Q    That was not in your original report; correct?

A    That is correct, yes.

Q    And that should have been completed by a physician not Nurse Russell; correct?

A    What should have been completed by a physician?

Q    The interpretation of white blood cells?

A    Yes.  Correct.

Q    Your opinions regarding prostatitis and urethritis in your supplemental report, those are not in your original report; correct?

A    Correct.

Q    I'm going to read a whole few sentences and then we'll talk about it.  You say, "I disagree with his opinion that there were no signs in the patient's history that required the medical staff to examine him for suicide.  Victims of sexual assault who are incarcerated frequently despair or fear being killed by their assailant.  Had they explored the symptoms further they surely would have identified the risk for suicide, which was clearly present, as manifested by the events -- events of the following day."  That -- those opinions were not in your original report; correct?

A    Correct.

Q    What signs in Mr. Hernandez's history required medical staff to examine him for suicide, outside of his presentation to Nurse Russell on November 5th?

A    Outside of that?

Q    Correct.

A    I don't -- I don't think I could identify something outside of her report.

Q    Was there anything in the record that evidenced Mr. Hernandez's feeling despair or fear of being killed by his assailant?

A    No.

Q    What would a risk suicide screening look like in this situation?

A    Questions asking about the patient's mood, patient's sense of hopelessness, whether -- direct question as to whether they thought about taking their own life or is life worth living.  There are a series of questions that you can ask that will assess the risk for suicide.

Q    And we'll never know how those questions would have been answered; right?

A    Correct.

Q    Have you heard of Dr. Meagher before?

A    No.

Q    Have you heard of Dr. Waxler before?

A    No.

Q    Are there any opinions that we haven't talked about today or that aren't in your report that you intend to give at a trial of this matter?

A    No.

Q    Are you planning to attend the trial of this matter?

A    If asked, yes.

Q    Do you have any -- so this trial is in April.  Do you have any trials or depositions scheduled between now and that trial?

A    No.

Q    Have you ever had -- been the subject of any discipline in the medical field?

A    No.

Q    Have you ever been convicted of a felony?

A    No.

Q    Or a misdemeanor of lying, cheating or stealing?

A    No.

Q    Have you understood all my questions today?

A    Yes, sir.

MR. BEAN:  Okay.  I don't have any more. I may have some followup if -- if Mr. Teague asks some, but I appreciate your time today.

THE WITNESS:  Thank you.

MR. TEAGUE:  Should we take a break?

THE WITNESS:  Two minutes.

MR. TEAGUE:  Yes.

THE WITNESS:  Yeah.

THE VIDEOGRAPHER:  We're going off --

we're off the record at 1:16 p.m.


          (There was a short break, after which, testimony

continues as follows:)


          THE VIDEOGRAPHER:  This is beginning of

Media 3.  We're back on the record at 1:24 p.m.


BY MR. TEAGUE:

     Q    All right.  Hello.  Good afternoon now,

Dr. Fournier.  How are you doing?

     A    Well, thanks.

     Q    Thanks for being here today.  I just want

to do some followup from your previous testimony.

My first question is, does emergency hemorrhage

management change depending on whether you're in a

prison versus a hospital?

     A    No.

     Q    Are the principles of stopping bleeding,

supporting circulation and calling for help

different in a correctional setting?

     A    No.

     Q    You've worked in Haiti and homeless

clinics with limited resources; correct?

     A    Yes.

Q    How does that relate to evaluating care in a prison?

A    Well, that's a -- that's a big question.  I'm not going to give you the answer you might be expecting. First of all, I think the interaction between the homelessness and people who are homeless and the mentally ill and people in jail has been underappreciated.  A lot of advances in medical science are made by specialization, but every once in a while you need to be an integrator and put it all together.  And I think my experiences working with the homeless, working with people with substance abuse problems, working with poor people who are mentally ill has given me a perspective of -- of their care needs that most academicians would not have.

Q    Okay.  In your it looks about -- to be about 40 years as an attending physician at Jackson Memorial, did you supervise nurses?

A    Yes.

Q    Would you say you supervised them every day?

A    Yes, nurses and nurse practitioners.

Q    Okay.  There was a discussion about the time line and a question about when or how long Mr. Hernandez was conscious.  So I want to -- I'm

going to -- I'm going to hand you what's going to be Plaintiff's Exhibit 1.

THE COURT REPORTER:  We'll keep it in line.  I'll mark it 6, I believe -- or 7.

MR. TEAGUE:  Oh, okay.  No -- no problem.

(Event Log was marked as Fournier Deposition Exhibit Number 7.)

BY MR. TEAGUE:

Q    All right.  So I'm handing you -- what I've handed to you is an event report from the EMS team.  Do you know whether you've seen this before?

