IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

DELISA HERNANDEZ REID,
*Administrator of the Estate of*
*Damian Hernandez*,
        Plaintiff,

    v.                                                 Civil No. 3:24cv309 (DJN)

THE GEO GROUP, INC., *et al.*,
        Defendants.

## MEMORANDUM OPINION
### (Resolving *Daubert* Motions)

This matter comes before the Court on various motions to exclude expert testimony

("*Daubert* Motions"). First, all Defendants except Defendant Michael Breckon seek to preclude

Christopher Colburn ("Dr. Colburn") from testifying as a damages expert on behalf of Plaintiff at

trial. (ECF Nos. 187, 197, 203 (collectively, "Colburn Motions").) Second, the same

Defendants move to exclude Arthur Fournier's ("Dr. Fournier") testimony as a medical expert on

behalf of Plaintiff. (ECF Nos. 193, 199, 200 (collectively, "Fournier Motions").) Third, the

same Defendants seek to disqualify and exclude trial testimony by Alix McLearen ("Dr.

McLearen") as a medical expert on behalf of Plaintiff. (ECF Nos. 195, 200, 204 (collectively,

"McLearen Motions").) Finally, Plaintiff Delissa Hernandez Reid ("Plaintiff") moves this Court

to exclude or significantly limit the expert testimony of Michael McMunn ("Dr. McMunn"),

Dennis O'Neill ("Dr. O'Neill"), Brian Waxler ("Dr. Waxler"), Alexander Meagher ("Dr.

Meagher"), and Karen Albert ("Dr. Albert") for the defense. (ECF No. 207 ("Plaintiff's

Motion").) For the reasons set forth below, the Court will GRANT the Colburn Motions (ECF

Nos. 187, 197, 203), GRANT the Fournier Motions (ECF Nos. 193, 199, 200), GRANT IN

PART and DENY IN PART the McLearen Motions (ECF Nos. 195, 200, 204), and GRANT IN PART and DENY IN PART Plaintiff's Motion (ECF No. 207).

## I.    BACKGROUND

The Court assumes the reader's familiarity with the underlying proceedings. As the facts of this case have been related elsewhere, (*see* ECF No. 226), this Opinion recounts only those facts necessary to resolve the instant *Daubert* Motions.

This negligence, gross negligence and § 1983 action arises out of Defendants' alleged failure to provide Damian Hernandez ("Hernandez") with adequate emergency medical care at the Lawrenceville Correctional Center ("LCC") on November 6, 2020. Plaintiff, administrator of Hernandez's estate, alleges that Hernandez "suffered great physical pain, injury, and mental anguish," and later died, because of Defendants' failure to provide appropriate medical care. (ECF No. 101 ¶¶ 53–54.)

### A.    Factual Background

#### 1.    The Defendants

LCC is a privately-run prison in Lawrenceville, Virginia operated by Defendant The GEO Group, Inc. ("GEO"). (ECF No. 101 ¶ 5.) The Virginia Department of Corrections("VDOC") contracts with GEO to operate LCC. (*Id.*) At all times relevant to Plaintiff's Third Amended Complaint, Defendant Michael Breckon ("Defendant Breckon") served as the warden of LCC. (*Id.* ¶ 19.) As warden, Breckon bore responsibility for the training and supervision of all natural person Defendants listed in Plaintiff's Third Amended Complaint. (*Id.*)

Defendants Delisa Jordan ("Defendant Jordan"), Merian Kamara ("Defendant Kamara") and Shirley Williams ("Defendant Williams") were employed by GEO as nurses at LCC. (*Id.*

2

¶¶ 6–8.) The Third Amended Complaint collectively refers to these three Defendants as the "Provider Defendants." (*Id.* ¶ 9.) GEO employed Defendants Samuel Davis, Martre Powell, Tewanda Patton, Quinton Hawkes, Tanis Fritz, Connie Jones, Shakenna Turner and Darrin Boyd as correctional officers at LCC. (*Id.* ¶¶ 10–17.) The Third Amended Complaint collectively refers to these eight Defendants as "Correctional Officer Defendants." (*Id.* ¶ 18.)

### 2.    Plaintiff's Allegations Relating to Hernandez's Medical Care at LCC

Since August 1, 2007, Hernandez had been incarcerated as an inmate at LCC. (*Id.* ¶ 22.) At 3:17 a.m. on November 6, 2020, Hernandez's cellmate, Antron Elder ("Mr. Elder"), discovered Hernandez on the ground, bleeding profusely.[1] (*Id.* ¶ 23.) Mr. Elder called in a medical emergency, which ultimately led to the Correctional Officer Defendants discovering Hernandez in a pool of his own blood. (*Id.* ¶¶ 23–24.) The Correctional Officer Defendants alerted LCC's medical team, but took no action to stop Hernandez's bleeding. (*Id.* ¶¶ 24–25.) At 3:21 a.m., GEO's emergency response team and medical staff, including Defendants Jordan and Kamara, arrived at Hernandez's cell. (*Id.* ¶ 26.) Despite still bleeding profusely, Hernandez was responsive and talking. (*Id.*)

The emergency team and medical staff transported Hernandez to the medical unit, a process that took approximately 10 minutes. (*Id.* ¶ 28.) During that time, Plaintiff alleges that

---

[1]    As the Court previously laid out in its May 15, 2025 Memorandum Opinion:

> Plaintiff's Complaint appears to reference "internal reports" as the source of this factual claim. (3d Am. Compl. ¶ 23.) Based on her use of the word "allegedly," the Court is unable to determine whether Plaintiff actually alleges that these events happened as described in the Complaint, or whether she is merely recounting what Defendants' internal reports "allege." Since this paragraph appears in a section entitled "Factual Allegations," the Court will assume that Plaintiff intends for the Court to treat them accordingly.

(ECF No. 130 at 3 n.1.)

3

neither Defendant Jordan nor Defendant Kamara attempted to stem Hernandez's blood loss. (*Id.*) Once Hernandez arrived in the medical unit, Defendants Jordan and Kamara applied pressure to Hernandez's wounds in an attempt to stop his blood loss. (*Id.* ¶ 31.) Plaintiff alleges that Defendants Jordan and Kamara failed to provide any other treatment, including intravenous fluid therapy, or immediately call 911, despite being "[in]adequately equipped to handle this medical emergency." (*Id.* ¶¶ 31–32.) While Hernandez was initially responsive and speaking, he eventually lost consciousness, prompting the staff to call 911 at 4:05 a.m. (*Id.* ¶¶ 30, 33–34.) Hernandez never made it to a hospital and was pronounced dead at 4:27 a.m. (*Id.* ¶ 38.)

On the day before his death, Hernandez reported that he was bleeding from his rectum and had found blood in his urine. (*Id.* ¶ 41.) In response, Defendants prescribed Pepto Bismol but performed no further investigation or medical testing concerning Hernandez's symptoms. (*Id.* ¶ 42.)

## B.    Procedural Background

On December 18, 2024, Plaintiff filed her Third Amended Complaint. (ECF No. 101.) On May 15, 2025, this Court granted in part and denied in part Defendants' various Motions to Dismiss. (ECF No. 131.) Thereafter, the Court entered a Scheduling Order, (ECF No. 160), and the parties then proceeded to file a total of nine motions pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (ECF Nos. 187, 193, 195, 197, 199, 200, 203, 204, 207). Due to the volume of *Daubert* Motions and the significant impact their resolution would have on this case and any future dispositive motions, on January 16, 2026, the Court issued an Order canceling the final pretrial conference and trial and staying all current and future deadlines, including deadlines for dispositive motions, pending resolution of the *Daubert* Motions. (ECF No. 225.)

The *Daubert* motions have been fully briefed, or the time to do so has now elapsed, (ECF Nos. 188, 192, 194, 196, 198, 201, 202, 205, 206, 209–224), rendering them ripe for the Court's review.

## II.    LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if" all of the following conditions are satisfied:

> (a) the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 thus establishes "a district court's gatekeeping responsibility to 'ensur[e] that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). In undertaking this gatekeeping function, district courts enjoy "broad latitude to consider . . . the unique circumstances of the expert testimony involved." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). The Rule 702 inquiry thus necessarily proves "flexible," focusing on the expert's "principles and methodology" rather than the conclusions that the expert draws. *Id.*

"A reliable expert opinion must be based on scientific, technical, or other specialized *knowledge* and not on belief or speculation." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). Courts look to several factors as indicia of reliability, including "testing, peer

review, evaluation of rates of error, and general acceptability" in the expert's field. *Id.* For an expert to satisfy a court's reliability inquiry, the court must find that "the reasoning or methodology underlying the [proffered] testimony is scientifically valid and . . . that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592–93. The Fourth Circuit recently reiterated that, while an expert "need not be precisely informed about all details of the issue . . . he must have satisfactory knowledge, skill, experience, training [or] education on the issue for which the opinion is proffered." *Brainchild Surgical Devices, LLC v. CPA Glob. Ltd.,* 144 F.4th 238, 254 (4th Cir. 2025) (quotation omitted).

Regarding relevance, district courts must ask "whether [the] expert testimony proffered . . . is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert,* 509 U.S. at 591. The relevance inquiry is one of "fit" — expert testimony must demonstrate "a valid . . . connection to the pertinent inquiry as a precondition" to admissibility. *Id.* at 591–92.

Throughout its Rule 702 analysis, a district court must remain cognizant of two bedrock, yet competing, principles. On the one hand, Rule 702 "was intended to liberalize the introduction of relevant expert evidence." *Westberry,* 178 F.3d at 261. District courts therefore "need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct." *Id.* On the other hand, expert testimony often proves uniquely capable of confusing or misleading the jury. *Id.* "[P]roffered evidence that has a greater potential to mislead than to enlighten" should therefore be excluded. *Id.* Critically, the proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. Fed. R. Evid. 702; *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert,* 509 U.S. at 592 n.10).

6

The Fourth Circuit has consistently emphasized that Rule 702's "touchstone . . . is whether the testimony will assist the jury." *United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011); *see also United States v. Sanders*, 107 F.4th 234, 258 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 1434 (2025) ("To be admissible, Rule 702 of the Federal Rules of Evidence requires that the expert's testimony 'will help the trier of fact.'") (citing Fed. R. Evid. 702(a)). Expert testimony "that merely states a legal conclusion as to the meaning or application of a rule or statute is not 'helpful,' as required by Rule 702," and is therefore generally inadmissible. *United States v. Cortez*, 205 F. Supp. 3d 768, 776 (E.D. Va. 2016); *see also United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006) (noting that an expert opinion is "generally inadmissible" if it "states a legal standard or draws a legal conclusion by applying law to the facts") (citation omitted). That is because "an expert telling a judge how to interpret a rule or statute does nothing more than give an attorney a redundant means of presenting legal argument to the Court." *Cortez*, 205 F. Supp. at 776; *see also Brainchild*, 144 F.4th at 253 (noting that "there is already a knowledgeable gentleman in a robe whose exclusive province it is to instruct the jury on the law." (quotation omitted).)

Trial courts enjoy broad discretion when ruling on *Daubert* motions. *See United States v. Dorsey*, 45 F.3d 809, 814 (4th Cir. 1995) ("[A] trial judge has a great deal of discretion in deciding whether to admit or exclude expert testimony.") In many instances, vigorous cross-examination at trial provides the more suitable remedy for a party seeking to exclude an opposing expert's testimony. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.") (quoting *United States v. 14.38 Acres of Land Situated in Leflore Cnty.*, 80 F.3d 1074, 1078 (5th Cir. 1996)); *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination,

7

presentation of contrary evidence and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### III.    DISCUSSION

The Court proceeds to address each set of *Daubert* Motions in turn, applying the legal standards set forth above.  As explained below, the Court will grant the Colburn and Fournier Motions in their entirety, grant the McLearen Motions in part, and grant Plaintiff's Motion in part.

