**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| |
|---|
| **DELISA HERNANDEZ REID,** **ADMINISTRATOR OF THE** **ESTATE OF DAMIAN HERNANDEZ,** *Plaintiff,* **v.** **THE GEO GROUP, INC., et al.,** *Defendants.* |

Civil Action No. **3:24-cv-309**

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants Samuel Davis ("Mr. Davis"), Shirley Williams ("Ms. Williams"), Martre

Powell ("Mr. Powell"), Tewanda Patton ("Ms. Patton"), Quinton Hawkes ("Mr. Hawkes"), Tanis

Fritz ("Mr. Fritz"), Connie Jones ("Ms. Jones"), Shakenna Turner ("Ms. Turner"), and Darrin Boyd

("Mr. Boyd") (collectively, "the Individual Defendants") and Defendant The GEO Group, Inc.

("GEO") (collectively GEO and The Individual Defendants "The GEO Defendants"), by counsel,

pursuant to Fed. R. Civ. P. Rule 56, state as follow in support of their Motion for Summary

Judgment against Plaintiff Delisa Hernandez Reid ("Plaintiff"):

## INTRODUCTION AND PROCEDURAL HISTORY

Delisa Hernandez Reid (hereinafter, "Ms. Reid" or "Plaintiff") is the Administrator of the

Estate of Damian Hernandez.  Ms. Reid brought suit under Virginia Code §§ 8.01-50, 8.01-25, and

42 U.S.C. § 1983 against thirteen named defendants, alleging they were negligent, grossly

negligent, and violated the Constitutional rights of Damian Hernandez ("Decedent" or "Mr.

Hernandez") under the Eighth and Fourteenth Amendments. Plaintiff sued GEO under the theory

of *respondeat superior* for the alleged improper actions of the Individual Defendants. The

Individual Defendants were all correctional officers or other employees of GEO, apart from Shirley

1

Williams, who was an LPN.  Shirley Williams is sometimes referred to in Plaintiff's Third Amended Complaint as a "Provider Defendant," while the remainder of the Individual Defendants are sometimes referred to as the "Correctional Officer Defendants".

Defendant Fritz removed the state litigation to the United States District Court for the Eastern District of Virginia on April 29, 2024. Plaintiff filed an amended complaint on August 19, 2024, asserting the same causes of action. (ECF 53.). Plaintiff filed a third and final amended complaint on December 18, 2024, setting forth the same negligence causes of action for Mr. Hernandez's suicide and the Eighth Amendment claims. (ECF 101.) The Court granted original defendant Breckon's Motion to Dismiss with respect to the supervisory claims against him and granted GEO's motion to dismiss the *Monell* claims, leaving only the Constitutional medical needs and delay in medical care claims along with the state wrongful death and survival claims. (ECF 130). Thereafter, the Court dismissed all remaining Constitutional claims, leaving only the state tort claims. (ECF 226).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(c), a motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The essence of the inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to the jury." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" and the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323.  After that required

showing, however, the party opposing the motion must set forth specific facts, supported by evidence, showing there is a genuine issue for trial. Anderson, 477 U.S. at 250.  The opposing party may not rest on the mere pleadings. Celotex, 477 U.S. at 324. "In determining whether summary judgment is appropriate, courts determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Odom v. South Carolina Dept. of Corrections, 349 F.3d 765, 769 (4th Cir. 2003).  A mere scintilla of proof will not prevent the entry of summary judgment. Peters v. Jenney, 327 F.3d 307, 314 (4th Cir. 2003). Absent objective corroboration, a party's self-serving testimony or argument is generally insufficient to establish the existence of a genuine issue for trial. Williams v. Giant Food Inc., 370 F.3d 423, 433 (4th Cir. 2004) (unpublished).

The GEO Defendants are entitled to summary judgment on Plaintiff's remaining claims against them, including the medical malpractice, negligence, and gross negligence claims (including wrongful death claims and survival actions) because (1) Plaintiff has no expert testimony to establish the standard of care, a deviation from the standard of care, or causation; (2) the Decedent was contributorily negligent and committed an illegal act; and (3) Plaintiff cannot prevail on the merits of her claim based on the undisputed material facts.  Under well-settled Federal and Virginia law, this is fatal to Plaintiff's claims as a matter of law.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.    Damian Hernandez's Incarceration History

45-year-old Damian Hernandez was an inmate in the custody of VDOC since April 22, 2000. **Exhibit 1**, Prison Records. He was serving a 46.5-year sentence for a homicide occurring during the commission of a robbery. Ex. 1. Hernandez was transferred to the Lawrenceville Correctional Center ("LVCC") on August 1, 2007. Ex. 1. On 1/15/15 and 2/25/15, Mr.

Hernandez was disciplined for being under the influence of drugs (unprescribed). Ex. 1.

Hernandez had no documented mental health history.

## II.     The Events of November 5, 2020

Nurse Russell, a GEO employee that is not named in the lawsuit, said she saw the Decedent for a sick call appointment about 12 hours before his death based on Decedent's Emergency Grievance. (**Exhibit 2**, GEO's Third Supplement to Answers to Plaintiff's Interrogatories, No. 23). The Emergency Grievance stated, "I have blood coming from my rectum and I am pissing blood. Request medical help." (**Exhibit 3**, Emergency Grievance).  During that encounter, she said the Decedent complained about stomach pain and gastrointestinal bleeding. (Ex. 2, No. 23). She asked about family history of colon cancer and referred him to the facility physician for treatment. The decedent received an antacid shortly thereafter. Decedent did not seem "off" in any way and did not express any suicidal ideation or other mental distress.

The Nursing Evaluation tool indicates that, on that date, the complaint at the time of treatment was rectal bleeding and dark urine. (**Exhibit 4**, Nursing Evaluation Tool). According to her Nursing Evaluation sheet, it appears the rectal bleedings was onset one week, off and on. His urine from the previous day was "dark".  He was not vomiting, had no pain, and was not dizzy or fatigued.  His last previous normal bowel movement was the Tuesday two days prior.  He did not have a history of GI bleeding or hemorrhoids.  His vital signs were normal, and he was in no distress.  Nurse Russell performed an abdominal exam and found no abnormality.  Nurse Russell ordered laboratory testing and referred him to the facility's physician. She gave Hernandez Pepto-Bismol tablets and instructed him to return if his condition did not improve; she provided education to Hernandez on his condition.  There is no documentation indicating that Mr. Hernandez made any complaints of assault, including sexual assault. Nurse Russell performed a full assessment of

4

the decedent and did not determine that there was a sexual assault risk. She also performed a full assessment and did not determine that there was a suicide risk.