A    Yes, I have seen this.

Q    Okay.  All right.  If we go down -- well, let's start at the top.  It states that -- up at the top right, it says date/time received?

A    Uh-huh.

Q    11/06/2020 at 4:05 a.m.?

A    That is correct.

Q    Okay.  If you go down to the kind of the middle of the page where it says "notes."

A    Yes, sir.

Q    All right.  Do you see there where it says, "Report advised?"  It says ADV, but "Report

advised the male is 47 and was conscious 15 minutes ago but was out of it"?

A    Yes, I see that.

Q    Okay.  So if this -- the call was made at 4:05 a.m., 15 minutes before that would be about 3:53 a.m.  Would you agree with that?

A    Yes.

Q    Okay.  And so if he -- according to your review of the records, Mr. Hernandez was discovered at about 3:18 or 3:17; correct?

A    Correct.

Q    And so -- and the nurses, according to their reports that have been entered in to -- as exhibits they arrived at the medical unit by about 3:20, 3:21.  Is that what you recall?

A    That is correct, yes.

Q    Okay.  So between 3:21 and 3:53 would you say that's over 30 minutes --

A    Yes, sir.

Q    -- of when Mr. Hernandez was conscious during which --

A    Yes.

Q    Okay.  And you've testified also that based on your review of the video when they administered Narcan Mr. Hernandez was conscious;

correct?

A    That's correct, yes.

Q    So Nurse Kamara's notes stating that he was unconscious at 3:35 a.m. when they administered Narcan, is that correct in your opinion?

A    Well, it was not what the video showed.  The video showed he was confused but conscious.  He was actually sitting up when they gave him the Narcan.

Q    Okay.  Okay.  So regarding his consciousness, in order to be conscious does that require that blood is circulating?

A    Yes.

Q    And does that recall -- I mean, sorry -- require that there be brain perfusion?

A    Yes, sir.

Q    Okay.  So at 3:21 a.m. when nurses found him conscious had he, quote, "bled to death" yet?

A    No.

Q    Okay.  Do people survive bilateral radial artery injuries with the proper treatment?

A    Yes, sir.

Q    Okay.  At 3:21 a.m. when nurses arrived was Mr. Hernandez dead?

A    No.

Q    Was he breathing?

A    Yes.

Q    Was his heart beating?

A    Yes, sir.

Q    So he was alive; correct?

A    Yes.

Q    Was there an opportunity to save his life at that moment?

A    Yes.

Q    Is it your opinion that to a reasonable degree of medical probability that Mr. Hernandez would have survived with an immediate 911 call, proper hemorrhage control and rapid transport?

A    Yes, sir.

MR. BEAN:  I'm just -- I'm going to object to form on that.

BY MR. TEAGUE:

Q    Okay.  There has been some testimony or maybe some implication that the defendants wanted to, you know, quote, "stabilize" Mr. Hernandez before calling 911.  Is that in line with the standard of care in your opinion?

A    No.  I think the standard of care is to do both.

Q    Okay.  So when you say "do both" what are

you referring to?

A   Call 911 and stabilize the patient.

Q   Okay.  When should 911 have been called?

A   I think when the nurses arrived and saw his degree of hemorrhage they -- they should have called 911. It was at three -- 3:20 or 3:18, around then, yeah.

Q   Okay.  So you've been asked a lot of questions about the sexual assault or the -- your opinion that Mr. Hernandez was sexually assaulted on November -- or had been sexually assaulted at some point prior to November 6th, 2020.  Did you say that sexual assault was the only possible cause or did you say reasonable and medical probability?

A   With reasonable medical probability.

Q   And what does that mean?  What does reasonable medical probability mean?

A   That means that there's a greater than 50 percent chance that that was the cause of his -- his rectal bleeding and his blood in his urine.

Q   Okay.  So is the question whether the Nurse Russell knew it for sure that he had been sexually assaulted or is the question whether she should have investigated it?

A   It should have been investigated.

Q   Okay.  Is Pepto-Bismol an appropriate

treatment for the symptoms that Mr. Hernandez reported on November 5th, 2020?

A    No.

MR. BEAN:  Object to form.

BY MR. TEAGUE:

Q    You've also testified that Nurse Russell should have, you know, called a physician on November 5th, 2020; correct?

A    Yes.

Q    Is the failure to call a physician that day a violation of the standard of care?

A    Yes.

Q    You were asked a bunch of questions about whether diverticulitis, for example, or ulcerative colitis, kidney stones, hemorrhoids, coag --

A    Coagulopathy.

Q    -- coagulopathy and inflammation were considered.  I mean and you responded with emphatic "nos."  Why -- why is that?