### A.    Colburn Motions

### 1.    Dr. Colburn's Expert Opinions

Plaintiff designated Dr. Colburn to provide an estimate of economic loss associated with Mr. Hernandez's passing.  (ECF No. 205-8 ("Colburn Report").)  Dr. Colburn's report offers three alternative calculations of the total economic loss.  First, he opines that if Mr. Hernandez had worked until age 67, the total loss would be $140,176, consisting of $31,061 in lost prison wages and $109,115 in lost post-release earnings.  (*Id.* at 3.)[2]  Second, if Mr. Hernandez had worked until age 70, Dr. Colburn calculates the total loss at $218,528, consisting of the same $31,061 pre-release figure and $187,467 in post-release losses.  (*Id.*)  Third, applying a downward adjustment to account for the fact that only 40% of formerly incarcerated individuals find employment, Dr. Colburn reduces the post-release figures and arrives at total earnings of $74,707 or $106,047, depending on Mr. Hernandez's retirement age.  (*Id.*)

Dr. Colburn's calculations rest on the following factual premises set out in the report: Hernandez "was incarcerated since 2007" (*id.* at 2); he "was serving a 45-year sentence" and "was expected to be released from incarceration in 2040" (*id.*); he "had a history of Sheet Metal

---

[2]    The Court employs the pagination assigned to the parties' filings by the CM/ECF system.

work as indicated on the Virginia Department of Corrections Mental Health Services Form dated 1/20/02" and would therefore earn the average Norfolk sheet metal worker's wage of $17.32 per hour, or $36,067.20 annually, upon release (*id.* at 2–3); he "earned $34.33 on average per week while incarcerated for the year 2020" (*id.* at 2); and a 40% post-release employment rate, drawn from a 2022 Prison Policy Initiative blog post, appropriately captures his diminished post-release employment prospects. (*Id.*) As the Court explains below, each of these premises proved either factually incorrect or methodologically unsupported when tested at deposition.

### 2.    Dr. Colburn's Report Relies Upon a Foundation of Incorrect Facts

Defendants advance several arguments in support of exclusion on foundational grounds. Defendant Kamara argues that Dr. Colburn "used incorrect facts to arrive at his opinions, such as the wrong date for incarceration, the wrong pay frequency in the prison, the wrong discharge occupation, and the wrong location for the discharge occupation," and that these errors render his opinions both irrelevant and unreliable under Rule 702. (ECF No. 188 at 5.) Defendants Samuel Davis, Shirley Williams, Martre Powell, Tewanda Patton, Quinton Hawkes, Tanis Fritz, Connie Jones, Shakenna Turner, Darrin Boyd and GEO (collectively, "Other Defendants") echo these contentions, further arguing that Dr. Colburn "ignored the gaps in Mr. Hernandez's work history while incarcerated" and that his reliance on a 2040 early release date, without any investigation into Mr. Hernandez's documented disciplinary history, deprives his projections of any reliable factual foundation. (ECF No. 198 at 10–11.) Defendant Jordan similarly argues that Dr. Colburn "used a multitude of incorrect facts as a basis for his opinions," cataloguing the wrong initial incarceration date, wrong payment frequency, wrong occupation and wrong post-release location, and contending that these errors collectively demonstrate that his opinions "were not based on sufficient facts and data" as Rule 702(b) requires. (ECF No. 205 at 7–8.) In her reply,

Defendant Jordan further emphasizes that Dr. Colburn's basic factual errors — including his citation of an incorrect incarceration date, which she notes "is public record and not in dispute" — call "into question the overall reliability of his calculations." (ECF No. 224 at 2.) In addition, she asserts that Dr. Colburn's conceded wage calculation error alone demonstrates a failure to "reliably appl[y]" his methodology to the facts of this case. (*Id.*)

Plaintiff responds that each of these alleged errors represents a factual dispute, not a methodological defect, and therefore goes to the weight of Dr. Colburn's testimony rather than its admissibility. (ECF No. 192 at 5–6; ECF No. 214 at 4–5; ECF No. 219 at 3–6.) With respect to the incarceration and release dates, Plaintiff argues that "the record is replete with references to Mr. Hernandez's 2040 release date" and that competing documentation about the correct date is "a paradigmatic weight issue" for the jury to resolve. (ECF No. 192 at 5.) On the wage frequency error, Plaintiff concedes that Dr. Colburn treated prison wages as weekly rather than monthly, but he characterizes this as a "conceded error" that "does not render the methodology unreliable" and that can be corrected before trial, noting that "Rule 702 is not a perfection standard." (*Id.* at 6.) Plaintiff further argues that "[w]holesale exclusion would be an extreme and unnecessary remedy where a narrower fix fully addresses any concern." (*Id.*)

The Court finds Plaintiff's responses unavailing. Rule 702 requires that an expert's testimony be "based on sufficient facts or data." Fed. R. Evid. 702(b). Dr. Colburn's report contains and relies on factual errors that are neither minor nor peripheral, but instead constitute significant inputs to every calculation that he performed. An expert opinion built on incorrect foundational facts, like Mr. Colburn's, cannot satisfy Rule 702's requirement and must be excluded.

First, Dr. Colburn's report states that Mr. Hernandez "was incarcerated since 2007." (Colburn Report at 2.) During his deposition, he revised this date to 2002, asserting that the 2007 date was a "typo." (ECF No. 205-9 ("Colburn Dep.") 52:20–21.) In fact, the record establishes that Hernandez's incarceration commenced on April 27, 2000, when he was booked at Norfolk City Jail. (ECF Nos. 188 at 1, 188-2 at 1.) The correct date thus falls seven years earlier than what Dr. Colburn listed in his report and two years earlier than what he testified to during his deposition. The length of Mr. Hernandez's incarceration directly drives the pre-release component of Dr. Colburn's lost earnings calculation. (Colburn Report at 3.) Dr. Colburn's reliance on this false information thus resulted in several opinions related to Mr. Hernandez's future earnings potential that lack "sufficient facts or data" to support them. Fed. R. Evid. 702(b).

Second, and more consequentially, Dr. Colburn's report states that Mr. Hernandez "earned $34.33 on average per week while incarcerated for the year 2020." (Colburn Report at 2.) The resident account summary, which Dr. Colburn acknowledged reviewing and listed among his six referenced materials, (*id.* at 1), provides that Mr. Hernandez was paid monthly. (Colburn Dep. 79:15–80:4.) His average monthly wage was approximately $34.11 before deductions, yielding an annual prison income of roughly $409, not the approximately $1,785 annually that underlies Dr. Colburn's calculations. Dr. Colburn conceded during his deposition that this error requires a reduction in "all of the calculations in the conclusion section of his report." (*Id.* 80:14–20.) However, he did not specify by how much these figures should be reduced, and no corrected report was ever produced. Dr. Colburn's proffered opinions concerning Mr. Hernandez's future earnings thus rely on yet another set of insufficient facts or data.

Third, Dr. Colburn's report states that Hernandez "was expected to be released from incarceration in 2040." (Colburn Report at 2.) Dr. Colburn acknowledged during his deposition that he derived this figure from the VDOC commitment records, which expressly conditioned the 2040 date on the assumption that Mr. Hernandez "will continue to earn good time at [the] present earning level and that [he] will not have earned good time taken from [him] as a result of misbehavior." (Colburn Dep. at 85:12–86:10.) Despite reading this language, Dr. Colburn appears not to have made any inquiry into Hernandez's disciplinary history and testified that he was unaware that a release date could be extended by disciplinary violations. (*Id.* 46:11–16.) The record documents at least seven disciplinary incidents during Hernandez's time at LCC alone, including drug offenses, fighting with another inmate causing injury that required hospitalization and multiple insubordination charges. (ECF No. 188-4.) The Court therefore finds that the purported 2040 release date, which affects every figure in the conclusions section of Dr. Colburn's report, constitutes yet another unreliable factual foundation for Dr. Colburn's projections.

Plaintiff's suggestions that such inaccuracies constitute mere arithmetic errors amenable to pre-trial correction or speak to the weight a jury should attribute to Dr. Colburn's opinions, as opposed to their admissibility, are incorrect. The Court's gatekeeping function does not permit it to defer reliability determinations to the jury, as Plaintiff suggests. *See Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281–82 (4th Cir. 2021) (finding that the district court "abandoned its gatekeeping function" under Rule 702 and thereby abused its discretion when it "cursorily dismissed [a party's] reliability and relevance arguments as only going to weight, not admissibility"). The Advisory Committee Notes accompanying the 2023 amendment to Federal Rule of Evidence 702 speak directly to this point, cautioning that "many courts have held that the

12

critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility," and declaring that "[t]hese rulings are an incorrect application of Rules 702 and 104(a)." Fed. R. Evid. 702 Advisory Committee's Note to 2023 Amendment. Plaintiff's repeated insistence that Defendants' challenges to Dr. Colburn's factual foundation go only to the weight of his testimony, and not to its admissibility, emulates the very approach that the Advisory Committee identified as an incorrect application of the Federal Rules. This Court declines Plaintiff's invitation to delegate to the jury the threshold reliability determinations that Rule 702 assigns to the Court.

Plaintiff further argues that disputes over incarceration and release dates represent classic factual questions for the jury to determine, and that the 2040 date appeared in the very records that Dr. Colburn reviewed. (ECF No. 192 at 5.) The Court agrees that competing release date projections could present a weight issue. However, in this case, Dr. Colburn read the conditional language expressly stating that the 2040 release date was contingent on continued good behavior, (Colburn Dep. 85:21–87:20), and still made no inquiry into the disciplinary history that would determine whether Hernandez had satisfied that condition. Such lack of inquiry represents a failure to investigate a foundational premise that the relevant documents flagged as uncertain. The Court thus cannot conclude that Dr. Colburn's testimony, built, as it was, on such an uninvestigated premise, is "based on sufficient facts or data" within the meaning of Rule 702(b).

Plaintiff also argues that Dr. Colburn was never "warned" of the deficiencies in his analysis and should have been given an opportunity to correct them before Defendants sought exclusion. (ECF No. 219 at 11.) The Court rejects this argument. Rule 702 places the burden of establishing admissibility squarely on the proponent of expert testimony. Federal Rule of Civil Procedure 26(e) independently obligates Plaintiff to supplement or correct an expert

13

disclosure "in a timely manner" when a party learns it is "in some material respect . . . incomplete or incorrect." Dr. Colburn's deposition, which laid bare the errors discussed above, occurred on December 3, 2025. No corrected or supplemental report was produced before the briefing on these motions closed in January 2026. The obligation to ensure the reliability and accuracy since the reliability of Plaintiff's expert testimony lies with Plaintiff, not with Defendants. Fed. R. Evid. 702; *Cooper*, 259 F.3d at 199.

For all of these reasons, the Court finds that Dr. Colburn's opinions concerning Hernandez's future earnings potential lack a sufficient factual basis and fail Rule 702 muster on these grounds.

### 3.    Dr. Colburn's Occupational Assumption Lacks Adequate Foundation

Defendants further argue that Dr. Colburn's selection of sheet metal work as Mr. Hernandez's projected post-release occupation lacks a sufficient foundation and stands directly contradicted by the only testimonial evidence in the record about Hernandez's actual post-release intentions. In Defendant Kamara's telling, Dr. Colburn "simply picked an occupation based on a list of prior work" that also included retail and restaurant employment, and that he "conducted no inquiry into whether [] sheet metal work had changed since Mr. Hernandez's incarceration, requiring training or resulting in job acquisition difficulties." (ECF No. 188 at 3.) Other Defendants emphasize that Dr. Colburn "offered no additional reason for his selecting 'sheet metal' other than it appearing first on the list," and that "[a]n occupation plucked from a list of three occupations on a record, without further investigation, especially when such is contradicted by his mother's deposition testimony, lacks adequate foundation." (ECF No. 198 at 11.) Defendant Jordan similarly argues that Dr. Colburn's failure to discuss Hernandez's pre-incarceration work history with anyone, combined with Hernandez's mother's unequivocal

14

testimony that he planned to operate a food truck in Texas after his release, renders the occupational assumption speculative and unreliable. (ECF No. 205 at 3–4, 7–8.)

Plaintiff responds that "[u]sing record-based vocational information to select a benchmark occupation is standard forensic-economics practice," and that the defense's preferred alternative occupation, should they have one, can be presented through cross-examination or a competing expert. (ECF No. 192 at 5; ECF No. 214 at 4–5; ECF No. 219 at 5–6.) Plaintiff further argues that Hernandez's mother's testimony about his planned operation of a food truck presents a factual dispute for the jury to resolve, not a methodological flaw warranting exclusion. (ECF No. 219 at 5.)