### III.    The Events of November 6, 2020

In the early morning of November 6, 2020, GEO employees completed visual safety checks of all pods in Unit 71 at 0000, 0030, 0130, 0200, 0230, and 0300. Control Logs, (**Exhibit 5**, Control Logs). Defendant Patton completed a count of all pods in Unit 71 at 0100. Id. On that date, Ms. Turner was employed by The GEO Group, Inc. as a correctional officer at Lawrenceville Correctional Center and was operating the Unit 70-71 control booth with Ms. Connie Jones. (**Exhibit 6**, Turner RFA Resps., Nos. 1, 3-4). Ms. Jones was a new correctional officer (approximately three days on the job) and was shadowing Ms. Turner in the control booth during the incident. (**Exhibit 7**, Jones Interrogatory Answers, Nos. 2-4).

At approximately 3:17–3:18 a.m., an inmate from cell 71-217 paged the control booth and reported that his cellmate needed help and that there was blood everywhere; Ms. Jones answered the page. (Ex. 6, Nos. 1, 3-4, 11). Following the page, Ms. Turner called Sergeant Tewanda Patton in the Unit 70 counselor's office to check on cell 71-217. (Ex. 6, No. 12). Ms. Jones received the page from cell 71-217, during which the inmate reported that the Decedent was bleeding, said "man what did you do," and stated the Decedent was on the top bunk and they needed to call medical. (**Exhibit 8**, Individual GEO Defendant's Omnibus Responses to Requests for Admission, Jones No. 15). Ms. Jones recounted that the cellmate paged the booth stating the Decedent was bleeding and needed help, kept saying "man what did you do," and that the Decedent was on the top bunk and they needed to call medical. (Id., Jones No. 16).

In response to the notification, Sergeant Martre Powell and Ms. Patton went to cell 71-217, where they encountered the Decedent and observed a large amount of blood in the cell. (**Exhibit**

5

**9**, Powell Interrogatory Answers, No. 7); (**Exhibit 10**, Patton Interrogatory Answers, No. 7). Upon arrival at the cell, Sergeant Powell and Sergeant Patton immediately radioed the medical emergency, called for medical assistance, and radioed master control to call 911. (Ex. 9, Nos. 7-8) (Ex. 8, Powell Nos. 19-22). A control log entry references "900 call 911" at approximately 3:25 a.m. on November 6, 2020. (Ex. 5; **Exhibit 11**, GEO Responses to Requests for Admission, No. 112). Control attempts to write down relevant radio traffic, and "900" refers to master control. (Ex. 7, Nos. 4, 7). Sergeant Tanis Fritz heard a radio call to master control to call 911 and heard master control respond "10/4". He believed 911 had been called. (**Exhibit 12**, Fritz Interrogatory Answers, No. 6; Ex. 8, Fritz Nos. 20-21, 24).

Sergeant Powell and Sergeant Patton removed the Decedent from the top bunk, searched for injuries, observed bleeding from the wrists area, and wrapped the Decedent's wrists to apply compression; they began CPR protocol. Security personnel, including Mr. Davis and Mr. Boyd, maintained pressure on the Decedent's wrists and performed CPR during movement to and within the medical unit. (**Exhibit 13**, Davis Interrogatory Answers, No. 6; **Exhibit 14**, Boyd Interrogatory Answers, No. 4; Ex. 9, No. 7; Ex. 8, Powell Nos. 24-28).

Medical staff arrived within minutes of the radioed emergency, took over care, and the Decedent was placed on a stretcher for transport to medical. Mr. Powell stated medical arrived after approximately three to four minutes and took over care; the care team placed the Decedent on a gurney and stretcher to transport him to medical with Mr. Powell's assistance. (Ex. 9, No. 7; Ex. 8, Powell Nos. 29-30; Ex.11, Nos. 45, 149-151).

While the response unfolded, Mr. Boyd responded to the medical code, observed blood on the mattress, floor, and sheets, and noted the response team separated the cellmate. (Ex. 14, No. 4). During the initial response in the cell, officers applied pressure to the Decedent's wrists to control

bleeding, including by wrapping with available materials; pressure continued during transport. Mr. Davis used T-shirts provided by the cellmate to wrap the Decedent's arms and immediately applied pressure near the wrists to stop bleeding. (Ex. 13, No. 6). The response team was squeezing the Decedent's wrists tightly to control bleeding, and pressure continued at medical. (Id., No. 4)

Mr. Powell departed the cell area to the sally port to direct arriving EMS and did not accompany the Decedent to the medical unit; he did not see the Decedent after he left the cell. (Ex. 9, No. 7; Ex. 8, Powell Nos. 32-33). The Decedent was transported by stretcher to the medical unit from his cell, and the trip from the cell to medical typically took approximately two to three minutes. The Decedent was transported from cell 71-217 to the medical unit between approximately 3:21 a.m. and 3:30 a.m. on November 6, 2020. (Ex. 11, No. 45). Typical transport from the unit to medical would have taken about two to three minutes. (**Exhibit 15**, No. 4).

During transport and upon arrival at medical, staff continued efforts to control bleeding and provide life-saving measures, including CPR and use of an AED. (Ex. 11, Nos. 80-82). Mr. Boyd stated the team continued applying pressure at medical and that one officer performed chest compressions. (Ex. 14, No. 4). Multiple responding officers, including Mr. Davis, Mr. Boyd, and Mr. Fritz, performed or participated in chest compressions during the medical response. Mr. Davis stated he started CPR when the Decedent coded near the gate and continued CPR in medical with Mr. Boyd and Mr. Fritz swapping. (Ex. 13, No. 6). Mr. Boyd stated he assisted in performing CPR in the medical unit and continued until told to cease. (Ex. 14, Nos. 4). Mr. Fritz stated he joined life-saving efforts by applying chest compressions and participated in a five-man rotation in medical. (Ex. 12, No. 6).