A    Because they won't explain -- first of all, very few of those conditions cause frank bleeding.  They may cause some blood showing and pus or -- in the stool, but they don't cause frank bleeding with the exception of hemorrhoids, but none of them will both cause rectal

bleeding and blood when you pass your urine.

Q   Okay.  So you mentioned that you supervised nurses on a daily basis I believe.  Do -- would you say that you're familiar with the standard of care for RNs?

A   Yes.

Q   Would you say that you're familiar with the care -- standard of care for LPNs?

A   Yes, sir.

Q   There was a question about whether Nurse Kamara -- well, whether -- let's just start with -- let me start over.

There's a question of whether you believe that nurse -- or LPN DeLisa Jordan violated the standard of care.  Do you believe that Nurse Jordan violated the standard of care with her actions on the -- November 6th?

MS. REYNOLDS:  Objection to the form and mischaracterization.

MS. COTTO:  I'll join that objection.

BY MR. TEAGUE:

Q   Okay.  What is your opinion about whether Nurse Jordan violated the standard of care on November 6th, 2020?

A    She was part of a team that violated the standard of care.  It's -- obviously there's chaos and confusion and it's hard to know what the chain of command was and who is responsible according to the -- the protocols, etc., but you have a patient who's hemorrhaging to death and the team failed and she was part of that team.

Q    Okay.  Is it a violation of the standard of care for a doctor not to have been called on November 6th, 2020?

A    Yes.

Q    Is it a violation of the standard of care for -- to not administer IVs or at least have started an IV?

A    Yes, and that's related to the former question. I'm sure that any reasonable physician had they been called would have said, "Start the IVs, get fire rescue there and put on some tourniquets because the bleeding is continuing."

Q    Uh-huh.  And since a physician wasn't called, did Nurse Kamara violate the standard of care by not starting an IV for Mr. Hernandez?

MS. REYNOLDS:  Object -- sorry.  Objection to the form.

A    Yeah.  Again, someone on the team should have

started an IV and I don't want to get into the legalisms. If it were -- let's -- let's take it out of the prison, and if you're a mother or a loved one you wouldn't be debating whether it was this one or that one. You just sort of say an IV should have been started and -- and -- and tourniquet should have been applied.

BY MR. TEAGUE:

Q    Okay.

A    Okay.

Q    And your understanding -- is it your understanding that Nurse Kamara and Nurse Jordan were the responders to Mr. Hernandez's cell?

A    That is correct.

Q    Is it your understanding that Nurse Kamara and Nurse Jordan were the ones in the medical unit administering care to Mr. Hernandez?

A    On -- on the 6th, yes.

Q    Yes. On the 6th? Yes.

A    Yeah.

Q    Okay. And is it your understanding that Nurse Kamara did not administer IV to Mr. Hernandez?

MS. REYNOLDS: Object -- sorry. Objection to the form.

BY MR. TEAGUE:

Q   From your review of the records did Ms. -- did Nurse Kamara administer an IV to Mr. Hernandez?

A   No.

Q   From your review of the records did Nurse Jordan administer an IV to Mr. Hernandez?

A   No.

Q   Upon your -- you know, according to your review of the records did Nurse Kamara apply a tourniquet --

A   No.

Q   -- to Mr. Hernandez?  According to your review of the records did Nurse Jordan apply a tourniquet to Mr. Hernandez on November 6th?

A   No.

Q   There was a question about clotting and gauze being treatments that could be applied to someone who's hemorrhaging.  Was that -- were those -- were those adequate treatments or -- let me back up.

Were clotting and gauze application the appropriate treatment for Mr. Hernandez in the situation that he was in?

MS. REYNOLDS:  Objection to the form.

A   I -- I think clotting is not the issue.  I

mean, here's -- here's the thing, gauze is an appropriate treatment for blood from cutting a vein.  Veins are low pressure and the amount of pressure you can achieve by pressing on a -- on a vein will stop the -- the bleeding and allow the incision to clot, but arterial bleeding is a whole different problem and -- and they failed to appreciate that this was arterial breeding.  I mean, the amount of blood that they found there was obviously, according to the -- I think was Exhibit 7, it's impressive.  There's no mention of it, but my guess is if we had a good careful clinical observation you would have seen this was pulsatile blood gushing out, and -- and gauze pads, you could predict that they were not going to be effective and, in fact, they were not effective.

BY MR. TEAGUE:

Q    Okay.  Regarding the photos that were taken I believe were Defendant's Exhibit 6 that you were previously shown --

A    Yes.

Q    -- do you have any idea when those photos were taken?

A    No.

Q    Okay.

A    I would say they're probably taken after he was

taken out of the room since he's not in the picture.

Q   All right.  So let's go to your -- your fees.  So defense has asked about your -- your hourly fees.  Where do those fees go?