The Court finds Defendants' position persuasive. Applying Rule 702's reliability requirements to forensic economic projections, the Court finds that a forensic economist may reasonably ground an occupational assumption in documented work history when that history is verified, reasonably current, and not contradicted by more probative evidence. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999) (requiring that an expert "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 202 (4th Cir. 2001) (finding expert opinion unreliable where expert applied boilerplate conclusions "regardless of the specific facts of the particular case" and failed to engage meaningfully with contrary evidence in the record). Dr. Colburn's report satisfies none of those conditions. According to his own testimony, he selected sheet metal work because it appeared first on a three-item list in a VDOC mental health intake screening form completed in January 2002, more than eighteen years before Hernandez's passing. (Colburn Report at 2; Colburn Dep. 31:9–32:6.) Dr. Colburn acknowledged that he did not know how long Hernandez had worked in the sheet metal industry.

15

(Colburn Dep. 29:1–3.)  He conducted no research into whether the sheet metal industry had changed during Hernandez's more than two decades of incarceration, whether any licensing or retraining would be required for reentry into the field, or what constitutes the hire rate for formerly incarcerated individuals in that industry specifically.  (Colburn Dep. 53:5–16.)  And he rendered no analysis of Hernandez's future earnings based on restaurant or retail work, which were the other two occupations listed on the same document.  (Colburn Dep.  31:19–32:11.)

More fundamentally, the only direct evidence in the record about Hernandez's post-release employment plans directly contradicts Dr. Colburn's assumption.  Hernandez's mother testified that he planned to return to Texas and live in his childhood home while operating a food truck, and that he had no plans or interest in working as a sheet metal worker in Norfolk.  (ECF No. 205-7 ("Hernandez-Woodhouse Dep.") 29:2–11; 41:2–22.)  Dr. Colburn was unaware of this testimony.  He spoke with no one about Hernandez's actual intentions, interviewed no family members and sought no additional records beyond the six documents provided to him.  (Colburn Dep. 27:20–28:3; 48:11–19.)  A single-line entry on a 2002 intake screening form completed by a prison official does not constitute a sufficient foundation for projecting decades of post-release earnings in a specific industry in a specific city, particularly when the expert undertook no verification whatsoever and the decedent's own mother contradicted the assumption at her deposition.  As emphasized in *Sardis*, an expert's mere *ipse dixit* is insufficient to meet the requirements of Rule 702.  10 F.4th at 289–90 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Daubert*, 509 U.S. at 590 ("'[K]nowledge' connotes more than subjective belief or unsupported speculation.")).  Dr. Colburn's occupational assumption constitutes precisely the

16

kind that stands "connected to existing data only by the *ipse dixit* of the expert," failing to meet the standard required under Rule 702. *Sardis*, 10 F.4th at 289–90.

### 4. Dr. Colburn's Employment Probability Adjustment is Not the Product of Reliable Methodology

Defendants also contend that Dr. Colburn's calculations of Hernandez's projected post-release earnings contains several methodological defects. Defendant Kamara argues that Dr. Colburn "reduced the total claimed lost wages to 40% because of a 2022 blog post" concerning employment of former inmates post-release and then failed to follow the guidance of that very source, which documented declining employment rates of released prisoners over time, substantially lower wages for those who do find employment relative to the general population, and a six-month average lag to first employment, none of which Dr. Colburn incorporated into his analysis. (ECF No. 188 at 6.) Other Defendants sharpen this point, noting that the blog post that Dr. Colburn cited is "not peer-reviewed literature" and that he "does not follow the guidance" provided by that article. (ECF No. 198 at 12.) Defendant Jordan further argues that Dr. Colburn's approach to reducing Hernandez's projected post-release earnings lacks internal consistency. (ECF No. 205 at 8.). While the blog post suggests that only 40 percent of released inmates find *any* employment, Dr. Colburn's formula treats the 40-percent employment figure as though it means that Hernandez would earn 40 percent of a full salary, when the correct actuarial approach would recognize a 40-percent probability of full salary and a 60-percent probability of zero earnings. (*Id.*) All defendants highlight that Dr. Colburn conceded during his deposition that Hernandez's murder conviction might well place him in the 60 percent of formerly incarcerated persons who find no employment at all, and that Dr. Colburn did not factor this criminal history and violent conviction into his 40-percent adjustment. (ECF No. 188 at 3–4; ECF No. 198 at 5–6; ECF No. 205 at 5.)

17

Plaintiff argues that the 6- percent reduction "reinforces, not undermines, the reliability of his testimony," because Dr. Colburn "affirmatively accounted for known re-entry disadvantages rather than presenting an unrealistically optimistic projection." (ECF No. 192 at 4–5.) Plaintiff further contends that whether the adjustment should be larger or calibrated differently is "precisely the type of merits dispute for the jury," and that Dr. Colburn's acknowledgment of limitations in his approach demonstrates methodological transparency, not unreliability. (*Id.* at 6; ECF No. 219 at 6.)

The Court again agrees with Defendants. The sole source that Dr. Colburn cites for his key adjustment to Hernandez's projected post-release earnings consists of a 2022 Prison Policy Initiative blog post. L. Wang and W. Bertram, *New Data on Formerly Incarcerated People's Employment Reveal Labor Market Injustices*, PRISON POLICY INITIATIVE, Feb. 8, 2022, https://www.prisonpolicy.org/blog/2022/02/08/employment/ [https://perma.cc/43T2-PRG2]. Even assuming that such a non-peer-reviewed source constitutes a permissible basis for an expert opinion, the Court finds that the manner in which Dr. Colburn relied upon this source in crafting his opinions reveals significant methodological failings. Most fundamentally, Dr. Colburn selectively applied one finding from the blog post —that only 40% of released inmates find employment — while ignoring the same source's other findings, which would have materially altered his damages estimates. The blog post demonstrates that the 40-percent employment figure represents the *maximum* employment rate observed at any given time over a four-year post-release study period, and that the rate declines to approximately 35 percent after four years. Dr. Colburn did not apply this declining rate. The post further reports that formerly incarcerated individuals who do find employment earn only 53 percent of the median worker's wage in the first months after release, a figure that gradually increases to approximately 84 cents on the

dollar after four years. Dr. Colburn did not incorporate this suppressed wage level into his calculations, instead using the full Norfolk sheet metal worker wage of $17.32 per hour, which he drew from Indeed.com. (Colburn Report at 3, 5.) The blog further reports that it takes an average of six months for a formerly incarcerated person to find their first job after release. Dr. Colburn, by contrast, assumed immediate employment upon release. (Colburn Dep. 71:1–9.)

When confronted with these methodological gaps and omissions at his deposition, Dr. Colburn explained that he was "trying to make a general statement" and acknowledged that incorporating the additional factors from his own cited source "would probably reduce" his numbers. (Colburn Dep. 65:8–66:6.) In so doing, Dr. Colburn argued that he sought to paint "with a big brush" to produce a "ballpark estimate." (Colburn Dep. 66:17–19.)

The Court further notes that Dr. Colburn's application of the 60-percent reduction lacks methodological soundness as evidenced by the internal inconsistencies in his reasoning. As Defendants' counsel established at his deposition, Dr. Colburn treated the 40-percent employment probability as though it meant that Hernandez would earn 40 percent of a sheet metal worker's full wages, which effectively assumes part-time or fractional employment. The correct actuarial approach, according to blog post, would be to calculate an expected value: a 40 percent probability of earning a full salary, plus a 60 percent probability of earning zero. (Colburn Dep. 83:4–11.) Dr. Colburn ultimately conceded that the 40-percent figure did not specifically account for Hernandez's criminal history or the violent nature of his convictions. (Colburn Dep. 95:1–96:2.) This concession confirms that the adjustment, as applied to the specific facts of this case, lacks the case-specific grounding that Rule 702(d) demands. Equally telling, when asked whether Mr. Hernandez's murder conviction might place him among the 60

percent of formerly incarcerated persons who find no employment at all, Dr. Colburn agreed that such an outcome was entirely possible. (Colburn Dep. 81:21–82:3; 83:4–11.)

Taken together, these deficiencies are fatal to Dr. Colburn's employment probability adjustment under Rule 702. Dr. Colburn cited a single non-peer-reviewed source, extracted one figure from it, ignored the balance of its findings, applied that figure through an internally incoherent formula, and then conceded during his deposition that his opinion constituted a "general statement" or a "ballpark estimate," rather than a case-specific calculation. (Colburn Dep. 65:1–12; 66:19.) The Court finds that this does not constitute a reliable application of principles and methods to the facts of this case. Because the post-release component accounts for the overwhelming majority of Dr. Colburn's damages figures under all three scenarios presented in his report, these defects alone stand sufficient to warrant exclusion under Rule 702.

Plaintiff's contention that Dr. Colburn's overall methodology, including his use of an earnings base, his consideration of work-life parameters, the employment probability reduction and present-value discounting, is "generally accepted" in forensic economics does not change the Court's analysis. (ECF No. 192 at 4–5.) A recognized framework cannot launder unreliable inputs. *See Sardis*, 10 F.4th at 289–90 (excluding expert testimony where the expert gestured toward industry standards that he could not identify or apply, and reaffirming that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997))). The question under Rule 702 is not whether forensic economists generally perform present-value lost earnings calculations, or whether such calculations are generally reliable, but whether this expert reliably applied that framework to valid, reliable inputs. On that latter question, the record speaks for itself.

In sum, every essential component of Dr. Colburn's report — the incarceration period, the wage base, the release date, the expected occupation, the release wage rate and the employment probability adjustment — is either factually incorrect, internally inconsistent or drawn from a single, non-peer-reviewed source.  The cumulative effect of these deficiencies is compounded by the risk that such inherently unreliable testimony poses to jurors in this particular case.  *See Westberry,* 178 F.3d at 261 (expert testimony that has "a greater potential to mislead than to enlighten" should be excluded).  Calculations presented as specific dollar figures can carry persuasive weight with lay jurors who may struggle to scrutinize its methodological underpinnings.  Where, as here, no sound methodological core remains to cross-examine, the Court's gatekeeping obligation requires exclusion.

For the foregoing reasons, the Court will GRANT the Colburn Motions (ECF Nos. 187, 187, 203).  Dr. Christopher Colburn shall be excluded as an expert witness in this matter, and his proposed testimony and opinions shall not be presented at trial.

## B.    Fournier Motions

### 1.    Dr. Fournier's Expert Opinions

Plaintiff designated Dr. Arthur Fournier, M.D. ("Dr. Fournier") to provide opinions on both the standard of care and causation in this matter.  (ECF No. 194 at 2.)  Dr. Fournier is a board-certified internist and Professor Emeritus of Internal Medicine and Family Medicine at the University of Miami Miller School of Medicine, where he served on the faculty from 1978 through his retirement in 2014.  (ECF No. 201-7 ("Fournier Dep.") 14:15; 25:5–23.)  He holds an active Virginia medical license, though that license does not appear on his curriculum vitae.  (*Id.* 10:18–11:8.)  His prior correctional facility experience consists of covering the prison medical ward at Jackson Memorial Hospital during his internship and residency from 1973 through 1976,

21

and supervising nurse practitioners in a Miami-Dade County jail via telemedicine from 1978 until his 2014 retirement. (*Id.* 46:22-47:12.) Since his retirement, Dr. Fournier's clinical activities have been limited to taking medical students to Haiti two to three times per year to provide primary care in mobile prenatal and maternity clinics, treating tuberculosis, screening for HIV, assessing patients for Marfan syndrome and supervising medical students in those activities. (*Id.* 25:24-28:11.) He confirmed that he did not work in any correctional facility in Haiti and did not respond to a medical emergency involving a hemorrhaging patient at any point from 2019 through 2021. (*Id.* 35:15-23; 80:17-81:3.)

Dr. Fournier's expert report, dated November 3, 2025, sets forth opinions in two categories: causation and standard of care. (ECF No. 201-5 ("Fournier Report") at 1–2.) On causation, Dr. Fournier opines that with reasonable medical probability that Mr. Hernandez's complaints on November 5, 2020 were the result of sexual assault; that "in all likelihood" that sexual assault contributed to suicidal ideation; and that Mr. Hernandez died of self-inflicted wounds. (*Id.* at 2.) Dr. Fournier lists as his stated basis for these causation opinions "[r]eview of records, autopsy report. Knowledge of corrections health issues." (*Id.*) On standard of care, Dr. Fournier identifies five potential breaches: (1) failure to consider the possibility of sexual assault to explain Hernandez's symptoms on November 5, 2020; (2) failure to perform an appropriate physical examination including a rectal examination and rape protocol; (3) failure to assess Hernandez's suicide risk; (4) unacceptable delay in calling 911 on November 6, 2020; and (5) failure to establish intravenous access, administer IV fluid therapy and apply tourniquets. (*Id.*) With respect to opinion five only, Dr. Fournier states that "[h]ad these treatments been done, with reasonable medical probability, the patient would not have died." (*Id.*) None of the five standard of care opinions names any specific individual defendant.