Ms. Williams was employed as a Licensed Practical Nurse at Lawrenceville Correctional Center on November 6, 2020, and had worked at the facility for approximately 20 years. (Ex. 8,

Williams Nos. 1, 3, and 4). On November 6, 2020, Ms. Williams was not at the Decedent's cell and was not part of the initial response; she was handling another matter and became aware of the emergency when she was in the medical unit and noticed commotion. (Ex. 15, Nos. 4 and 8). Upon approaching the medical area, Ms. Williams observed numerous personnel assisting the decedent and could not enter the treatment room due to the number of people present. Id. Ms. Williams asked the team whether EMS had been called and was advised by a Captain that master control had already called. (Ex. 15, Nos. 4 and 18). A correctional officer in medical asked Ms. Williams to bring gauze and a gown, which she obtained and handed off to an officer at the doorway because she could not enter the room. (Ex. 15, Nos. 4 and 8). Ms. Williams also worked to obtain the decedent's identifying information in case transfer was needed and began preparing transfer paperwork by gathering records, although no one specifically instructed her to do so. (Ex. 15, Nos. 4 and 5). Ms. Williams could not make observations of the decedent's physical or mental condition in the medical unit because she was unable to gain entry to the treatment room and did not see the decedent until after he had expired. (Ex. 15, Nos. 4 and 8). Ms. Williams did not provide direct hands-on medical care to the decedent during the emergency and characterizes her role as assisting as needed with supplies and administrative preparation. (Ex. 15, No. 4).

Several responding officers and nurses observed that the Decedent was conscious and speaking during portions of the response, including during transport to the medical unit. When nurses arrived at approximately 3:21 a.m., the Decedent was conscious, responsive, and speaking, and upon arrival at the medical unit at approximately 3:30 a.m., he was still conscious and speaking. (Ex. 11, Nos. 44, 49); (Ex. 12, No. 6)

The Decedent was pronounced dead in the early morning of November 6, 2020, at Lawrenceville Correctional Center. (Ex. 11, Nos. 22, 24)

8

The Virginia Medical Examiner determined the manner of death to be suicide. (Ex. 11, No. 134; **Exhibit 16**, Medical Examiner's Report).

## EXPECTED UNREBUTTED EXPERT TESTIMONY

The GEO Defendants will present three experts, each of whose testimony will be unrebutted as Plaintiff's experts have been disqualified or materially limited in their testimony.

First, GEO will submit Karen Albert, an expert in the field of correctional institutions. Ms. Albert is eminently qualified as evidenced by her expert report and resume. (**Exhibit 17**, GEO Defendants' Expert Disclosure). Based on her review of the records and expansive experience, Ms. Albert will make the following points, none of which can be rebutted by Dr. Alix McLearn, Plaintiff's expert, who will be limited in her testimony based on the Court's ruling on *Daubert* Motions:

- There was no evidence to suggest that Mr. Hernandez was subject to substantial risk of imminent sexual abuse nor should Nurse Russell have furthered her screening of Mr. Hernandez beyond inquiring about his history
- The [sic] was no apparent reasonable suspicion that a sexual assault took place.
- The response time was almost immediate, and great care was taken to provide for immediate attention and emergency protocols.
- Care was taken to support Mr. Hernandez in the exam room as … custody staff attended to Mr. Hernandez.
- Standards of care were followed consistent with emergency response including recording the events during the emergency response. There is no indication that staff failed to act appropriately or without concern.
- Mr. Hernandez's unfortunate death was not caused by The GEO Group's staff failure to provide appropriate and industry accepted preventative and emergency response measures to suicide attempt in a correctional environment.
- The actions of the staff were consistent with applicable standards of care

GEO will also submit Dr. Alexander Meager, a medical doctor with expertise in correctional settings. Dr. Meager has extensive experience as evidenced by his expert report and resume. (Ex. 17). As Plaintiff's medical expert has been entirely excluded, the following opinions will go unrebutted:

9

- The entirety of medical care, including the actions of GEO Medical staff defendants, in addressing the medical needs of Mr. Damian Hernandez during his incarceration in November of 2020 were reasonable, appropriate, and within the standard of care.
- The cause of death was 'incised wounds to the back of the hands' and the manner of death was suicide
- Suicide is defined as death caused by self-inflicted injurious behavior with any intent to die as a result of the behavior.
- At no point during the incident did GEO medical staff act in a way that was inconsistent with accepted practices and procedures for medical staff in providing medical care in a corrections setting.
- The actions of GEO Medical staff on hand with respect to the medical care of Damian Hernandez were reasonable, appropriate, and consistent with accepted practices and procedures for medical staff within the field of correctional health care.
- The actions of Nurse Williams in her role as a medical staff in relation to the care of Damian Hernandez were reasonable, appropriate, and consistent with accepted practices and procedures for medical staff within the field of correctional health care
- Trauma is not the only cause for blood in the urine and stool, one must also consider coagulopathy, inflammatory processes, infection, hemorrhoids, kidney stones, anal fissure/constipation, cancer, etc.
- The Decedent's presentation warranted further workup, and the staff appropriately referred the patient to the physician for further evaluation after initial evaluation did not dictate emergency evaluation.
- Based on the available records and staff reports, there is no way to determine why Mr. Hernandez committed suicide.
- Per the autopsy report, the postmortem drug testing was positive for cannabis metabolites. Marijuana is associated with an increased risk of suicide.
- A more plausible reason than a sexual assault for Mr. Hernandez's suicidal ideations were due to his recent marijuana use
- Decedent did not report sexual assault to staff, nor did he give any indication in his presentation that would lead the medical staff to believe an assault had taken place. Decedent's presentation did not have any red flags. Marked fear, tearfulness, or other injuries would be red flags to further explore the possibility of sexual assault. Mr. Hernandez was also aware of the steps necessary to make a PREA report.
- The staff performed an appropriate physical examination. The staff obtained vital signs and performed an abdominal exam, which are necessary steps to help triage the patient's presentation. At this facility a medical provider such as a physician or advanced practice practitioner is not available every day, thus available medical staff must triage patients to determine how emergent/urgent a provider's evaluation is warranted.
- A rectal examination and rape protocol were not indicated. The patient was referred to a physician where a rectal examination may have been indicated. There were no red flags or reports of sexual assault that warranted a rape protocol.
- There was no failure to assess the patient's risk for suicide. The patient had no abnormal mental health history during his incarceration at Lawrenceville Correctional Center. His presentation to medical with complaints of abdominal pain and blood in urine and stool did not warrant medical staff to assess him for his risk of suicide.