A   I do not take the fees for myself.  I donate -- my administrator bills directly for my charity in Haiti and I use them to support my charitable efforts in Haiti.

Q   Okay.  And what is -- what is that charity?

A   The charity is -- two charities actually.  One is called HealthShare Global and the other is Project Medishare, and one is location specific for the central plateau.  That's Project Medishare, and the other I can use with flexibility for different other projects so --

Q   Okay.  Are you personally profiting from your testimony?

A   No.

Q   To strip down to the brass tacks all the complexity what should have happened at 3:21 when nurses found Mr. Hernandez conscious but bleeding?

MS. REYNOLDS:  Objection to form.

A   They -- as soon as it was practically possible they should have started an IV and applied tourniquets and gotten fire rescue there to take him to the hospital.

BY MR. TEAGUE:

Q   Okay.  In your estimation of this -- this case, what is this case about?

MS. REYNOLDS:  Objection to form.

MR. BEAN:  Object to form.

MS. COTTO:  Join that objection.

BY MR. TEAGUE:

Q   Okay.  Regarding Mr. Hernandez's treatment or medical treatment on November 6th, 2020 what is your fundamental opinion about what occurred that day?

A   That other reasonable providers in similar circumstances would have treated him differently.  They would have initiated IV therapy, restored his volume and applied tourniquets to stop his bleeding, and had that happened he would have survived.

Q   Okay.  Regarding your --

A   And that's with regard to the 6th.  I also have opinions which I stated with regard to his care on the 5th which has to do with being sensitive to his -- the possibility of sexual assault, consulting a medical backup and identifying the -- the explanation for the white cells in his urine.

Q   Okay.  Regarding your expert report and --

and your supplemental -- well, let's just take them one at a time.  The opinions expressed in your expert report -- the original expert -- expert report were they arrived at with a medical -- let me -- sorry.  Let me withdraw that question.

Are all of your opinions in your original expert report to a reasonable degree of medical probability?

A     Yes.

MR. BEAN:  Object to form.

BY MR. TEAGUE:

Q     And what about the opinions in your supplemental expert report?

MR. BEAN:  Same objection.

A     Well, what is the question?

BY MR. TEAGUE:

Q     The opinions expressed in your supplemental expert report, are they given with a reasonable degree of medical probability?

A     Yes, they are.

Q     I believe you were asked whether CPR and the use of a defibrillator were within the standard of care.  What is your answer to that?

A    Yes, they're using a -- using a machine to monitor his heart rate once he lost consciousness was certainly part of the standard of care.

Q    Okay.  Okay.  So -- so if I understand you correctly, those are appropriate treatments after Mr. Hernandez lost consciousness?

A    Yes, there was one, however, point that I didn't understand, which is according to the interrogatories of Nurse Jordan I think it was, the defibrillator -- they actually did shock the patient but I saw -- in the video I saw no evidence that he was actually shocked because the defibrillator voice never said shock the patient.  So there's that, but, you know, I'm not sure that that influenced the outcome.  They followed what -- they did what the machine told them to do and that is the standard of care, but there is a quibble about whether he was actually shocked or not. Probably he never had ventricular defibrillation.  He just had cardiac standstill or just low blood pressure, a little bradycardia or something like that.

Q    Okay.

A    If -- if you really wanted an answer we could get the -- I'm sure the defibrillator has a record of what the rhythm was, but my educated guess is there was no ventricular fibrillation.  There was some other

arrhythmia --

Q    Okay.

A    -- that didn't require a shock.

Q    Okay.  And based on your review of the materials were there IV -- was there IV equipment at GEO?  I'm sorry.  Let me just withdraw the question.

According to your review of the records, was there IV equipment at Lawrenceville Correctional Center on November 6th, 2020?

A    Not only was there IV equipment at the center, it was at -- it -- it was in the treatment room on the cart.

Q    Okay.  In your experience and knowledge of RN scope of work, are RNs usually trained in IV therapy?

MS. REYNOLDS:  Objection to the form.

A    Yes.

BY MR. TEAGUE:

Q    Okay.  Assuming based on the -- the medical records that you've reviewed, that Mr. Hernandez was conscious until at least 3:53 according to the event report.  Was that time -- let me rephrase the question.

The event report that we've

introduced as, I think, Exhibit 7 that you've reviewed, you have in front of you, we've noted that the report says that the reporter advised the male is 47 and was conscious 15 minutes ago but was out of it.  You previously stated that 15 minutes ago according to this report would have been 3:53; correct?

A    Uh-huh.  Yes.

Q    From 3:21 when Nurse Jordan encountered Mr. Hernandez in his cell to 3:53 a.m., was there time to save his life?

A    Yes.

MS. REYNOLDS:  Asked and answered.

Objection to form.