22

Dr. Fournier subsequently submitted a supplemental report dated December 8, 2025, after reviewing the expert reports of defense experts Dr. Dennis O'Neill, Dr. Michael McMunn and Dr. Karen Albert, along with discovery responses and licensing documentation for Nurses Jordan and Kamara. (ECF No. 215-4 ("Fournier Supp. Report").) The supplemental report introduced for the first time: Dr. Fournier's prostatitis or urethritis theory linking white blood cells in Mr. Hernandez's urine to a sexually transmitted infection from an alleged assault; the requirement for a digital rectal exam with perianal inspection and stool blood testing; the opinion that a doctor or nurse practitioner should have been consulted on November 5; the opinion that victims of sexual assault in prison "frequently despair or fear being killed by their assailant" such that suicide risk was "clearly present"; and the opinion that there was a closing "window of opportunity" to save Hernandez's life. (Supp. Report at 1-3.) Dr. Fournier confirmed during his deposition that none of these opinions appeared in his initial report. (Fournier Dep. 98:23–99:6; 138:23–140:25.)

### 2. Virginia Code § 8.01-581.20 Governs the Admissibility of Dr. Fournier's Standard of Care Opinions

Defendant Kamara and Defendant Jordan both argue that Virginia Code § 8.01-581.20[3] governs whether Dr. Fournier is qualified to testify on the standard of care, because this is a medical malpractice action in which Virginia law supplies the rule of decision, and that Dr. Fournier fails to qualify as an expert under that statute. (ECF No. 194 at 7; ECF No. 201 at 8.) In support, Defendant Kamara cites *Moreno v. Bosholm*, 151 F.4th 543 (4th Cir. 2024), which

---

[3] Virginia Code § 8.01-581.20(A) governs both the substantive standard of care in Virginia medical malpractice actions and the qualifications of expert witnesses who testify regarding that standard. As relevant here, it provides that "[a] witness shall be qualified to testify as an expert on the standard of care if he demonstrates expert knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standards and if he has had active clinical practice in either the defendant's specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of the action." Va. Code § 8.01-581.20(A). Sections 3 and 4 below address each of these two requirements in turn.

held that in state law medical malpractice actions filed in federal court, Federal Rule of Evidence 601 requires the application of state law expert qualification requirements, and which found that every United States Circuit Court of Appeals to address that question had reached the same conclusion that state law applies. (ECF No. 222 at 3–4.)

Plaintiff opposes this argument, claiming in her opposition to Defendant Kamara's motion that Federal Rule of Evidence 702 governs and that this rule preempts Virginia Code § 8.01-581.20, because this is a federal question case brought under 28 U.S.C. § 1331, with the state law claims proceeding only under supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). (ECF No. 217 at 7.) Notably, and somewhat puzzlingly, Plaintiff does not advance this preemption argument in her oppositions to the two other motions, instead conceding that § 8.01-581.20 applies and arguing that Dr. Fournier satisfies its requirements. (ECF No. 215 at 8–9; ECF No. 218 at 5–6.)

The Court agrees with Defendants and finds that Virginia Code § 8.01-581.20 governs the question of whether Dr. Fournier may serve as a medical malpractice expert in this case. Federal Rule of Evidence 601 provides that "[i]n a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 601. The Fourth Circuit recently held in *Moreno v. Bosholm*, 151 F.4th 543 (4th Cir. 2024), that Rule 601 "directs that federal courts apply such a state competency rule to state claims pursued in federal court." (*Id.* at 561.) Furthermore, the Fourth Circuit applied that principle to require application of North Carolina's expert qualification rule in a federal medical malpractice action governed by North Carolina law. (*Id.* at 561–62.) *Moreno* expressly endorsed the holdings of the Fifth, Sixth, Ninth, and Eleventh Circuits, each of which has reached the same conclusion regarding its own state's expert qualification rule, and observed that

24

"[n]o circuit court has reached a different conclusion." *Id.* at 562. The Fourth Circuit had previously applied Virginia Code § 8.01-581.20 in evaluating standard of care expert testimony in a Virginia medical malpractice action tried in federal court in *Creekmore v. Maryview Hosp.*, 662 F.3d 686, 690–93 (4th Cir. 2011), although in that earlier decision the court declined to expressly resolve whether the Federal Rules of Evidence or Virginia Code § 8.01-581.20 governed because the result was the same under either. *See id.* at 690 ("Under either the Federal Rules of Evidence or the Virginia Rules of Evidence, the district court's decision to allow Dr. Stokes to testify as an expert was discretionary and is reviewed as such."). After *Moreno*, that question is no longer open: Rule 601 directs the application of state expert competency rules in state-law medical malpractice actions, and § 8.01-581.20 constitutes Virginia's expert competency rule for such actions.

The state negligence claims in this action arise under Virginia law, and expert testimony establishing the standard of care, breach and causation is required to prove those claims. *Raines v. Lutz*, 341 S.E.2d 194, 197 (Va. 1986). Since Virginia law supplies the rule of decision on Plaintiff's state law claims, and since Rule 601 mandates that state law governs witness competency for such claims, the Court finds that Virginia Code § 8.01-581.20 governs whether Dr. Fournier is competent to offer standard of care testimony in this case. That the § 1983 claims arise under federal question jurisdiction does not alter this analysis: Plaintiff's state law claims are governed by Virginia law, and it is those claims for which standard of care testimony is required. The Court accordingly rejects Plaintiff's Rule 702 preemption argument and proceeds to consider whether Dr. Fournier fulfills § 8.01-581.20's criteria.

25

### 3.    Dr. Fournier Fails the Active Clinical Practice Requirement of Virginia Code § 8.01-581.20

All Defendants seeking exclusion of Dr. Fournier's opinions argue that he fails the active clinical practice requirement of Virginia Code § 8.01-581.20, which requires that a standard of care expert "had active clinical practice in either the defendant's specialty or a related field of medicine within one year of the date of the alleged act or omission." Va. Code § 8.01-581.20. In light of Plaintiff's factual allegations, that statutory window in this case runs from November 6, 2019 through November 6, 2021. Defendants contend that Dr. Fournier's only clinical activity during this period consisted of taking medical students to Haiti two to three times per year to provide prenatal care, tuberculosis screening, HIV screening and Marfan syndrome assessment in mobile community health clinics, which did not involve responding to hemorrhagic emergencies in a correctional facility or assessing incarcerated patients for sexual assault. (ECF No. 194 at 7–10; ECF No. 202 at 10–11; ECF No. 201 at 11–13.)

Defendants rely on three Virginia Supreme Court decisions establishing that the active clinical practice requirement demands recent experience with the specific procedure at issue, not merely general activity in the same medical specialty. In *Hinkley v. Koehler*, 606 S.E.2d 803 (Va. 2005), the court excluded the opinions of an obstetrician who worked exclusively as a teacher and consultant during the statutory period, holding that he failed § 8.01-581.20's active clinical practice requirement, because he "did not evaluate, manage, or treat problems in pregnancies in the context of direct patient care" as the defendant physicians had done. *Id.* at 807. In *Perdieu v. Blackstone Family Practice Center, Inc.*, 568 S.E.2d 703 (Va. 2002), the court upheld the exclusion of opinions by two physicians and one nurse in a nursing home fracture case: one who saw patients only one day per week at a family practice clinic and health department but did not treat fractures or nursing home patients; one who worked in a hospital

26

with elderly patients but did not provide nursing services in a long-term care setting; and one who had retired from primary care and had not treated nursing home patients in over thirty years. *Id.* at 710. The court emphasized that the requirement focuses on whether the expert recently engaged in "the actual performance of the procedures at issue" in the same context as the alleged negligence, rather than an expert's credentials, prior experience or proximity of specialty. *Id.* Finally, in *Fairfax Hospital System, Inc. v. Curtis*, 457 S.E.2d 66 (Va. 1995), the court affirmed the trial court's exclusion of a pediatrician's expert testimony where that physician had been serving as the director of a helicopter transport service during the statutory period rather than in a neonatal intensive care unit, holding that his transport work "[c]ertainly" did not constitute active clinical practice in the specific field of neonatal intensive care at issue. *Id.* at 70. Defendants argue that these precedents compel the same result here. (ECF No. 194 at 9–10.) Just as the *Perdieu* experts had adjacent but non-specific clinical activity, Dr. Fournier's work during the relevant period in Haiti involved community primary care wholly unrelated to hemorrhagic emergency response in a correctional setting. (*Id.* at 9.) Defendants highlight that Dr. Fournier himself confirmed during his deposition that he did not respond to a medical emergency involving a hemorrhaging patient at any point from 2019 through 2021. (ECF No. 202 at 4 (citing Fournier Dep. 80:17–25; 81:3).)

Plaintiff responds that Dr. Fournier practiced medicine in Haiti during 2019 and 2020, directly within the statutory window, and that this practice, in resource-limited settings, stands analogous to correctional healthcare, because both environments require physicians to make critical triage decisions with limited equipment, stabilize patients without immediate hospital resources and determine when to activate external emergency services. (ECF No. 215 at 7–10.) Plaintiff further contends that the core interventions at issue — IV fluid resuscitation, tourniquet

application and 911 activation — constitute universal emergency medicine principles that apply equally in a hospital, a prison or a mobile clinic in Haiti, and that Dr. Fournier's board certification in internal medicine provides him expertise in these areas regardless of his practice setting. (ECF No. 215 at 8–10.)[4] Plaintiff argues that *Hinkley, Perdieu* and *Fairfax Hospital* can be distinguished, because those cases involved experts with no direct patient care activities during the statutory period, whereas Dr. Fournier provided active patient care in Haiti during the relevant timeframe. (ECF No. 217 at 7; ECF No. 218 at 9–10.) Plaintiff also asserts that Dr. Fournier treated approximately twenty patients per trip, for a total of forty to sixty patients annually during the statutory period, constituting a sufficiently significant level of "clinical activity." (ECF No. 218 at 9.)

The Court finds that Dr. Fournier fails the active clinical practice requirement. The active clinical practice requirement "concerns the 'relevant medical procedure at issue in a case' or, more specifically, the 'actual performance of the procedures at issue.'" *Creekmore*, 662 F.3d at 691 (quoting *Hinkley*, 606 S.E.2d at 807). Its purpose "is to prevent testimony by an individual who has not recently engaged in the actual performance of the procedures at issue in a case." *Sami v. Varn*, 535 S.E.2d 172, 175 (Va. 2000). The requirement is determined by reference to the specific medical procedure at issue. *Wright v. Kaye*, 593 S.E.2d 307, 313 (Va. 2004). The procedures at issue here concern responding to a hemorrhaging patient in a correctional facility and assessing an incarcerated patient presenting with rectal bleeding and hematuria for the possibility of sexual assault. Dr. Fournier performed neither during the

---

[4]    In their reply, Other Defendants further note that Dr. Fournier's "universal principles" argument is undermined by his own testimony that providing care in a correctional facility is different from providing care in a hospital emergency department or primary care office. (ECF No. 220 at 2–3 (citing Fournier Dep. 15:14–21).)

28

statutory window. As such, the Court cannot find that Dr. Fournier maintained an active clinical practice during the relevant medical procedures at issue, mandating exclusion of his opinion pursuant to Va. Code § 8.01-581.20.

Plaintiff's argument that the core interventions at issue concern "universal principles" that apply equally across practice settings stands refuted by Dr. Fournier's own testimony. When asked directly whether correctional center medical unit care differs from a hospital emergency department or a primary care office, Dr. Fournier answered both questions in the affirmative. (Fournier Dep. 15:14–21.) Later during the same deposition, when discussing the 911 timing analysis, Dr. Fournier acknowledged that the emergency medicine rule that he was applying in crafting his expert opinions was "an apple" derived from hospital-based trauma center experience while a correctional facility constitutes "an orange," conceding that he "can't take an opinion on one — on the apple and turn it into an opinion on the orange." (Fournier Dep. 135:22–136:2.) Plaintiff cannot successfully establish that correctional and non-correctional settings are functionally equivalent for purposes of the statutory qualification requirement when her own expert acknowledged the opposite under oath. *See Lloyd v. Kime*, 654 S.E.2d 563, 570 (Va. 2008) (placing burden on proponent to demonstrate overlapping medical practices and similar standards of care).