10

- Considering that the responding EMS took 17 minutes to arrive after being contacted by officers, it is speculative to conclude that Mr. Hernandez would have survived had EMS been called at the initial discovery of the emergency.
- It is speculative to conclude that compression alone failed to control Mr. Hernandez's bleeding.
- Mr. Hernandez had already sustained significant blood loss by the time staff discovered him, making it impossible to conclusively determine that he would have survived had different treatment been provided.

GEO will also submit Dr. Brian Waxler, a mental health practitioner with expertise in correctional settings. Dr. Waxler has extensive experience as evidenced by his expert report and resume. (Ex. 17). As Plaintiff's medical expert has been entirely excluded, the following opinions will go unrebutted:

- A comprehensive review of Mr. Hernandez's correctional medical and mental health records, spanning from 2001 through 2020, revealed no evidence that he ever endorsed, exhibited signs, or was diagnosed with any mental health condition. Across multiple points of contact with medical staff, he consistently denied symptoms of depression, anxiety, psychosis, or other forms of emotional distress. There was no documented history of suicidal ideation, suicide attempts, or self-injurious behavior at any time during his incarceration. Mr. Hernandez was never prescribed psychotropic medication, never placed on the mental health caseload, and there is no record indicating that he ever requested or required mental health services.
- The available documentation reflects that Mr. Hernandez was familiar with institutional procedures for accessing medical and mental health care, as evidenced by his prior medical requests and evaluations. Notably, when he was evaluated by medical staff on 11/05/2020, the day prior to his death, he was documented as having "no acute distress." His request that day pertained to physical health concerns and contained no statements suggestive of psychological distress, victimization, or self-harm intent.
- Additional PREA or suicide screening would only be warranted if Mr. Hernandez had alleged sexual assault or if there was reasonable suspicion that a sexual assault took place. The record provides no indication that such an allegation was made or implied, or that there was any suspicion by the evaluating nurse.
- The threshold for reasonable suspicion of sexual assault was not met. Reasonable suspicion typically includes: a verbal or written allegation (no documented evidence in this case), statements suggesting coercion, threat, or unwanted contact (no documented evidence in this case), observable injuries or behavior clearly consistent with assault (no documented evidence in this case), a clinician's belief based on presentation and context that assault is possible (no documented evidence in this case). Mr. Hernandez made no statements indicating sexual assault, there were no behavioral indicators of mental status changes noted, and the nurse documented that Mr. Hernandez was in "no acute distress."
- Drs. McLearen's opinions appear to fall victim to "hindsight bias" and "false causal link." Hindsight bias is a cognitive bias where people tend to perceive past events as more

11

predictable than they actually were at the time they occurred. This is often called the "knew-it-all-along" effect. A false causal link is a logical fallacy when one concludes that event A caused event B just because event B immediately followed event A. Chronological succession does not guarantee causation. Medical/nursing staff do not have the benefit of knowing the future outcome of a situation and can base their decisions and actions only on the clinical history and presentation that they have access to at the time of the encounter.

- Mr. Hernandez did not display any acute distress when he was evaluated for rectal bleeding and blood in his urine on 11/05/2020 and there was no reasonable suspicion of sexual abuse that would trigger a more extensive PREA evaluation or suicide risk screening
- When Mr. Hernandez was later discovered following the self-injurious event, he was reportedly still conscious and repeatedly stated, "I fu\*\*ed up." While the precise intent behind his actions cannot be determined with certainty, this statement may suggest that this behavior was impulsive in nature, which supports the opinion that it was not predictable by medical/nursing staff.
- Regardless of his intent, intentional self-harm that results in death is considered suicide.
- This tragic outcome does not alter the fact that there were no prior clinical indicators that would have alerted staff to an increased risk of suicide or self-harm.
- This opinion is further supported by Mr. Hernandez's cellmate (Anton Elder) who was interviewed telephonically on 11/06/2020. During this interview, Mr. Elder reported that Mr. Hernandez was "back to himself and listening to music as he usually does." This statement suggests there were no obvious or overt signs that he was expressing symptoms or warning signs that were missed by correctional or healthcare staff.
- Based on the totality of the clinical evidence and documentation, there was no reasonable basis for any practitioner to conclude that Mr. Hernandez required placement on suicide precautions, heightened observation, or mental health monitoring. The absence of identifiable risk factors, combined with consistent denials of mental health symptoms and the lack of behavioral warning signs, supports the conclusion that this event was unpredictable and could not have been anticipated by correctional or healthcare staff.

These expert opinions are utterly overwhelming and, without any rebuttal, no reasonable jury could rule in favor of Plaintiff in light of the opinions.

**ARGUMENT**

**I.    THE GEO DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFF CANNOT PRESENT EXPERT EVIDENCE TO SUPPORT HER CLAIMS**

Rule 56 of the Federal Rules of Civil Procedure allows a party to move for summary judgment on claims or defenses. Fed. R. Civ. P. 56. Summary judgment shall be granted when there is no genuine issue of material fact on those claims or defenses, and the moving party is entitled to judgment as a matter of law. Giles v. Nat'l R.R. Passenger Corp. (Amtrak), 59 F.4th

12

696, 701 (4th Cir. 2023). Under the Rule, the assertion that claims or defenses lack supporting facts may be established by showing that the non-moving party cannot produce admissible evidence in support of those claims or defenses. Fed. R. Civ. P. 56(c)(1)(B).

The remaining counts that Plaintiff asserts against the GEO Defendants are based on theories of negligence and gross negligence.  Such claims relate to the alleged delay in calling 911 and the treatment that Mr. Hernandez received on or about November 6, 2020.  At their core, such claims are medical malpractice claims.

### A.  Plaintiff cannot offer any expert testimony on the issues of standard of care, deviation from the standard of care, or causation.

Plaintiff's standard of care and causation experts designated to opine that the GEO Defendants violated the standard of care and that the violation caused Mr. Hernandez's injuries were excluded from providing testimony at trial, in part, because they lacked the required active clinical practice to render reliable opinions. Plaintiff cannot prove the elements of this medical malpractice case without standard of care and causation experts. Accordingly, Plaintiff's case must be dismissed on summary judgment.