BY MR. TEAGUE:

Q    Okay.

A    Yes.

Q    Okay.  Regarding Nurse Kamara in that period from 3:21 to 3:53 was that time that Nurse Kamara could have saved Mr. Hernandez's life?

MS. REYNOLDS:  Objection, asked and answered and objection to form.

A    Yes.

BY MR. TEAGUE:

Q    Okay.  I believe I'm finishing up here. Well, one last question about your work in Haiti. Are you still doing that today?

A    Yes.

Q    Okay.  And what kinds of service -- services do you render in Haiti?

A    Well, in the central plateau we're caring for a hundred thousand people.  We support a Haitian workforce that includes Haitian doctors, Haitian nurses and Haitian community health workers and they're doing, again, a population of a hundred thousand in remote villages.  And we send out the community health workers and they organize and bring patients in for mobile clinics.  We also have a nutrition program and orphans and vulnerable children program, and one of our medical students actually donated enough money after the cholera epidemic, we actually have a bleach factory and we're manufacturing bleach to sterilize the water so people will have clean water to drink.

In addition to that, we started and then turned it over to an organization called Partners in Health, the first ever family medicine residency training program in Haiti.  And my greatest thrill of this month was I got a report

HealthShare Global invested a little bit of money to our director of sickle cell anemia in Haiti, which is a huge problem.  Turns out sickle cell -- Haiti has the highest incidence of sickle cell anemia in the world, and Dr. Alvarez, one of our faculty in pediatrics, went down there.  She took the initiative, wrote a grant to the NIH.  She turned my $5,000 initial donation to get her to go down there into a 5 million grant from the NIH, and we have screened 15,000 kids for sickle cell anemia and diagnosed it in sixty-six and they're on treatment.  And this year we're going to move it into the central plateau.  This was in four hospitals in -- in -- in the northern part of Haiti near the city of Cap-Haïtien, but now we're going to go screening in rural Haiti so --

Q    All right.

A    Thanks for asking.  I was hoping you would.

Q    All right.  In terms of -- I do have just a couple more questions.  You were asked a question about whether you've published articles or written on correctional medicine?

A    Uh-huh.

Q    I believe you said no.  The work that you have written or the writings that you have done, has

your experience that you previously testified about been a part of that -- that writing?

MS. REYNOLDS:  I'm going to object to the form of that question.  It's vague.

MR. TEAGUE:  I understand.  Yeah, that is. Yeah.


BY MR. TEAGUE:

Q    Okay.  Dr. Fournier, you -- you've previously testified that you have worked with correctional facilities; correct?

A    Yes.

Q    And you've provided care to inmates; correct?

A    Yes.

Q    I believe you also testified that you've supervised nurse practitioners who worked in correctional settings?

A    Yes, that's correct.

Q    Okay.  Now, is that experience working in correctional medicine or with correctional facilities, is that included in your -- any of your -- your writings that you've done?

MS. REYNOLDS:  Objection to form.

A    Not explicitly, but as I said, there's several

articles that I wrote that deal with the -- the interface between homelessness, mental illness and incarceration. I can actually read them off of my CV if you want, but just take my word at this point in the day.

BY MR. TEAGUE:

Q    Okay.  All right.

A    Yeah.

MR. TEAGUE:  All right.  I think that's it.

BY MS. REYNOLDS:

Q    I have some follow-up questions on your Exhibit Number 7, if I may.

A    Surely.

Q    Okay.  You have Exhibit Number 7 in front of you?  It's the event report.

A    Yes.  Have it right here.

Q    Okay.  On -- halfway down on notes, "Report advised the male is 47 and was conscious 15 minutes ago but was out of it."  Do you know "but was out of it" means?

A    I don't know with a hundred percent accuracy, but I assume that that means that the patient had an altered state of consciousness.

Q    Okay.

A    Was delirious or stuporous, one or the other or both.

Q    Do you know who that report was given by?

A    No, I don't.

Q    Okay.  And then down on times, "Call received 4:05:02," and it says, "First arrive 4:22:39."  So 17 minutes and 37 seconds.  Do you see that, times?

A    I got the times, okay.  I've got that.  All right.  Now which column am I looking at?

Q    So the first line says, "Call received 4:05"?

A    Got it.  Okay.

Q    That's when the call came in?

A    To fire -- to, yeah, emergency response, okay.

Q    Okay.  And then down it says, "First arrive," when they arrived at the correctional center 4:22:39.  Do you see that?

A    Uh-huh.  Yes, I do.

Q    So would you agree that's 17 minutes and 37 seconds reaction time?

A    Well, I don't know that for -- with a hundred percent assurity because what I don't know is whether that means they arrived at the facility at that time or

they arrived at the patient at that time.

Q   Well, the patient was at the facility; right?