The Virginia Supreme Court's precedents also compel exclusion. In *Perdieu*, the court upheld exclusion of three experts' opinions who lacked experience specific to the type of care at issue — nursing home care — despite the fact that those experts had active clinical practices in adjacent fields during the statutory period. 568 S.E.2d at 710. As the court reaffirmed, the relevant inquiry turns on whether the expert recently engaged in "the actual performance of the procedures at issue," not on whether the expert held an active license or practiced medicine

29

generally. *Id.* Dr. Fournier's situation stands analogous. His Haiti trips involved community primary care which included that prenatal screening, tuberculosis treatment, and Marfan syndrome assessment. None of this practice involved responding to arterial hemorrhage, applying tourniquets, initiating emergency IV resuscitation or assessing incarcerated patients for sexual assault.

Plaintiff's attempt to distinguish *Perdieu* on the ground that its experts performed zero relevant patient care while Dr. Fournier conducted some clinical activity misses the point. The *Perdieu* court affirmed the exclusion of those experts' opinions not merely because they lacked any clinical activity, but because the clinical activity that they did perform was not specific to the type of care at issue. 568 S.E.2d at 710. That Dr. Fournier treated patients in Haiti does not satisfy the statute when none of that treatment involved the procedures at issue here. The Court further notes that Plaintiff's assertion that Dr. Fournier treated approximately twenty patients per trip stands unsupported by the record. (ECF No. 223 at 9.) The Court declines to credit counsel's unsupported assertion as a substitute for evidence. Because Dr. Fournier did not engage in active clinical practice in the defendant's specialty or a related field within the statutory window, he is not qualified to render standard of care opinions under Virginia Code §8.01-581.20. This ground alone suffices as a basis to exclude his proposed standard of care testimony.

### 4. Dr. Fournier Also Fails the Knowledge Requirement Under Virginia Code § 8.01-581.20

Defendants argue that Dr. Fournier also fails the knowledge requirement set forth in Virginia Code § 8.01-581.20, which requires that a standard of care expert "demonstrate[] expert knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standards." Va. Code § 8.01-581.20. Defendants specifically point to three

30

statements by Dr. Fournier during his deposition: (1) he does not know the Virginia Board of Nursing requirements for ordering and administering IV fluid therapy; (2) his assertion that, even if starting IV fluids would violate Virginia nursing regulations, "I don't care. There's a higher calling"; and (3) his lack of knowledge that correctional facility nurses are prohibited from carrying personal cell phones[5] and his unawareness of the specific rules and regulations at Lawrenceville Correctional Center. (ECF No. 194 at 4; ECF No. 201 at 5.) Defendant Jordan argues in her reply that this testimony affirmatively demonstrates that Dr. Fournier lacks the knowledge that the statute requires, because an expert who opines that compliance with the standard of care would necessitate violating Virginia nursing regulations clearly does not know what the standard of care in Virginia requires. (ECF No. 223 at 4–5.)

Plaintiff responds that Dr. Fournier's forty years of clinical experience, his role as Medical Director of the University of Miami School of Nursing Nurse Practice Program from 1986 through 1988, and his secondary appointment as Associate Professor of Nursing from 1987 through 2012 provide him with ample knowledge of nursing standards of care. (ECF No. 217 at 8; ECF No. 218 at 6–7.) Plaintiff characterizes Dr. Fournier's "I don't care" testimony regarding Virginia nursing regulations as a medical judgment reflecting the principle that patient survival takes precedence over regulatory compliance in an emergency, not as ignorance of applicable standards. (ECF No. 218 at 7.) Plaintiff further argues that Dr. Fournier's opinions address what medical interventions were required to prevent Mr. Hernandez's death, not whether Virginia nursing regulations authorized nurses to provide them, and that any gap in his knowledge of the regulatory scheme goes to weight rather than admissibility of his opinions. (Id. at 7–8.)

---

[5]    Defendants Kamara and Jordan represent — and Dr. Fournier did not dispute — that correctional facility nurses are prohibited from carrying personal cell phones. (ECF No. 194 at 4ECF No. 201 at 5.)

31

The Court finds that Dr. Fournier fails the knowledge requirement to proffer his expert opinion in this case under Virginia law. Virginia Code § 54.1-2901(A)(4) requires that the administration of intravenous infusions occur only "under the orders of a person licensed to practice medicine or osteopathy, an advanced practice registered nurse or a physician assistant." . Dr. Fournier testified that he did not know what the Virginia Board of Nursing requirements were for IV therapy administration and that he did not care whether starting IV fluids would have violated Virginia nursing regulations. (Fournier Dep. 74:1–20.) The Court rejects Plaintiff's characterization of this testimony as a "medical judgment." (ECF No. 218 at 7.) An expert's opinion concerning the appropriate physiological intervention for a hemorrhaging patient is materially distinct from an opinion that the legal standard of care requires nurses to act in violation of Virginia regulations delineating their scope of practice. The latter fails to demonstrate familiarity with the applicable standard of care and instead reflects a fundamental misunderstanding of it. An expert who opines that nurses violated the standard of care by failing to perform an act that Virginia law prohibited them from performing unilaterally has not carried his burden to show knowledge of the defendant's specialty and of what conduct conforms to that standard. *Creekmore*, 662 F.3d at 691 (*citing* Hinkley, 269 Va. at 88, 606 S.E.2d at 806).

Dr. Fournier's unawareness that correctional nurses cannot carry personal cell phones and therefore cannot personally place calls to the outside world similarly reflects a lack of knowledge of the correctional nursing standard of care that bears directly on his opinion that the nurse defendants should have called 911 more promptly. (Fournier Dep. 47:13–48:4.) A standard of care opinion concerning the timeliness of an action that the provider was institutionally constrained from performing herself, and where the expert lacked awareness of those constraints,

32

expressly demonstrates a *lack* of "expert knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standards." Va. Code § 8.01-581.20.

In sum, because Dr. Fournier satisfies neither the active clinical practice requirement nor the knowledge requirement of Virginia Code §8.01-581.20, his standard of care opinions are inadmissible under the governing statutory framework.[6]

### 5.    Dr. Fournier's Opinions as to Specific Defendant Groups

Other Defendants argue that even if Dr. Fournier's opinions were otherwise admissible — which the Court has found that they are not — his standard of care opinions concerning the events of November 6, 2020, fail to apply to any of Defendant GEO's medical staff, because Dr. Fournier expressly declined to criticize the care of Shirley Williams, the only GEO medical employee involved in the November 6 response. (ECF No. 202 at 3; ECF No. 220 at 6.)

---

[6]    Defendants raise three additional grounds for exclusion, each of which independently supports the result arrived at by the Court. First, Dr. Fournier's standard of care opinions constitute impermissible group malpractice allegations under Virginia law, as his report names no individual defendant and attributes all alleged breaches to "the medical team," in contravention of Virginia's requirement that expert testimony establish a specific defendant's individual breach and its causal connection to the plaintiff's harm. (ECF No. 201 at 16; ECF No. 194 at 10;) *Raines*, 341 S.E.2d at 196. Second, Dr. Fournier's initial report fails to comply with Federal Rule of Civil Procedure 26(a)(2)(B), because it presents bare causation conclusions with no analytical bridge connecting specific facts, medical findings or methodology to those conclusions, and his supplemental report cannot cure that deficiency by supplying reasoning that should have appeared in the initial report. (ECF No. 202 at 11–13;) *See Goodrich v. John Crane, Inc.*, No. 4:17CV9, 2018 WL 10562401, at *6 (E.D. Va. Aug. 10, 2018) (excluding opinion because "[t]he reports fail to explain how and why the doctors reached these conclusions"); *Campbell v. United States*, 470 F. App'x 153, 157 (4th Cir. 2012) (rejecting amended report where it "attempted to recast [the expert's] initial opinions"). Third, Dr. Fournier's causation opinions are insufficiently reliable under Federal Rule of Evidence 702, as his sexual assault opinion rests on post hoc reasoning rather than accepted differential diagnosis methodology, and his 911 timing opinion depends on counterfactual interventions that never occurred and EMS capabilities that he could not verify. (ECF No. 202 at 7–8;) *See Sardis*, 10 F.4th at 289-90 (excluding opinions based solely on the expert's *ipse dixit*). Since the Court has already found that Dr. Fournier's proffered opinions do not pass legal muster, the Court need not analyze these grounds at this time.

Defendants Kamara and Jordan separately note that Dr. Fournier confirmed during his deposition that his standard of care opinions concerning the events of the previous night, November 5, 2020, do not apply to either of them, because neither was present for Mr. Hernandez's care on that date. (ECF No. 194 at 4; ECF No. 201 at 4 (citing Fournier Dep. 45:6–46:12.)

The Court agrees with Defendants on both points. As to Defendants Kamara and Jordan, Dr. Fournier's November 5, 2020 standard of care opinions do not apply to either, because neither was present for Hernandez's care on that date, as Dr. Fournier himself confirmed. (Fournier Dep. 45:6–46:12.) These opinions are therefore excluded as to Defendants Kamara and Jordan on that additional ground. As to the Other Defendants, Dr. Fournier expressly declined to criticize the care of Shirley Williams, LPN, who was the only GEO medical employee involved in the November 6 response. (Fournier Dep. 92:14–20.) He identified no other GEO medical employee whose individual conduct he criticized, and Plaintiff has identified no other GEO medical employee as having participated in the November 6 events. Testimony that a medical team failed a patient, where the expert cannot identify any member of the defendant employer's medical personnel as having individually breached the standard of care, provides no assistance to the trier of fact on the claims against those defendants and risks misleading the jury. *See* Fed. R. Evid. 702(a).

For all of the foregoing reasons, the Court will GRANT the Fournier Motions (ECF Nos. 193, 199, 200). Dr. Fournier may not serve as an expert witness in this matter, and his proposed testimony and opinions shall be excluded.

34

### C.    McLearen Motions

#### 1.    Dr. McLearen's Expert Opinions

Plaintiff designated Dr. Alix M. McLearen, Ph.D. ("Dr. McLearen") to testify regarding correctional standards of care, policies and practices applicable to GEO staff at LCC. (ECF No. 201-8 ("McLearen Report") ¶¶ 2–3.) Dr. McLearen is a clinical psychologist who retired from the Federal Bureau of Prisons ("BOP") in September 2024 after approximately twenty-one years of service. (*Id.* ¶¶ 1, 6; ECF No. 201-10 ("McLearen Dep.") 15:10–11.) She holds a doctorate in "Clinical Psychology and the Law" from the University of Alabama, is licensed as a psychologist in Alabama, and has never been licensed as a psychologist or nurse in Virginia. (McLearen Report ¶ 5; McLearen Dep. 19:10–20; 28:8–14.) From 2018 through 2022, Dr. McLearen served as Acting, and then as Senior Deputy Assistant Director of the BOP's Reentry Services Division, overseeing Prison Rape Elimination Act ("PREA") compliance, suicide prevention programs and administrative operations across 122 federal facilities and over 200 halfway houses. (McLearen Report ¶¶ 1, 10.) In December 2022, she was appointed Acting Director of the National Institute of Corrections, the federal agency that provides training and technical assistance to correctional systems nationwide. (*Id.* ¶¶ 1. 11.) She has never been licensed as a registered nurse or licensed practical nurse in any state, has supervised only two nurses during her career and has never provided clinical nursing care. (McLearen Dep. 88:12–89:2.) Moreover, she has never been qualified as an expert in any court. (*Id.* 26:3–5.)

Dr. McLearen's expert report sets forth three categories of opinions. (McLearen Report ¶¶ 52–71.) First, she opines that PREA protocol requirements were not properly followed when Hernandez presented to the medical unit on November 5, 2020 with rectal bleeding, because no PREA-type victimization questions were documented and no physical examination addressing

the possibility of sexual assault was performed. (*Id.* ¶¶ 53–56.) Second, she opines that suicide prevention and emergency response standards were not properly followed after LCC staff were alerted to Hernandez's bleeding on November 6, 2020, criticizing the delay in providing treatment during transport, the absence of first aid or CPR until Hernandez arrived in the medical unit, the responders' difficulty locating oxygen equipment and problems with the AED pads. (*Id.* ¶¶ 57–65.) Third, she opines that follow-up standards were not properly followed in the aftermath of Hernandez's death, including the absence of post-incident reviews, the failure to investigate alternative causes of death and the failure to properly secure evidence. (*Id.* ¶¶ 66–69.) Dr. McLearen confirmed during her deposition that her report "did not focus on the individual" and "really focused on the system response." (McLearen Dep. 70:1–9.) She further confirmed that she cannot render an opinion concerning whether the outcome would have been different if PREA standards had been followed. (*Id.* 63:15–64:9.)