In its May 15, 2026, Order, the Court granted various motions to exclude testimony from Plaintiff's designated medical expert Dr. Fournier, striking the expert altogether, and precluded Plaintiff's correctional expert, Dr. McLearen, from providing "any opinion that any delay in calling 911 violated the applicable standard of care". (ECF 227).  Plaintiff has no medical practitioner expert witness who can provide a causation opinion regarding whether the delay in 911 call or the type of treatment the correctional officers provided caused the death of Mr. Hernandez.  For this independent reason, summary judgment is appropriate as to all claims against the GEO Defendants.

B.  Without expert testimony, Plaintiff cannot prove any of her remaining claims against the GEO Defendants, which are fundamentally medical malpractice claims.

Defendants move this Court for summary judgment of the remaining claims against the GEO Defendants because Plaintiff cannot produce admissible evidence to support facts surrounding medical malpractice duty, breach of the medical malpractice duty, and proximate cause.  This matter cannot, under Virginia law, proceed to trial without expert testimony on the standard of care and causation.  Plaintiff cannot prove a set of facts that are essential to the remaining claims against the GEO Defendants, which are state law medical malpractice/negligence/gross negligence claims (including wrongful death claims and survival action claims), including claims brought against GEO under a *respondeat superior* theory.

A *prima facie* case of medical malpractice consists of evidence establishing the applicable standard of care, violation of the standard of care, and a causal relationship between the violation and the claimed injuries.  See Dixon v. Sublett, 295 Va. 60, 67, 809 S.E.2d 617, 620 (2018).  This Court has stated "Put simply, plaintiff must establish: (1) the applicable standard of care, (2) a breach of that standard of care, and (3) that this breach proximately caused plaintiff's injuries." Parker v. United States, 475 F. Supp. 2d 594, 598 (E.D. Va. 2007), aff'd, 251 F. App'x 818 (4th Cir. 2007).

Under Virginia medical malpractice law, experts are required to opine at trial on standards of care and causation.  Webb v. Smith, 276 Va. 305, 308, 661 S.E.2d 457, 459 (2008).  The elements of a medical malpractice claim are to be determined by state law. Fitzgerald v. Manning, 679 F.2d. 341, 346 (4th Cir.1982).  In Virginia, standard of care and proximate cause are to be established by expert testimony. Webb, 276 Va. at 308, 661 S.E.2d at 459; see also, Va. Code §8.01-581.20; Summers v. Syptak, 293 Va. 606, 613, 801 S.E.2d 422, 425 (2017) (granting summary judgment); Fruiterman v. Granata, 276 Va. 629, 637-38, 668 S.E.2d 127, 132 (2008).

14

"Malpractice" is broadly defined under Chapter 21.1 of Title 8.01 of the Virginia Code to mean "any tort action or breach of contract action for personal injuries or wrongful death, based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient." Va. Code § 8.01-581.1. "Health care" is defined broadly under the Act to mean "any act, professional services in nursing homes, or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical diagnosis, care, treatment or confinement." Id.

Virginia Code Section 8.01-581.20 applies to claims against health care providers, including nurses, in a correctional setting. Va. Code § 8.01-581.20. The statute defines the standard of care as "that degree of skill and diligence practiced by a reasonably prudent practitioner in the field of practice or specialty in this Commonwealth" and requires an expert to demonstrate knowledge of the standards of defendant's specialty and have had active clinical practice in that specialty or a related field within one year of the alleged act or omission. Va. Code § 8.01-581.20(A).

The Fourth Circuit Court of Appeals has noted "In order to establish a standard of medical care as well as a violation of such standard, expert testimony is required." Fitzgerald v. Manning, 679 F.2d 341, 347 (4th Cir. 1982). Virginia courts applied this rule in cases involving claims by prisoners arising out of a correctional setting. e.g. Est. of Harvey ex rel. Dent v. Roanoke City Sheriff's Off., 585 F. Supp. 2d 844, 862-63 (W.D. Va. 2008) ("Under Virginia law, expert testimony is ordinarily necessary to establish each of these elements" [relating to a medical malpractice claim] and holding that Virginia Code Section 8.01-581.20 applies to a medical malpractice claim arising out of a person's incarceration).

15

When "a plaintiff 'calls into question' a 'quintessential professional medical judgment,' the matter 'can be resolved *only* by reference to expert opinion testimony.'" Parker v. United States, 475 F. Supp. 2d 594, 597 (E.D. Va. 2007), aff'd, 251 F. App'x 818 (4th Cir. 2007) (quoting Callahan v. Cho, 437 F.Supp.2d 557, 563 (E.D.Va. 2006)).

While there is an exception to the requirement for expert testimony in a medical malpractice action, those cases are rare because "only rarely do the alleged acts of medical negligence fall within the range of a jury's or factfinder's common knowledge and experience." Parker, 475 F. Supp. 2d at 597 (citing Beverly Enterprises–Virginia v. Nichols, 247 Va. 264, 267, 441 S.E.2d 1 (1994)).

In the case of Robinson v. King, this Court excluded the expert testimonies of the plaintiff's only experts on standard of care and causation in a medical malpractice case. Robinson v. King, Civil Action No. 2:09cv418, 2010 WL 8944269, at *3 (E.D. Va. November 12, 2010).  This Court noted that plaintiff could not establish standard of care and causation and, thus, could not establish a *prima facie* case of medical malpractice. Id. at *3. The Court found that because plaintiff could not establish a medical malpractice case, there was no genuine issue of material fact, and the case was dismissed on summary judgment. Id.

C.  Plaintiff can offer no expert testimony about the standard of care or deviation from the standard of care in the context of a correctional facility.