A   If it's a big facility.  As you mentioned there's two different -- two separate buildings involved. I don't know.  It's a small point, but I would say certainly we got 17 minutes here documented, yes.

Q   Okay.  And so on the back side you see where it says "Event Log"?

A   Uh-huh.

Q   And you see that first line there "Time received, 4:05:02"?

A   Right.

Q   Which is the same as the 4:05:02 where the call was received?

A   Sure.  Yes, I do.

Q   How does it say how this call was received?

A   It doesn't.

Q   Does it say by phone there under comment?

A   Oh, yeah.  It does say by phone, yes.  Yeah.

Q   Okay.  And we understand that the nurses did not have access to phone at the correctional facility?

A   You've educated me on that today.  Thank you.

MS. REYNOLDS:  Okay.  You're welcome.

Those are my questions.  Thank you.

BY MS. COTTO:

Q    I just have a few follow-up questions as well.

THE VIDEOGRAPHER:  Would you grab that mike?  Sorry.

BY MS. COTTO:

Q    You testified that it was a breach in the standard of care for the nurses not to call a doctor on November 6th of 2020, but would you agree that you did not express that opinion in either your original expert report or your supplemental expert report?

A    Yes.

Q    And Mr. Teague had asked you and you agreed that the nurses arrived at the medical unit at 3:21 a.m., but would you agree that that was the time that they arrived at Mr. Hernandez's cell?

A    Yes.

Q    Not the medical unit?

A    Yes.

MS. COTTO:  Those are all the questions I

have.  Thank you.

BY MR. BEAN:

Q    I do have a couple followups.  Mr. Teague just asked you if you continue your work in Haiti. That's just administrative support you're providing; correct?

A    Well, until the embargo -- until we were forbidden to go there I was still taking medical students down there as late as 2021.  So we were doing direct patient care up to '21, and I'm hoping to go back.

Q    Okay.  There was one issue I forgot to address with you.  In Nurse Russell's evaluation she made the note, "Urine voided yesterday, dark." There's a clinical difference between blood in the urine and dark urine; correct?

A    Yes, there is.  Yeah.

Q    Okay.  So what -- from the clinical perspective how -- how do you come to the opinion that Mr. Hernandez had blood in his urine?

A    He said it.

Q    Okay.  Do patients sometimes make mistakes about their symptomology?

A    I've never had a patient mistake red urine for anything other than blood.

Q    Well, that -- that's not the question.
The question is do patients sometimes mistake their
symptomology?

A    That's a different question --

MR. TEAGUE:  Objection, vague.

A    -- than the one you originally asked, but, yes,
patients -- patients attribute -- sometimes attribute
their symptoms to things that aren't necessarily the
cause, yes.

BY MR. BEAN:

Q    So what makes you believe that Nurse
Russell didn't ask questions to correct a
misapprehension of Mr. Hernandez and that he
actually had dark urine as opposed to blood in his
urine?

A    Because he said I had -- I -- I've never used a
four letter word so I don't want to -- but he said, "I
had blood when I peed."  The last word is not his exact
word but he said it.  Why -- why should we -- why should
we confound -- don't multiply causes unnecessarily, okay.
He saw blood in his urine.  If you saw blood in your
urine you'd say, "I saw blood in my urine," and I'd
believe you and most of the time you'd be correct.

Q    Sure.  Clinically though -- clinically

though you try to be as clear as you can, accurate as you can in records; correct?

A    One would hope, yes.

Q    So clinically if you put on a record dark urine as opposed to blood in urine that would be clinically different?

A    So no.  The answer -- you're -- here's -- here's what we do.  When a urine specimen is collected the collector, be it a nurse, an orderly or a patient care technician, they're asked to comment on the color of the urine, okay.  And they have a choice.  They can say it's yellow, straw colored, dark, etc.  Usually when a provider says dark urine they mean it's concentrated or it may mean that it has bilirubin in it, but dark is dark and red is red, okay.

Q    And dark urine can be a sign of a number of different things such as dehydration and other issues?

A    Yeah.  It means the urine is concentrated, yeah, or the patient is hemorrhaging.

Q    And there's no other clinical evidence of blood in the urine except for the patient's representations; correct?

A    Correct.

MR. BEAN:  Okay.  That's all the questions

I have.

BY MR. TEAGUE:

Q    I think -- well, just one followup.  Just one followup regarding the urine.  Okay.  So you were just -- Dr. Fournier, you were just asked about the urine that I guess the report that Damian Hernandez made to Nurse Russell regarding the blood in his urine; correct?

A    Correct.

Q    And was there -- according to your -- your review of the records was there a urinalysis done?

A    Yes.

Q    Okay.  I have one for you.

MS. REYNOLDS:  Oh, this is one we haven't been provided?