### 2. Virginia Code § 8.01-581.20 Applies to Some, But Not All of Dr. McLearen's Opinions

Defendants argue that Virginia Code § 8.01-581.20 also applies to Dr. McLearen's standard of care opinions and that she satisfies neither of its two requirements. (ECF No. 196 at 6–9; ECF No. 201 at 13–16; ECF No. 206 at 7–9.) They contend, in relevant part, that Dr. McLearen's report opines substantively on the adequacy of medical care and medical staff conduct, and that any opinion touching on health care rendered by a health care provider falls within the Virginia Medical Malpractice Act's definition of "health care" and "malpractice" and therefore requires § 8.01-581.20 qualification. (ECF No. 201 at 9–10–11, 16 (citing Va. Code §8.01-581.1); ECF No. 223 at 8–9.)

Plaintiff responds that § 8.01-581.20 does not apply to correctional operations experts testifying about institutional systems, policies and regulatory compliance. (ECF No. 213 at 9.)

36

Plaintiff draws a sharp distinction between Dr. Fournier's opinions concerning the clinical nursing standard of care and Dr. McLearen's opinions concerning correctional operational standards, arguing that the two are complementary and non-overlapping. (ECF No. 218 at 13.) Plaintiff further argues that applying § 8.01-581.20 to correctional operations experts would improperly immunize correctional facilities from expert scrutiny of their emergency response systems, simply because medical staff participated in the response. (ECF No. 213 at 8–9.)

The Court finds that the answer to this threshold question depends on the specific opinion at issue. Section 8.01-581.20 applies "in any action against a . . . health care provider to recover damages alleged to have been caused by medical malpractice," Va. Code § 8.01-581.20, and the relevant state law provision defines "health care" as "any act . . . or treatment performed or furnished, or which should have been performed or furnished by any health care provider for, to, or on behalf of a patient during the patient's medical diagnosis, care, treatment or confinement." Va. Code § 8.01-581.1. Plaintiff correctly asserts that § 8.01-581.20 does not automatically apply to every opinion offered by every expert in a case that also contains medical malpractice claims. A correctional operations expert who opines on whether a facility followed proper PREA protocols, conducted adequate post-incident reviews, or maintained appropriate institutional emergency preparedness in the context of claims that also concern non-health care actions does not offer medical standard of care testimony and is not subject to § 8.01-581.20's requirements. However, where an expert's opinion is substantively an opinion about whether medical care provided to a patient by a health care provider conformed to applicable standards, the opinion falls within § 8.01-581.20's scope. The Court must therefore resolve for each category of Dr. McLearen's opinions which side of that line that it falls on.

37

### 3.    Dr. McLearen's PREA Pre-Incident Opinions Are Partially Admissible

Defendants argue that Dr. McLearen's pre-incident opinions substantively constitute criticisms of Nurse Russell's clinical care on November 5, 2020, and therefore require § 8.01-581.20 qualification, which Dr. McLearen lacks. (ECF No. 206 at 3–4; ECF No. 221 at 3.) They point to Dr. McLearen's deposition testimony that her criticism focuses on Nurse Russell (the only individual identified in Dr. McLearen's pre-incident analysis) and her opinion that Nurse Russell's examination was inadequate, because it did not explore sexual assault as a cause of the rectal bleeding. (ECF No. 206 at 3–4 (citing McLearen Dep. 56:20–57:3; 58:3–19; 59:11–21).)

Plaintiff responds that Dr. McLearen's opinion that PREA protocol requirements were not properly followed constitutes an institutional systems opinion, not a clinical nursing opinion. (ECF No. 216 at 10–11; ECF No. 213 at 9–10.) Plaintiff argues that PREA imposes obligations on correctional facilities as institutions, rather than individual nurses as clinical practitioners, and that whether the facility's systems properly flagged Hernandez's complaint for sexual assault screening presents a correctional policy compliance question that does not require an expert with clinical nursing expertise. (ECF No. 213 at 9–11.)

The Court finds that Dr. McLearen's PREA pre-incident opinion straddles the line between permissible operational testimony and impermissible medical standard of care testimony, and thus must be limited. To the extent that Dr. McLearen opines that LCC as an institution failed to have adequate PREA training, protocols, and systems in place to flag potential sexual assault complaints for appropriate follow-up, that constitutes a correctional operational opinion that does not require § 8.01-581.20 qualification. However, to the that extent Dr. McLearen opines that Nurse Russell's clinical examination and actions toward Hernandez on

38

November 5, 2020, fell below the applicable standard of care, under PREA or otherwise, such an opinion constitutes a medical standard of care opinion subject to § 8.01-581.20's requirements, which Dr. McLearen does not satisfy. During her deposition, Dr. McLearen confirmed that her criticism centers on Nurse Russell specifically, (McLearen Dep. 56:20–57:3), that she believes that "if someone reports to medical with a rectal bleed, they should be examined, questioned about where that came from, including the possibility of sexual abuse," (id. 59:18–21), and that she believes that Nurse Russell's care fell below the standard of care, because she did not explore the possibility of sexual assault. (Id. 56:20–57:3.) Because these opinions constitute clinical nursing standard of care opinions, the Court finds that Dr. McLearen is not qualified to offer them and excludes them accordingly.

In sum, the Court permits Dr. McLearen to testify about whether LCC's institutional systems, such as its PREA training programs, its protocols for flagging potential sexual abuse complaints, and its policies governing staff response to such complaints, did or did not comply with applicable correctional operational standards. She may not opine that Nurse Russell's actions on November 5, 2020, violated the nursing standard of care. To the extent that Defendants seek exclusion on the basis that Dr. McLearen lacks awareness of any specific PREA standard requiring screening when a patient presents with rectal bleeding or whether outcomes might have been different if PREA standards had been followed, the Court finds that these issues constitute matters for cross-examination rather than grounds for further exclusion.

### 4. Dr. McLearen's November 6 Emergency Response Opinions Are Excluded

Defendants argue that Dr. McLearen's opinions concerning the emergency response on November 6, 2020 — that nothing was done to stem Hernandez's bleeding during transport in violation of "internal or external standards," that treatment was delayed in the medical unit, that

39

oxygen was not properly connected, and that there was difficulty with AED pads — constitute medical standard of care opinions evaluating the actions of medical staff that require § 8.01-581.20 qualification. (ECF No. 196 at 3–4; ECF No. 206 at 5; ECF No. 223 at 8–9.) They rely on Dr. McLearen's confirmation, during her deposition, that when she criticized the absence of care during transport and the problems with equipment in the medical unit, her criticism was directed at the medical staff, not the correctional officers. (ECF No. 206 at 5–6 citing McLearen Dep. 39:22–40:3; 77:22–78:12.) To the extent that these opinions lament systemic institutional failures not tied to a specific employee's wrongdoing, Other Defendants argue that these claims are legally irrelevant to any remaining claim, since the only remaining allegations against GEO stand predicated on respondeat superior liability, which requires employee-specific misconduct. (ECF No. 221 at 2 (citing *Parker v. Carilion Clinic*, 819 S.E.2d 809, n.11 (Va. 2018).) They further note that Dr. McLearen rendered no specific opinions concerning Shirley Williams (the only medical practitioner named in the suit that was also a GEO employee regarding the November 6 events) and could not identify any wrongdoing by any GEO medical staff member. (ECF No. 206 at 3; McLearen Dep. 84:3–15.)

Plaintiff responds that Dr. McLearen's emergency response opinions concern correctional facility systems, such as how the facility organized its emergency response, whether adequate equipment was accessible and whether staff coordination met correctional standards, and therefore do not require clinical nursing expertise. (ECF No. 213 at 11–12.) Plaintiff argues that every medical emergency in a correctional facility involves both correctional and medical personnel and that Defendants cannot transform correctional operations opinions into medical opinions subject to § 8.01-581.20's requirements simply by asserting that medical staff were involved. (*Id.* at 8.)

40

The Court finds that Dr. McLearen's November 6 emergency response opinions must be excluded. As already discussed, Virginia Code § 8.01-581.1 defines "health care" to include "any act . . . or treatment performed or furnished, or which should have been performed or furnished by any health care provider for, to, or on behalf of a patient during the patient's medical . . . care, treatment, or confinement." Va. Code § 8.01-581.1. Dr. McLearen's opinions that medical staff failed to provide treatment during Hernandez's transport, that the medical unit's response was delayed, that oxygen was not properly connected, and that the appropriate standards were not properly followed during this response substantively constitute opinions about what kind of health care should have been provided to Hernandez by health care providers during his medical care and treatment. However they are labeled, these actions fall squarely within the applicable definition of "health care," subjecting Dr. Mc Learan's opinions to § 8.01-581.20's requirements, which apply "in any action against a . . . health care provider to recover damages alleged to have been caused by medical malpractice." Va. Code § 8.01-581.20. Dr. McLearen confirmed as much during her deposition when she stated that her criticisms of the transport period and the medical unit response were directed at "medical staff" and not at correctional officers. (McLearen Dep. 39:22-40:3; 77:21-78:12.) She also confirmed that she did not know the standard of care for nurses in a correctional setting, and she was unable to articulate any specific standard that the medical staff violated on November 6, 2020. (*Id.* 88:16–89:15.) Because her opinions are medical in nature, and because Dr. McLearen satisfies neither the knowledge requirement nor the active clinical practice requirement of Virginia Code § 8.01-581.20, her November 6 emergency response opinions must be excluded.[7]

---

[7]    Defendants raise two additional grounds for excluding Dr. McLearen's November 6 emergency response opinions. First, they argue that her medical staff opinions constitute impermissible group malpractice opinions, because her report does not focus on any individual

### 5.    Dr. McLearen's Opinion Concerning the Timing of the 911 Call Is Excluded Under Federal Rule of Civil Procedure 26(a)(2)(B)

Other Defendants argue that Dr. McLearen's report presents no concrete opinion that any delay in calling 911 violated the requisite standard of care, and that her proffered opinion that the emergency response standards were "not properly followed," (McLearen Report ¶ 65), proves too vague to constitute an admissible expert opinion on this specific issue. (ECF No. 206 at 9–10; ECF No. 221 at 3–4.) Defendants point to the only 911-related passages in her report, which note that the records are inconsistent as to timing and that "Master Control" was assigned responsibility for 911 calls, and argue that these passages suggest at most a recordkeeping discrepancy, not a standard of care violation. (ECF No. 221 at 3.)

Plaintiff responds that Dr. McLearen's opinions concerning the timing of the 911 call falls within her general opinion that emergency response standards were not properly followed. In addition, Plaintiff asserts that her report adequately identifies the issue by noting the conflicting records and Master Control's responsibility, and that Defendants suffered no prejudice from any alleged incompleteness of these opinions, because they were able to depose Dr. McLearen extensively about the 911 call. (ECF No. 213 at 13–14.)

The Court finds that it must exclude any opinions by Dr. McLearen concerning the timing of the 911 call under Federal Rule of Civil Procedure 26(a)(2)(B). That rule requires an expert report to contain "a complete statement of all opinions the witness will express and the

---

defendant and based on her testimony that she does not know the names of the individual defendants. (ECF No. 201 at 16–17; McLearen Dep. 69:1-9.) Second, Other Defendants argue that, because Dr. McLearen does not identify any wrongdoing by Defendant Williams (the only GEO medical employee named in the suit as being present on November 6, 2020), her institutional opinions would risk misleading the jury into believing GEO is on trial for its institutional conduct rather than for the conduct of a specific employee, as is required under respondeat superior liability. (ECF No. 221 at 2.) Given that it has already excluded these opinions on other grounds, the Court need not address these alternative arguments at this time.