Without a proper expert witness, correctional or medical, to testify as the standard of care, a deviation from the standard of care, and causation, Plaintiff cannot prove her claims against the GEO Defendants.  Beyond the fatal lack of a proper medical expert witness, Plaintiff also needs to have expert testimony regarding the operation and management of the correctional facility at issue, which she will not be able to offer.  "Proper operation and management of a correctional institution, including the duties owed by a reasonable correctional officer, not just a reasonable

16

person, is well beyond the province of a lay jury." Boley v. Armor Corr. Health Servs., Inc., No. 2:21CV197, 2022 WL 3104767, at *5 (E.D. Va. Aug. 4, 2022).  Such evidence "requires experts in corrections to understand and apply the standards and guidelines for operating these institutions." Id. (citing Cf. Rhodes v. Chapman, 452 U.S. 337, 342 (1981)). The Court put it very plainly that "To argue that this subject does not require specialized knowledge but rather is common knowledge among lay persons, and that jury would not be helped to understand the evidence or determine a fact in issue by considering such expert testimony, is simply incorrect." Boley, 2022 WL 3104767, at *5.  Further, expert testimony is necessary to establish the proper standard of care in cases of negligent treatment of medical conditions while incarcerated.  Hill v. United States, No. 7:05–CV–00597, 2006 WL 2819701, at *4 (W.D.Va. Sep. 28, 2006).

The necessity of expert testimony in correctional institution negligence cases is broadly recognized, both in federal and state courts of appeals. See Porter v. Arizona Dep't of Corr., No. 2:09-CV-2479-HRH, 2012 WL 7180482, at *5 (D. Ariz. Sept. 17, 2012) ("Prison operations are outside the common knowledge of the average juror. Correction officers have to manage potentially dangerous individuals living in close proximity to each other. The standard of care required in such an environment is a matter beyond the ken of the average juror that requires expert testimony … Here, expert testimony on the standard of care would not invade the province of the jury but rather is necessary to help the jury understand what the proper standard of care is in a gross negligence case involving a correctional facility.") (internal citations omitted); Clark v. D.C., 708 A.2d 632, 634 (D.C. 1997) ("We have repeatedly held that the standard of care owed by the District of Columbia to persons in its custody is a matter beyond the ken of the average juror that requires expert testimony … Thus, expert testimony was required here."); Gordon v. Kitsap Cnty., 187 Wash. App. 1023 (Wash.Ct.App. 2015) ("In light of

17

the complex considerations inherent in the management of a correctional facility, we hold that expert testimony was necessary to establish what constitutes reasonable care.") (internal citations omitted); Villalobos v. Bd. of Cnty. Comm'rs of Doña Ana Cnty., 322 P.3d 439, 442 (N.M.Ct.App. 2014) ("We hold that, in order for a jury to make a decision regarding the standard of care of the monitoring by prison officials in this instance, expert testimony is required.")

Dr. McLearen's only criticisms were of the medical response team and the institution in general (relating only to PREA protocols and post-incident investigation). Dr. McLearen will not criticize the response time of the correctional officers. **Exhibit 18**, Deposition Transcript of Alex McLearen, 36:2-18. Her criticism is of the medical staff that arrived at the cell, not the correctional staff. Id. 38:22-39:3. The May 15, 2026, Order ruled that Dr. McLearen could not make "any opinion regarding the adequacy of medical staff conduct during the November 6, 2020, emergency response, including the absence of treatment during transport, the management of oxygen and AED equipment, and the overall adequacy of the medical unit's response." (ECF 227).  Thus, there will be no expert at trial that can assist a jury in understanding the standard of care of the correctional officers involved and whether any correctional officers breached that duty.  Dr. McLearen's testimony regarding post-incident procedures and institutional matters have no bearing as GEO is not on trial for its actions, and that testimony will in no way assist the trier of fact in determining if any particular employee violated the applicable standard of care. Further, Plaintiff has no expert that can logically link PREA protocols and post-incident investigation into the negligence causation arguments, nor can she because there *is* no analytical link.  Dr. McLearen specifically testified that she could not make an opinion that, if PREA standards had been followed, the outcome would have been different. Ex. 18, 62:15-63:9. Dr. McLearen further testified that, while she cited a specific PREA standard in her report in

18

paragraph 33, she did not intend to cite any specific PREA standard at trial, but instead would cite PREA conceptually, as a whole. Id. 41:16-44:12.  In any event, such a causal link would require expert testimony, and Dr. McLearen is emphatic that she cannot and will not provide that opinion. Without an expert witness who can opine on the applicable standard of care for correctional officers/employees, Plaintiff cannot prove her case against the GEO Defendants. For this reason, the GEO Defendants are entitled to summary judgment as to all claims against them in this matter.

An instructive case on this issue is the case of Parker v. U.S.  In that case, the plaintiff alleged "that the medical staff of the Bureau of Prisons negligently failed to diagnose and treat his neurological impairment." Parker v. United States, 475 F. Supp. 2d 594, 594 (E.D. Va. 2007), aff'd, 251 F. App'x 818 (4th Cir. 2007).  The plaintiff in that case alleged that he suffered a fall and hit his head.  Id. at 595.  He also alleged that he was evaluated by practitioners in the prison but later fainted or passed out and was determined to be suffering from an intracranial bleed, subsequently "diagnosed as a chronic subdural hematoma."  Id. at 595.

In that case, this Court granted summary judgment in favor of the defendant, in part, because the plaintiff could not establish the elements of a medical malpractice claim without expert testimony. Id. at 599. The Court rejected plaintiff's argument that no expert testimony was needed and said "This argument fails as this case, which questions the medical staff's professional judgment, does not fall within a factfinder's common knowledge. To begin with, without the aid of expert testimony, a lay factfinder would not know the appropriate standard of care, or whether the medical staff's actions or failures to act constituted a breach of this standard."  Id. at 598.  The Court further held "Put simply, there is no evidence of the standard of care applicable to the prison medical staff in the circumstances of this case and no evidence that the prison's medical staff failed

19

to meet this standard of care. Accordingly, summary judgment is appropriate because, without expert testimony, plaintiff is unable to adduce any evidence of medical negligence sufficient to create triable issue of fact." Id. at 599.  The Court also noted that plaintiff could not prove proximate causation without expert testimony. Id.

In the case of Oden v. Wilson, an inmate plaintiff contended that an expert certification was not required in a lawsuit he brought relating to the quality and lack of medical care he received during his incarceration. Oden v. Wilson, No. 3:17CV489, 2019 WL 6357247, at *2 (E.D. Va. Nov. 27, 2019) This Court, however, rejected that contention and held that an expert would be required for an inmate's claims relating to the quality and lack of medical care that he received during his incarceration. Id. at *5. The Court noted "Similarly, [plaintiff's] complaints that [d]efendants acted negligently by failing to provide a medically appropriate housing assignment, by failing to transfer him to an appropriate medical facility sooner, and by transferring him to a different facility when he had medical appointment pending, are not 'within the range of the jury's common knowledge and experience.'" Id. at *5.  Further, the Court noted "Laymen do not know the correct procedures and standard of care for treatment of [plaintiff's] host of ailments, and professional medical judgment would be required to decide whether [d]efendants acted negligently with respect to these claims and whether negligence was the cause of an injury to [plaintiff]." Id.