MR. TEAGUE:  No.  It just came as a -- a result of this.

BY MR. TEAGUE:

Q    So Mr. -- Dr. Fournier, is -- did you -- have you seen this document before?

A    No.

Q    What -- do you -- do you recognize what that document is?

A    Yes.  It's a urinalysis.

Q    Okay.

MR. BEAN:  Is that Bates labeled such that I can pull it up?

MS. REYNOLDS:  It's VADOC-MED000101.

MR. BEAN:  Thank you.

BY MR. TEAGUE:

Q    Okay.  And would any of the results there be something that would -- should prompt Nurse Russell to perform her suicide -- or sorry.  Let me back up.  I'll withdraw that question.

Is there anything about that urinalysis that in your opinion should prompt Nurse Russell to consider sexual assault?

A    Yes, the white cells of the urine and the nitrite, they both indicate an infection in the urinary system.

Q    Okay.

A    Which in a male in prison my number one, two, three, four and five would be sexual assault.

MR. TEAGUE:  Okay.  And that will be Exhibit 8, and I'm done.

(Chemistrip Urinalysis was marked as Fournier

Deposition Exhibit Number 8.)


BY MS. REYNOLDS:

Q    I just have one question.  Doctor, this -- this question has just been really bothering me and I have got to ask it on the sexual assault.

A    Sure.

Q    In any of the records you do not see that Mr. Hernandez reported a sexual assault and you've testified that sexual interactions do occur in a prison.  How do you know it wasn't a consensual sexual act?

A    Because -- because he was suicidal.  It's post hoc ergo propter hoc.

Q    I know what that means.

A    Yeah.  So -- so after -- after he was assaulted he had -- that's the reason why he was suicidal.  I mean, there's no doubt he was suicidal.  So why was he suicidal?  Well, something happened.  What's the most likely explanation for what happened in a guy in jail?  It's sexual assault particularly with the symptoms of both blood in his urine and rectal bleeding.

Q    So, Doctor, and let me -- because I was a logic --

A    Right.  A philosophy major.

Q   Yes, at William & Mary.  Post hoc ergo propter hoc is a logical fallacy that says just because something happened earlier in time does not mean what happened later is the cause?

A   That's correct.

Q   Okay.  So --

A   Both are true.

Q   So it's not necessarily -- wait a minute. I'm not done.

A   Okay.

Q   So, Doctor, would you agree it's not necessarily the case that he was sexually assaulted because there's no evidence of that?

A   It is not necessarily the case, but with reasonable medical probability it was.

MR. TEAGUE:  I'm done.

THE VIDEOGRAPHER:  All right.  No further questions?

BY MR. BEAN:

Q   I have questions.  In talking about whether it's consensual or non-consensual, suicide -- is it -- can you not also suffer suicidal ideation from regrettable consensual sex?

A   Yes.

Q    Okay.  Maybe especially if it's your first time in engaging in a certain type of sexual act?

A    Well, again, that's speculative, but it's possible, yes.

Q    So from a clinical perspective how did you rule out consensual sex?

A    Well, one can't given the inadequacy of information we have.  I mean, it wasn't asked, but the fact that -- what -- what would have given us the answer is a rectal examination.  If it were non-consensual you'd see trauma, you'd see scratches, you'd see bruises, you'd see anal tears.  That's what you see with -- with sexual assault and that didn't happen.  So the answer to your question is we can't be sure, but I wish -- I sure wish I had a rectal exam.

Q    But it's also true that those signs could also -- those signs don't necessarily accompany sexual assault, correct, with a submissive victim?

A    But with reasonable medical probability they would have pointed us towards one rather than the other.

Q    How do you -- how can you say that?  Is -- is there not situations where a submissive victim does not have those markers of sexual assault?

A    Most of the cases of consensual sexual assault lubrication is used and it's meant to give mutual

pleasure.  So, again, if it's -- if there's evidence of trauma around the rectum I think you can assume it was nonconsensual with reasonable medical probability.  Now, are there exceptions to that?  Yes, but with reasonable medical probability I think you would assume, particularly in somebody who ended up trying to kill himself, that it was more likely non-consensual than consensual.

Q    But -- but in this situation you cannot -- you do not have the information to assist you in testifying one way or the other whether this was consensual or not?

A    I do not have the information one way or the other, that's correct.

Q    With respect to the urinalysis, I don't have it in front of me.  Is there anything in the urinalysis that shows blood in the urine?

A    No.  It says, "Blood, negative."

Q    So wouldn't that tend to support the position that Nurse Russell's statement that it was dark urine as opposed to blood in the urine that there was actually not blood in the urine?