42

basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i).  To satisfy this requirement, an expert report must provide an "analytical bridge" from its findings to its conclusions and "outline a line of reasoning arising from a logical foundation." *Goodrich v. John Crane, Inc.*, No. 4:17cv9, 2018 WL 10562401, at *6 (E.D. Va. Aug. 10, 2018).  Here, Dr. McLearen's report lacks a clear opinion concerning the timing of the 911 call and its relationship to any standard of care.  The report never expressly opines that any delay in calling 911 fell below the standard of care.  Rather, it merely notes that records conflict as to the timing of that call and that the governing policy assigned 911-calling responsibilities to "Master Control."  During her deposition, Dr. McLearen confirmed that no specific standard establishes how quickly 911 must be called under the relevant circumstances,  (McLearen Dep. 67:16–19), that the officers on the scene made efforts to have 911 called and were not themselves responsible for placing the call, (*id.* 70:14–71:11), and that she does not have an opinion on whether any individual GEO employee violated a standard of care by failing to call 911.  (*Id.* 70:1–9; 72:15–73:15.)  Plaintiff cannot cure the absence of a concrete 911 opinion by pointing to Dr. McLearen's general statement that emergency response standards were not properly followed.  Nor does Rule 26(a)(2)(B) permit Plaintiff to argue at trial that a vague general statement encompasses a specific standard of care opinion that Dr. McLearen herself could not articulate during her deposition.  *See Sharpe v. United States*, 230 F.R.D. 452, 458–59 (E.D. Va. 2005) (describing Rule 26(a)(2)(B)'s purpose as addressing issues around "sketchy and vague expert summaries that do not dispense with the need to depose or adequately forecast trial testimony").  The Court therefore excludes any opinions by Dr. McLearen concerning the timing of the 911 call on these grounds.

### 6.    Dr. McLearen's Post-Incident Opinions Are Admissible in a Limited Form

Defendants argue that Dr. McLearen's post-incident opinions should be excluded for lack of relevance. In support, Defendants highlight that Dr. McLearen herself conceded that completion of post-incident protocols would not have changed the outcome of Hernandez's treatment. (ECF No. 206 at 10.) In addition, discussion of these protocols constitutes evidence of remedial measures barred by Federal Rule of Evidence 407. (*Id.*) Defendants further argue that Plaintiff did not plead a negligent investigation claim, and that even if she had, Virginia law does not recognize such claims. (*Id.* (citing *Porter v. Woods*, 96 Va. Cir. 280 (Va. Cir. Ct. 2017).)

Plaintiff responds that Rule 407 does not apply to Dr. McLearen's opinions, because they concern the adequacy of Defendants' post-incident investigative procedures, not subsequent remedial measures taken to prevent future harm. (ECF No. 213 at 17–18.) Plaintiff further argues that Dr. McLearen's opinions concerning the post-incident investigation prove relevant to evaluating issues around deliberate indifference, credibility, evidentiary gaps and punitive damages independently of whether the alleged actions and omissions affected the outcome of Hernandez's care. (*Id.* at 18–19.)

As to Rule 407, the Court agrees with Plaintiff that this rule does not bar Dr. McLearen's post-incident opinions. Rule 407 governs subsequent measures "taken that would have made an earlier injury or harm less likely to occur." Fed. R. Evid. 407. Dr. McLearen's opinions concern whether Defendants properly investigated Mr. Hernandez's death after it occurred, specifically whether they secured the scene, analyzed alternative causes and conducted post-incident reviews. (McLearen Report ¶¶ 66–69.) These opinions speak to the adequacy of the investigation, rather

44

than to remedial measures designed to prevent future harm. As such, Rule 407 does not apply, and the Court does not exclude these opinions on this ground.

As to relevance, the Court finds Dr. McLearen's post-incident opinions are relevant as to Plaintiff's § 1983 deliberate indifference claims, since evidence of a pattern of indifference to inmates and inmate well-being may carry legal significance beyond a direct causal relationship to the specific harm alleged. The Court notes, however, that Dr. McLearen's concession that completion of post-incident protocols would not have changed Mr. Hernandez's outcome substantially limits the probative value of these opinions as to the state law negligence and wrongful death claims, and that limitation is reserved for appropriate handling at trial.

### 7. Paragraphs 23–26, 29, 33, 38, and 41 of Dr. McLearen's Report Are Excluded

Defendants argue that Dr. McLearen should be precluded from testifying about the news reports, institutional background and specific standards cited in paragraphs 23–26, 29, 33, 38, and 41 of her report. These paragraphs include background on LCF and its prior management by GEO, drawn from a Virginia Mercury article, a Virginia Interfaith Center for Public Policy report, and two local news pieces (¶¶ 23–25); a general observation about private prisons citing a Bureau of Justice Assistance publication (¶ 26); a citation to *Estelle v. Gamble*, 429 U.S. 97 (1976) (¶ 29); and references to PREA training standards (¶ 33), ACA suicide-prevention standards (¶ 38), and NCCHC recommendations (¶ 41). Defendants argue for exclusion, because Dr. McLearen acknowledged during her deposition that those materials played "very little, if any" role in forming her opinions, that she would not cite specific PREA standards at trial, that she could not explain the content of the American Correctional Association ("ACA") standards that she cited, and that she does not assert that any party violated National Commission on Correctional Healthcare ("NCCHC") standards. (ECF No. 206 at 6–7.) Plaintiff responds

45

that background and contextual information is admissible to provide foundation for expert testimony, that Dr. McLearen's plan to testify about PREA conceptually rather than citing specific standard numbers constitutes proper expert practice, and that any deficiencies in her reliance on these materials may be appropriately addressed through cross-examination. (ECF No. 213 at 19–21.)

The Court finds that the challenged paragraphs must be excluded. Federal Rule of Evidence 702 requires that expert testimony be based on sufficient facts or data and reflect a reliable application of principles and methods to the facts of the case. Fed. R. Evid. 702(b), (d). An expert who acknowledges that certain sources played "very little, if any" role in forming her opinions, who cannot explain the content of specific standards that she cited and who intends to testify about a federal statutory scheme only "conceptually, as a whole" without reference to specific provisions has not established a reliable factual or methodological basis for testimony grounded in those materials. (McLearen Dep. 40:17–41:5; 47:3–53:10.) Plaintiff's characterization of these materials as mere background context fails to change the Court's conclusion: if the background played no meaningful role in forming the opinions, it serves no permissible function at trial and carries a real risk of misleading the jury into believing Defendants violated specific standards. The Court therefore excludes the news reports in paragraphs 23–26 and the general institutional commentary in paragraph 29 as irrelevant to any admissible opinion. Dr. McLearen is further precluded from testifying to or relying upon the specific PREA standard numbers cited in paragraph 33, the specific ACA standards cited in paragraph 38, or the NCCHC standards referenced in paragraph 41, though she may testify about the general principles and purposes of PREA as a regulatory framework in the more limited form described above. *See supra* Section III.C.3.

46

In sum, for the foregoing reasons, the McLearen Motions (ECF Nos. 195, 200, 204) are GRANTED IN PART and DENIED IN PART. Dr. McLearen is excluded from offering the following testimony at trial: (1) any opinion that Nurse Russell's individual clinical examination, documentation or judgment on November 5, 2020, violated the nursing standard of care; (2) any opinion regarding the adequacy of medical staff conduct during the November 6, 2020, emergency response, including the absence of treatment during transport, the management of oxygen and AED equipment, and the overall adequacy of the medical unit's response; (3) any opinion that any delay in calling 911 violated the applicable standard of care; (4) any opinion concerning the facility's post-incident investigation and review procedures; and (5) any testimony relying upon the materials or standards cited in paragraphs 23–26, 29, 33, 38, and 41 of her report. Dr. McLearen may testify only that the correctional facility's institutional PREA training programs, protocols and systems for flagging potential sexual abuse complaints did or did not comply with applicable correctional operational standards, provided that she does not opine on the clinical adequacy of Nurse Russell's individual examination.

### D.    Defendants' Experts

Finally, Plaintiff moves to exclude or limit the testimony of five defense experts: Dr. Michael McMunn, DNP, APRN, Dr. Dennis O'Neill, MD, Dr. Brian Waxler, Psy.D., Dr. Alexander Meagher, MD and Dr. Karen Albert, Ed.D. (ECF No. 209.) For the following reasons, Plaintiff's Motion to Exclude Defendants' Experts will be GRANTED IN PART and DENIED IN PART.

### 1.    Dr. O'Neill's Xylazine Opinion Is Admitted in a Limited Form

Plaintiff seeks to exclude Dr. O'Neill's opinion that Hernandez injected himself "with a form of muscle relaxant/pain-killing medication, such as Xylazine," a veterinary muscle relaxant,

47

before his death in its entirety. (ECF No. 209 at 4–6 (citing ECF No. 209-1 ("O'Neill Report") at 6.)  Plaintiff identifies four purported defects:  toxicological evidence does not support Dr. O'Neill's theory, as the autopsy detected only cannabis metabolites; no syringes or injection paraphernalia were found in the cell; the medical examiner characterized the relevant neck wounds as "attempted lethal cuts," rather than injection sites; and Dr. O'Neill's circular reasoning, which uses Hernandez's heart rate of 79 to infer Xylazine and then using Xylazine to explain the heart rate. (*Id.*)

Defendants respond that Dr. O'Neill provided two sound explanations for the absence of toxicological evidence:  many standard toxicology panels do not test for Xylazine, because it is a veterinary drug, and even panels that do test for it will not detect it after thirty to sixty minutes, even though its effects may persist far longer. (ECF No. 211 at 5.)  Defendants further argue that the opinion rests on a valid syllogism grounded in record facts. (ECF No. 212 at 7.)  Significant blood loss triggers an elevated heart rate, yet Defendants Jordan and Kamara's nursing notes documented a heart rate of only 79. (*Id.* at 7, 10.)  Defendants thus contend that the low heart rate and amount of blood loss experienced by Hernandez could only be explained by a chemical agent suppressing it. (*Id.* at 7.)  They add that the neck puncture wounds, Mr. Hernandez's documented history of contraband drug use, and Xylazine's known pharmacological effects on heart rate and cardiac function provide independent record-based support. (ECF No. 211 at 5–6.) As to the absence of any drug paraphernalia, Defendants note that no marijuana was found in the cell either, yet toxicology confirmed its presence, rendering the absence of such paraphernalia inconclusive. (*Id.* at 6.)

The Court finds Dr. O'Neill's Xylazine opinion admissible in a limited form. Hernandez's heart rate of 79 constitutes an independent record fact documented by the treating

48

nurses. Building from that documented fact to an inference that a depressant substance may have been present constitutes a permissible form of clinical reasoning grounded in the expert's decades of experience in internal medicine and as a medical examiner. While the absence of toxicological confirmation and the medical examiner's characterization of Hernandez's neck wounds as "attempted lethal cuts" may ultimately limit the weight that the jury attributes to Dr. O'Neill's opinion, these are matters for cross-examination rather than exclusion. However, the affirmative assertion that Mr. Hernandez "injected himself with a form of muscle relaxant/pain-killing medication, such as Xylazine" goes beyond what the record supports and crosses from permissible differential reasoning into speculation. (ECF No. 211 at 3;) *See Daubert,* at 589–90 ("The subject of an expert's testimony must be 'scientific . . . knowledge.' The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation.") Dr. O'Neill may testify that Mr. Hernandez's clinical presentation (specifically, the documented heart rate of 79 following the significant blood loss) was consistent with the presence of a depressant substance, and that Xylazine is one substance consistent with that presentation, given its known pharmacological profile and documented presence in correctional settings. He may not, however, testify that Mr. Hernandez in fact injected himself with Xylazine or a similar substance as an established conclusion.

###     2.      Dr. McMunn's "Less Than 1%" Statistic Is Excluded in Its Numerical Form

Plaintiff argues that Dr. McMunn's opinion that "in my correctional healthcare education and experience, less than 1% of all rectal bleeds in long-term prison settings are due to sexual assault" must be excluded, because it is presented as a statistic without any disclosed data source, study, sample size or methodology. (ECF No. 209 at 6–7 (citing ECF No. 211-1 ("McMunn

49

Report") at 4–5).) Defendants respond that Dr. McMunn's 23 years of correctional healthcare experience as a nurse practitioner across more than 50 Georgia correctional facilities provides the data source and methodology, and that an expert's specialized experience provides a sufficient basis for opinion testimony under *Kumho*. (ECF No. 211 at 8–10; ECF No. 212 at 2–6.) Defendant Jordan adds that Dr. McMunn provided a sample size in his CV, which includes more than 50 facilities housing 25 to 2,500 inmates, and that the opinion must be read in context as a response to Dr. Fournier's assertion that rectal bleeding alone establishes sexual assault with reasonable medical probability. (ECF No. 211 at 9.)