In the case of Bond v. U.S., an inmate plaintiff brought a claim arising out of the alleged delay in treating a torn tendon in his finger. Bond v. United States, No. 1:08CV324 (JCC/TRJ), 2008 WL 4774004, at *1 (E.D. Va. Oct. 27, 2008). The plaintiff in that case did not have an expert certification as required by Virginia law. Id. at *3-4.  The Court noted that plaintiff "would have to show that the failure to provide him with an orthopedic examination for his finger injury within two months deviated from the applicable standard of care, and that the delay was the proximate

20

cause of his allegedly permanent damage. Clearly, resolution of these issues does not lie within 'the range of the jury's common knowledge and experience,' and instead would be dependent upon the presentation of expert medical testimony.'" Id. at *3. The Court granted summary judgment in favor of the defendant. Id. at *5.

Without a correctional expert to testify that the correctional staff responding to Mr. Hernandez violated some duty of care, Plaintiff cannot prove her case. As a result, the GEO Defendants are entitled to summary judgment.

D. Any asserted exception to the expert requirement based on the common experience of a lay jury is unpersuasive

An argument that a lay jury does not need a standard of care expert to render a decision on the facts is not plausible in this matter and is not supported by applicable law. The standard of care for a nurse in a correctional facility when confronted with severe hemorrhaging from a suicide attempt is not within the common knowledge of a lay jury. The standard of care for correctional officers responding to such a situation is not within the common knowledge of a lay jury.

Plaintiff claims in her Third Amended Complaint that the medical provider defendants did not take steps to stem the flow of blood. What the appropriate response steps are is a medical opinion not within the common knowledge of a juror. Plaintiff claims that they were not equipped to handle the medical emergency. What constitutes being equipped to handle the medical emergency is for medical expert opinion. Plaintiff asserts that the providers should have administered intravenous fluid therapy, which is purportedly routine for hemorrhage cases. Types of nursing responses to hemorrhaging is not within the common knowledge of lay jurors. In fact, as defendant Meriam Kamara, R.N. pointed out in her Memorandum in Support of Rule 56 Motion for Summary Judgment, the experts disagreed on this assertion. (Meriam Kamara's Memorandum

21

in Support of Rule 56 Motion for Summary Judgment, Ex. C, p. 5 and Ex. D, pp. 2-3.) (ECF No. 238).

Since there is no expert witness who can opine as to the standard of care and causation, summary judgment is appropriate as to all claims against Defendant Ms. Williams and any *respondeat superior* claims against GEO for medical malpractice. For the reasons stated, summary judgment is appropriate in this medical malpractice case in which the Plaintiff does not have experts to opine on standard of care and causation.

E.  As applied, Plaintiff cannot prove negligence or gross negligence claims (including claims for wrongful death and survival actions) against the GEO Defendants without expert testimony.

Plaintiff asserts negligence and gross negligence claims against the GEO Defendants. "The elements of an action in negligence are a legal duty on the part of the defendant, breach of that duty, and a showing that such breach was the proximate cause of injury, resulting in damage to the plaintiff." Blue Ridge Serv. Corp. of Virginia v. Saxon Shoes, Inc., 271 Va. 206, 218, 624 S.E.2d 55, 62 (2006).

The Supreme Court of Virginia has defined gross negligence as "'the utter disregard of prudence amounting to complete neglect of the safety of another. It is a heedless and palpable violation of legal duty respecting the rights of others which amounts to the absence of slight diligence, or the want of even scant care.'" Volpe v. City of Lexington, 281 Va. 630, 639, 708 S.E.2d 824, 828 (2011) (quoting Chapman v. City of Virginia Beach, 252 Va. 186, 190, 475 S.E.2d 798, 800-01 (1996)).

As described above, a plaintiff must have an expert witness to testify to the standard of care and causation arising out of an inmate's medical care during incarceration, including in a wrongful death claim and survival claim. To prove her wrongful death claim, Plaintiff must show that the

22

GEO Defendant's caused the Decedent's death by their "wrongful act, neglect, or default". Va. Code § 8.01-50.  Virginia Code Section 8.01-50.1 provides that every wrongful death complaint against a health care provider be deemed a certification, at the time of service, that the plaintiff has obtained from a qualified expert a written opinion providing that defendant deviated from the applicable standard of care and the deviation was a proximate cause of the claimed injuries.

These same principles apply to Plaintiff's survival actions based on negligence and gross negligence.  For the reasons previously stated, these claims, too, are doomed due to the lack of expert testimony on the issues of standard of care and causation.

Plaintiff's remaining claims against the GEO Defendants such as the delay in calling 911 clearly require expert testimony.  Any claim relating to an alleged delay in calling 911 will necessarily involve the Plaintiff having to establish the standard of care and a deviation from the standard of care, which will involve consideration of correctional protocols, policies, and operations.  Moreover, Plaintiff will have to establish that the delay in the 911 call proximately caused the death of Mr. Hernandez.  These topics are well outside the province of a lay jury, and, accordingly, Plaintiff simply cannot proceed on those claims, as a matter of law, without expert testimony.

In this case, Plaintiff's negligence and gross negligence counts are inseparable from a medical malpractice theory.  Given that Plaintiff's claims are based on purported medical malpractice theory, Plaintiff must satisfy the requirement of Virginia Code Section 8.01-581.20, even when styling the claim/count as a wrongful death or survival action.  As explained above, only in the very "rare" case where the alleged negligence clearly lies within the common knowledge and experience of a lay jury may a plaintiff proceed without expert testimony.  This is not one of those cases.