A    Well, again, there's a -- there's a conflict between what Nurse Russell said and what the report -- this says the urine color is clear so --

Q    So -- so why -- when was the -- when was the urinalysis conducted?

A    11/5/2020.  It doesn't give a time, but it was the day -- the day that -- that he saw Nurse Russell and in fact --

Q    So if he has no blood --

A    In fact --

Q    If he has no -- oh, sorry.  Go ahead.

A    She -- she -- she commented on the fact that there were white cells in the urine, although she didn't do any treatment for it.

Q    So if there was no blood in his urine doesn't that undercut all your opinions about blood being in the urine coupled with a bleeding rectum?

A    No, it doesn't.  This is what I -- I -- I thought I was pretty clear when I talked about terminal -- proximal, terminal and continuous hematuria. It's his -- the bleeding was coming from his prostate, and as he -- as he passed more urine it flushed the blood out.

Q    And clinically --

A    That's what you see -- that's what you see with prostatitis.

Q    And what supports that position clinically here?

A    The fact that he complained of peeing blood and the fact that the urinalysis didn't show blood but did show white cells.

Q    And that's not in your -- and that -- that opinion is not in your original report; correct?

A    Correct.

MR. BEAN:  No -- no other questions. Thank you.

MR. TEAGUE:  No.

THE VIDEOGRAPHER:  No further questions, this will conclude the videotaped deposition of Dr. Arthur Fournier.  A total of three media were used and we're off the record at 2:13 p.m.

MR. TEAGUE:  Dr. Fournier, I think you know the drill here, but you have the option of reading the transcript --

THE WITNESS:  I wish to read.

MR. TEAGUE:  -- and signing it or you have the option trusting that the court reporter has taken everything down accurately.  It's totally your choice.

THE WITNESS:  I'm sure she took everything down accurately but as a matter of standard operating procedure I will review it.

MR. TEAGUE:  Okay.

Old Dominion Reporting
Telephone:  (757) 620-6836

(The witness was excused.)

COMMONWEALTH OF VIRGINIA AT LARGE, To-Wit:

I, Shannon A. Crittenden-Mann, a Notary Public in and for the Commonwealth of Virginia at Large, whose commission expires May 31, 2029, certify that the foregoing videotaped deposition of **ARTHUR FOURNIER, MD,** was duly taken and sworn to before me at the time and place for the purpose in the caption mentioned, and that the foregoing is a true and correct transcript to the best of my ability of the testimony given by the witness.

I further certify that I am not a relative or employee of attorney or counsel of any of the parties or financially interested in the action.

Given under my hand this _____ day of _____, _____.

_____
Notary Public
Registration No. 217036

INSTRUCTIONS FOR READING AND SIGNING

Please read the deposition thoroughly and carefully.  Note any typographical errors or anything that you feel was omitted or transcribed incorrectly.  Do not add anything that was not stated at the time of the deposition. After reading, please place your signature in the appropriate spot before a notary public.  Upon completion please mail back the correction sheet and the signature page to Old Dominion Reporting, P.O. Box 47, Carrollton, Virginia 23314.

According to Federal Law, you have 30 days in which to read and sign the deposition, after which, your signature is deemed waived.

If you have any questions, please feel free to contact our office.

CORRECTION SHEET

PAGE_____ LINE_____ CORRECTION_____

PAGE_____ LINE_____ CORRECTION_____

PAGE_____ LINE_____ CORRECTION_____

PAGE_____ LINE_____ CORRECTION_____

PAGE_____ LINE_____ CORRECTION_____

PAGE_____ LINE_____ CORRECTION_____

PAGE_____ LINE_____ CORRECTION_____

PAGE_____ LINE_____ CORRECTION_____

PAGE_____ LINE_____ CORRECTION_____

PAGE_____ LINE_____ CORRECTION_____

PAGE_____ LINE_____ CORRECTION_____

PAGE_____ LINE_____ CORRECTION_____

PAGE_____ LINE_____ CORRECTION_____

PAGE_____ LINE_____ CORRECTION_____

PAGE_____ LINE_____ CORRECTION_____

PAGE_____ LINE_____ CORRECTION_____

PAGE_____ LINE_____ CORRECTION_____

PAGE_____ LINE_____ CORRECTION_____

PAGE_____ LINE_____ CORRECTION_____

PAGE_____ LINE_____ CORRECTION_____

PAGE_____ LINE_____ CORRECTION_____

PAGE_____ LINE_____ CORRECTION_____

I, Arthur Fournier, MD, hereby certify that the foregoing transcript of testimony taken on the 19th day of December 2025 is true and accurate.

_____ Witness

COMMONWEALTH OF VIRGINIA AT LARGE, To-Wit:  Subscribed to and sworn before me this _____day of _____,

_____. _____

Notary Public My Commission expires: _____,

_____.