The Court finds that the "less than 1%" opinion must be excluded in its specific numerical form. Experience-based testimony is permissible under *Kumho*, 526 U.S. at 151, but when an expert presents a specific numerical percentage, he has made an empirical claim that requires an identifiable foundation beyond a general reference to experience. A statistic asserts a quantified relationship between phenomena across a defined population. Dr. McMunn discloses no denominator, no numerator, no methodology for generating the percentage and no explanation of how his clinical experience in Georgia correctional facilities produces a reliable estimate of the national correctional population. A list of facilities in a CV does not constitute a methodology for a prevalence statistic. Dr. McMunn's statistical opinion presents precisely the type of *ipse dixit* that Rule 702 was designed to exclude. *Sardis*, 10 F.4th at 289–90. However, Dr. McMunn may testify that in his clinical experience sexual assault does not constitute a common cause of rectal bleeding in correctional settings, and that the absence of any report of sexual assault by Mr. Hernandez stands relevant to the differential diagnosis. But he may not attach a specific percentage to that opinion.

50

3.    **Dr. McMunn's and Dr. Meagher's Synthetic Cannabinoid Causal Conclusions as to Suicidal Ideation Are Excluded, While the General Pharmacological Testimony Is Permitted**

Plaintiff next seeks exclusion of Dr. McMunn's opinion that cannabis metabolites in Mr. Hernandez's system likely came from adulterated marijuana and Dr. Meagher's opinion that synthetic marijuana — which "can often go undetected and is commonly laced into marijuana supplies" — provided "a more plausible reason than sexual assault for Mr. Hernandez's suicidal ideations." (ECF No. 209 at 7–9 (citing ECF No. 209-8 ("Meagher Report") at 16).)  Plaintiff argues that no toxicological evidence detected synthetic cannabinoids, that neither expert cites scientific literature connecting cannabis to suicide risk, and that both opinions employ post hoc reasoning.  (*Id.* at 8–9.)

Defendants respond that Dr. Meagher employed a standard differential diagnosis methodology, considering and weighing alternative causes for Mr. Hernandez's presentation and suicidal ideation, and that literature citation is not required when an expert relies on training and experience combined with case-specific facts.  (ECF No. 210 at 3–6.)  They point to Dr. Meagher's specific record-based observations, such as the documented cannabis metabolites, Mr. Hernandez's uncharacteristic irritability in the weeks before the incident, and the absence of any documentation concerning sexual assault.  (*Id.* at 3–4.)  Defendant Jordan further argues that the toxicology report tested only for certain substances and thus cannot be used to affirmatively establish the absence of substances not tested for.  (ECF No. 211 at 11.)

The Court finds that these opinions may be admitted only in limited form.  Dr. McMunn's general opinion that "[i]t is common for marijuana and marijuana variants in correctional settings to be adulterated by additional mind-altering substances," (McMunn Report at 3), and Dr. Meagher's opinion explaining the pharmacological effects of synthetic

51

cannabinoids and the limitations of standard toxicology screening — neither of which Plaintiff appears to challenge — are grounded in both experts' clinical experience and therefore admissible. However, the specific causal conclusion that synthetic cannabinoids or adulterated marijuana caused or contributed to Mr. Hernandez's alleged suicidal ideation is a bridge too far on the record before the Court. No case-specific evidence demonstrates that Mr. Hernandez ingested adulterated marijuana, and the inference chain from "cannabis was present in his blood" to "it was probably adulterated" to "adulteration caused suicidal ideation" rests on "the *ipse dixit* of the expert" rather than case-specific information, leaving "too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146 ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.") While Dr. McMunn and Dr. Meagher may testify about the general prevalence of adulterated marijuana in correctional settings, the pharmacological effects of synthetic cannabinoids and the limitations of the toxicology screening performed in this case, they may not testify that adulterated marijuana or synthetic cannabinoids caused or contributed to any suicidal ideation on Hernandez's part.

### 4.    Plaintiff's Arguments Concerning Legal Conclusions Lack Merit

Plaintiff moves to strike a broad swath of opinions by Dr. McMunn, Dr. O'Neill, Dr. Meagher and Dr. Albert that use legal-sounding phrases including "complied with the standard of care," "not negligent," "did not cause his death," "reasonable," and "appropriate." (ECF No. 209 at 9–11.) Plaintiff cites *Elliott v. Carter*, 791 S.E.2d 730 (Va. 2016), for the proposition that opinions framed in legal terminology must be excluded. (*Id.* at 10.)

Defendants respond that Federal Rule of Evidence 704(a) expressly provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue," and that Virginia law

affirmatively requires expert testimony concerning the breach and causation elements of in medical malpractice actions. (ECF No. 210 at 6–8; ECF No. 211 at 12–13; ECF No. 212 at 8–11.) Other Defendants also correctly note that Plaintiff's citation to *Elliott v. Carter* fails to provide support to her claims, since that case addresses the gross negligence standard of care, not expert opinions on ultimate issues. (ECF No. 210 at 6 n.3.)

The Court denies Plaintiffs' request for exclusion on the grounds argued by Defendants. Rule 704(a) expressly permits expert opinions on ultimate issues, while Virginia law requires that experts in medical malpractice actions opine on whether the defendant breached the standard of care and whether that breach caused the plaintiff's harm. An opinion that a nurse "complied with the standard of care" or "did not cause death" constitutes the required substantive content of a medical malpractice expert's designated testimony and cannot be excluded simply because it employs the same vocabulary as the ultimate legal question. The Fourth Circuit's test for improper legal conclusions focuses on whether a term has a separate, distinct and specialized legal meaning different from its ordinary meaning. *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002). Terms like "reasonable," "appropriate" and "standard of care" do not carry such specialized legal meanings in this context. To the extent that any of Defendants' proffered experts employ legal terminology at trial in a manner that the Court finds inappropriate, a limiting instruction or rephrasing constitute the appropriate remedy, not pretrial exclusion.

### 5.    Dr. Waxler's Hindsight Bias Opinions Are Not Excluded

Plaintiff argues that Dr. Waxler's opinions that conclusions by Plaintiff's experts Dr. Fournier and Dr. McLearen evince "hindsight bias" and "false causal link[s]" constitute improper expert-on-expert credibility attacks without proper methodological support. (ECF No. 209 at 11.) Defendants respond that Dr. Waxler provided substantial factual and methodological

53

support for his opinions concerning Plaintiff's experts' findings, documenting Mr. Hernandez's complete absence of mental health history across nearly twenty years of incarceration, the absence of any documented suicidal ideation or self-injurious behavior, the absence of psychotropic medication or mental health caseload placement and the lack of any PREA indicators at the November 5 medical visit. (ECF No. 210 at 8–9.) He explained the concepts of hindsight bias and false causal link and applied them specifically to his evaluation of the opinions in this case. (*Id.* at 9.)

The Court finds Dr. Waxler's hindsight bias opinion admissible. An expert may critique the methodology of an opposing expert's opinion. *See United States v. Stitt*, 250 F.3d 878, 897 (4th Cir. 2001) (defining rebuttal evidence as evidence given "to explain, repel, counteract, or disprove facts given in evidence by the opposing party"); *Mahaska Bottling Co., Inc. v. PepsiCo, Inc.*, 441 F. Supp. 3d 745, 759 (S.D. Iowa 2019) ("Courts regularly permit expert witness testimony even if the expert primarily critiques the opposing expert's approach without offering an alternative approach"). Further, Dr. Waxler does not merely label Plaintiff's experts' conclusions, instead grounding his critique in specific record facts and applying a recognized psychological concept to explain why he believes that the other experts' conclusions lack analytical soundness. (ECF No. 209-11 at 6–7.) This constitutes permissible rebuttal expert testimony and does not warrant exclusion.

### 6.    Dr. Albert is Limited to Correctional Operations Opinions

Finally, Plaintiff argues that Dr. Albert, who holds a doctorate in educational leadership and is not a licensed medical professional, should be precluded from offering opinions on the clinical adequacy of medical staff conduct, including the adequacy of the November 5, 2020 medical evaluation of Hernandez's rectal bleeding and whether the medical staff's emergency

54

response met the applicable standard of care. (ECF No. 209 at 11–13.) Plaintiff concedes that Dr. Albert may testify on correctional operational standards within her demonstrated expertise. (*Id.* at 12.)

In the Other Defendants' telling, Dr. Albert was designated to respond to Dr. McLearen's opinions; therefore, the same limitations that the Court applies to Dr. McLearen's testimony should be applied symmetrically to Dr. Albert's. (ECF No. 210 at 10.) They further argue that Dr. Albert's statement that "standards of care were followed consistent with emergency response" addresses procedural and operational compliance, not clinical nursing judgment. (*Id.* at 11.)

The Court finds that Dr. Albert must be limited to correctional operational opinions, symmetrically with the limitations imposed on Dr. McLearen, as discussed above. *See supra* Section III.C.3. Much like Dr. McLearen, Dr. Albert's lack of medical training or licensure disqualifies her from opining on whether clinical assessments, physical examinations or medical interventions met applicable standards of care. She may, however, testify that correctional staff's operational response, such as response times, adherence to emergency protocols, documentation practices and coordination between custody and medical staff, did or did not comply with applicable correctional operational standards.

\* \* \* \* \*

For the foregoing reasons, Plaintiff's Motion (ECF No. 209) will be GRANTED IN PART and DENIED IN PART. Dr. O'Neill may testify that Mr. Hernandez's clinical presentation was consistent with the presence of a depressant substance and that Xylazine is one substance consistent with that presentation, but he may not testify that Hernandez in fact injected himself with Xylazine as an established conclusion; (2) Dr. McMunn's "less than 1%" statistic is

55

excluded, but Dr. McMunn may testify that in his clinical experience sexual assault is not a common cause of rectal bleeding in correctional settings and that the absence of a sexual assault report by Mr. Hernandez stands relevant to the differential diagnosis; (3) Dr. McMunn and Dr. Meagher may testify about the general prevalence of adulterated marijuana in correctional settings, the pharmacological effects of synthetic cannabinoids, and the limitations of the toxicology screening, but they may not testify that adulterated marijuana or synthetic cannabinoids caused or contributed to Mr. Hernandez's alleged suicidal ideation; (4) Plaintiff's request to exclude legal conclusion language will be denied; (5) Plaintiff's request to exclude Dr. Waxler's hindsight bias opinions will be denied; and (6) Dr. Albert is limited to correctional operational opinions, symmetrically with the limitations imposed on Dr. McLearen. Defendants' requests for sanctions are denied.[8]

## IV.   CONCLUSION

For the foregoing reasons, the Court will GRANT the Colburn Motions (ECF Nos. 187, 197, 203), GRANT the Fournier Motions (ECF Nos. 193, 199, 200), GRANT IN PART and

---

[8] With regard to Plaintiff's motion Defendant Kamara filed a request for sanctions. (ECF No. 212 at 8, 11.) Plaintiff's brief contains errors of attribution and an incorrect case citation, as already discussed. However, the Court finds that these deficiencies do not rise to the level of sanctionable conduct. Defendant Kamara's requests for sanctions are thus denied.

Furthermore, the Court addresses Defendants' requests to strike ten exhibits filed by Plaintiff after the December 31, 2025 deadline. (ECF Nos. 210, 211, 212.) The Court notes that Plaintiff filed her initial memorandum at 12:00 a.m. on January 1, 2026, with eight exhibits attached. (ECF No. 208.) She filed a second memorandum with eighteen exhibits at 12:09 a.m., nine minutes after the December 31, 2025 deadline. (ECF No. 209.) The Court declines to strike the additional exhibits, as the motion itself was timely filed and a nine-minute delay does not warrant the harsh remedy of partial exclusion of the supporting record. However, the Court notes the pattern of dilatory filing and reminds the parties of their obligation to strictly comply with all remaining deadlines.

Lastly, Plaintiff's request for jury instructions regarding defense experts' financial bias is denied. (ECF No. 209 at 17. Expert compensation and testimony patterns go to weight, not admissibility. *Bilenky v. Ryobi Ltd.*, 2014 WL 12591078, at *3 (E.D.Va. Oct. 22, 2014).

DENY IN PART the McLearen Motions (ECF Nos. 195, 200, 204), and GRANT IN PART and DENY IN PART Plaintiff's Motion to Exclude Defense Experts (ECF No. 207).

An appropriate order will issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Date: May 15, 2026