**II.    THE GEO DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFF'S CLAIMS ARE BARRED BY THE DECEDENT'S COMMISSION OF AN ILLEGAL ACT AND CONTRIBUTORY NEGLIGENCE**

Virginia's contributory negligence statutes are applicable to survival/wrongful death claims. See e.g. Hodge v. Soper, 2001, 17 Fed.Appx. 196, 2001 WL 1010420; Pack v. Doe, 1988, 374 S.E.2d 22, 236 Va. 323.  Further, any cause of action resulting from the suicide is considered a common-law immoral and illegal act under Virginia law and is thus barred. Brown v. Harris, 240 F.3d 383, 386 (4th Cir. 2001). To commit suicide at common law, a person must: (1) take his own life; (2) be "of years of discretion"; and (3) be of "sound mind." *Id.* (citing Wackwitz v. Roy, 244 Va. 60, 418 S.E.2d 861, 864 (1992).

Plaintiff Answer to Interrogatory 6 stated that the Medical Examiner's Report supports the factual allegations in her Complaint. (**Exhibit 19**, Plaintiff's Answers to D. Kamara's Interrogatories). The Medical Examiner identifies the cause of death to be lacerations to his hands from suicide. (Ex. 16, pp. 5-6, 12-16). Plaintiff's Answers to D. Kamara's Interrogatories No records exist that Mr. Hernandez received psychiatric care, medications for a psychiatric condition or psychological counseling, as the GEO Defendants' experts will confirm. Plaintiff has never claimed that Damian Hernandez suffered from a psychiatric or psychological condition and has not produced evidence to that effect.

It is very clear that the Decedent not only committed an illegal act, but also that the was contributorily negligent.  There are no undisputed facts that will rebut these assertions that can survive summary judgment.  As such, the GEO Defendants request entry of summary judgment on these bases.

24

III.    **THE GEO DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE MERITS OF THE CLAIM**

Plaintiff's Counts I, III, and V are wrongful death claims, under Virginia Code Section 8.01-50. Counts II and IV are survival claims, under Virginia Code Section 8.01-25. All other counts have been dismissed, and thus the only issue before the court is whether Plaintiff's claims for negligence can survive summary judgment. They clearly cannot.

To prove her wrongful death claim, Plaintiff must show that the GEO Defendant's caused the Decedent's death by their "wrongful act, neglect, or default." Va. Code § 8.01-50. This is, in essence, a negligence claim. To prove her survival claim for negligence, Plaintiff must show that one or more of the Individual Defendants (1) owed a duty to the Decedent; (2) breached the standard of care relating to that duty owed to Decedent; and (3) that the breach proximately caused Decedent's damages (i.e. his injury before death for the survival action or his death for the wrongful death action). GEO can only be responsible via the theory of *respondeat superior*, meaning that Plaintiff must prove that a GEO employee acting within the scope of their employment negligently caused Decedent injury or death.

The undisputed facts show that each and every one of the Individual Defendants took great care to prevent Decedent's suicide and save his life. No reasonable jury (especially without the assistance of experts and in the face of comprehensive and cohesive defense experts) could rule in favor of Plaintiff. The GEO Defendants' actions in the moments that followed Decedent's call for help reflect an immediate, coordinated effort to save his life. Officers in the control booth promptly relayed the emergency and multiple actors radioed a request to call 911 or otherwise ensured that the proper personnel were called upon to assist Decedent.

From there, the team turned immediately to hands-on lifesaving care. Responders entered the cell, assessed the bleeding, and applied pressure and wraps to Mr. Hernandez's wrists to slow

25

blood loss; they moved him to a stretcher and transported him toward medical while continuing care despite his combative resistance, and once in medical, they continued life-saving measures – including CPR with rotating compressions and use of an AED – until EMS arrived. Multiple witness attest to wrapping Decedent's wrists to apply compression and slow the bleeding, initiating CPR protocol, assisting getting Mr. Hernandez onto a gurney, and helping transport him to medical During transport, Mr. Hernandez was described as uncooperative and combative, trying to get off the stretcher, requiring officers to maintain pressure and control while moving him swiftly to medical In short, the record shows officers promptly sounded the alarm and worked relentlessly to give Mr. Hernandez every chance they could despite Decedent's self-inflicted wounds.

Based on the undisputed evidence before the Court, even if the Court finds that the case is not subject to summary judgment based on lack of experts, commission of a criminal act, or contributory negligence, the case should be dismissed on summary judgment on the merits.

## CONCLUSION

For the foregoing reasons, the GEO Defendants ask that this Court grant their Motion for Summary Judgment and dismiss them from this action against them with prejudice.

26

Respectfully Submitted, **THE GEO GROUP, INC., SAMUEL DAVIS, SHIRLEY WILLIAMS, MARTRE POWELL, TEWANDA PATTON, QUINTON HAWKES, TANIS FRITZ, CONNIE JONES, SHAKENNA TURNER, AND DARRIN BOYD**

Gregory S. Bean (VSB No. 80119)
Whiteford, Taylor & Preston L.L.P.
1021 E. Cary Street, Suite 2001
Richmond, Virginia 23219
Telephone: (804) 977-1241
Facsimile: (804) 977-3299
gbean@whitefordlaw.com
*Attorneys for Defendants The GEO Group, Inc., Samuel Davis, Shirley Williams, Martre Powell, Tewanda Patton, Quinton Hawkes, Tanis Fritz, Connie Jones, Shakenna Turner and Darrin Boyd*

27

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2026, I sent a true and accurate copy of the foregoing **MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** through the ECF system to the following:

Rodney S. Dillman, Esq. (VSB #46803)
Anna M. Cotto, Esq. (VSB # 99970)
DILLMAN LEGAL GROUP
295 Bendix Road, Suite 220
Virginia Beach, VA 23452
Telephone: 757-356-2300
Facsimile: 757-356-2341
rsdillman@dillmanlegalgroup.com
amcotto@dillmanlegalgroup.com
*Counsel for DeLisa Jordan, LPN*

Nancy F. Reynolds, Esq. (VSB #38236)
Kiernan Trebach LLP
1108 E Main Street, Suite 801
Richmond, VA 23219
Telephone: 757-797-0932
nreynolds@kiermantrebach.com
*Counsel for Meriam Kamara, R.N.*

Stephen C. Teague Esq.
LAW OFFICE OF STEPHEN C. TEAGUE
PO Box 706
Newport News, VA 23607
Telephone: 757-317-0716
Facsimile: 757-215-2974
stephen@teaguelawoffice.com
*Counsel for Plaintiff*

_____
Counsel

28